# AFFIDAVIT OF DAVID A. SCHWARTZ

STATE OF MINNESOTA

COUNTY OF RAMSEY

Before me, the undersigned Notary Public in and for said state and county, personally appeared David A. Schwartz who is known to me, and who being by me first duly sworn, deposes and states as follows:

"My name is David A. Schwartz. I am Assistant General Counsel for Green Tree Servicing LLC ("Green Tree") located in St. Paul, Minnesota. I have personal knowledge of the matters and transactions set forth hereafter. I make this affidavit in the action styled *Julie Ann Mangina v. Conseco Finance Corp., et al.*, United States District Court for the Middle District of Alabama, Case No. 2:05-cv-00485-MEF-DRB.

Green Tree Servicing LLC was formerly known as Conseco Finance Servicing Corp. and was formerly a wholly-owned subsidiary of Conseco Finance Corp. On December 17, 2002, Green Tree Servicing LLC (then Conseco Finance Servicing Corp.) and Conseco Finance Corp. filed for bankruptcy protection under Chapter 11 in the United States Bankruptcy Court for the Northern District of Illinois.

Pursuant to the Sale Order entered by the bankruptcy court on March 14, 2003, which approved the Amended and Restated Asset Purchase Agreement ("Asset Purchase Agreement") dated that same day, certain assets of Conseco Finance Corp. and its operating subsidiaries were sold to CFN Investment Holding LLC. Under Article II, Section 2.1(b) to the Asset Purchase Agreement, CFN Investment Holding LLC had the option of purchasing the assets of Green Tree Servicing LLC or purchasing all outstanding capital stock of Green Tree Servicing LLC. CFN Investment Holding LLC elected to purchase all outstanding capital stock in Green Tree Servicing LLC, which was then deemed Purchased Assets as defined in the Asset Purchase Agreement.

The Closing Date on the sale of the capital stock of Green Tree Servicing LLC to CFN Investment Holding LLC was June 23, 2003.

Attached hereto as Exhibit 1 is a true and correct copy of the Sale Order with the accompanying Asset Purchase Agreement as referenced herein."

_____
DAVID A. SCHWARTZ

SWORN TO AND SUBSCRIBED before me this the 15th day of June, 2005.

SEAL



_____
Notary Public
My Commission Expires: 1.31.08

DEFENDANT'S
EXHIBIT
B
tabbies

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

In re:                 )     Chapter 11

                     )

Conseco, Inc., et al.,      )     Case No. 02 B 49672

                     )     (Jointly Administered)

           Debtors[1]   )

                     )

                     )     Hon. Carol A. Doyle

ORDER PURSUANT TO 11 U.S.C. §§ 105(a), 363, 365 AND 1146(c)
AND FED. R. BANKR. P. 2002, 6004 AND 6006 AUTHORIZING
AND APPROVING: (I) ASSET PURCHASE AGREEMENT WITH
CFN INVESTMENT HOLDINGS LLC; (II) SALE OF CERTAIN OF
THE CFC DEBTORS' ASSETS FREE AND CLEAR OF LIENS,
CLAIMS AND ENCUMBRANCES; (III) ASSUMPTION AND
ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND
UNEXPIRED LEASES; AND (IV) CERTAIN RELATED RELIEF

Upon the motion, dated December 19, 2002 (the "Motion"), of Conseco Finance

Corp. and Conseco Finance Servicing Corp. each Debtors in the above-captioned chapter 11

cases, for, among other things, entry of: (a) an order approving, among other things, (i) certain

bid protections, including a break-up fee (the "Breakup Fee"), expense reimbursement, auction

procedures and overbid requirements (collectively, the "Bidding Procedures"), and (ii) the form

and manner of notice with respect to such procedures and the hearing to consider entry of this

Order; and (b) an order (the "Sale Order") under 11 U.S.C. §§ 105(a), 363, 365 and 1146(c) and

---

[1]     The Debtors are the following entities: (i) Conseco, Inc., CIHC, Incorporated, CTIHC, Inc., Partners Health Group, Inc., Conseco Finance Corp. ("CFC") and Conseco Finance Servicing Corp (collectively, the "Initial Debtors") and (ii) Conseco Finance Corp. - Alabama, Conseco Finance Credit Corp., Conseco Finance Consumer Discount Company, Conseco Finance Canada Holding Company, Conseco Finance Canada Company, Conseco Finance Loan Company, Rice Park Properties Corporation, Landmark Manufactured Housing, Inc., Conseco Finance Net Interest Margin Finance Corp. I, Conseco Finance Net Interest Margin Finance Corp. II, Green Tree Finance Corp. - Two, Conseco Agency of Nevada, Inc., Conseco Agency of New York, Inc., Green Tree Floorplan Funding Corp., Conseco Agency, Inc., Conseco Agency of Alabama, Inc., Conseco Agency of Kentucky, Inc., and Crum-Reed General Agency, Inc. (collectively, the "CFC Subsidiary Debtors," and together with CFC and Conseco Finance Servicing Corp., the "CFC Debtors").



DEFENDANT'S
EXHIBIT

I

1139792.14

Fed. R. Bankr. P. 2002, 6004 and 6006 (i) approving that certain Asset Purchase Agreement by and among Conseco Finance Corp. and certain Selling Subsidiaries (collectively, the "Sellers"), and CFN Investment Holdings LLC, (collectively with any affiliates that may be receiving assets pursuant to such agreement, the "Buyer"), dated as of December 19, 2002 (as restated and amended as of March 14, 2003, the "Purchase Agreement"),[2] a copy of which is annexed hereto as Exhibit A), and certain Transaction Documents, substantially in the forms annexed as exhibits to the Purchase Agreement, (ii) authorizing the Sellers to sell (the "Sale") to the Buyer and/or its affiliates, certain assets (as defined more specifically in the Purchase Agreement, the "Purchased Assets") free and clear of all Liens (other than Permitted Liens), all Liabilities (other than Assumed Liabilities), Interests (as defined herein) and Claims (as defined herein), and exempt under 11 U.S.C. § 1146(c) from any stamp, transfer, sales, recording or similar tax, (iii) authorizing the assumption and assignment of the Assumed Agreements, and (iv) granting certain related relief; and this Court having entered an order on December 20, 2003 (the "Breakup Fee Order") approving the Breakup Fee; and this Court having entered a further order on January 8, 2003 (the "Bidding Procedures Order"), approving, among other things, the proposed Bidding Procedures and notice of the Sale; and an auction (the "Auction") having been commenced on February 28, 2003, and subsequently continued to March 4, 2003, in accordance with the Bidding Procedures; and the CFC Debtors having determined that the Buyer submitted the highest or otherwise best bid at the Auction for the Purchased Assets; and this Court having entered an order, dated February 3, 2003 (the "Applicability Order"), that, among other things, made the Bidding Procedures Order applicable to the CFC Subsidiary Debtors (as defined in the

---

[2]   Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion or the Purchase Agreement, as the case may be.

1139792.14

Applicability Order); and a hearing having been held on March 14, 2003 (the "Sale Hearing"); and adequate and sufficient notice of the Bidding Procedures, the Purchase Agreement and all transactions contemplated thereunder (including, without limitation the filing of chapter 11 cases for the GT Debtors (as defined herein) pursuant to Section 5.8(a) of the Purchase Agreement) and in this Sale Order having been given to all parties in interest in these cases and as required by the Bidding Procedures Order; and all interested parties having been afforded an opportunity to be heard with respect to the Motion and all relief related thereto; and the Court having reviewed and considered: (i) the Motion, (ii) the objections thereto, if any, and (iii) the arguments of counsel made, and the evidence proffered or adduced, at the Sale Hearing; and after due deliberation thereon; and good and sufficient cause appearing therefor, it is hereby

FOUND AND DETERMINED, THAT:[3]

A.      This Court has jurisdiction over the Motion under 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A). Venue of these cases and the Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

B.      The statutory predicates for the relief sought in the Motion are sections 105(a), 363, 365 and 1146(c) of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1330 (as amended, the "Bankruptcy Code"), and Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

C.      As evidenced by the affidavits of service and publication filed with this Court, and based on the representations of counsel at the Sale Hearing: (i) due, proper, timely,

---

[3] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. See Fed. R. Bankr. P. 7052.

1139792.14

adequate and sufficient notice of the Motion, the Auction (including the opportunity to submit

higher and better offers for the Purchased Assets in connection therewith), the Sale Hearing, the

Sale and the transactions contemplated thereby, including without limitation, the assumption and

assignment of the Assumed Agreements, has been provided in accordance with sections 102(1),

105(a), 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006 and 9014, and

all other provisions of the Bankruptcy Rules and/or the Local Bankruptcy Rules governing the

transactions that are the subject of the Motion, and in substantial compliance with the Bidding

Procedures, the Purchase Agreement and the Bidding Procedures Order; (ii) such notice was

good, sufficient and appropriate under the circumstances; and (iii) no other or further notice of

the Motion, the Sale Hearing, the Sale or the transactions contemplated thereby (including,

without limitation, the assumption and assignment of the Assumed Agreements), is or shall be

required.

      D.     A reasonable opportunity to object and be heard with respect to the

Motion and the relief requested therein has been afforded to all interested persons and entities,

including the following: (i) the Office of the United States Trustee; (ii) counsel to the Buyer; (iii)

counsel to the Official Committee of Unsecured Creditors appointed in the CFC Debtors' cases

(the "Committee"); (iv) counsel to the lenders (the "Prepetition Lenders") under the CFC

Debtors' prepetition credit facilities; (v) counsel to the administrative agent for the lenders (the

"DIP Lenders") under the CFC Debtors' postpetition secured financing facility; (vi) all entities

known by the CFC Debtors to have expressed an interest in acquiring all or a substantial portion

of the Purchased Assets; (vii) all entities known by the CFC Debtors to have asserted any Lien in

or upon any of the Purchased Assets; (viii) taxing authorities for those jurisdictions in which the

CFC Debtors conduct business, (ix) federal regulatory agencies having oversight responsibility

1139792.14

over the CFC Debtors' lending activities, including, without limitation, the Federal Housing

Administration and the Government National Mortgage Association; (x) all non-Debtor parties

to the Assumed Agreements; (xi) the Securities and Exchange Commission; (xii) all counsel for

the Consultation Parties; (xiii) all other parties that had filed a notice of appearance and demand

for service of papers in these bankruptcy cases under Bankruptcy Rule 2002 as of the date of the

Motion; and (xiv) all parties on the CFC Debtors' master mailing list (collectively, the "Notice

Parties"). Further, certificateholders of record were provided notice of possible changes to the

Pooling and Servicing Agreements with respect to the amount and priority of the servicing fee

contained therein by notices sent by U.S. Bank National Association as Securitization Trustee on

January 6, 2003 and February 21, 2003 and by Wells Fargo Bank Minnesota as Securitization

Trustee on February 21, 2003.

        E.     The CFC Debtors may sell the Purchased Assets free and clear of all

Interests, as defined in paragraph M below (other than Permitted Liens and Assumed Liabilities)

because each entity with a security interest in any Purchased Assets to be transferred on the

Closing Date, including the Assumed Agreements: (i) has consented to the Sale (including the

assumption and assignment of the Assumed Agreements) or is deemed to have consented to the

Sale; (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of

such interest; or (iii) otherwise falls within the provisions of section 363(f) of the Bankruptcy

Code, and therefore, in each case, one or more of the standards set forth in section 363(f)(1)-(5)

of the Bankruptcy Code has been satisfied.

        F.     Good and sufficient reasons for approval of the Purchase Agreement and

the Sale have been articulated. The relief requested in the Motion is in the best interests of the

1139792.14

CFC Debtors, their estates, their creditors and other parties in interest, including holders of Certificates issued by the Securitization Trusts (as defined in the Interim 9019 Order).

G.    The CFC Debtors have demonstrated both: (a) good, sufficient and sound business purposes and justification; and (b) compelling circumstances for the Sale other than in the ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code, in that, among other things: (i) the immediate consummation of the Sale to the Buyer is necessary and appropriate to maximize the value of the CFC Debtors' estates; (ii) the Sale will provide the means for the CFC Debtors to maximize distributions to creditors and enable the successful confirmation of a plan of reorganization; and (iii) absent consummation of the Sale, the CFC Debtors may be forced to discontinue certain of their operations and liquidate.

H.    Each of the CFC Debtors has full corporate power and authority to execute the Purchase Agreement, and all other documents contemplated thereby (including, without limitation, the Transaction Documents), and to consummate the transactions contemplated by the Purchase Agreement. The Purchase Agreement and all of the transactions contemplated thereby, including an order approving a final settlement pursuant to Fed. R. Bankr. P. 9019 with respect to servicing fee and priority, and waiver and settlement of claims (a "Final 9019 Order"), have been duly and validly authorized by all necessary corporate action of each of the CFC Debtors. No consents or approvals, other than the consent and approval of this Court and those expressly provided for in the Purchase Agreement, are required for each of the CFC Debtors to consummate the Sale, except as may be otherwise provided under the terms of this Order.

I.    The Purchase Agreement was negotiated, proposed and entered into by the CFC Debtors and the Buyer without collusion and in good faith. The Buyer is not an "insider" of any of the CFC Debtors, as that term is defined in section 101 of the Bankruptcy Code.

1139792.14

Neither the CFC Debtors nor the Buyer have engaged in any conduct that would cause or permit the Purchase Agreement (or the transactions contemplated thereby) to be avoided or the Buyer to be subjected to any claim under section 363(n) of the Bankruptcy Code.

        J.      The Buyer is a good faith purchaser under section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby.

        K.      The consideration provided by the Buyer pursuant to the Purchase Agreement: (i) is fair and reasonable; (ii) is the highest and best offer for the Purchased Assets; (iii) will provide a greater recovery for the CFC Debtors' estates than would be provided by any other practical, available alternative; and (iv) constitutes reasonably equivalent value and fair consideration for the Purchased Assets.

        L.      The Purchase Agreement was not entered into for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code and/or under the laws of the United States, any state, territory, possession, or the District of Columbia.

        M.      The transfer of the Purchased Assets to the Buyer pursuant to the Purchase Agreement will be a legal, valid, and effective transfer of the Purchased Assets, and vests with or will vest in the Buyer all right, title, and interest of the Sellers to the Purchased Assets free and clear of liens, mortgages, security interests, conditional sales or other title retention agreements, pledges, claims, judgments, demands, encumbrances including, without limitation, claims, and encumbrances: (i) that purport to give to any party a right or option to effect any forfeiture, modification or termination of the Sellers' or the Buyer's interests in the Purchased Assets; or (ii) in respect of taxes, easements, restrictions, rights of first refusal, charges or interests of any kind or nature, if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership, with exception of those

1139792.14

Interests expressly assumed in connection with the Purchase Agreement (collectively, the "Interests"), with all such non-assumed Interests to attach to the Sellers' interest, if any, in the proceeds of the Sale (the "Sale Proceeds") in order of priority, subject to any rights, claims and defenses of the CFC Debtors or other parties in interest on behalf of the CFC Debtors with respect thereto.

N.    Neither the Buyer nor its affiliates, successors or assigns, as a result of any action taken in connection with the purchase of the Purchased Assets: (a) is a successor to the CFC Debtors; (b) has, *de facto* or otherwise, merged with or into the CFC Debtors; or (c) is a continuation or substantial continuation of the CFC Debtors or any enterprise of the CFC Debtors.

O.    The Sale must be approved and consummated promptly in order to preserve the viability of the CFC Debtors' businesses as going concerns, to maximize the value of the CFC Debtors' estates and to position the CFC Debtors to emerge from chapter 11. The Sale of the Purchased Assets to the Buyer is a prerequisite to the CFC Debtors' ability to confirm and consummate a chapter 11 plan. The Sale is in contemplation of a plan and, accordingly, is a transfer pursuant to section 1146(c) of the Bankruptcy Code, which shall not be taxed under any law imposing a stamp, recording, transfer or similar tax, *provided, however* that the foregoing finding shall not apply with respect to any taxes owed to the State of Illinois; *provided further, however,* that the CFC Debtors reserve all rights to seek a separate order applying the finding contained in this paragraph to any taxes that otherwise would be owed to the State of Illinois.

P.    The Buyer (or an appropriate Affiliate) is distinct from and independent of any CFC Party under and in conformity with all of the Servicing Contracts included among the Purchased Assets.

8

1139792.14

Q.    CFN has consented to this form of Order, notwithstanding any inconsistencies between this Order and the "Sale Order" defined in the Purchase Agreement.

R.    The CFC Debtors have demonstrated that assuming and assigning the Assumed Agreements in connection with the Sale is an exercise of their sound business judgment, and that such assumption and assignment is in the best interests of the CFC Debtors' estates.

S.    The CFC Debtors shall have cured, settled, or will provide adequate assurance of cure of, any and all defaults existing prior to the date hereof, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code, under the Assumed Agreements, and shall provide compensation or adequate assurance of compensation to any non-Debtor party to such Assumed Agreements for any of their actual pecuniary losses resulting from a default prior to the date hereof under any of the Assumed Agreements, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code (collectively, the "Cure Amounts").

T.    As of the Closing Date, each Assumed Agreement shall be in full force and effect and enforceable against the non-Debtor party thereto in accordance with its terms.

U.    On or before the Closing Date, the CFC Debtors will pay all undisputed Cure Amounts and will segregate any disputed Cure Amounts with respect thereto pending the resolution of any such dispute by this Court or mutual agreement of the parties. Any non-Debtor party to any Assumed Agreement who objected to the Cure Amounts (a "Cure Amount Objection") is protected by having such disputed amount segregated on or before the Closing Date.

V.    The CFC Debtors have, to the extent necessary, satisfied the requirements of sections 365(b)(1) and 365(f) of the Bankruptcy Code in connection with the Sale, the

1139792.14

assumption and assignment of the Assumed Agreements, and shall upon assignment thereof on the Closing Date, be relieved from any liability for any breach thereof; and it is therefor

ORDERED, ADJUDGED AND DECREED THAT:

1.    The Motion is granted.

2.    Any objections to the entry of this Sale Order or the relief granted herein and requested in the Motion that have not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby denied and overruled on the merits with prejudice.

### Approval of the Purchase Agreement

3.    The Purchase Agreement (including the Transaction Documents), and all of the terms and conditions thereof and transactions contemplated thereby, including, but not limited to, the sale of the Purchased Assets, in exchange for the Purchase Price and assumption of the Assumed Liabilities, by the Buyer, as set forth in the Purchase Agreement, hereby are approved in all respects.

4.    Pursuant to sections 363(b) and (f) of the Bankruptcy Code, the CFC Debtors are authorized and (subject to the applicable closing conditions set forth in the Purchase Agreement) directed to consummate the Sale, pursuant to and in accordance with the terms and conditions of the Purchase Agreement.

5.    The CFC Debtors are authorized and (subject to the applicable closing conditions set forth in the Purchase Agreement) directed to execute and deliver, and empowered to perform under, consummate and implement, the Purchase Agreement, collectively with all additional instruments and documents (including, without limitation, the Transaction Documents) that may be reasonably necessary or desirable to implement the Purchase Agreement, and to take all further actions as may be requested by the Buyer for the purpose of transferring the Purchased Assets to the Buyer or as may be necessary or appropriate to the

1139792.14

performance of the obligations contemplated by the Purchase Agreement (including, without limitation, the effectuation of any conversions or other changes in organizational status of any Subject Subsidiary pursuant to Section 2.1(b) of the Purchase Agreement). The Buyer shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the Purchase Agreement, the Transaction Documents or any other Sale-related document. The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence.

### Transfer of Purchased Assets

6.    Except as expressly permitted or otherwise specifically provided for in the Purchase Agreement or this Sale Order, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, the Purchased Assets shall be transferred to the Buyer and, as of the Closing Date, shall be free and clear of: (a) all Interests; and (b) all debts arising under, relating to, or in connection with any acts of the CFC Debtors, claims (as that term is defined in section 101(5) of the Bankruptcy Code), liabilities, obligations, demands, guaranties, options, rights, contractual commitments, restrictions, interests and matters of any kind and nature, whether arising prior to or subsequent to the commencement of these cases, and whether imposed by agreement, understanding, law, equity or otherwise (including, without limitation, claims and encumbrances: (i) that purport to give to any party a right or option to effect any forfeiture, modification, right of first refusal, or termination of any of the Sellers' or the Buyer's interests in the Purchased Assets, or any similar rights, or (ii) in respect of taxes, easements, restrictions, rights of first refusal, charges or interests of any kind or nature, if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership), but specifically excluding Permitted Liens and Assumed Liabilities, (collectively, "Claims") with all the Interests and Claims to attach to the CFC Debtors' interest in the Sale Proceeds, in the order

11

1139792.14

of their priority, with the same validity, force and effect which they now have against the Purchased Assets, subject to any rights, claims and defenses the CFC Debtors or any other parties in interest on behalf of the CFC Debtors may possess with respect thereto. The CFC Debtors shall apply the Sale Proceeds: first, to the lenders pursuant to the "Final Order: (i) Authorizing Debtors in Possession to Enter Into Post-Petition Credit Agreement Pursuant to Section 364 of the Bankruptcy Code, (ii) Authorizing Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, and (iii) Granting Adequate Protection Pursuant to Sections 363 and 364 of the Bankruptcy Code," dated January 14, 2003 (the "Final DIP Order"); and second, the CFC Debtors shall place a sufficient amount of the remaining sale proceeds in escrow to satisfy the Claims of parties asserting liens in the Purchased Assets, such Claims to be determined after notice and an opportunity to object by the CFC Committee; *provided, however,* that the CFC Debtors will not be obligated to pay interest to any holder of a Claim pending allowance of such Claim other than such interest (if any) accrued in the escrow.

7.    Except as expressly permitted by the Purchase Agreement, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax and regulatory authorities, lenders, trade and other creditors, holding Interests or Claims of any kind or nature whatsoever against the CFC Debtors or in the Purchased Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinated), arising under or out of, in connection with, or in any way relating to, the CFC Debtors, the Purchased Assets, the operation of the CFC Debtors' businesses prior to the Closing Date or the transfer of the Purchased Assets to the Buyer, shall be and hereby are forever barred, estopped and permanently enjoined from asserting, prosecuting or otherwise pursuing against the Buyer, its property, its successors and

12

1139792.14

assigns, its affiliates or the Purchased Assets, such persons' or entities' Interests or Claims. Following the Closing Date, no holder of an Interest in or Claim against the CFC Debtors shall interfere with Buyer's title to or use and enjoyment of the Purchased Assets based on or related to such Interests or Claims, and all such Claims and Interests, if any, shall be, and hereby are channeled, transferred and attached solely and exclusively to the Sale Proceeds.

8.      The transfer of the Purchased Assets to the Buyer pursuant to the Purchase Agreement shall not result in: (i) the Buyer having any liability or responsibility for any claim (other than for Permitted Liens or Assumed Liabilities) against the CFC Debtors or against an insider of the CFC Debtors; or (ii) the Buyer having any liability or responsibility to the CFC Debtors except pursuant to the Purchase Agreement, the Transaction Documents and this Order.

9.      Pursuant to Section 2.1(b)(i) of the Purchase Agreement, the CFC Debtors are authorized and directed to cause one or more of the CFC Debtors (other than a Subject Subsidiary) to unconditionally assume all Liabilities (other than Assumed Liabilities) of each Subject Subsidiary; *provided, however,* that nothing in Section 2.1(b)(i) shall be construed to impair the CFC Debtors' right to challenge any liability assumed by the CFC Debtors pursuant to Section 2.1(b)(i) on the same grounds that would have been available to the Subject Subsidiary in the absence of such assumption.

10.      The Buyer shall have no liability or responsibility for any liability or other obligation of the CFC Debtors arising under or related to the Purchased Assets other than as expressly set forth in the Purchase Agreement, this Order or any Final 9019 Order with respect to the manufactured housing servicing fee and priority to which the Buyer has consented. Without limiting the effect or scope of the foregoing, the transfer of the Purchased Assets from the Sellers to the Buyer does not and will not subject the Buyer or its affiliates, successors or assigns or their

1139792.14

respective properties (including the Purchased Assets) to any liability for claims (as that term is defined in section 101(5) of the Bankruptcy Code) against the CFC Debtors or the Purchased Assets by reason of such transfer under the laws of the United States or any state, territory or possession thereof applicable to such transactions other than with respect to Assumed Liabilities. Neither the Buyer nor its affiliates, successors or assigns shall be deemed, as a result of any action taken in connection with the purchase of the Purchased Assets to: (a) be a successor to the CFC Debtors; (b) have, *de facto* or otherwise, merged with or into the CFC Debtors; or (c) be a continuation or substantial continuation of the CFC Debtors or any enterprise of the CFC Debtors. Neither the Buyer nor its affiliates, successors or assigns is acquiring or assuming any liability, warranty or other obligation of the CFC Debtors, including, without limitation, any tax incurred but unpaid by the CFC Debtors prior to the Closing Date, including, but not limited to, any tax, any fine or penalty relating to a tax, or any addition to tax, whether or not previously assessed, fixed or audited, whether or not paid, and whether or not contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction, except as otherwise expressly provided in the Purchase Agreement or this Order.

11. The transfer of the Purchased Assets to the Buyer pursuant to the Purchase Agreement constitutes a legal, valid and effective transfer of the Purchased Assets, and shall vest the Buyer with all right, title and interest of the CFC Debtors in and to the Purchased Assets free and clear of all Claims and Interests of any kind or nature whatsoever.

12. On the Closing Date, this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance and transfer of the Purchased Assets or a bill of sale transferring good and marketable title in the Purchased Assets to the Buyer. Each and every federal, state, and local governmental agency or department is

14

1129792.14

hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

13.    Subject to the occurrence of the Closing Date, this Order: (a) is and shall be effective as a determination that, subject to those Claims and Interests expressly assumed in connection with the Purchase Agreement, on the Closing Date, all Interests and Claims of any kind or nature whatsoever existing as to the Purchased Assets prior to the Closing Date have been unconditionally released, discharged and terminated, and that the conveyances described herein have been effected; and (b) shall be binding upon and shall govern the acts of all entities, including without limitation all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Purchased Assets.

14.    The transactions contemplated by the Purchase Agreement, and the execution, delivery and/or recordation of any and all documents or instruments necessary or desirable to consummate the transactions contemplated by the Purchase Agreement shall be, and hereby are, exempt from the imposition and payment of all recording, stamp, transfer or any other similar taxes, pursuant to section 1146(c) of the Bankruptcy Code; *provided, however,* that the foregoing exemption shall not apply to any taxes owed to the State of Illinois; *provided further, however* that the CFC Debtors reserve all rights to file a separate motion seeking an

1139792.14

order exempting, pursuant to section 1146(c) of the Bankruptcy Code, any taxes that otherwise would be owed to the State of Illinois but for section 1146(c).

### Assumption and Assignment of Assumed Agreements

15.    The Sellers are hereby authorized, in accordance with sections 105(a), 363 and 365 of the Bankruptcy Code, to: (a) assume and assign to the Buyer, effective upon the Closing Date, the Assumed Agreements, and to transfer, sell and deliver to Buyer all of Sellers' right, title and interest in and to the Assumed Agreements, free and clear of all Interests and Claims of any kind or nature whatsoever; and (b) execute and deliver to the Buyer such documents or other instruments as may be necessary to assign and transfer the Assumed Agreements to the Buyer.

16.    The requirements of sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code shall be deemed satisfied as of the Closing Date with respect to the Assumed Agreements pursuant to the Cure Amount Procedures which shall be:

> If the CFC Debtors and a party objecting to the CFC Debtors' proposed cure amount have failed to resolve an objecting party's cure objection (the "Cure Objection") prior to the Sale Hearing, they shall take the following steps to resolve the Cure Objection:

- The CFC Debtors and the objecting party (collectively, the "Parties") shall attempt to resolve the disputed portion ("Disputed Portion") of all Cure Objections (defined below) in good faith prior to the Closing Date.

- If the CFC Debtors and a party objecting to the CFC Debtors' proposed cure amount have failed to resolve an objecting party's cure objection (the "Cure Objection") prior to the Closing Date, they shall take the following steps to resolve the Cure Objection:

- On or about the Closing Date, the CFC Debtors shall make payments of any undisputed cure amounts from the Sale Proceeds to the objecting party(ies) to contracts that the CFC Debtors wish to assume;

1139792.14

- The CFC Debtors also shall set aside an amount equal to the amount disputed (the "Disputed Amount") of those contracts the CFC Debtors wish to assume;

- If the parties have failed to resolve the Disputed Amount by the Closing Date, the CFC Debtors shall file a response to all unresolved cure objections on or about ten (10) business days after the Closing Date and the Cure Objection will be heard at the first omnibus hearing date thereafter or such other time as the Court may hear such matters.

17.    The Cure Amount Procedures shall apply to resolve all Cure Amount Disputes unless the parties thereto have agreed to a different treatment.

18.    Neither the Buyer, the Trustees nor any holder of Certificates (both terms as defined in the Interim 9019 Order) shall have any liability to any obligor under any loan or manufactured housing contract (an "Obligor"), and all such claims of Obligors against the Buyer, the Trustees or the Certificateholders (as defined in the Interim 9019 Order) shall be barred. The CFC Debtors shall establish a bar date prior to which any and all such claims shall be asserted against the CFC Debtors. Any and all claims of Obligors shall be the subject of a channeling order for consideration by this Court and this Court shall maintain continuing jurisdiction over claims arising out of or asserted against the CFC Debtors by Obligors related directly or indirectly to the CFC Debtors' servicing activities.

19.    As of the Closing Date, the Assumed Agreements shall be transferred to, and remain in full force and effect for the benefit of, the Buyer, in accordance with their respective terms, notwithstanding any provision in any such Assumed Agreements (including provisions of the type described in sections 365(b)(2), (e)(1) and (f)(1) of the Bankruptcy Code) that prohibits, restricts or conditions such assignment or transfer. The non-Debtor party to each Assumed Agreement shall be deemed to have consented to such assignment under section 365(e)(1)(B) of the Bankruptcy Code, and the Buyer shall enjoy all of the rights and benefits

1139792.14

under each such Assumed Agreement as of the Closing Date without the necessity of obtaining

such non-Debtor party's written consent to the assumption and assignment thereof.

20.    Pursuant to section 365(k) of the Bankruptcy Code, the CFC Debtors and

their estates shall be relieved from any liability for any breach of any Assumed Agreement after

such assignment to and assumption by the Buyer on the Closing Date.

21.    All liquidated monetary defaults, claims or other obligations of the CFC

Debtors arising or accruing under each Assumed Agreement prior to the assumption of such

Assumed Agreement (without giving effect to any acceleration clauses or any default provisions

of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be promptly cured by the

CFC Debtors upon assumption and assignment as provided in section 365(b)(1) of the

Bankruptcy Code.

22.    If there exists on the Closing Date any default related to an Assumed

Agreement, the CFC Debtors shall be responsible for any amounts to be cured pursuant to

section 365(a) of the Bankruptcy Code as a condition to the assumption and assignment of such

Assumed Agreement. At or prior to the Closing Date, the CFC Debtors shall pay all cure

amounts for the Assumed Agreements as provided in the Cure Amount Procedures, and the

Buyer shall have no liability or obligation with respect to any default or obligation arising or

accruing under any Assumed Agreement prior to the Closing Date, except to the extent expressly

provided in the Purchase Agreement.

23.    Each non-Debtor party to an Assumed Agreement is forever barred,

estopped and permanently enjoined from asserting against the Buyer or its property or affiliates,

any breach or default under any Assumed Agreement, any claim of lack of consent or any other

condition to the assignment thereof, or any counterclaim, defense, setoff, right of recoupment or

18

1139792.14

any other claim asserted or assertable against the CFC Debtors, arising under or related to the Assumed Agreements and existing as of the Closing Date or arising by reason of the Sale, except to the extent expressly provided for in the Purchase Agreement.

24.    Upon assignment of the Assumed Agreements to the Buyer on the Closing Date, no default shall exist under any Assumed Agreement and no non-Debtor party to any Assumed Agreement shall be permitted to declare a default by the Buyer under such Assumed Agreement or otherwise take action against the Buyer as a result of any CFC Debtor's financial condition, bankruptcy or failure to perform any of its obligations under the Assumed Agreement, including any failure to pay any amounts necessary to cure any Debtor's defaults thereunder. Upon entry of this Sale Order and assumption and assignment of the Assumed Agreements, the Buyer shall be deemed in compliance with all terms and provisions of the Assumed Agreements.

25.    Except as set forth in Section 2.7(b) of the Purchase Agreement, Buyer shall be responsible for all costs and expenses, incurred after the Closing Date, that are determined by the Buyer to be necessary in connection with providing adequate assurance of future performance with respect to the Assumed Agreements.

26.    Buyer shall have no liability for liabilities arising under the Assumed Agreements prior to the Closing Date.

Additional Provisions

27.    Upon the granting of this Sale Order, with respect to the Purchase Agreement, including the assumption and assignment of the Assumed Agreements approved and authorized herein, the Buyer shall be entitled to protection under section 363(m) of the Bankruptcy Code. The transactions contemplated by the Purchase Agreement are undertaken by the Buyer in good faith, as that term is used in Bankruptcy Code section 363(m) and, accordingly, the reversal or modification on appeal of the authorization provided herein to

1139792.14

consummate the Sale shall not affect the validity of the Sale to the Buyer, unless such authorization is duly stayed pending such appeal.

28.     The effectiveness of this Order shall be contingent upon the entry of a Final 9019 Order, which shall govern with respect to all the terms and conditions pursuant to which the MH Servicing Contracts shall be assumed by the Sellers and assigned to the Buyer, including with respect to any consequent claims and cure issues.

29.     In accordance with Section 9.7 of the Purchase Agreement, the first $10 million of Sellers' obligations (if any) under Section 5.1(b)(i)(C) of the Purchase Agreement and Article 9 thereof shall constitute an administrative expense of the Sellers under section 364(c)(1) of the Bankruptcy Code with priority over any and all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code and the balance of such obligations shall be general unsecured obligations only of the Sellers.

30.     The Mill Creek Transition Obligations: (a) shall be satisfied as and when they become payable pursuant to the terms of the Purchase Agreement; and (b) shall constitute administrative expenses of the CFC Debtors pursuant to section 503(b) of the Bankruptcy Code.

31.     No Liability shall attach to or remain with the Purchased Businesses on account of any Liability, including without limitation, a Tax Liability, existing as of the Closing Date for which the Sellers are jointly and/or severally liable with any of the CFC Parties (other than Assumed Liabilities).

32.     Any Subject Subsidiary or Subsidiary of a Subject Subsidiary acquired by the Buyer shall have no Liability for any Tax of Parent or any present or former Subsidiary of Parent by virtue of Treasury Regulation Section 1.1502-6 or any comparable provision of state, local or foreign law.

1139792.14

33.    That certain letter agreement, dated as of December 19, 2002, pursuant to which, among other things, Parent has agreed to indemnify the Buyer and certain other parties for tax obligations of Parent's Affiliated Group under Treasury Regulation Section 1.1502-6 and certain other obligations is hereby authorized and approved and, pursuant to section 365 of the Bankruptcy Code, shall be deemed assumed by Parent as of the Closing Date.

34.    The Buyer (or its Affiliate), as successor servicer under the Servicing Contracts included in the Purchased Assets (the "Successor Servicer"), shall be entitled to the priority of payment of the servicing fees payable thereunder afforded to a successor servicer under such Servicing Contracts.

35.    The Buyer (or its Affiliate), as Successor Servicer, shall be entitled to delegate its servicing duties under the Servicing Contracts to one or more Affiliates, provided that any such delegation shall not relieve the Successor Servicer of any obligations under the relevant Servicing Contracts or otherwise be construed to effect an assignment of such Servicing Contracts by the Successor Servicer to any party.

36.    Pursuant to Section 5.26 of the Purchase Agreement, the CFC Debtors are authorized and directed to continue to operate the Non-Transferred Insurance Business in the manner in which such business has been conducted prior to the Petition Date and to cooperate with the Buyer in achieving the transfer of the Non-Transferred Insurance Assets on a timely basis, all as more fully set forth (and to the full extent set forth) in Section 5.26 of the Purchase Agreement.

37.    Within three business days of the commencement of the chapter 11 cases of Green Tree Residual Finance Corp. I. and Green Tree Finance Corp.-Five (the "GT Debtors"), the CFC Debtors are authorized and directed to file a notice and proposed order applying the

1139792.14

findings herein to the GT Debtors and to serve such notice and order on all known creditors of the GT Debtors.

38.    This Court retains jurisdiction to enforce and implement the terms and provisions of this Order and the Purchase Agreement, all amendments thereto, any waivers and consents thereunder, and of each of the agreements executed in connection therewith in all respects, including, but not limited to, retaining jurisdiction to: (a) compel delivery of the Purchased Assets to the Buyer; (b) compel assumption of the Assumed Liabilities and payment of the Purchase Price by the Buyer; (c) resolve any disputes arising under or related to the Purchase Agreement, except as otherwise provided therein; and (d) interpret, implement and enforce the provisions of this Sale Order.

39.    All entities who are presently, or on the Closing Date may be, in possession of some or all of the Purchased Assets are hereby directed to surrender possession of the Purchased Assets either to: (i) the CFC Debtors prior to the Closing Date, for subsequent transfer to the Buyer on the Closing Date; or (ii) to the Buyer on and after the Closing Date.

40.    Each of the CFC Debtors' creditors is authorized and directed on or before the Closing Date to execute such documents and take all other actions as may be necessary to release its Interests in or Claims against the Purchased Assets, if any, as such Interests or Claims may have been recorded or otherwise exist.

41.    If any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens* or other documents or agreements evidencing Claims against or Interests with respect to the Sellers and/or the Purchased Assets shall not have delivered to the CFC Debtors and the Buyer prior to the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Claims

22

1139792.14

or Interests which such person or entity has with respect to the Sellers and/or the Purchased Assets or otherwise, then: (i) the CFC Debtors are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Purchased Assets; and (ii) the Buyer is hereby authorized to file, register or otherwise record a certified copy of this Sale Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Claims or Interests in the Purchased Assets as of the Closing Date, of any kind or nature whatsoever (other than the Permitted Liens and Assumed Liabilities).

42.    The terms and provisions of the Purchase Agreement and this Sale Order shall be binding in all respects upon, and shall inure to the benefit of, the CFC Debtors, their estates, the Buyer and its respective affiliates, successors and assigns, and any affected third parties, including, but not limited to, all persons asserting a Claim against or Interest in the Purchased Assets, notwithstanding any subsequent appointment of any trustee(s) for the CFC Debtors under any chapter of the Bankruptcy Code, as to which trustee(s) such terms and provisions likewise shall be binding.

43.    All persons who hold Claims against or Interests in the CFC Debtors are forever barred, estopped and permanently enjoined from asserting or prosecuting any claims or causes of action against Buyer, its affiliates, or any of its respective officers, directors, employees, attorneys or advisors, arising out of or in connection with the Sale.

44.    The Purchase Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto, in a writing signed by such parties, and in accordance with the terms thereof, without further order of the

1139792.14

Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the CFC Debtors' estates.

45.    Nothing contained in any chapter 11 plan confirmed in these cases or any order confirming any such plan or in any other order in these cases (including any order entered after any conversion of these cases to cases under chapter 7 of the Bankruptcy Code) shall alter, conflict with, or derogate from, the provisions of the Purchase Agreement or this Sale Order.

46.    Subject to the satisfaction of the obligations of the CFC Debtors under the Final DIP Order and notwithstanding any other provision of this Order, and to the extent the Indenture Escrow (as such term is defined in the order authorizing the CFC Debtors to sell certain Purchased Assets to General Electric Capital Corporation, entered on or about March 14, 2003, the "GE Sale Order") is not funded out of the Sale Proceeds (as defined in the GE Sale Order), the CFC Debtors shall place an amount of the Sale Proceeds (as defined herein) equal to the proceeds of any of the Purchased Assets (as defined herein), in which the Noteholders have a security interest in such Purchased Assets (as defined herein) to the extent of such security interest in escrow (the "Notes Escrow") pending entry of a final (no longer appealable) order resolving any allegation (by such statutory committee, entity or other person) as to the extent, validity and priority of the Noteholders' (as such term is defined in the Final DIP Order) security interests in the stock of Mill Creek Bank (the "Noteholders' Lien Order"); provided, however that nothing in this order shall affect the accrued or accruing interest, fees and expenses under the Indentures with respect to the Notes and under applicable law; provided, further however, that the Indenture Trustee's (as such term is defined in the Final DIP Order) reasonably documented current and continuing fees and expenses (including out of pocket legal fees and expenses) shall be paid by the Debtors.  Notwithstanding anything contained herein to the

24

1139792.14

contrary, this order shall be and is without prejudice to any and all rights of the Indenture Trustee or Noteholders with respect to the Notes Escrow or the continuing accrual and/or right to payment of post-petition interest, costs, fees and other charges due under the Indentures, Notes and applicable law, or the rights (if any as of the date hereof) of any statutory committee, entity or person to challenge the Indenture Trustee's or Noteholders' assertions of such rights.

47.    The failure specifically to include any particular provisions of the Purchase Agreement in this Sale Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the Purchase Agreement be authorized and approved in its entirety.  Likewise, all of the provisions of this Order are nonseverable and mutually dependent.

48.    Notwithstanding anything in this Order to the contrary, the respective objections of the South Dakota Board of Economic Development and Textron Financial Corporation have been resolved by separate stipulations to be "so ordered" contemporaneously with this Order (collectively, the "Settlement Stipulations") and, accordingly, the respective rights of those parties shall be governed by the Settlement Stipulations.

49.    Notwithstanding anything in this Order to the contrary, any provision of this Order, the Purchase Agreement, and any other Transaction Documents, none of the Buyer or any successor or assign thereof shall be entitled to vote to accept or reject a plan of reorganization in the Chapter 11 Case.

50.    In furtherance of Section 2.1(c) of the Purchase Agreement, the Buyer shall be deemed to have waived any right to a distribution from the CFC Debtors'.estates on account of any B-2 Guarantee Rights; *provided, however,* that except as provided in the immediately preceding paragraph, nothing in this Order or the Asset Purchase Agreement shall

25

1139792.14

be construed to impair any other rights of the Buyer attendant to its purchase and subsequent ownership of the related B-2 Certificates. This paragraph shall be binding upon the Buyer and any affiliate, successor or assign thereof and any subsequent purchasers or transferees of any B-2 Certificates constituting the Purchased Assets.

51.    Notwithstanding anything in this Order to the contrary, any provision of this Order or the Purchase Agreement and any other document contemplated thereby purporting to release or exculpate the Buyer or any affiliate, successor or assign thereof shall not act to release or exculpate: (a) Lehman Brothers, Inc., U.S. Bank National Association, any other pre-petition lender, or any affiliate thereof; or (b) any other third-party to the extent that such liability arises out of conduct other than the transaction contemplated by this Order and unrelated to the Purchased Assets. Moreover, nothing in this Order act to release or otherwise affect any claims of any of the CFC Debtors against Conseco, Inc., CIHC, Incorporated, CTIHC, Inc., or Partners Health Group, Inc.

52.    Notwithstanding anything to the contrary in this Order, the transfer of any loans backing securities guaranteed by the Government National Mortgage Association (the "GNMA Securities") or the transfer of any loans insured by the Federal Housing Administration (the "FHA Loans") shall be in accordance with all applicable federal statutes and regulations governing such loans. For the avoidance of doubt, any rights that the Government National Mortgage Association and the Federal Housing Administration may have pursuant to the National Housing Act, 12 U.S.C. 1701-1749, are specifically preserved, and shall not be impaired by this Order. The Court makes no ruling as to the terms of any transfer of any GNMA Securities and FHA Loans or any rights or assets associated therewith, and the right of the

1139792.14

Government National Mortgage Association and the Federal Housing Administration to object to such transfer or the terms thereof is specifically reserved.

      53.    Notwithstanding the provisions of Bankruptcy Rules 6004(g) and 6006(d) and Rule 62(a) of the Federal Rules of Civil Procedure, this Order shall not be stayed for ten (10) days after the entry hereof, but shall be effective and enforceable immediately upon issuance hereof.

Dated: Chicago, Illinois
      March ___, 2003

 

                                _____
                                THE HONORABLE CAROL A. DOYLE
                                UNITED STATES BANKRUPTCY JUDGE

ENTERED
MAR 14 2003
CAROL A. DOYLE
BANKRUPTCY JUDGE

# EXHIBIT A

[Execution Copy]

# AMENDED AND RESTATED ASSET PURCHASE AGREEMENT

by and among

CONSECO FINANCE CORP.

THE SELLING SUBSIDIARIES NAMED HEREIN

and

CFN INVESTMENT HOLDINGS LLC

Dated as of

March 14, 2003

TABLE OF CONTENTS

                                                                                      Page

ARTICLE I. DEFINITIONS ..................................................................................1
     1.1.      Definitions. ...........................................................................................1

ARTICLE II. PURCHASE AND SALE OF ASSETS..............................................27
     2.1.      Purchased Assets. ................................................................................27
     2.2.      Liabilities. ............................................................................................31
     2.3.      Closing Transactions. ..........................................................................34
     2.4.      Purchase Price. ....................................................................................37
     2.5.      Post-Effective Time Amounts Received and Paid. ...............................37
     2.6.      True Sale. .............................................................................................37
     2.7.      Assumption of Certain Leases and Contracts. .....................................37
     2.8.      Consents to Certain Assignments. .......................................................38
     2.9.      Real Estate Apportionments and Payments. .........................................39

ARTICLE III. REPRESENTATIONS AND WARRANTIES OF THE SELLERS ......39
     3.1.      Organization and Power. ......................................................................39
     3.2.      Authorization of Transactions. .............................................................40
     3.3.      Absence of Conflicts; Required Consents, Approvals and Filings. ........40
     3.4.      Company Subsidiaries. .........................................................................41
     3.5.      Good Title. ...........................................................................................41
     3.6.      Compliance with Laws; Permits............................................................41
     3.7.      Assets Necessary to Conduct Businesses. ............................................42
     3.8.      Facilities; Real Property. ......................................................................42
     3.9.      Personal Property. ................................................................................44
     3.10.     Receivables. ..........................................................................................44
     3.11.     Material Agreements. ...........................................................................45
     3.12.     Intellectual Property. ...........................................................................46
     3.13.     Brokerage. ............................................................................................47
     3.14.     Employees. ...........................................................................................47
     3.15.     Affiliate Transactions. ..........................................................................47
     3.16.     ERISA; Employee Benefits....................................................................48
     3.17.     Depository Institutions. ........................................................................48
     3.18.     Litigation. .............................................................................................48
     3.19.     Financial Statements.............................................................................49
     3.20.     Indebtedness; Guarantees; Absence of Undisclosed Liabilities. ...........49
     3.21.     Residual Assets. ...................................................................................50
     3.22.     Tax Matters...........................................................................................50
     3.23.     Insurance. .............................................................................................55
     3.24.     Environment, Health and Safety...........................................................56
     3.25.     Accounting Controls.............................................................................56
     3.26.     Summary of Securitizations..................................................................56
     3.27.     Representations as to Certain Purchased Assets. .................................56
     3.28.     Securities Offerings. .............................................................................56

3.29.    No Powers of Attorney. ...................................................................56
3.30.    Securities Laws Matters; No Registration. ...............................56
3.31.    Green Tree RECS II Guaranty Corporation. .............................57
3.32.    Conseco HE/HI 2001-B-2, Inc. ...................................................57
3.33.    Conseco Finance Securitizations Corp. ....................................57
3.34.    Green Tree First GP Inc. .............................................................57
3.35.    Green Tree Second GP Inc. .........................................................57
3.36.    Conseco Finance Advance Receivables Corp. ..........................57
3.37.    Conseco Finance Liquidation Expense Advance Receivables 2002-B Corp. ..58
3.38.    Convergent Lending Services, LLC. ...........................................58

ARTICLE IV. REPRESENTATIONS AND WARRANTIES OF THE BUYER .......................59
4.1.    Organization and Corporate Power. ..........................................59
4.2.    Authorization of Transaction. ....................................................59
4.3.    No Violation. .................................................................................59
4.4.    Governmental Authorities and Consents. .................................59
4.5.    Litigation. ......................................................................................59
4.6.    Brokerage. ......................................................................................60
4.7.    Availability of Funds. ...................................................................60
4.8.    Stock Purchase. .............................................................................60
4.9.    Knowledge. .....................................................................................60

ARTICLE V. ADDITIONAL AGREEMENTS .......................................................................60
5.1.    Tax Matters. ...................................................................................60
5.2.    Access to Information and Facilities. .........................................66
5.3.    Confidentiality. .............................................................................66
5.4.    Conduct of the Businesses Prior to Closing. ............................67
5.5.    Restrictions on Certain Actions. ................................................67
5.6.    Press Releases and Announcements. .........................................69
5.7.    Approvals of Third Parties; Satisfaction of Conditions to Closing. ................70
5.8.    Bankruptcy Actions. ....................................................................70
5.9.    Exclusivity; No Solicitation of Transactions. ...........................71
5.10.    Employees. ....................................................................................72
5.11.    Transition. .....................................................................................76
5.12.    Seller's Trademarks. ....................................................................76
5.13.    Notices to Obligors. .....................................................................77
5.14.    Non-Solicitation and Non-Competition. ...................................77
5.15.    Further Actions. ............................................................................78
5.16.    Further Assurances. .....................................................................78
5.17.    Mail Forwarding. .........................................................................78
5.18.    DIP Loan. .......................................................................................78
5.19.    REMIC Items Reflected on Tax Returns; Bring Down on Certain Information. 78
5.20.    Title Insurance. ............................................................................79
5.21.    Preparation of License Applications. ........................................79
5.22.    Provision of Bank Information. ..................................................80
5.23.    Access to Records After the Closing. .........................................80
5.24.    Liens. ..............................................................................................81

5.25.    Exclusion of Certain Purchased Assets. ...........................................81
5.26.    Certain Insurance Matters. ..............................................................81
5.27.    Financial Information. ......................................................................83
5.28.    GE Loan Services; Transition Services. .........................................84
5.29.    Intellectual Property Licenses. .......................................................84
5.30.    GE Leases. .......................................................................................85
5.31.    Waiver of B-2 Guarantee Rights. ...................................................85
5.32.    Termination of HE Origination Business. .....................................85
5.33.    Seller Transition Services. ..............................................................86

ARTICLE VI. CONDITIONS PRECEDENT TO THE BUYER'S OBLIGATIONS ..............86
6.1.     Representations and Warranties; Covenants; Certificates. .............86
6.2.     Bankruptcy Condition. .....................................................................87
6.3.     Litigation. .........................................................................................87
6.4.     Approvals. ........................................................................................87
6.5.     Instruments of Conveyance and Transfer; Title. ............................87
6.6.     Transition Services Agreement. ......................................................88
6.7.     Resignation or Removal of Officers and Directors of Subject Subsidiaries. ..88
6.8.     Lehman Facility. ..............................................................................88
6.9.     No Material Adverse Effect. ............................................................88
6.10.    Reserved. ..........................................................................................88
6.11.    Servicing Rights. .............................................................................89
6.12.    Tax Opinion. ....................................................................................89
6.13.    Data Service Contracts. ...................................................................90
6.14.    Acceptance of Employment Offers. ...............................................90
6.15.    Parent Guarantee. ............................................................................90
6.16.    Goldman. ..........................................................................................91

ARTICLE VII. CONDITIONS PRECEDENT TO THE SELLERS' OBLIGATIONS ..............91
7.1.     Representations and Warranties; Covenants; Certificates. .............91
7.2.     Bankruptcy Condition. .....................................................................91
7.3.     Litigation. .........................................................................................91
7.4.     Approvals. ........................................................................................92
7.5.     Reserved. ..........................................................................................92
7.6.     Other Documents. ............................................................................92

ARTICLE VIII. TERMINATION ...........................................................................92
8.1.     Termination Prior to Closing. .........................................................92
8.2.     Break-Up Fee and Expense Reimbursement. ..................................93
8.3.     Termination by Reason of Buyer Default. ......................................94
8.4.     Effect of Termination. .....................................................................95

ARTICLE IX. SURVIVAL OF REPRESENTATIONS; INDEMNIFICATION ....................95
9.1.     Survival of Representations. ............................................................95
9.2.     Indemnification. ...............................................................................95
9.3.     Qualifications on Indemnification. ..................................................96
9.4.     Notice and Defense of Claims. ........................................................97

9.5.    Tax Treatment. ................................................................................98
9.6.    Remedy. ..........................................................................................98
9.7.    Administrative Expense; Administrative Priority. .........................98

ARTICLE X. MISCELLANEOUS ...........................................................................99
10.1.    Expenses. ........................................................................................99
10.2.    Amendment and Waiver. ................................................................99
10.3.    Notices. ...........................................................................................99
10.4.    Binding Agreement; Assignment. ...............................................100
10.5.    Severability. ..................................................................................101
10.6.    Construction. .................................................................................101
10.7.    Captions. ........................................................................................101
10.8.    Entire Agreement. .........................................................................101
10.9.    Counterparts. .................................................................................102
10.10.   Governing Law. .............................................................................102
10.11.   Parties in Interest. .........................................................................102
10.12.   Consent to Jurisdiction. ................................................................102
10.13.   Delivery by Facsimile. ..................................................................102
10.14.   Disclosure Schedules. ...................................................................103
10.15.   Specific Performance. ...................................................................103

## ASSET PURCHASE AGREEMENT

THIS AMENDED AND RESTATED ASSET PURCHASE AGREEMENT (this "Agreement") is made as of March 14, 2003, by and among Conseco Finance Corp., a Delaware corporation (the "Company"), the Subsidiaries of the Company owning Purchased Assets, which are named on the signature pages hereof or become parties hereto in accordance with this Agreement (the "Selling Subsidiaries"), and CFN Investment Holdings LLC, a Delaware limited liability company (the "Buyer") and amends and restates the Asset Purchase Agreement, dated as of December 19, 2002, by and among the Company, the Selling Subsidiaries and the Buyer, as amended (the "Original Agreement"). The Company and the Selling Subsidiaries are collectively referred to herein as the "Sellers" and, individually, as a "Seller". The Sellers, the Parent and the Buyer are collectively referred to herein as the "Parties" and, individually, as a "Party".

WHEREAS, on the terms and subject to the conditions set forth in this Agreement, the Buyer desires to purchase from the Sellers, and the Sellers desire to sell to the Buyer, the Purchased Assets, in a sale authorized by the Bankruptcy Court pursuant to, inter alia, sections 105, 363, 365 and 1146(c) of the Bankruptcy Code;

WHEREAS, it is intended that the acquisition of the Purchased Assets would be accomplished through the sale, transfer and assignment of assets of the Company and the Selling Subsidiaries owning, leasing or having the right to use the Purchased Assets and/or, as provided herein, through the sale of capital stock of one or more direct or indirect Subsidiaries of the Company;

WHEREAS, the Buyer also desires to assume, and the Sellers desire to assign and transfer, the Assumed Liabilities; and

WHEREAS, the Company and the Filing Company Subsidiaries either have filed or will file a Chapter 11 Case and have obtained debtor-in-possession financing from FPS DIP LLC.

NOW, THEREFORE, in consideration of the premises and mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, the Parties hereby agree as follows:

### ARTICLE I.

### DEFINITIONS

1.1.    Definitions. For purposes of this Agreement, the following terms shall have the meanings set forth below:

"Accrued and Unpaid Interest" means, with respect to any Loan, as of any date, the interest, fees, premiums, consignment fees, costs, advances and other charges that have accrued on such Loan (whether or not such fees, costs or charges have been billed) but have not been paid by the Obligor on such Loan or otherwise collected by offset, recourse to collateral or otherwise.

"Acquisition Proposal" means a written proposal(s) relating to (a) any merger, consolidation, business combination, sale, reorganization or other direct or indirect disposition of one or more of the Purchased Businesses or of all or a portion of the Purchased Assets, pursuant to one or more transactions, to one or more affiliated or unaffiliated parties (other than transactions in the ordinary course of business or transactions permitted or approved pursuant to Section 5.5), (b) the sale of 20% or more of the outstanding shares of capital stock of the Company (including, without limitation, by way of foreclosure or plan of reorganization or liquidation) to one or more affiliated or unaffiliated parties or a similar transaction involving one or more affiliated or unaffiliated parties, or (c) any transaction or series of transactions in which a Person or group provides or commits to provide $50 million or more of capital to the Company or its Subsidiaries (whether as debt or equity or a combination thereof) (other than (i) debt financing in which none of the Purchased Assets is pledged as collateral or subjected to any Lien other than Permitted Liens, (ii) the DIP Loan, (iii) the Additional Lehman Debt and (iv) transactions specifically contemplated by the GE Approved Agreement).

"Additional Lehman Debt" means an additional warehouse financing facility (or an amendment of an existing Lehman Facility) in an amount not to exceed $250 million to finance the origination of Loans by the Company and its Subsidiaries, which, subject to Section 5.5(b), would be included in the Purchased Assets, on terms and conditions reasonably satisfactory to the Buyer.

"Affiliate" of any particular Person means any other Person controlling, controlled by or under common control with such particular Person, where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities or otherwise.

"Affiliated Group" means any affiliated group of corporations within the meaning of Section 1504(a) of the Tax Code as well as any other group of corporations filing a consolidated, combined, or unitary Income Tax Return under federal, state, local or foreign Law.

"Agreement" shall have the meaning set forth in the Recitals.

"ALTA" means the American Land Title Association.

"Assigned Receivables" means those Receivables identified in Section 3.10(a) of the applicable Business Schedules with respect to a particular Purchased Business, and any Receivables generated by the applicable Purchased Business in the ordinary course from and including the last date as of which the Business Schedules identifying such Receivables are updated under this Agreement through the Closing Date, and including all obligations to make additional extensions of credit under the Assumed Receivables Contracts.

"Assumed Agreements" means, collectively, the Assumed Leases, the Assumed Contracts, the Assumed Retention Agreements and the Assumed Receivables Contracts.

"Assumed Contracts" means those Contracts identified in Section 2.1(a) of the applicable Business Schedules under the heading "Assumed Contracts", but excluding (i) Assumed Leases, Assumed Receivables Contracts and those Contracts that expire or are

terminated in the ordinary course of business prior to the Closing Date and (ii) all Employee Agreements (other than the Assumed Retention Agreements).

"Assumed Leases" means real property leases, subleases, licenses or other Contracts set forth in Section 3.8(b) of the applicable Business Schedules pursuant to which a Seller or Mill Creek Bank leases the Leased Premises as a tenant thereof or leases all or any part of the Owned Real Premises as the landlord thereunder.

"Assumed Liabilities" shall have the meaning set forth in Section 2.2(a) hereof.

"Assumed Receivables Contracts" means Contracts of the Purchased Businesses evidencing or executed and delivered in connection with the Assigned Receivables.

"Assumed Retention Agreements" means the agreement, dated as of December 19, 2002, by and between the Company and Dan Hall, the agreement, dated as of December 19, 2002, by and between the Company and Walter Carter and, if the GE condition is not satisfied, the agreement, dated as of December 19, 2002, by and between the Company and Todd Woodard.

"Auction" means the auction conducted by the Sellers pursuant to the Bidding Procedures Order.

"B-2 Certificates" means the certificates identified as such on the Residuals Schedule under the captions "Junior P&I Regular Interests - Manufactured Housing" and all other interests (whether certificated or uncertificated) of a substantially similar nature owned by a Seller.

"B-2 Guarantee Rights" shall have the meaning set forth in Section 2.1(c) hereof.

"Backup Agreements" shall mean the purchase agreement between the Sellers and EMC Mortgage Corporation (or any of its Affiliates) and the purchase agreement between the Sellers and Charlesbank Capital Partners, LLC (or any of its Affiliates) to acquire the assets of the Sellers and which is entered into pursuant to the Auction and contingent upon the termination of this Agreement and Bankruptcy Court approval.

"Bank Information" shall have the meaning set forth in Section 5.22 hereof.

"Banks" means (a) Mill Creek Bank and (b) Green Tree Retail Services Bank.

"Bankruptcy Code" means title 11 of the United States Code.

"Bankruptcy Court" means the United States Bankruptcy Court for the Northern District of Illinois or such other court having jurisdiction over the Chapter 11 Case originally administered in the United States Bankruptcy Court for the Northern District of Illinois.

"Bidding Procedures Order" means the order of the Bankruptcy Court: (a) establishing procedures for the submission of higher and better offers for the Purchased Assets; (b) prescribing the form and manner of notice of the proposed sale of the Purchased

Assets to creditors and other interested parties, including but not limited to publication notice; (c) authorizing and approving the payment of the Break-Up Fee and Expense Reimbursement to the Buyer in the event they become due under the Original Agreement, without the need for any further order; and (d) otherwise approving and implementing the provisions of Sections 5.9, 5.10 and 5.11 of the Original Agreement, such Bidding Procedures Order to be satisfactory to the Buyer in its sole and absolute discretion.

"Break-Up Fee" shall have the meaning set forth in Section 8.2(a) hereof.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banking institutions in the State of New York are authorized or obligated by law or executive order to be closed.

"Business Employees" shall have the meaning set forth in Section 5.10(a) hereof.

"Business Schedules" means the Residuals Schedule and the Purchased Businesses Schedule.

"Buyer" shall have the meaning set forth in the Recitals.

"Buyer Indemnified Parties" shall have the meaning set forth in Section 9.2(a) hereof.

"Buyer Information" shall have the meaning set forth in Section 5.3(b) hereof.

"Buyer IT Employees" shall have the meaning set forth in Section 5.10(a)(iv) hereof.

"Cap" shall have the meaning set forth in Section 9.3(a) hereof.

"CFARC Contracts" shall have the meaning set forth in Section 3.36 hereof.

"CFC Parties" means, collectively, the Company and the Company's Subsidiaries.

"CFC Party" means, individually, the Company or any of the Company's Subsidiaries, as applicable.

"CFLEAR 2002-B C Contracts" shall have the meaning set forth in Section 3.37 hereof.

"CFSC Contracts" shall have the meaning set forth in Section 3.33 hereof.

"Chapter 11 Case" means, collectively, the cases commenced or to be commenced by the Company and the Filing Company Subsidiaries under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

"CL Business" means the consumer installment loan business of the CFC Parties, excluding securities taken back or retained by any CFC Party.

- 4 -

"CL Origination Business" means the consumer installment loan origination business of the CFC Parties, excluding Securities taken back or retained by any CFC Party.

"Cleanup Calls" means the rights of the Sellers, servicers, holders of residuals or other securities or assignees thereof, exercisable by such Persons in any capacity, to purchase Securitized Loans under the terms of any Securitization Documents and to retire the securities issued to other parties pursuant to such Securitizations, listed on the Residuals Schedule under the caption, "Cleanup Calls".

"Clear Facility" means the Indenture, dated as of April 1, 2002, by and among Conseco Finance Liquidation Expense Advance Receivables 2002-B Corp., as issuer, U.S. Bank, as trustee, as calculation agent and as paying agent, and the Company, together with any successor entity, individually and as servicer of the qualified trusts pursuant to which the Clear Facility Notes were issued.

"Clear Facility Notes" means the Conseco Finance Liquidation Expense Advance Receivables Backed Notes, dated as of April 1, 2002.

"Closing" shall have the meaning set forth in Section 2.3(a) hereof.

"Closing Date" shall have the meaning set forth in Section 2.3(a) hereof.

"Closing Transactions" shall have the meaning set forth in Section 2.3(b) hereof.

"Company" shall have the meaning set forth in the Recitals.

"Confidential Information" shall have the meaning set forth in Section 5.3 hereof.

"Confidentiality Agreement" means that Confidentiality Agreement, dated as of November 8, 2002, between Parent, Fortress Investment Group LLC and J.C. Flowers & Co., LLC and the Confidentiality Agreement, dated as of October 28, 2002, between Parent and AEGIS Mortgage Corporation.

"Consent Agreement" means a fully executed agreement among the Buyer, the Company, the trustees with respect to each of the securitization transactions for which an MH Servicing Contract has been entered into (the "Trustees"), the Official Committee of Unsecured Creditors of the Company (the "Unsecured Creditors Committee"), the Ad Hoc Committee of Certificateholders (the "Ad Hoc Committee") and Federal National Mortgage Association ("Fannie Mae"), evidencing the consent of the Trustees, the Unsecured Creditors Committee, the Ad Hoc Committee and Fannie Mae to the matters covered by Section 6.11(b) and (c), which agreement is in form and substance reasonably acceptable to the Buyer.

"Consumer Loan" means the retail installment contracts and direct consumer loans of the Purchased Businesses secured by a purchase money or other security interest creating a first lien in favor of the Company or one of its Subsidiaries on personal property such as recreational vehicles, motorcycles, watercraft, trailers and snowmobiles, and the related promissory notes or other evidences of indebtedness, together with any and all rights, benefits,

collateral, payments, recoveries and proceeds arising therefrom or in connection therewith including the Servicing Rights related to such loans.

"Contract" means any contract, license, sublicense, franchise, permit, mortgage, deed to secured debt or deed of trust, purchase order, indenture, loan agreement, note, lease, sublease, agreement, obligation, commitment, understanding, instrument or other binding arrangement or any commitment to enter into any of the foregoing (in each case, whether written or oral).

"Convergent Contracts" shall have the meaning set forth in Section 3.38 hereof.

"Credit Facilities" means the Lehman Facilities; the Credit Agreement, dated as of December 27, 2000, as amended on January 9, 2002, July 9, 2002, August 29, 2002, September 6, 2002 and November 27, 2002, between the Company and U.S. Bank (the "U.S. Bank Credit Agreement"); and the Master Repurchase Agreement dated April 16, 1999 between Credit Suisse First Boston Mortgage Capital LLC and Green Tree Financial Corporation (the Company), as amended by Annex I--Amended and Restated Supplemental Terms to Master Repurchase Agreement, dated as of March 26, 1999, and as each of the same may be further amended in accordance with the terms thereof and of this Agreement.

"Deferred Recognition Amounts" shall have the meaning set forth in Section 3.22(d) hereof.

"Deutsche Bank" means Deutsche Bank National Trust Company.

"DIP Loan" shall have the meaning set forth in Section 5.18 hereof.

"Direct Claim" means any claim by an Indemnified Party on account of a Loss which does not result from a Third Party Claim.

"Employee Agreements" shall have the meaning set forth in Section 5.10(j) hereof.

"Employee Benefit Plans" shall have the meaning set forth in Section 3.16 hereof.

"Employees" shall have the meaning set forth in Section 3.14 hereof.

"Environmental Law" means any Law relating to (a) the release or threatened release of Hazardous Substances, (b) pollution or the protection of human health, safety or the environment, including ambient air (including air inside buildings), surface water, ground water, land surface or subsurface strata and natural resources or (c) the manufacture, handling, transport, use, treatment, storage or disposal of Hazardous Substances.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"Excess Cash" shall have the meaning set forth in the credit agreement for the DIP Loan.