"Excluded Assets" shall have the meaning set forth in Section 2.1(c) hereof.

"Excluded Business" means any Purchased Business or portion thereof that is excluded pursuant to Section 2.1(a).

"Excluded Contracts" means (a) each of the Non-MH Servicing Contracts, except with respect to the Non-MH Servicing Rights, Guarantee Fees and Cleanup Calls thereunder or any Residual Assets related thereto, (b) each of the MH Servicing Contracts, except with respect to the MH Servicing Rights, Guarantee Fees and Cleanup Calls thereunder or any Residual Assets related thereto and (c) the other Contracts set forth in Section 2.1(c) of the Purchased Businesses Schedule under the caption, "Excluded Contracts".

"Excluded Covenants" has the meaning set forth in Section 5.5 hereof.

"Excluded Liabilities" has the meaning set forth in Section 2.2(b) hereof.

"Excluded Servicing Liabilities" means all Liabilities under the Servicing Contracts other than the duty to perform the obligations solely of a servicer or successor servicer thereunder first arising after the Closing Date.

"Expense Reimbursement" shall have the meaning set forth in Section 8.2(b) hereof.

"Facilities" means the Owned Real Premises and Leased Premises.

"FDIC" shall have the meaning set forth in Section 3.3 hereof.

"Files" means, whether in paper or electronic form, books; records; customer and vendor lists; correspondence; files; advertising, marketing and sales materials; personnel files of employees; financial records and statements; correspondence, reports and examinations of Governmental Authorities other than those with respect to Mill Creek Bank; and legal proceedings materials.

"Filing Company Subsidiaries" means those Selling Subsidiaries that have commenced a Chapter 11 Case on or before February 3, 2003 and the SPEs.

"Final Order" means an Order as to which the time to file an appeal, a motion for rehearing or reconsideration (excluding any motion under F.R.C.P. 60(b)) or a petition for writ of certiorari has expired and no such appeal, motion or petition is pending.

"Finance Laws" shall have the meaning set forth in Section 3.3 hereof.

"Financial Statements" shall have the meaning set forth in Section 3.19 hereof.

"FIRPTA" shall have the meaning set forth in Section 3.22(c) hereof.

"Floorplan Certificates" means Receivables from Loans made for the floorplan of manufactured homes and vehicle inventory at manufactured home dealerships.

"GAAP" means United States generally accepted accounting principles consistently applied.

"GE" shall have the meaning set forth in Section 2.1(a)(iv) hereof.

"GE Approved Agreement" shall have the meaning set forth in Section 2.1(a)(iv) hereof.

"GE Assumed Liabilities" means the "Assumed Liabilities" as defined in the GE Approved Agreement.

"GE Condition" shall have the meaning set forth in Section 2.1(a)(iv) hereof.

"GE IT Employees" shall have the meaning set forth in Section 5.10(a)(iv) hereof.

"GE Purchased Assets" means the "Purchased Assets" as defined in the GE Approved Agreement.

"GE Sale Order" means the "Sale Order" as in the GE Approved Agreement.

"Goldman" means Goldman Sachs Credit Partners, L.P.

"Goldman Commitment Letter" means the Commitment Letter, dated February 26, 2003, between Goldman and the Company.

"Goldman Credit Agreement" means the Secured Super-Priority Debtor in Possession Credit Agreement, among the Company, as debtor and debtor in possession, as borrower, and the subsidiaries of the borrower party thereto, in certain cases as debtors and debtors in possession, as subsidiary guarantors, and Conseco Finance Credit Corp, as debtor and debtor in possession, and the lenders from time to time party thereto and Goldman, as administrative agent and loan agent attached as an exhibit to the Motion For Entry of a Final Order: (I) Authorizing CFC Debtors In Possession to Enter Into Post-Petition Credit Agreement Pursuant to Section 364 of the Bankruptcy Code, (II) Authorizing Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (III) Granting Adequate Protection Pursuant to Sections 363 and 364 of the Bankruptcy Code, and (IV) Approving the Tax Indemnity Obligations of Conseco, Inc. hereunder filed with the Bankruptcy Court on March 4, 2003.

"Goldman Expense Reimbursement" means the payment of $5 million for expenses incurred prior to February 26, 2003 to the post-petition agent and post-petition lenders associated with the Goldman Credit Agreement.

"Goldman Final DIP Order" means the Final DIP Order as defined in the Goldman Credit Agreement.

"Goldman Interim Commitment Fee" means the payment, pursuant to the terms of the Goldman Commitment Letter, of $3.75 million to the post-petition agent and post-petition lenders as provided for in Section 2.10(b)(i) of the Goldman Credit Agreement.

"Goldman Interim Order" means the order of the Bankruptcy Court entered on February 26, 2003 (a) authorizing the Goldman Commitment Letter, the Goldman Expense Reimbursement and the Goldman Interim Commitment Fee; (b) declaring that the Expense Reimbursement shall not be subject to the approval of the Bankruptcy Court and that no recipient thereof shall be required to file any fee application associated therewith; and (c) approving the payment, as an administrative expense, and seniority of the Goldman Expense Reimbursement and Goldman Interim Commitment Fee with respect to any and all other administrative expenses, except with respect to those similar claims previously granted by the Bankruptcy Court.

"Governmental Authority" means any United States federal, state or local or any foreign government, governmental regulatory or administrative authority, agency or commission or any court, tribunal or judicial or arbitral body.

"Grantor Trust" means a fixed investment trust, as defined in Section 301.7701-4(c) of the Treasury Regulations or any entity or arrangement that has purported to be such a fixed investment trust, irrespective of whether such entity or arrangement qualifies as a fixed investment trust under Section 301.7701-4(c) of the Treasury Regulations.

"Green Tree Retail Services Bank" means Green Tree Retail Services Bank, Inc., a South Dakota chartered limited purpose credit card bank, and its wholly-owned subsidiaries.

"GTF Contracts" shall have the meaning set forth in Section 3.34 hereof.

"GTS Contracts" shall have the meaning set forth in Section 3.35 hereof.

"Guarantee Fees" means the rights of a Seller to receive payments from any REMIC or other entity created to effect a Securitization on account of a guarantee given by the Seller with respect to one or more classes of securities issued in such Securitization.

"Guarantee Reimbursement Rights" means any and all claims the Sellers may have to be reimbursed for payments made by any of them pursuant to guarantees given by the Sellers with respect to any classes of securities issued in a Securitization.

"Guarantees" means any and all obligations relating to guarantees, letters of credit, support agreements, bonds and other credit assurances or supports of a comparable nature of any CFC Party.

"Hazardous Substances" means any substance whether solid, liquid, gaseous or any combination of the foregoing which is listed, defined or regulated pursuant to any Environmental Law.

"HE Business" means the home equity loan business of the CFC Parties, excluding securities taken back or retained by the Company or any Subsidiary in a Securitization.

"HELOC" means all revolving, variable rate mortgage loans secured by first or second liens on single family residential real property (including, without limitation, condominiums and planned unit developments), and the related promissory notes or other

evidences of indebtedness, together with any and all rights, benefits, collateral, payments, recoveries and proceeds arising therefrom or in connection therewith.

"HI Business" means the home improvement business of the CFC Parties, excluding securities taken back or retained by the Company or any Subsidiary in a Securitization.

"HI Origination Business" means the home improvement origination business of the CFC Parties, excluding securities taken back or retained by the Company or any Subsidiary in a Securitization.

"Home Equity Loans" means all fixed rate mortgage loans secured by first, second or third liens on single family residential real property (including, without limitation, condominiums and planned unit developments), including, without limitation, any such high loan-to-value mortgage loans, and the related promissory notes or other evidences of indebtedness, together with any and all rights, benefits, collateral, payments, recoveries and proceeds arising therefrom or in connection therewith.

"Home Improvement Loans" means all first, second or third lien or unsecured home improvement retail installment contracts, and the related promissory notes or other evidences of indebtedness, whether insured or uninsured, and the related promissory notes or other evidences of indebtedness, together with any and all rights, benefits, collateral, payments, recoveries and proceeds arising therefrom or in connection therewith.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the regulations related thereto.

"Income Tax" means all federal, state, local, or foreign Taxes based upon, measured by, or calculated with respect to (i) gross or net income or gross or net receipts or profits (including, but not limited to, any capital gains, minimum taxes and any Taxes on items of tax preference, but not including sales, use, goods and services, real or personal property transfer or other similar Taxes); (ii) multiple bases (including, but not limited to, corporate franchise, doing business or occupation Taxes) if one or more of the bases upon which such Tax may be based upon, measured, or calculated with respect to, is described in clause (i); or (iii) withholding taxes, measured by, or calculated with respect to, any payments or distributions (other than wages).

"Income Tax Return" means any return, declaration, report, claim for refund, or information return, amended return or statement relating to Income Taxes, including any schedule or attachment thereto.

"Incremental Liabilities" shall have the meaning set forth in Section 2.1(b) hereof.

"Indemnified Parties" shall have the meaning set forth in Section 9.2(b) hereof.

"Indemnifying Party" means a party from whom indemnification is sought.

"Indemnity Deductible" shall have the meaning set forth in Section 9.3(a) hereof.

"Insurance Approvals" shall have the meaning set forth in Section 5.26(a) hereof.

"Insurance Assets" means the assets, properties, Contracts (other than Excluded Contracts) and rights owned or primarily used or held for use in the operation of the Insurance Business, including, without limitation, all expirations, receivables and prepaid amounts relating thereto.

"Insurance Budget" shall have the meaning set forth in Section 5.26(c) hereof.

"Insurance Business" means the insurance agency assets and businesses referred to in Section 2.1(a) of the applicable Business Schedules.

"Insurance Profits" shall have the meaning set forth in Section 5.26(d) hereof.

"Insurance Subsidiaries" means Conseco Agency of Alabama, Inc., Conseco Agency of Kentucky, Inc., Crum-Reed General Agency, Inc., Conseco Agency, Inc., Conseco Agency of New York, Inc., Conseco Agency of Nevada, Inc., Conseco Agency Reinsurance Limited and Convergent Lending Services, LLC.

"Insurance Policies" means those policies of insurance which the CFC Parties maintain with respect to their assets and operations.

"Intellectual Property" means all of the following in any jurisdiction throughout the world: (a) patents, patent applications and patent disclosures including re-issues, continuations, divisions, continuations-in-part, renewals and extensions; (b) trademarks, service marks, trade dress, trade names, corporate names, logos and slogans (and all translations, adaptations, derivations and combinations of the foregoing) and Internet domain names, together with all goodwill associated with each of the foregoing; (c) copyrights and copyrightable works; (d) registrations and applications for any of the foregoing; (e) trade secrets, confidential information, know-how, processes, technology and inventions; (f) computer software, hardware and systems (including, without limitation, source code, executable code, data, databases and documentation); and (g) all other intellectual property.

"Intellectual Property Assignment Agreements" means the Trademark Assignment Agreement and Domain Name Transfer Agreement in customary form as reasonably agreed by the Parties.

"Interim 9019 Order" means an order of the Bankruptcy Court authorizing and approving, on an interim basis pending a final hearing on notice to interested parties, a settlement pursuant to which the MH Servicing Fees are increased to 1.25% and accorded the level of priority that would be accorded to a third party successor servicer under the cash flow waterfall provisions of the MH Servicing Contracts (except, in the case of securitization trusts for which principal and interest insurance is in force, in which cases the MH Servicing Fees will be paid in the highest priority that will not adversely affect the continuation in force of such insurance), such order to be satisfactory in form and substance to the Buyer.

"Investors" means J.C. Flowers I L.P., a Delaware limited liability company, together with its Affiliates, and Fortress Investment Trust II, a Delaware limited liability

company, together with its Affiliates, Cerberus Capital Management, L.P., a limited partnership, together with its Affiliates, and such co-investors, if any, as may invest in the Buyer.

"IO Regular Interests" means the REMIC Regular Interests listed on the Residuals Schedule under the caption, "IO Regular Interests".

"Junior P&I Regular Interests" means the REMIC Regular Interests listed on the Residuals Schedule under the caption "Junior P&I Regular Interests".

"JV Arrangements" shall have the meaning set forth in Section 5.10(a)(ii) hereof.

"Knowledge" means, with respect to the Sellers, the knowledge of Keith A. Anderson, James R. Breakey, Cheryl A. Collins, Brian F. Corey, Charles H. Cremens, Shawn Gensch, Dan Hall, Ron Siemers, Pamela Strauss and Todd Woodard.

"Laws" means all statutes, rules, regulations, codes, injunctions, judgments, writs, orders, decrees, rulings, constitutions, ordinances, common laws, standards, limitations, compliance schedules, written directions, requests or treaties, whether legislatively, judicially, administratively or otherwise promulgated, of any Governmental Authority.

"Leased Premises" means real property leased by the Sellers as the tenant thereof pursuant to the Assumed Leases.

"Lehman Back-Up Security Agreement" means the Back-Up Security Agreement, dated as of January 30, 2002, among the Company, Conseco Finance Vendor Services Corporation, Green Tree Titling Limited Partnership I, Green Tree Titling Limited Partnership II, Green Tree Finance Corp.-Five, Conseco Finance Leasing Trust, Lehman Commercial Paper Inc. and U.S. Bank, as custodian.

"Lehman Debt Amount" means, as of any date, the sum, without duplication, of (a) the Indebtedness (as defined in the Lehman Residuals Facility), plus, (b) the Additional Lehman Debt, plus, (c) an amount equal to the unreimbursed out-of-pocket expenses incurred by Lehman Brothers Holdings Inc. and its Affiliates in connection with the transactions contemplated by this Agreement and the Lehman Facilities, but not in excess of $3 million, in each case of such date. Section 3.20(c) sets forth the Lehman Debt Amount as of the close of business on March 6, 2003.

"Lehman Documents" means the Lehman Facilities, the Lehman Back-Up Security Agreement, the Lehman Forbearance Agreement, the Lehman Umbrella Agreement and the Contract evidencing the Additional Lehman Debt.

"Lehman Facilities" means, collectively, the Lehman Residuals Facility and the Lehman Warehouse Facility.

"Lehman Forbearance Agreement" means the Amended and Restated Forbearance Agreement, dated as of October 9, 2002, among the Company, Green Tree Finance Corp.-Five, Green Tree Residual Finance Corp. I, Lehman Commercial Paper, Inc. and Lehman Brothers Inc., as amended by the First Amendment to Amended and Restated Forbearance

Agreement, dated as of November 29, 2002, as the same may be amended in accordance with the terms thereof and of this Agreement.

"Lehman Residuals Facility" means (a) the Master Repurchase Agreement and Annex to Master Repurchase Agreement Supplemental Terms and Conditions, each dated as of September 29, 1999, between Green Tree Residual Finance Corp. I and Lehman Brothers, Inc., and as amended by the amendments thereto dated as of September 22, 2000, January 30, 2002 and April 30, 2002 and (b) the Asset Assignment Agreement, dated as of February 13, 1998, between Green Tree Residual Finance Corp. I and Lehman ALI Inc., as assignee of Lehman Commercial Paper Inc., and as amended by the amendments thereto dated as of June 23, 1998, February 23, 2000, May 10, 2000, August 1, 2000, September 22, 2000, September 28, 2001, January 30, 2002, April 30, 2002 and October 9, 2002, and as each of the same may be further amended in accordance with the terms thereof and of this Agreement.

"Lehman Umbrella Agreement" means the Amended and Restated Agreement, dated as of January 30, 2002, among the Company, the Parent, CIHC, Incorporated, Green Tree Residual Finance Corp. I, Green Tree Finance Corp.-Five and Lehman Brothers Holdings Inc., as the same may be further amended in accordance with the terms thereof and of this Agreement.

"Lehman Warehouse Facility" means the Second Amended and Restated Master Repurchase Agreement, dated as of January 30, 2002, between Lehman Commercial Paper, Inc. and Green Tree Finance Corp.-Five, as amended by the amendments thereto dated as of April 30, 2002, August 12, 2002 and October 9, 2002, and as the same may be further amended in accordance with the terms thereof and of this Agreement.

"Liability" means any liability or obligation whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether matured or unmatured, whether liquidated or unliquidated, whether incurred or consequential and whether due or to become due, including any liability for Taxes or any other liability arising out of applicable Law.

"Lien" means any mortgage, deed to secured debt or deed of trust, pledge, security interest, encumbrance, claim, Tax, equitable interest, negative pledge, lien or charge of any kind (including, without limitation, any conditional sale or other title retention agreement or lease in the nature thereof) or any agreement to file any of the foregoing, any sale of receivables with recourse against the Sellers or any of their Affiliates, any filing or agreement to file a financing statement as debtor under the Uniform Commercial Code or any similar statute and all claims (including, but not limited to, all "claims" within the meaning of section 101(5) of the Bankruptcy Code).

"Loan and IT Services" shall have the meaning set forth in Section 5.33 hereof.

"Loans" shall mean all loans, or other extensions of credit, either purchased by a CFC Party from Third Parties or pursuant to which the CFC Parties have lent money, in each case, which are owned by the CFC Parties or subject to repurchase by or similar Contract of a CFC Party, including, but not limited to, (a) loans which have been partially or fully charged off, (b) interests in loan participations and assignments, (c) legally binding commitments and

obligations to extend credit (including any unfunded or partially funded revolving loans, lines of credit or similar arrangements), (d) retail installment contracts, (e) Home Equity Loans and HELOCs, (f) Home Improvement Loans, (g) MH Contracts and (h) Other Loans, in each case, which are owned by the CFC Parties or subject to repurchase by or similar Contract of a CFC Party; provided that for purposes of this Agreement, a Securitized Loan shall not be deemed a "Loan".

"Loss" means any loss, Liability, demand, claim, action, cause of action, cost, damage, deficiency, Tax, penalty, fine or expense, whether or not arising out of third party claims (including, without limitation, interest, penalties, reasonable attorneys' fees and expenses, court costs and all amounts paid in investigation, defense or settlement of any of the foregoing); provided however that Losses shall not include consequential (such as loss of business or profits), incidental, special or punitive losses, damages, costs, expenses or Liabilities.

"Material Adverse Effect" means (a) any change or effect that is materially adverse to the business, financial condition, property, operations, net income or assets of the Purchased Businesses (excluding the Excluded Assets and Excluded Liabilities) taken as a whole; or (b) any material adverse effect that would prevent or materially impair the ability of the Sellers to consummate the transactions contemplated by this Agreement or the Transaction Documents; provided that none of the following shall be deemed to constitute, and none of the following shall be taken into account in determining whether there has been, a Material Adverse Effect: (i) any adverse change, event, development or effect arising from or relating to (A) general business or economic conditions, including such conditions related to the businesses of the Sellers and their Subsidiaries, except for such changes, events, developments or effects which disproportionately impact the Purchased Businesses, or (B) national or international political or social conditions, including the engagement by the United States in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States, except for such changes, events, developments or effects which disproportionately impact the Purchased Businesses, (ii) the filing of the Chapter 11 Case and the Parent's filing of its case under chapter 11 of the Bankruptcy Code, (iii) adverse changes in the value of the Residual Assets related to the MH Business as a result of a restructuring of the MH Servicing Business or the inability to consummate such a restructuring and (iv) an Amortization Event under the Private Label Credit Card Master Note Trust Documents unless it results in the occurrence of an event of default under the DIP Loan.

"Material Agreement" shall have the meaning set forth in Section 3.11 hereof.

"MESA Collateral" means the certificates representing beneficial ownership of a Grantor Trust that holds certain REMIC regular interests and certain other debt obligations and related assets.

"MESA Equity" means the ownership interest in the Mesa Issuers.

"MESA Issuers" means the MESA 2001-4, 2002-1, 2002-3 and 2002-4 Global Issuance Company entities (exempted companies) created under the laws of the Cayman Islands that are the issuers of the MESA Notes and the owners of the MESA Collateral.

"MESA Notes" means the debt instruments issued by the MESA Issuers in the four transactions designated and identified as the issuance of (a) US $73,866,000 Home Loan-Backed Notes, Series 2001-4 notes by MESA 2001-4 Global Issuance Company, pursuant to the Indenture, dated as of July 1, 2001, with Wells Fargo, Indenture Trustee; (b) US $344,864,000 Home Loan Asset-Backed Notes Series 2002-1 notes by MESA 2002-1 Global Issuance Company, pursuant to the Indenture, dated as of February 1, 2002, with Wells Fargo, Indenture Trustee; (c) US $180,000,000 Home Loan Asset-Backed Notes Series 2002-2 notes by MESA 2002-2 Global Issuance Company, pursuant to the Indenture, dated as of September 1, 2002, with Deutsche Bank, Indenture Trustee; and (d) US $145,252,000 Home Loan Asset-Backed Notes Series 2002-3 notes by MESA 2002-3 Global Issuance Company, dated as of October 1, 2002, with Deutsche Bank, Indenture Trustee.

"MH Business" means the manufactured housing business of the CFC Parties, excluding securities taken back or retained by the Company or any Subsidiary in a Securitization.

"MH Community Loans" means Loans made by the CFC Parties to finance the construction of manufactured homes, parks and communities.

"MH Contracts" means all retail installment sales contracts and Loan agreements for manufactured housing, including, without limitation, retail installment sales contracts and Loan agreements for manufactured housing that has been repossessed and refinanced.

"MH Servicing Assets" means (a) the rights of the servicer under the MH Servicing Contracts; (b) with respect to each Loan and Securitized Loan subject to a MH Servicing Contract, the escrow payments (including, without limitation, tax and insurance escrows) or other similar payments with respect to such Loan and any amounts actually collected and held by the CFC Parties with respect thereto; (c) all accounts and other rights to payment related to any of the MH Servicing Rights or MH Servicing Contracts; and (d) any and all documents, files, records, servicing files, servicing documents, servicing records, data tapes, computer records or other information pertaining to the servicing of each Loan or pertaining to the past, present or prospective servicing of such Loan, in each case that is subject to a MH Servicing Contract.

"MH Servicing Business" means all Servicing Rights of a CFC Party relating to the MH Business and all assets of the CFC Parties used in the conduct of such business, including, without limitation, all cash, deposits, receivables and Prepaid Expenses relating thereto.

"MH Servicing Business Schedule" means the disclosure schedule attached hereto containing information relating to the MH Servicing Business.

"MH Servicing Contracts" means collectively, (a) each of the Contracts providing for loan servicing in connection with a Securitization or other transaction that is identified in the MH Servicing Business Schedule under the caption, "List of MH Servicing Contracts", and (b) all other Contracts or documents creating, defining or evidencing the right of any CFC Party

to service loans including any pooling and servicing agreement and purchase or sale agreement pertaining to any Loan or Securitized Loan.

"MH Servicing Fees" means all servicing fees payable from time to time to the Company and any of the Selling Subsidiaries with respect to the MH Servicing Business.

"MH Servicing Rights" means the right to act as servicer or successor servicer under each of the MH Servicing Contracts and all rights, privileges and benefits of being servicer or successor servicer under each MH Servicing Contract or that are incidental thereto (but not including any rights included in the Insurance Business) including without limitation any and all of the following: (a) any and all rights to service such Loan or any Securitized Loan; (b) all servicing fees and other fees, compensation or moneys payable to the servicer under the MH Servicing Contracts and (c) any late fees, investment income or similar payments or penalties (including, without limitation, prepayment penalties) with respect to such Loan or Securitized Loan payable to the servicer under the MH Servicing Contracts.

"Mill Creek Bank" means Mill Creek Bank, Inc., a Utah industrial loan corporation, and its wholly-owned Subsidiaries.

"Mill Creek Transition Obligations" shall have the meaning set forth in the definition of "Sale Order" contained herein.

"NIMS Collateral" means any Guaranty Fees, REMIC Regular Interests and REMIC Residual Interests, and any other related assets, pledged by the NIMS Issuer to secure the NIMS Notes.

"NIMS Equity" means the ownership interest in the NIMS Issuer.

"NIMS I" shall have the meaning set forth in Section 2.3(b)(viii) hereof.

"NIMS II" shall have the meaning set forth in Section 2.3(b)(viii) hereof.

"NIMS Issuer" means the NIMS Trust.

"NIMS Notes" means the Floating Rate Variable Funding Notes dated September 28, 2001 issued by the NIMS Trust.

"NIMS Trust" means the trust created by the Trust Agreement, dated as of September 1, 2001, among NIMS I, NIMS II and Wilmington Trust Company as trustee, as the same may be amended in accordance with the terms thereof and of this Agreement.

"9019 Order" means an order of the Bankruptcy Court authorizing and approving a settlement pursuant to which the MH Servicing Fees are increased to 1.25%, and accorded the level of priority that would be accorded to a third party successor servicer under the cash flow waterfall provisions of the MH Servicing Contracts (except, in the case of securitization trusts for which principal and interest insurance is in force, in which cases the MH Servicing Fees will be paid in the highest priority that will not adversely affect the continuation in force of such insurance), such order to be reasonably satisfactory in form and substance to the Buyer.

"Non-MH Servicing Assets" means (a) the rights of the servicer under the Non-MH Servicing Contracts; (b) with respect to each Loan and Securitized Loan subject to a Non-MH Servicing Contract, the escrow payments (including, without limitation, tax and insurance escrows) or other similar payments with respect to such Loan and any amounts actually collected and held by the CFC Parties with respect thereto; (c) all accounts and other rights to payment related to any of the Non-MH Servicing Rights or Non-MH Servicing Contracts; and (d) any and all documents, files, records, servicing files, servicing documents, servicing records, data tapes, computer records or other information pertaining to the servicing of each Loan or pertaining to the past, present or prospective servicing of such Loan, in each case that is subject to a Non-MH Servicing Contract.

"Non-MH Servicing Business" means all Servicing Rights of a CFC Party relating to any business of the Company other than the MH Servicing Business and all assets of the CFC Parties primarily used in the conduct of such business, including, without limitation, all cash, deposits, receivables and Prepaid Expenses relating thereto.

"Non-MH Servicing Contracts" means, collectively, (a) each of the Contracts providing for loan servicing in connection with a Securitization or other transaction which has been identified in Section 2.1(a) of the applicable Business Schedules under the Caption, "List of Non-MH Servicing Contracts" and (b) all other Contracts or documents creating, defining or evidencing the right of any CFC Party to service loans including any pooling and servicing agreement and purchase or sale agreement pertaining to any Loan or Securitized Loan.

"Non-MH Servicing Fees" means all servicing fees payable from time to time to the Company and any of the Selling Subsidiaries with respect to the Non-MH Servicing Business.

"Non-MH Servicing Rights" means the right to act as servicer or successor servicer under each of the Non-MH Servicing Contracts and all rights, privileges and benefits of being servicer or successor servicer under each Non-MH Servicing Contract or that are incidental thereto including without limitation any and all of the following: (a) any and all rights to service such Loan or any Securitized Loan; (b) all servicing fees and other fees, compensation or moneys payable to the servicer under the Non-MH Servicing Contracts; and (c) any late fees, investment income or similar payments or penalties (including, without limitation, prepayment penalties) with respect to such Loan or Securitized Loan payable to the servicer under the Non-MH Servicing Contracts.

"Non-Transferred Insurance Asset" shall have the meaning set forth in Section 5.26(a) hereof.

"Non-Transferred Insurance Business" shall have the meaning set forth in Section 5.26(a) hereof.

"November 30 Balance Sheet" means the Company's consolidated balance sheets as of November 30, 2002 set forth in Section 2.1(a) of the Purchased Businesses Schedule.

"Obligor" means, with respect to any Loan, the Person(s) obligated to make payments with respect to such Loan, including, without limitation, the applicable borrower, or any guarantor, co-signer, surety or other obligor therefor.

"Order" means any decree, order, injunction, rule, judgment, consent of or by any Governmental Authority.

"Organizational Documents" means certificates of incorporation, by-laws, certificates of formation, limited liability company operating agreements, limited liability partnership agreements, partnership or limited partnership agreements or other formation or governing documents of a particular entity.

"Original Agreement" shall have the meaning set forth in the Recitals.

"Other Assets" means assets of Green Tree Retail Services Bank specified in Section 2.1(a) of the Business Schedules.

"Other Loans" means, collectively, all (a) Vehicle Leases, (b) Consumer Loans, and (c) other consumer loans, and (in each case) the related promissory notes or other evidences of indebtedness, together with any and all rights, benefits, collateral, payments, recoveries and proceeds arising therefrom or in connection therewith, including the Servicing Rights related to such loans.

"Other Securitization Entity" shall have the meaning set forth in Section 3.22(l)(i) hereof.

"Other Transferred Intellectual Property" means, other than the Transferred Trademarks and the Transferred Intellectual Property Agreements, all Intellectual Property owned by the Sellers and primarily used or held for use in the Purchased Businesses.

"Owned Real Premises" means real property used in the Purchased Businesses as set forth in Section 3.8(a) of the applicable Business Schedules, title to which is held by the Sellers.

"Owned Real Premises Leases" means real property leases, subleases, licenses or other Contracts set forth in Section 3.8(a) of the applicable Business Schedules pursuant to which a Seller leases all or any part of the Owned Real Premises as the landlord thereunder.

"Parent" means Conseco, Inc., an Indiana corporation.

"Parties" shall have the meaning set forth in the Recitals.

"Party" shall have the meaning set forth in the Recitals.

"Permitted Liens" shall mean: (a) statutory liens for current Taxes or other governmental charges with respect to the assets of a CFC Party not yet due and payable or which may thereafter be paid without penalty or the amount or validity of which is being contested in good faith by appropriate proceedings by the CFC Party and for which appropriate reserves have

been established on the CFC Party's books and records in accordance with GAAP, (b) mechanic's, carrier's, worker's, repairer's and similar statutory liens arising or incurred in the ordinary course of business with respect to a Liability which is not yet due or delinquent; (c) zoning, entitlement, building and other land use regulations imposed by Governmental Authority having jurisdiction over the Owned Real Premises and Leased Premises which are not violated by the current use and operation of the Owned Real Premises and Leased Premises; (d) covenants, conditions, restrictions, easements and other similar matters of record affecting title and other irregularities of title to the Purchased Assets which do not, individually or in the aggregate, materially impair the present value, occupancy or continued use of the Purchased Assets for the purposes for which each is currently used in the respective Purchased Business; and (e) the Owned Real Premises Leases.

"Person" means an individual, a partnership, a limited liability company, a corporation, a cooperative, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or a Governmental Authority.

"Petition Date" shall have the meaning set forth in Section 5.8 hereof.

"PL Business" means the Company's private label credit card business, including all business conducted by the Banks, excluding securities taken back or retained by the Company or any Subsidiary in a Securitization.

"Post-Closing Tax Period" means (a) any taxable year or period beginning after the Closing Date, and (b) for any Straddle Period, the portion of such period beginning after the Closing Date.

"Post-Signing Balance Sheets" shall have the meaning set forth in Section 5.27 hereof.

"Pre-Closing Period" shall have the meaning set forth in Section 2.1(a) hereof.

"Pre-Closing Tax Period" means (a) any taxable year or period ending on or before the Closing Date and (b) for any Straddle Period, the portion of such period ending on and including the Closing Date.

"Prepaid Expenses" means operating costs or other expenses incurred by the CFC Parties with respect to the Purchased Businesses and Purchased Assets after the Closing Date which were paid by the Sellers, any Subsidiary of Sellers or Mill Creek Bank on or prior to the Closing Date, including any real or personal property, use or other Taxes (other than Income Taxes, to the extent attributable to periods or portions thereof beginning after the Closing Date).

"Private Label Credit Card Master Trust Certificates" means, to the extent outstanding on the Closing Date, (a) the Conseco Private Label Credit Card Master Note Trust 2001-A certificate and (b) the Conseco Private Label Credit Card Master Note Trust 2001-B certificate.

"Private Label Credit Card Master Note Trust Documents" means the (a) Conseco Private Label Credit Card Master Note Trust Amended and Restated Trust Agreement, dated as

of May 1, 2001, between Mill Creek Bank, as transferor, Conseco Finance Credit Card Funding Corp., as transferor, and Wilmington Trust Company, as owner trustee; (b) Master Indenture, dated as of May 1, 2001, by and among Conseco Private Label Credit Card Master Note Trust, U.S. Bank, as indenture trustee and securities intermediary, and Mill Creek Bank, as servicer; (c) Series 2001-A Indenture Supplement, dated as of May 1, 2001, by and among Conseco Private Label Credit Card Master Note Trust, U.S. Bank, as indenture trustee and securities intermediary, and Mill Creek Bank, as servicer; (d) Series 2001-B Indenture Supplement, dated as of May 1, 2001, by and among Conseco Private Label Credit Card Master Note Trust, U.S. Bank, as indenture trustee and securities intermediary, and Mill Creek Bank, as servicer; and (e) Class A Note Purchase Agreement, dated as of May 31, 2001, by and among Conseco Private Label Credit Card Master Note Trust, issuer, Mill Creek Bank, transferor and servicer, Conseco Finance Credit Funding Corp., individually and as a transferor, Green Tree Retail Services Bank, individually and as an account owner, the Class A Purchasers, the agents for the Purchaser Groups, from time to time parties thereto, and Credit Suisse First Boston, administrative agent for the Class A Purchasers, and as amended by the amendments thereto dated as of May 30, 2002 and September 30, 2002.

"Purchase Price" shall have the meaning set forth in Section 2.4(a) hereof.

"Purchased Assets" means assets, properties, Contracts (other than Excluded Contracts) and rights owned or primarily used or held for use in the operation of the Purchased Businesses of whatever kind and nature, real or personal, tangible or intangible, owned, leased, licensed, used or held for use or license, wherever located, including, without limitation, (a) all Servicing Rights (b) all of the outstanding capital stock of Mill Creek Bank, (c) the Other Assets, (d) the Residual Assets, (e) the Assumed Agreements, (f) the Assigned Receivables and related Loans, (g) the Servicing Assets, (h) the Servicing Contracts to the limited extent the Buyer will act as servicer or successor servicer thereunder, (i) all collateral securing the Lehman Facilities, (j) those other assets, properties, Contracts and rights set forth on Section 2.1(a) of the applicable Business Schedules, (k) the Floorplan Certificates, (l) the MH Community Loans, (m) the Insurance Assets, and (n) the Private Label Credit Card Master Trust Certificates, excluding, in each case, Excluded Assets. The foregoing is subject to the provisions of Section 2.1(a).

"Purchased Businesses" means the HE Business, the CL Business, the HI Business, the PL Business, the Non-MH Servicing Business, the MH Servicing Business and the Insurance Business, but not including any Excluded Business. The foregoing is subject to the provisions of Section 2.1(a).

"Purchased Businesses Schedule" means the schedule by that name annexed to this Agreement.

"Receivables" means all financial obligations arising under the Loans, including, but not limited to, any amounts owing for the payment of goods and services, periodic finance charges (including unearned and billed), Accrued and Unpaid Interest, late charges, bank advances and any other fee, expense or charge of every nature, kind and description whatsoever, including any amount owed by the Sellers to the holder of the account thereon as a credit balance.

"Records" means books and records relating to the Purchased Businesses which are in the possession of a CFC Party, including (a) customer and vendor lists, correspondence and files, (b) advertising, marketing and sales materials, (c) personnel files of the Transferred Employees, and (d) financial records and statements, but specifically excluding any such other property which is listed as an Excluded Asset.

"RECS" shall have the meaning set forth in Section 3.31 hereof.

"RECS Contracts" shall have the meaning set forth in Section 3.31 hereof.

"Regulators" shall have the meaning set forth in Section 5.22 hereof.

"REMIC" means a real estate mortgage investment conduit under Section 860D(a) of the Tax Code or any other entity or arrangement that has purported to be a real estate mortgage investment conduit that is a REMIC under Section 860D(a) of the Tax Code irrespective of whether such entity or arrangement qualifies as a REMIC under Section 860D(a) of the Tax Code.

"REMIC Regular Interest" means a regular interest, as defined in Section 860G(a)(1) of the Tax Code, in a REMIC or any interest that has been represented or otherwise held out to be a regular interest in a REMIC irrespective of whether such interest qualifies as a regular interest in a REMIC as defined in Section 860G(a)(1) of the Tax Code.

"REMIC Residual Interest" means a residual interest, as defined in Section 860G(a)(2) of the Tax Code, in a REMIC or any interest that has been represented or otherwise held out to be a residual interest in a REMIC irrespective of whether such interest qualifies as a residual interest in a REMIC as defined in Section 860G(a)(2) of the Tax Code.

"Residual Assets" means the Junior P&I Regular Interests, the IO Regular Interests, the REMIC Residual Interests listed on the Residuals Schedule under the caption, "Residual Interests", the residuals and retained interests listed on the Residuals Schedule under the caption, "Credit Cards", all other assets listed on the Residuals Schedule including the Cleanup Calls, the Guarantee Fees, the Non-MH Servicing Fees, the Guarantee Reimbursement Rights, the Servicer Advance Reimbursement Rights and any other interest, including equity, retained or residual interests, (whether certificated or uncertificated) issued or created by or in connection with a Securitization or similar transaction that the Company or any other CFC Party may hold or own (whether or not pledged to another party or sold under a repurchase agreement), including, without limitation, the NIMS Equity or NIMS Collateral and the MESA Equity or the MESA Collateral, and all other cash or other proceeds and all other rights arising from certificated or uncertificated securities, interests or rights purchased or retained by a CFC Party, including, without limitation, rights to prepayment penalties or charges, late fees, investment income and other charges not required to be paid to the servicer, any servicing, interest-only or other payment right (whether certificated or uncertificated) arising in connection with a Ginnie Mae Pool, including, without limitation, the pools identified on the Ginnie Mae Pool List included in Attachment A to Section 3.26 of the Purchased Businesses Schedule and repurchase options or similar rights arising in connection with a Securitization.

"Residuals Schedule" means the disclosure schedule attached hereto containing information relating to the Residual Assets.

"Rule" or "Rules" means the Federal Rules of Bankruptcy Procedure.

"Sale Order" means the order of the Bankruptcy Court: (a) finding that the results of the auction conducted by the Sellers are authorized and approved; (b) authorizing and approving the sale of the Purchased Assets to the Buyer under the terms of this Agreement free and clear of any Liens, claims, or other encumbrances of any kind or nature pursuant to sections 363 and 365 of the Bankruptcy Code (other than Permitted Liens and Assumed Liabilities); (c) providing that the transfers of the Purchased Assets to the Buyer are legal, valid and effective transfers that will vest the Buyer with good and marketable title to the Purchased Assets; (d) finding that the Buyer is entitled to the protections provided to a good faith purchaser under section 363(m) of the Bankruptcy Code; (e) finding that the consideration provided by the Buyer for the Purchased Assets constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and applicable non-bankruptcy law; (f) finding that the form and manner of notice of the sale of the Purchased Assets and the opportunity to submit higher and better bids for the Purchased Assets was adequate and appropriate; (g) providing that except as expressly permitted by this Agreement, all Persons and entities holding interests or claims of any kind and nature with respect to the Purchased Assets shall be enjoined from asserting, prosecuting or otherwise pursuing such interests and claims of any kind and nature against the Buyer, its successors or assigns, or the Purchased Assets; (h) providing that, with respect to any agreements assumed by the Sellers and assigned to the Buyer pursuant to section 365 of the Bankruptcy Code, that the Buyer shall have no liability for any obligations first arising prior to the date of such assignment; (i) providing that neither the Buyer nor its Affiliates, successors or assigns will be deemed, as a result of any action taken in connection with the purchase of the Purchased Assets, to: (i) be a successor to any of the Sellers; (ii) have, de facto or otherwise, merged with or into all or any of the Sellers; or (iii) be a continuation or substantial continuation of any of the Sellers or any enterprise of any of the Sellers; (j) finding that the Buyer and the Sellers did not engage in any conduct that would allow the transactions contemplated by this Agreement to be set aside pursuant to section 363(n) of the Bankruptcy Code; (k) providing that the Sellers shall execute, deliver, perform under, consummate and implement this Agreement, the Transaction Documents and all additional instruments and documents that may be reasonably necessary or desirable to implement the foregoing; (l) providing that the notice provided in connection with the sale motion and the assignment and transfer of Purchased Assets free and clear of all Liens and Excluded Liabilities (other than Permitted Liens) pursuant to this Agreement, complied with sections 363 and 365 of the Bankruptcy Code, Rules 2002, 6004, 6006, 9014 of the Federal Rules of Bankruptcy Procedure and all other provisions of the Federal Rules of Bankruptcy or the Local Bankruptcy Rules governing the transactions that are the subject of the sale motion; (m) providing that the provisions of Rules 6004(g) and 6006(d) of the Federal Rules of Bankruptcy Procedure are waived and there will be no stay of the Sale Order under Rule 62(a) of the Federal Rules of Civil Procedure; (n) providing that the provisions of the Sale Order are nonseverable and mutually dependent; (o) providing that the Bankruptcy Court shall retain jurisdiction to interpret and enforce the terms and provisions of this Agreement; (p) exempting the sale of the Purchased Assets from the imposition and payment of any and all recording taxes, stamp taxes, transfer taxes, or similar taxes pursuant to section 1146(c) of the Bankruptcy Code; (q) providing that no Liability shall attach to or remain with the Purchased Businesses on

- 22 -

account of any Liability, including without limitation, a Tax Liability, existing as of the Closing Date for which the Sellers are jointly and/or severally liable with any of the CFC Parties; (r) providing that any Subject Subsidiary or Subsidiary of a Subject Subsidiary acquired by the Buyer shall have no Liability for any Tax of Parent or any present or former Subsidiary of Parent by virtue of Treasury Regulation Section 1.1502-6 or any comparable provision of state, local or foreign Law; (s) authorizing and approving that certain letter agreement dated as of December 19, 2002, pursuant to which, among other things, Parent has agreed to indemnify the Buyer and certain other parties for tax obligations of Parent's Affiliated Group under Treasury Regulation Section 1.1502-6 and certain other obligations; (t) providing that CIHC, Incorporated shall be released from its guaranty obligations related to the Lehman Facilities; (u) confirming the installation of the Buyer (or its appropriate Affiliate) as a successor servicer being distinct from and independent of any CFC Party under, and in conformity with, all of the Servicing Contracts included among the Purchased Assets and confirming the senior priority of payment of the servicing fees payable thereunder to the Buyer or such Affiliate as such successor servicer; (v) providing that the increase in the servicing fees contemplated by Section 6.11(c) shall be effective; (w) authorizing the arrangements described in Section 5.26; (x) authorizing and directing the Sellers to pay any amounts owed by Sellers pursuant to Section 5.10(a)(ii) and Section 5.33 (the "Mill Creek Transition Obligations"), as and when the Mill Creek Transition Obligations become due; and (y) providing that the Mill Creek Transition Obligations shall constitute administrative expenses of the Sellers' estates pursuant to Section 503(b)(1) of the Bankruptcy Code; such Sale Order to be satisfactory to the Buyer in its sole and absolute discretion.

"Section 338 Election" shall have the meaning set forth in Section 5.1(i) hereof.

"Securitization" means any transaction in which the Company or any of its Subsidiaries: (a) was the "sponsor", as defined in Section 1.860F-2(b)(1) of the Treasury Regulations, of a REMIC or has held itself out to be the sponsor of a REMIC irrespective of whether it has met the requirements to be a sponsor in a REMIC; (b) transferred Loans, other debt instruments or interests therein to a Grantor Trust, either taking back or selling pass-through certificates or other similar interests evidencing the ownership of such Grantor Trust; (c) transferred Loans, REMIC Regular Interests, REMIC Residual Interests, interests in a Grantor Trust or other assets to a NIMS Issuer or a MESA Issuer or (d) transferred or pledged Loans either to secure an indebtedness of the Company or any Selling Subsidiary or by way of a repurchase transaction.

"Securitization Documents" means all of the documents governing the rights and obligations of the Company, the applicable Selling Subsidiary, the issuer and the holders of securities issued in any Securitization.

"Securitized Loan" shall mean all loans, or other extensions of credit, either purchased by a CFC Party from Third Parties or pursuant to which the CFC Parties have lent money, in each case, which are owned by the CFC Parties or subject to repurchase by or similar Contract of a CFC Party, including, but not limited to, (a) loans which have been partially or fully charged off, (b) interests in loan participations and assignments, (c) legally binding commitments and obligations to extend credit (including any unfunded or partially funded revolving loans, lines of credit or similar arrangements), (d) retail installment contracts, (e)

Home Equity Loans and HELOCs, (f) Home Improvement Loans, (g) MH Contracts and (h) Other Loans, in each case, which are owned by the CFC Parties or subject to repurchase by or similar Contract of a CFC Party, in each case which are (I) pledged by an entity or arrangement as collateral for a debt instrument issued by such entity, (II) treated as sold by or through an entity or arrangement in the form of pass-through certificates in a Grantor Trust or a REMIC or (III) otherwise pledged, transferred or sold in a Securitization.

"Seller" shall have the meaning set forth in the Recitals.

"Seller Indemnified Parties" shall have the meaning set forth in Section 9.2(b) hereof.

"Seller Liquidated Damages" shall have the meaning set forth in Section 8.3 hereof.

"Sellers" shall have the meaning set forth in the Recitals.

"Selling Subsidiaries" shall have the meaning set forth in the Recitals.

"Servicer Advance Facility" means the Indenture, dated as of February 1, 2002, by and among Conseco Finance Advance Receivables Corp., as issuer, U.S. Bank, as trustee, as verification agent and as paying agent, and the Company, together with any successor entity, individually and as servicer of the qualified trusts pursuant to which the Servicer Advance Facility Notes were issued.

"Servicer Advance Facility Notes" means the Conseco Finance Advance Receivables Backed Notes, Series 2002-A, dated as of February 1, 2002.

"Servicer Advance Reimbursement Rights" means any and all claims any CFC Party may have to be reimbursed for advances made as servicer in accordance with the Securitization Documents governing any Securitization.

"Servicing Assets" means, collectively, the MH Servicing Assets and the Non-MH Servicing Assets.

"Servicing Contracts" means, collectively, the MH Servicing Contracts and the Non-MH Servicing Contracts.

"Servicing Fees" means, collectively, the MH Servicing Fees and the Non-MH Servicing Fees.

"Servicing Rights" means, collectively, the MH Servicing Rights and the Non-MH Servicing Rights.

"Shares" shall have the meaning set forth in Section 2.1(b) hereof.

"Specified Cure Payment" shall have the meaning set forth in Section 2.7(b)(i) hereof.

"SPEs" shall mean, collectively, Green Tree Residual Finance Corp. I and Green Tree Finance Corp.-Five.

"State Banking Authority" shall have the meaning set forth in Section 3.3 hereof.

"Statement" shall have the meaning set forth in Section 5.1(c) hereof.

"Stock Sale" shall have the meaning set forth in Section 2.1(b) hereof.

"Straddle Period" shall mean any taxable year or period beginning on or before and ending after the Closing Date.

"Subject Subsidiary" shall have the meaning set forth in Section 2.1(b) hereof.

"Subject Subsidiary Owner" shall have the meaning set forth in Section 2.1(b) hereof.

"Subsidiary" means, with respect to any Person, any corporation, partnership, limited liability company, association or other business entity of which (a) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (b) if a partnership, limited liability company, association or other business entity, a majority of the partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by any Person or one or more Subsidiaries of that Person or a combination thereof. For purposes hereof, a Person or Persons shall be deemed to have a majority ownership interest in a partnership, limited liability company, association or other business entity if such Person or Persons shall be allocated a majority of partnership, limited liability company, association or other business entity gains or losses or shall be or be control the managing director or general partner of such partnership, limited liability company, association or other business entity.

"Support Employees" shall have the meaning set forth in Section 5.10(a) hereof.

"Surveyors" shall have the meaning set forth in Section 5.20 hereof.

"Surveys" shall have the meaning set forth in Section 5.20 hereof.

"Tax" or "Taxes" means (a) any federal, state, local or foreign income, gross receipts, capital gains, franchise, alternative or add-on minimum, excess inclusion income, estimated, sales, use, goods and services, transfer, registration, value added, excise, natural resources, severance, stamp, occupation, premium, windfall profit, environmental, customs, duties, real property, personal property, capital stock, social security, unemployment, employment, disability, payroll, license, employee or other withholding, contribution or other tax, of any kind whatsoever, including any interest, penalties or additions to tax or additional amounts in respect of the foregoing; (b) any Liability for Taxes as a transferee under a Contract indemnity; (c) any Liability for Taxes under Treasury Regulation § 1.1502-6 or similar Law

applicable in the case of a group that files on a consolidated, combined or unitary basis; and (d) any applicable Liability for Taxes due to application of bulk sale laws.

"Tax Code" means the Internal Revenue Code of 1986 as amended from time to time.

"Tax Proceeding" shall mean any claim, examination, suit, action, negotiation or proceeding, or other proposed change or adjustment by any Tax authority involving Liability for Taxes.

"Tax Return" means any return, declaration, report, claim for refund, information return, amended return or other documents (including any related or supporting schedules, statements or information) filed or required to be filed in connection with the determination, assessment or collection of Taxes of any Person or the administration of any laws, regulations or administrative requirements relating to any Taxes.

"Taxable Period" shall have the meaning set forth in Section 5.1(b) hereof.

"Terminated Employees" shall have the meaning set forth in Section 5.32 hereof.

"Third Party" means any Person other than (a) the Parent, the CFC Parties or any of their Affiliates and (b) the Buyer, the Investors and their Affiliates.

"Third Party Claim" means any claim or the commencement of any claim, action or proceeding made or brought by a Third Party.

"Title Commitments" shall have the meaning set forth in Section 5.20 hereof.

"Title Company" shall have the meaning set forth in Section 5.20 hereof.

"Title Insurance Policies" shall have the meaning set forth in Section 5.20 hereof.

"Transaction Documents" means this Agreement and any other agreement, certificate, consent, waiver, document or instrument to be executed and/or delivered at Closing, including, but not limited to, those agreements, certificates, consents, waivers, documents and other instruments required to be delivered by or on behalf of a Person under ARTICLE VI and ARTICLE VII herein, as applicable.

"Transfer Date" shall have the meaning set forth in Section 5.26(b) hereof.

"Transferred Employees" shall have the meaning set forth in Section 5.10(b) hereof.

"Transferred Intellectual Property" means the Transferred Trademarks, Other Transferred Intellectual Property, and the Transferred Intellectual Property Agreements, together with all income, royalties, damages, and payments due or payable at the Closing or thereafter (including, without limitation, damages and payments for past or future infringements or misappropriations thereof), the right to sue and recover for past infringements or

misappropriations thereof, any and all corresponding rights that, now or hereafter, may be secured throughout the world.

"Transferred Intellectual Property Agreements" means all licenses and other Intellectual Property agreements to which a Seller or Mill Creek Bank is a party that are primarily used or held for use in the operation or conduct of the Purchased Businesses, including the agreements set forth in Section 3.12 of the Business Schedules.

"Transferred Trademarks" means all trademarks, service marks, trade names, corporate names, logos and slogans and all registrations and applications of the foregoing, owned by a Seller or Mill Creek Bank and primarily for use in the operation or conduct of the Purchased Businesses together with the goodwill associated therewith.

"Transition Services Agreement" shall have the meaning set forth in Section 6.6 hereof.

"Treasury Regulation" means a regulation promulgated by the Treasury Department under the Tax Code, including a temporary regulation and a proposed regulation to the extent that, by reason of their actual or proposed effective date, would or could, as of the date of any determination or opinion as to the Tax consequences of any action or proposed action or transaction, be applied to the Purchased Businesses and Purchased Assets.

"URM Employees" shall have the meaning set forth in Section 5.10(a)(ii) hereof.

"U.S. Bank" means U.S. Bank National Association, a national banking association, and its successors.

"Vehicle Leases" means all open-ended leases of trucks or other commercial vehicles entered into by a CFC Party as lessor.

"WARN Act" shall have the meaning set forth in Section 5.10(a) hereof.

"Welfare Benefits" shall have the meaning set forth in Section 5.10(h) hereof.

"Wells Fargo" means Wells Fargo Bank Minnesota, National Association.

## ARTICLE II.

## PURCHASE AND SALE OF ASSETS

2.1.    Purchased Assets.

(a)    Purchase and Sale of Assets.    On the terms and subject to the conditions contained in this Agreement, on the Closing Date, the Company will sell, convey, transfer, assign and deliver to (or cause to be sold, conveyed, transferred, assigned and delivered by the relevant Selling Subsidiaries owning, leasing or having the right to use the Purchased Assets to) the Buyer, and the Buyer will purchase and take assignment and delivery from the Sellers of all of the legal and beneficial right, title and interest of the Sellers in and to the Purchased Assets,

free and clear of any Lien of any kind whatsoever other than a Permitted Lien and the Lien identified in Section 3.8(a) of the applicable Business Schedules with respect to the Owned Real Premises located in Rapid City, South Dakota; provided, however, that if the GE Condition is satisfied, then the Owned Real Premises located in Rapid City, South Dakota shall be transferred free and clear of such Lien identified in Section 3.8(a) of the applicable Business Schedules. The Buyer will acquire such Purchased Assets in exchange for the Buyer's payment of the cash portion of the Purchase Price (as set forth in Section 2.4 hereof) and the assumption of the Assumed Liabilities (as set forth in Section 2.2(a) hereof).

(i)    The Purchased Assets will include any additions to such assets, properties, Contracts and rights in the ordinary course of business between December 19, 2002 and the Closing Date (such period of time, the "Pre-Closing Period"), but specifically excluding (x) the Excluded Assets, (y) any deletions, dispositions or expirations of such assets, properties, Contracts and rights pursuant to Section 5.4 and (z) subject to compliance with Section 5.5(b), any deletions, dispositions or expirations of such assets, properties, contracts and rights in the ordinary course of business consistent with past practice during the Pre-Closing Period.

(ii)    Upon written notice to the Company during the Pre-Closing Period and at the Buyer's option, in its sole discretion, the Buyer may determine to exclude any assets, properties, Contracts and rights from the Purchased Assets (including, without limitation, any "asset" having a negative value and the capital stock of Mill Creek Bank) which shall then be deemed Excluded Assets hereunder; provided that such exclusion shall not reduce the Purchase Price, except as provided in Section 2.1(a)(iv) and Section 2.4 hereof. The Buyer may not determine to exclude any Purchased Businesses pursuant to this Section 2.1(a)(ii). In the event the Buyer elects to exclude any Residual Assets from the Purchased Assets pursuant to this Section 2.1(a)(ii), the Purchased Assets shall include all related Cleanup Calls, to the extent such Cleanup Calls are separately transferable, unless the Buyer elects otherwise. In the event the Buyer elects to exclude the capital stock of Mill Creek Bank, pursuant to this Section 2.1(a)(ii), then as of the Closing (x) the Buyer agrees to lease on commercially reasonable terms consistent with a lease for a similar type of property in the same geographic region with similar mortgage debt on such property to the Sellers the Owned Real Premises located in Rapid City, South Dakota (as listed on Section 3.8(a) of the applicable Business Schedules), which Owned Real Premises shall not be deemed an Excluded Asset, but shall be transferred subject to the mortgage in favor of Mill Creek Bank, as in effect on the date hereof and (y) at the option of the Buyer, Mill Creek Bank shall continue to service the portion of the PL Business conducted outside of Mill Creek Bank on terms and conditions substantially the same as in effect on the date hereof.

(iii)    Nothing contained in this Agreement, shall be construed to imply that the Buyer will assume the Excluded Servicing Liabilities or any Guarantees given to any holders of interests in a Securitization.

(iv)    The Company and General Electric Capital Corporation or one or more of its affiliates ("GE") shall not enter into an asset purchase agreement for the purchase and sale of assets of the PL Business, CL Origination Business and/or HI Origination Business without the prior written approval of the Buyer. If the Company and GE enter into an asset purchase agreement in form and substance reasonably satisfactory to the Buyer and which is also approved on the Bankruptcy Court's docket pursuant to the GE Sale Order (the "GE Approved Agreement"), then (x) the Purchase Price shall be computed in accordance with Section 2.4 hereof, (y) the stock of Mill Creek Bank and the GE Purchased Assets shall be Excluded Assets and the PL Business, CL Origination Business and HI Origination Business shall be Excluded Businesses and (z) all GE Assumed Liabilities and other Liabilities arising from, related to, in connection with or with respect to Mill Creek Bank, the PL Business, the HI Origination Business, the CL Origination Business shall be Excluded Liabilities. The entry by the Company and GE into the GE Approved Agreement and the entry on the Bankruptcy Court's docket of the GE Sale Order shall be referred to herein as the "GE Condition." If the GE Sale Order is not entered by March 14, 2003, then this Section 2.1(a)(iv) shall thereafter be of no force and effect.

(b)    Stock Sale.    At any time prior to the Closing, the Buyer may, with the consent of the Company (not to be unreasonably withheld), elect to acquire the Purchased Assets, in part, through the purchase of all of the outstanding capital stock or other equity interests (the "Shares") of one or more of the Selling Subsidiaries (a "Subject Subsidiary") which own, lease or have the right to use Purchased Assets ("Stock Sale"), it being agreed that, with respect to any Subject Subsidiary, such consent of the Company may not be withheld if (i) the sale of the Shares of such Subject Subsidiary would not result in the CFC Parties incurring any net incremental Liabilities (which are not Assumed Liabilities and other than reasonable attorneys' fees and disbursements and similar transaction costs associated with the implementation of such Stock Sale), as compared to a sale of the Purchased Assets owned by such Subject Subsidiary, as determined in good faith by the Parties ("Incremental Liabilities"), or (ii) the Buyer, at its option, elects to pay or hold the Company harmless (under arrangements reasonably satisfactory to the Company) from such Incremental Liabilities. Upon the request of the Buyer, the Company shall use commercially reasonable efforts to cause the conversion prior to the Closing of the Subject Subsidiaries specified by the Buyer into limited liability companies properly organized in the same jurisdiction as the Subject Subsidiary whether by way of amendments to the Organizational Documents of the Subject Subsidiaries or by merger or otherwise. If the Company reasonably determines that the Buyer is not likely to be able to obtain the licenses required for the operation of the Purchased businesses from Governmental Authorities prior to August 1, 2003, the Company may elect to sell the Purchased Assets, in part, through a Stock Sale of the Subject Subsidiaries set forth in Section 2.1(b) of the Business Schedules that own such licenses, provided that, with respect to any such Subject Subsidiary, such election may not be made (x) if it results in any Incremental Liabilities to the Buyer, unless the Company elects to pay or hold the Buyer harmless (under arrangements reasonably satisfactory to the Buyer) from such Incremental Liabilities or (y) if the purchase of the Shares otherwise adversely affects, in any material manner, the value of the Purchased Assets transferred to the Buyer thereby because of the tax or other attributes of such Subject Subsidiary (unless arrangements reasonably satisfactory to the Buyer are made with respect thereto). In

connection with any Stock Sale (whether at the election of the Buyer or the Company as provided herein), the Company shall cause any such Subject Subsidiary to become a Filing Company Subsidiary and shall take all reasonable actions to obtain an order from the Bankruptcy Court pursuant to Federal Rule of Bankruptcy Procedure 3003(c) establishing a bar date for prepetition claims and shall diligently prosecute objections to such claims, as appropriate, in order to ensure that the Liabilities of such Subject Subsidiary consist only of those Liabilities that would be Assumed Liabilities if the Buyer would have acquired the Purchased Assets of such Subject Subsidiary free and clear of all Liens other than Permitted Liens. In the event the Buyer elects to acquire or the Company elects to sell a portion of the Purchased Assets through a Stock Sale, then the Shares which are the subject of the Stock Sale shall be deemed Purchased Assets hereunder. If the Buyer and/or the Company elect one or more Stock Sales:

(i)    prior to the Closing Date, the Company shall unconditionally assume, or shall cause one of its Affiliates (other than another Subject Subsidiary) to unconditionally assume all Liabilities of the Subject Subsidiary (other than the Assumed Liabilities) in a manner and in form and substance reasonably satisfactory to the Buyer and the Company;

(ii)    prior to the Closing Date, the Company shall, or shall cause the Subject Subsidiary to, transfer any Excluded Assets of the Subject Subsidiary to the Company or one of its Affiliates (other than another Subject Subsidiary) in a manner and in form and substance reasonably satisfactory to the Buyer and the Company; and

(iii)    the Company shall, or shall cause its Subsidiary which directly owns the Shares (the "Subject Subsidiary Owner") to, sell, assign, transfer, convey and deliver the Shares, free and clear of all Liens (other than Permitted Liens), to the Buyer, and the Buyer shall purchase and accept the Shares, at the Closing (in which case, the Subject Subsidiary Owner shall be deemed a Selling Subsidiary hereunder, and the Company shall cause such Subject Subsidiary Owner to execute a counterpart signature page hereto).

Notwithstanding the foregoing, this Section 2.1(b) shall not apply to Mill Creek Bank or Green Tree Retail Services Bank.

(c)    Excluded Assets.  (i) The Excluded Contracts; (ii) the assets, properties, Contracts and rights, if any, set forth in Section 2.1(c) of the applicable Business Schedules; (iii) the outstanding capital stock of Green Tree Retail Services Bank; (iv) cash of an Excluded Business or representing the proceeds of the disposition of an Excluded Asset, provided that all required payments under the DIP Loan shall have been made; (v) up to $4.5 million of cash and cash equivalents owned by Green Tree Retail Services Bank; (vi) if the GE Condition is satisfied, the stock of Mill Creek Bank and the GE Purchased Assets; (vii) all rights and claims as holders of B-2 Certificates, or rights derivative of B-2 Certificates, solely to the extent arising from Guarantees by the CFC Parties pursuant to the MH Servicing Contracts (the "B-2 Guarantee Rights"), notwithstanding the fact B-2 Certificates constitute Purchased Assets (it being agreed that if and to the extent such separation of the B-2 Guarantee Rights from the B-2 Certificates is not permitted under the relevant Contract or applicable law or is not ordered by the

Bankruptcy Court by a Final Order, the provisions of <u>Section 5.31</u> shall apply), (viii) the Sellers' rights under this Agreement; (ix) if the GE Condition is satisfied, all Loans and Receivables with respect to the HE Business on the balance sheet of Mill Creek Bank as of January 31, 2003 valued at $35.5 million and all Loans and Receivables originated by Mill Creek Bank after January 31, 2003; (x) if the GE Condition is satisfied, all Community Reinvestment Act assets, (xi) if the GE Condition is satisfied, all reaffirmed accounts; (xii) if the GE Condition is satisfied, all Excluded Receivables as defined in the GE Approved Agreement; (xiii) the Excluded Contracts; (xiv) rights in and with respect to tax refunds, credits and claims for periods prior to the Closing; (xv) all defenses, claims, counter-claims, rights of offset and other actions against any person asserting or seeking to enforce any Excluded Liability against any of the Sellers or any rights with respect to Excluded Assets, solely to the extent such defense, claim, counter-claim, right of offset or other action relates to such Excluded Liability or Excluded Asset; (xvi) any avoidance or similar actions, including, but not limited to actions under sections 544, 545, 547, 548, 550 and 553 of the Bankruptcy Code, including without limitation any avoidance or similar action with respect to the stock of Mill Creek Bank; and (xvii) those other assets, properties, contracts and rights, if any, that become Excluded Assets (the "<u>Excluded Assets</u>") shall be excluded from the Purchased Assets to be sold, assigned, transferred, conveyed and delivered to the Buyer hereunder and, to the extent in existence on the Closing Date, shall be retained by the Sellers (as applicable).

    2.2.  <u>Liabilities</u>.

        (a)   <u>Assumed Liabilities</u>. Subject to the conditions set forth herein, the Buyer will assume, effective as of the Closing Date, and thereafter will pay, perform and discharge in accordance with their terms, as and when due, only those liabilities specifically identified in <u>Section 2.2(a)</u> of the applicable Business Schedules and the Liabilities with respect to the Permitted Liens (the "<u>Assumed Liabilities</u>"); <u>provided</u>, <u>however</u>, that Liabilities associated with assets, properties, Contracts and rights excluded from the Purchased Assets or any Liabilities associated with any Excluded Business in accordance with <u>Section 2.1(a)(i)</u> and <u>2.1(a)(iv)</u> shall not be Assumed Liabilities.

        (b)   <u>Excluded Liabilities</u>. Except for the Assumed Liabilities, the Buyer shall not assume, perform or be liable for, and the Sellers shall retain and pay, perform and discharge in accordance with their terms (as the same may be modified in connection with the Chapter 11 Case or otherwise), as and when due, all Liabilities of the CFC Parties that are not expressly Assumed Liabilities (the "<u>Excluded Liabilities</u>") which include, but are not limited to, any Liability of the CFC Parties or the Parent or any Subsidiary of the Parent or Affiliate thereof:

            (i)   arising from, related to or in connection with any of the Parent's or the Sellers' transaction expenses;

            (ii)   except for the Liabilities specifically assumed pursuant to <u>Section 2.2(a)-(iv)</u> of the applicable Business Schedules, for (A) any indebtedness or other Liability arising under or with respect to any indebtedness of the CFC Parties or the Parent including intercompany indebtedness between Affiliates or (B) any Guarantees of the CFC Parties or the Parent, including intercompany Guarantees

between Affiliates and any Guarantees given to any holders of interests in a Securitization;

(iii)    for any Taxes, whether or not relating to the Purchased Businesses, the Purchased Assets or the transactions contemplated hereby other than Taxes of any Subject Subsidiary (or a Subsidiary of a Subject Subsidiary after the Closing Date) for any Post-Closing Tax Period, provided, that Taxes of a Subject Subsidiary (or Subsidiary thereof) for a Post-Closing Tax Period shall not include any Liability of Parent or any Affiliate that a Subject Subsidiary or Subsidiary thereof is required to pay by virtue of Treasury Regulation Section 1.1502-6 or comparable provision of state, local or foreign law;

(iv)    attributable to the Purchased Assets or the operation of the Purchased Businesses for all periods up to and including the Closing including, without limitation, any Liabilities for any default or breach, or for any event, occurrence, condition or act which, with the giving of notice, the passage of time or both, would result in a default or breach, of any of the Assumed Agreements to the extent such default or breach or event, occurrence, condition or act existed on or prior to the Closing Date;

(v)    to indemnify any Person by reason of the fact that such Person was a director or officer of any of the CFC Parties or the Parent or was serving at the request of the CFC Parties or the Parent as a partner, trustee, director, officer, employee or agent of another Person;

(vi)    with respect to any principal, partner, employee, officer, director, consultant, independent contractor, agent or Affiliate of the CFC Parties or the Parent (other than Liabilities with respect to the Transferred Employees and Business Employees specifically assumed pursuant to Section 5.10 and the Assumed Retention Agreements) arising out of employment, compensation, severance, change of control, stay-pay, sale bonus, retention bonus or other special compensation or golden parachute agreements, plans or arrangements, including any such Liability incurred in connection with the execution and performance of this Agreement and the consummation of the transactions contemplated hereby and not expressly assumed herein;

(vii)    arising under, out of, with respect to or in connection with any Employee Benefit Plan and not expressly assumed by the Buyer herein;

(viii)    arising out of or resulting from any noncompliance with or violation of any Laws (including, without limitation, any securities Laws or Environmental Laws) occurring prior to the Closing;

(ix)    arising out of any occurrences of bodily injury, property damage or personal injury which take place on or prior to the Closing Date;

(x)    arising out of, related to, in connection with or with respect to any deferred purchase price payment obligations or non-competition payment

obligations associated with (A) any acquisition prior to the Closing of any business, Subsidiary, security or assets of any Person or (B) any disposition of any business, Subsidiary, security or assets of any Person;

(xi)    to indemnify any Third Party in connection with the disposition of any subsidiary, business, properties or assets or operations of any Person;

(xii)    arising from, in connection with or with respect to such Person's direct or indirect ownership (beneficial or otherwise) at any time of any capital stock of or other beneficial interest in (or any right to acquire such stock of or interest in) any of the CFC Parties or the Parent;

(xiii)    arising from, related to or in connection with any cure or other amount payable with respect to the assignment of any contractual obligation to the Buyer hereunder;

(xiv)    arising from, related to, in connection with or with respect to any Excluded Asset;

(xv)    under this Agreement;

(xvi)    for infringement or misappropriation arising from the development, modification or use of intellectual property on or before the Closing Date;

(xvii)    relating to any claim, dispute or litigation asserted or threatened or governmental proceeding or investigation instituted or threatened, arising out of any act or omission of the CFC Parties or the Parent or any of their Affiliates on or prior to the Closing Date, or arising out of the conduct, on or prior to the Closing Date, of the Purchased Businesses;

(xviii)    arising out of (A) any noncompliance with or violation of any Environmental Law on or before the Closing Date, (B) any existing environmental condition (whether or not relating to any noncompliance) of the Purchased Assets, or (C) any release of Hazardous Substances on or before the Closing Date, in each case, regardless of whether any of the foregoing was known to or disclosed to the Parties or any of their Affiliates;

(xix)    under any insurance coverage, self-insurance or retention program provided to customers in connection with the Purchased Businesses;

(xx)    arising from, related to or in connection with any Owned Real Premises or Assumed Leases arising or accruing prior to the Closing Date and/or due to a breach by the Sellers or any of their Subsidiaries under any contractual obligation due to the consummation of the transactions contemplated hereby, except to the extent relating to any Permitted Lien;

(xxi)  to any equity holder or former equity holder of the CFC Parties or the Parent;

(xxii)  relating to any repurchase, assumption or similar Liability under any Contract pursuant to which loans were sold to a Third Party;

(xxiii)  which are Excluded Servicing Liabilities;

(xxiv)  if the GE Condition is satisfied, all of the Liabilities arising from, relating to, in connection with or with respect to Mill Creek Bank, the HI Origination Business, the PL Business and the CL Origination Business, except as specifically set forth in Section 2.2(a) of the applicable Business Schedules;

(xxv)  if the GE Condition is satisfied, all of the Liabilities arising from, relating to, in connection with or with respect to the GE Purchased Assets and all of the GE Assumed Liabilities; or

(xxvi)  assumed by the Company or one if its Affiliates pursuant to Section 2.1(b)(i).

2.3.  Closing Transactions.

(a)  Closing.  Subject to the satisfaction or waiver of the conditions contained in this Agreement, the closing of the transactions contemplated by this Agreement (the "Closing") shall take place at the offices of Kirkland & Ellis, 200 East Randolph Drive, Chicago, Illinois 60601, at 10:00 a.m. on the second Business Day following the satisfaction or waiver of the conditions to the Buyer's and the Sellers' obligations set forth in ARTICLE VI and ARTICLE VII, respectively, or at such other place or time and on such other date as the Parties may agree to in writing; provided that the Company may in its sole discretion delay the Closing until any Business Day prior to or on the calendar month-end next following the second Business Day following the satisfaction or waiver of the conditions to the Buyer's and the Sellers' obligations set forth in ARTICLE VI and ARTICLE VII, respectively provided the Buyer receives at least 11 Business Days advance notice of the Closing.  The date and time of the Closing are herein referred to as the "Closing Date".

(b)  Closing Transactions.  Subject to the conditions set forth in this Agreement, the Parties shall consummate the following "Closing Transactions" on the Closing Date:

(i)  The Sellers shall convey all of the Purchased Assets to the Buyer in accordance with Section 2.1 and shall deliver to the Buyer such appropriately executed instruments of sale, transfer, assignment, conveyance and delivery, warranty deeds, warranty assignments of leases, assignments, stock certificates or evidence of limited liability company equity interests (in the event of a Stock Sale), certificates duly registered in the Buyer's name representing the Residual Assets (to the extent such Residual Assets are certificated), vehicle titles, transfer Tax declarations, title policies (if required pursuant to Section 5.20 hereof) and all other instruments of conveyance which are necessary or desirable to effect

transfer to the Buyer of good and marketable title to the Purchased Assets (subject however to any Permitted Liens).

(ii)    On and prior to the Closing Date, the Sellers shall, with respect to all Purchased Assets that are owned of record by any Person other than the Company or a Selling Subsidiary (including, without limitation, the Residual Assets, Assigned Receivables or other Purchased Assets subject to a repurchase agreement or otherwise transferred to Lehman Brothers Holdings Inc. or any of its Affiliates under the Lehman Forbearance Agreement or any of the other Lehman Facilities and, to the extent the Buyer elects to acquire the NIMS Collateral directly rather than the NIMS Equity, the NIMS Collateral, and to the extent the Buyer elects to acquire the MESA Collateral directly rather than the MESA Equity, the MESA Collateral), exercise all rights, and take all such other actions, as may be necessary to effect the conveyance of the Purchased Assets to the Buyer on the Closing Date (subject to the receipt on the Closing Date of the Purchase Price).   The Sellers shall reasonably cooperate with the Buyer, at Buyer's expense, in completion of any financing arrangements arranged by the Buyer with respect to the purchase of the Purchased Assets, including, without limitation, any such arrangements with Lehman Brothers Holdings Inc. or its Affiliates under which the Residual Assets or the Assigned Receivables are to be held or financed. If any Purchased Assets are owned of record by any CFC Party other than the Company or a Selling Subsidiary, then the Company shall cause such CFC Party to become a party to this Agreement and execute a counterpart signature page to this Agreement as a Selling Subsidiary hereunder.

(iii)    The Buyer shall deliver to the Company or its designee, by wire transfer of immediately available funds to an account or accounts designated not less than three Business Days before the Closing Date by the Sellers, the cash portion of the Purchase Price as set forth in Section 2.4 hereof; provided, however, that cash at least equal to the portion of the Lehman Debt Amount that is owed by the SPEs shall be paid directly to the applicable SPEs to enable such SPE to repay such portion of the Lehman Debt Amount at Closing.

(iv)    The Buyer shall assume the Assumed Liabilities and shall deliver to the Sellers such appropriately executed assumption agreements and all other instruments which are necessary or desirable to effect the assumption by the Buyer of the Assumed Liabilities.

(v)    The Sellers and the Buyer shall deliver all other Transaction Documents required to be delivered by or on behalf of such Person, as applicable.

(vi)    The Company shall deliver, or cause to be delivered, at the Closing, to the Buyer or to such Person as the Buyer may designate (including, without limitation, any custodian appointed by the Buyer to hold such items) all documentation and other items pertaining to the Assigned Receivables, including, without limitation, original notes (with appropriate endorsements), installment contracts, guarantees, mortgages and other security agreements and all

assignments, assumptions, modifications, consolidations and extensions thereof, UCC financing statements or such other evidence of perfection of a security interest in the applicable collateral in the relevant jurisdictions, powers of attorney, certificates of title, all evidence of title insurance policies, hazard or flood insurance policies, loan applications, closing statements, credit reports, appraisals, surveys, disclosure statements, sales contracts, tax and insurance receipts, verification statements delivered by the borrowers, and all other documentation related to the loan files associated with the applicable Assigned Receivables. If, after the Closing Date, a CFC Party (or any other Person acting on its behalf) comes into possession of any additional documentation, books and records relating to the Assigned Receivables, such additional documentation shall be deemed to have been received and held in trust for the benefit of the Buyer and promptly shall be delivered to the Buyer or such other Person as the Buyer may direct. Effective as of the Closing, the Company shall (i) have caused to be terminated any existing custodial or other similar arrangement under which any of the documentation relating to the Assigned Receivables is held and shall obtain and deliver to the Buyer appropriate releases in connection therewith and (ii) execute and deliver to the Buyer (or its designees) on the Closing Date powers of attorney in form and substance reasonably satisfactory to the Buyer giving the Buyer or such designees full power and authority to execute any further agreements, assignments, endorsements or other documentation as may be deemed necessary by the Buyer to allow the Buyer (and its designees) to exercise full rights of ownership with respect to the Assigned Receivables. The Company shall fully cooperate with the Buyer from and after the Closing to take all other actions necessary or appropriate to effect the transfer of, and vest in the Buyer, all right, title and interest in and to the Assigned Receivables.

(vii)   The Sellers shall deliver to the Buyer the Post-Signing Balance Sheets and the Closing Date Balance Sheet within the time periods specified in Section 5.27 hereof.

(viii)   Upon the request of the Buyer prior to the Closing, the Sellers shall cause each of (x) the limited recourse note, dated September 28, 2001, in the amount of $192,921,000 issued by Conseco Finance Net Interest Margin Finance Corp. I ("NIMS I") to Conseco Finance Net Interest Margin Finance Corp. II ("NIMS II"), (y) the Security Agreement, dated as of September 1, 2002, between NIMS I and NIMS II and (z) the Participation Agreement, dated as of September 1, 2002 by and between NIMS II and the NIMS Issuer to be cancelled immediately prior to the Closing and shall deliver to the Buyer evidence of such cancellation in form and substance satisfactory to the Buyer.

Notwithstanding anything to the contrary in the foregoing in this Section 2.3(b)(vi), no Seller shall be in breach of this Section 2.3 for failure to deliver any item set forth herein which is not within its control to deliver; provided that the foregoing shall not limit any of Seller's obligations under Section 5.7 hereof; provided further, however, that the condition contained in Section 6.5 shall not be satisfied unless all items set forth herein are delivered.

2.4.   Purchase Price.

(a)   The aggregate purchase price for the Purchased Assets (the "Purchase Price") shall be equal to (i) the Lehman Debt Amount as of 12:01 A.M. on the Closing Date, plus (ii) $399 million, minus (iii) $270 million, but such subtraction shall be made only if the GE Condition is satisfied. The Purchase Price shall be paid in cash.

(b)   The Sellers shall cause all cash proceeds in excess of the Lehman Debt Amount paid for the Purchased Assets to be used to repay amounts outstanding under the DIP Loan at the time of the Closing. If a Consent Agreement is executed by the Buyer, the Company, Trustees, Unsecured Creditors Committee and the Ad Hoc Committee and is in full force and effect as of the Closing Date, the Company shall allocate $25 million of the cash portion of the Purchase Price to a $35 million aggregate reserve account to be established to resolve claims based on pre-Closing breaches of the MH Servicing Contracts as shall be provided in such Consent Agreement.

2.5.   Post-Effective Time Amounts Received and Paid. All funds collected on or after the Closing Date from Receivables which constitute Purchased Assets shall belong to, and if received by the Company or any of its Affiliates, shall be received for the benefit and the account of the Buyer, and the Sellers shall, on a weekly basis, transfer by way of wire transfer, and remit to the Buyer all such amounts received by or paid to the Company or any of its Affiliates on or after the Closing Date. To the extent that Buyer receives any funds or other payments on account of any Excluded Assets, then notwithstanding such receipt, such funds and other payments shall belong to Sellers and be held in trust for the benefit of Sellers and, as promptly as practicable, shall be remitted to such account as Sellers may designate in writing to Buyer from time to time.

2.6.   True Sale. Each of the Parties acknowledge and agree that a true sale of the Purchased Assets is intended pursuant to this Agreement, the Buyer will have legal and equitable title to all Purchased Assets upon payment of the Purchase Price, and there is no intent by any Party to create a lending relationship between the Buyer and the Sellers. Upon the sale of the Purchased Assets, the Sellers shall have no legal or equitable title or interest whatsoever in the Purchased Assets or any collections thereunder, and the Sellers shall have no right to redeem any Purchased Assets.

2.7.   Assumption of Certain Leases and Contracts. The Sale Order shall provide for the assumption by the Sellers and assignment to the Buyer, effective upon the Closing, of the Assumed Agreements set forth on a pleading submitted to the Bankruptcy Court on the following terms and conditions:

(a)   As of the Closing, the Sellers (as applicable) shall assign to the Buyer the Assumed Agreements. The Assumed Agreements shall be identified by the date of the Assumed Agreements (if available), the other party to the Contract and the address of such party, all included on an exhibit attached to either the motion filed in connection with the Sale Order or a motion for authority to assume and assign such Assumed Agreements. Such exhibit shall set forth the amounts necessary to cure defaults under each of such Assumed Agreements as determined by the Sellers based on the Sellers' books and records.

(b)    If there exists on the Closing Date any default related to an Assumed Agreement, the Sellers shall be responsible for any amounts to be cured pursuant to section 365(a) of the Bankruptcy Code as a condition to the assumption and assignment of such Assumed Agreement. At or prior to the Closing Date, the Sellers shall pay all cure amounts for the Assumed Agreements. Notwithstanding the foregoing, if

(i)    a Seller is required to make a cure payment in connection with a Non-MH Servicing Contract in respect of which the Buyer becomes the successor servicer thereunder as of the Closing Date, which cure payment is attributable to the failure of such Seller prior to the Closing Date to make a servicing advance in respect of a delinquent Securitized Loan and where such advance was not made solely because the Seller deferred or rescheduled such delinquent payment (a "Specified Cure Payment");

(ii)    the Specified Cure Payment is made with the proceeds received from the Buyer as part of the Purchase Price; and

(iii)    after the Closing Date, the Buyer, in its capacity as the Person entitled, under the terms of the relevant Non-MH Servicing Contract, to the recovery of the servicing advances deemed to have occurred as a result of such Specified Cure Payment, actually receives a cash payment directly attributable to the fact that such Purchase Price proceeds were applied to the Specified Cure Payment and such cash payment is not subject to any custody arrangement, claim, offset or other right in favor of any other person under the relevant Non-MH Servicing Contract, then

the Buyer shall, within 10 Business Days of receipt of any such cash payment, reimburse to the Company an amount equal to any such cash payment actually received in such capacity; provided that the total amount reimbursed hereunder shall not exceed $57 million. Nothing contained herein shall be deemed an admission by any Seller that any cure payment is required in respect of the foregoing.

(c)    Except as set forth in Section 2.7(b), the Buyer shall be responsible for all costs and expenses, incurred after the Closing Date, that are necessary in connection with providing adequate assurance of future performance with respect to the Assumed Agreements.

2.8.    Consents to Certain Assignments. Without limiting the effect of Section 6.4 or Section 6.13, the Buyer and the Sellers agree that there shall be excluded from the Purchased Assets any Assumed Agreements that are not assignable or transferable pursuant to the Bankruptcy Code or otherwise without the consent of any Person other than the Sellers or any Affiliate of the Sellers, to the extent that such consent shall not have been given prior to the Closing; provided, however, that the Sellers shall have the continuing obligation (both before and after the Closing) to use all commercially reasonable efforts (including, without limitation, prosecution of appropriate motions pursuant to Section 365 of the Bankruptcy Code) to endeavor to obtain all necessary consents to the assignment thereof and, upon obtaining the requisite Third Party consents thereto, such Assumed Agreement shall be assigned to the Buyer at no cost free and clear of all Liens other than the Permitted Liens; provided, that, the Sellers shall not be

required to incur any unreasonable costs or make any material payment to any Third Party (other than cure costs) to obtain any consent. With respect to any Assumed Agreement which is not transferred at the Closing as contemplated by the immediately preceding sentence, effective as of the Closing, the Sellers shall enter into arrangements reasonably requested by the Buyer designed to provide the Buyer the full and exclusive benefits of such asset (as between the Buyer and the Sellers) provided the Buyer assumes the duty to perform the obligations relating to such Assumed Agreements accruing on and after the Closing (and provides indemnification to the Sellers with respect thereto). If and to the extent such arrangements cannot be made, the Buyer shall have no obligation with respect to such Assumed Agreement. For the avoidance of doubt, this Section 2.8 shall not be applicable to Servicing Rights.

2.9.    Real Estate Apportionments and Payments. With respect to the Facilities, all income from and expenses relating to the Facilities of every type and nature as is customary with a closing of this type (including, without limitation, accrued expenses not yet due and payable and income collected prior to the Closing) shall be apportioned and prorated over the appropriate period in a manner that fairly apportions such income and expenses among the Buyer and the Sellers at the Closing as of the close of business on the day immediately preceding the Closing Date. The prorations and apportionments hereunder shall be jointly prepared by the Buyer and the Sellers before the Closing on the basis of actual and estimated amounts as provided. Notwithstanding anything to the contrary herein, the Sellers shall be responsible for payment of all real property Taxes for all years prior to the year the Closing takes place. The obligations of the Parties under this Section 2.9 shall survive the Closing; provided, however, with respect to Owned Real Premises Leases, the Sellers shall be responsible for only that portion of the real property Taxes that are not required to be paid by the tenants under the Owned Real Premises Leases.

## ARTICLE III.

## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

Except as set forth in the Business Schedules, which schedules will be arranged in sections corresponding to the sections contained in this ARTICLE III (provided that each section of which qualifies the correspondingly numbered representation and warranty in this ARTICLE III to the extent specified therein and such other representations and warranties in this ARTICLE III to the extent a matter in such section is disclosed in such a way as to make its relevance to the information called for by such other representation and warranty in this ARTICLE III reasonably apparent), as a material inducement to the Buyer to enter into this Agreement, the Sellers hereby represent and warrant to the Buyer the following:

3.1.    Organization and Power.

(a)    The Company is a Delaware corporation duly organized, validly existing and in good standing under the laws of Delaware. Mill Creek Bank is an industrial loan corporation duly organized, validly existing and in good standing under the laws of Utah. Each of the Selling Subsidiaries is listed in Section 3.1(a) of the applicable Business Schedules and is duly organized, validly existing and in good standing under the laws of its state of incorporation or organization (as applicable). Each of the Sellers and Mill Creek Bank is qualified to do

business and is in good standing as a foreign corporation or entity (as applicable) in each jurisdiction listed in Section 3.1(a) of the applicable Business Schedules, which jurisdictions are the only jurisdictions where the nature of the activities conducted by it or the character of the property owned, leased or operated by it makes such qualification necessary, except for any failure to be so qualified or in good standing that has not had and could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. The Sellers and Mill Creek Bank have the requisite corporate or other entity power and authority to own and operate the Purchased Assets and to carry on the Purchased Businesses as currently conducted. The Company has delivered or otherwise made available to the Buyer complete and correct copies of the Organizational Documents of the Sellers and Mill Creek Bank and represents that such documents are in full force and effect. None of the Sellers or Mill Creek Bank is in default under or in violation of any provision of its Organizational Documents.

(b)    A complete and correct chart showing the Company and its direct and indirect Subsidiaries is set forth in Section 3.1(b) of the applicable Business Schedules.

3.2.    Authorization of Transactions.  The execution, delivery and performance of this Agreement and the other Transaction Documents, and the consummation of the transactions contemplated hereby and thereby to be consummated by the Sellers and Mill Creek Bank, have been duly and validly authorized by all necessary corporate or other entity action (as applicable) on the part of each of the Sellers and Mill Creek Bank.  This Agreement has been, and each of the Transaction Documents after execution and delivery thereof at the Closing will have been, duly and validly executed and delivered by the Sellers and Mill Creek Bank, as applicable, and, subject to any necessary authorization from the Bankruptcy Court, this Agreement constitutes, and each of the Transactions Documents will constitute, its legal, valid and binding obligation, enforceable in accordance with its terms.

3.3.    Absence of Conflicts; Required Consents, Approvals and Filings.  The execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby by the Sellers and Mill Creek Bank do not and shall not (a) constitute a material breach or violation of or default under any Law, governmental permit or license of the CFC Parties or to which any of the foregoing is subject, in each case relating to the Purchased Businesses, including but not limited to state usury laws, state laws requiring licenses to engage in consumer lending, consumer finance, mortgage lending and the other businesses of the Sellers and Mill Creek Bank, the Truth in Lending Act, the Real Estate Settlement Procedures Act, the Home Mortgage Disclosure Act, the Consumer Credit Protection Act, the Right to Financial Privacy Act, the Equal Credit Opportunity Act, the Fair Credit Reporting Act, the Homeowners Ownership and Equity Protection Act, the Federal Trade Commission Act, the Fair Debt Collection Practices Act and other Laws regulating lending (the "Finance Laws"), which breach, violation or default would prevent or materially delay the Sellers and Mill Creek Bank from being able to perform their obligations under this Agreement and the other Transaction Documents to which they are a party, (b) constitute a breach or violation of or default under the Organizational Documents of the Sellers or Mill Creek Bank, which breach, violation or default would prevent or materially delay the Sellers from being able to perform their obligations under this Agreement and the other Transaction Documents to which they are a party, or (c) with respect to the Assumed Agreements, require the affirmative consent or approval of any Governmental Authority or other Third Party, in each case, except for (i) the

expiration or earlier termination of the waiting period under the HSR Act, (ii) filings in respect of, and approvals and authorizations of, any Governmental Authority having jurisdiction over the consumer lending, banking, insurance or other financial services businesses set forth in Section 3.3 of the applicable Business Schedules, (iii) filings required as a result of the particular status of the Buyer, (iv) consents and approvals set forth in Section 3.3 of the applicable Business Schedules, (v) the approval of the Department of Financial Institutions of the State of Utah (the "State Banking Authority") and (vi) the approval of the Federal Deposit Insurance Corporation (the "FDIC") under the Change in Bank Control Act or the expiration of the waiting period thereunder.

3.4.    Company Subsidiaries.  All of the outstanding shares of capital stock of, or other ownership interests in, each Selling Subsidiary and Mill Creek Bank, are owned by the Company, directly or indirectly.  All of the issued and outstanding shares and interests (as applicable) of the Selling Subsidiaries and Mill Creek Bank and their Subsidiaries have been duly authorized, are validly issued, fully paid and assessable, were issued free of pre-emptive or similar rights and are held of record or beneficially by the Persons indicated on Section 3.1(b) of the applicable Business Schedules.  Other than this Agreement, there are no outstanding or authorized options, warrants, purchase rights, subscription rights, conversion rights, exchange rights or other contracts or commitments that could require any of the Selling Subsidiaries and their Subsidiaries or Mill Creek Bank and its Subsidiaries to issue, sell or otherwise cause to become outstanding any of its capital stock or rights in respect thereof.  There are no outstanding or authorized stock appreciation, phantom stock, profit participation or similar rights with respect to the Selling Subsidiaries and their Subsidiaries.

3.5.    Good Title.  Other than Owned Real Premises, Assumed Leases and Transferred Intellectual Property, as to each Purchased Asset (including, without limitation, the Private Label Credit Card Master Trust Certificates), a Seller has good and valid title to, or a valid leasehold interest in or other valid right to use, and, subject to obtaining the consents and approvals and making the filings set forth in Section 3.3 of the applicable Business Schedules and Section 3.3 of this Agreement, the power and authority to sell, transfer and assign to the Buyer the Purchased Assets, free and clear of all Liens (other than Permitted Liens and Liens which will be discharged by the Bankruptcy Court prior to the Closing Date).

3.6.    Compliance with Laws; Permits.

(a)    The Sellers and Mill Creek Bank have conducted and are conducting the Purchased Businesses in compliance with all applicable Laws, including, without limitation, the Finance Laws, except to the extent such failures to comply would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.  Except as set forth in Section 3.6 of the applicable Business Schedules, as of the date hereof, there are no material proceedings pending or, to the Knowledge of the Sellers, threatened alleging any violation of any such applicable Laws which would reasonably be expected to result in a Material Adverse Effect.

(b)    The CFC Parties have in effect all material authorizations, permits, licenses, certificates of authority, consents, orders and approvals of, and have made all material filings, applications and registrations with, Governmental Authorities that are necessary in order

for the CFC Parties to own and operate the Purchased Assets and to conduct the Purchased Businesses in all material respects as presently conducted, and such authorizations, permits, licenses, certificates of authority, consents, orders and approvals (which are set forth on Section 3.6(b) of the applicable Business Schedules opposite the name of the CFC Party which is the holder thereof) are in full force and effect and the CFC Parties are in compliance therewith in all material respects. Except as set forth on Section 3.6(b) of the applicable Business Schedules, as of the date hereof, there are no material proceedings pending or, to the Knowledge of the Sellers, threatened seeking to terminate or suspend or to adversely modify any such authorization, permit, license, certificate of authority, consent, order or approval.

3.7.    Assets Necessary to Conduct Businesses.  Except as set forth in Section 3.7 of the applicable Business Schedules, subject to Section 2.8 above and satisfaction of the conditions in ARTICLES VI and VII, the Purchased Assets including any assets, properties, Contracts and rights identified by the Buyer pursuant to Section 2.1(a)(ii) and the GE Purchased Assets, together with the Buyer's rights under this Agreement and the Transaction Documents (including the assets, rights and services to be made available under the Transition Services Agreement), constitute all of the assets, properties, contracts and rights primarily used in the Purchased Businesses and which are necessary to carry on the Purchased Businesses by the CFC Parties as currently conducted on the date of this Agreement and there are no assets or properties used in or necessary for the conduct of the Purchased Businesses as presently conducted which are not owned, leased or licensed by the Sellers or Mill Creek Bank and its Subsidiaries. Except as set forth on Section 3.15 of the applicable Business Schedules, no part of the Purchased Businesses is conducted by or through any Person other than the Sellers.

3.8.    Facilities; Real Property.

(a)    Owned Real Premises.  Section 3.8(a) of the applicable Business Schedules contains a true and complete list of all Owned Real Premises included in the Purchased Assets of each Purchased Business. Subject to the entry of the Sale Order, the Sellers own such Owned Real Premises listed on the Business Schedules (and all of the improvements located thereon) in good and marketable fee simple title free and clear of all Liens (including any restrictions on transfer, restrictions on use or restrictions on leases to third parties), other than the Permitted Liens and except as set forth on Section 3.8(a) of the Business Schedules. Except for the Owned Real Premises Leases, matters set forth on Section 3.8(a) of the applicable Business Schedules and matters that will be satisfied pursuant to the Sale Order, none of the Owned Real Premises is subject to any right or option of any Person to purchase or otherwise obtain title to such property. Except for the Owned Real Premises Leases and as set forth on Section 3.8(a) of the applicable Business Schedules, no Person other than the Sellers or Mill Creek Bank have any right to use, occupy or lease all or any portion of the Owned Real Premises. To the Knowledge of the Sellers, there are no Tax abatements or exemptions specifically affecting the Owned Real Premises, and neither the Sellers nor their Affiliates have received any written notice of (and the Sellers do not have any Knowledge of) any proposed increase in the assessed valuation of the property or of any proposed public improvement assessments.

(b)    Leased Premises.  Section 3.8(b) of the applicable Business Schedules contains a true and complete list of each written Assumed Lease (and any amendments or modifications thereto) included in the Purchased Assets of each applicable Business Schedule

and the GE Purchased Assets and indicates with respect to each Assumed Lease (i) the current rent (including any additional rent) under each Assumed Lease, (ii) the expiration date of the Assumed Leases, (iii) the security deposits being held pursuant to the Owned Real Premises Leases and (iv) any guarantees thereunder.  Except as set forth in Section 3.8(b) of the applicable Business Schedules and subject to the entry of the Sale Order, all of the Assumed Leases are in full force and effect and have not been modified, altered or amended in any material respect. Except in connection with matters that will be cured pursuant to the Sale Order, neither the Sellers nor their Affiliates have received written notice of any material default under any Assumed Lease by the Sellers, Mill Creek Bank or any of their Affiliates a party thereto and, except as set forth in Section 3.8(b) of the applicable Business Schedules and, to the Sellers' Knowledge, there has not occurred any material default thereunder by any other party thereto (other than those breaches that resulted from the filing of the Chapter 11 Case).  True, complete and accurate copies of the Assumed Leases have been delivered to the Buyer.  Except as set forth in Section 3.8(b) of the of the applicable Business Schedules, neither the Sellers, Mill Creek Bank nor any of their Affiliates have assigned their interest under any Assumed Leases, or subleased all or any part of the space demised thereby, to any Third Party.

(c)    Restrictive Covenants.  To the Knowledge of the Sellers, there is no material violation of a condition or agreement contained in any covenant, easement or any similar agreement affecting the Owned Real Premises (except for violations that will be remedied in connection with the entry of the Sale Order that would, individually or in the aggregate, have a Material Adverse Effect on the use, occupancy or value of the Owned Real Premises).  To the Knowledge of the Sellers, the covenants affecting the Owned Real Premises do not with respect to each Owned Real Premises materially impair the ability of the Sellers and Mill Creek Bank to use any such Owned Real Premises in the operation of the Purchased Businesses as currently conducted.

(d)    Insurance Notices.  Except as set forth in Section 3.8(d) of the applicable Business Schedules, neither the Sellers nor any of their Affiliates have received any notice from any insurance carrier regarding defects or inadequacies in the Owned Real Premises, which, if not corrected, would result in the termination of the insurance coverage therefor or a material increase in the cost thereof.

(e)    Eminent Domain.  There is no pending or, to the Knowledge of the Sellers, threatened condemnation of any part of the Owned Real Premises by any Governmental Authority.

(f)    Utilities.  Neither the Sellers nor any of their Affiliates have received any notice from any utility company or municipality of any fact or condition which could result in the discontinuation of currently available or otherwise necessary sewer, water, electric, gas, telephone or other utilities or services for the Owned Real Premises or the Leased Premises.

(g)    No Commissions.  All brokerage commissions and other compensation and fees payable by Sellers, Mill Creek Bank or any of their Affiliates in connection with the Owned Real Premises or the Leased Premises, have been paid in full.

(h)     Improvements. To the Knowledge of the Sellers, all improvements on the Owned Real Premises conform in all material respects to all Laws, zoning, land use and building ordinances and health and safety ordinances (including, without limitation, the Americans with Disabilities Act), and neither the Sellers nor any of their Affiliates, have received any notice of any violation of any such Laws or ordinances that would, individually or in the aggregate, have a Material Adverse Effect on the use, occupancy or value of the Owned Real Premises. To the Knowledge of the Sellers, the Owned Real Premises are zoned for the various purposes for which the real estate and improvements have been used in connection with the normal operation of the Purchased Businesses. All improvements on the Owned Real Premises, including the leasehold improvements, have not suffered any casualty or other material damage that has not been repaired in all material respects. To the Knowledge of the Sellers, there is no material structural, mechanical or other significant defect, soil condition or deficiency in the improvements located on the Owned Real Premises that would, individually or in the aggregate, have a Material Adverse Effect on the use, occupancy or value of the Owned Real Premises.

(i)     Intentionally Deleted.

(j)     Contracts. Except as set forth on Section 3.8(j) of the applicable Business Schedules, there are no property management agreements affecting any of the Owned Real Premises and Leased Premises to which the Sellers, Mill Creek Bank or any of their Affiliates is a party.

(k)     Construction Allowances/Reimbursements. To the Knowledge of the Sellers, Section 3.8(k) of the applicable Business Schedules sets forth a summary of all construction allowances or reimbursements payable in connection with the Assumed Leases and the amounts thereof which, as of December 19, 2002, have not been paid or reimbursed, as applicable, by the Sellers, Mill Creek Bank or any of their Affiliates.

3.9.     Personal Property. Section 3.9 of the applicable Business Schedules contains a complete and accurate list of all furniture, fixtures and equipment which the Sellers can identify based on their books and records and limited review, as of November 30, 2002, located on the Leased Premises or the Owned Real Premises that is primarily used in connection with the applicable Purchased Businesses and Excluded Businesses.

3.10.     Receivables.

(a)     Section 3.10(a) of the applicable Business Schedules contains the following information regarding the Assigned Receivables with respect to the Purchased Businesses and the Excluded Businesses identified thereon as of November 30, 2002: (i) account number; (ii) name of each Obligor; (iii) secured status; (iv) the outstanding principal balance; and (v) the outstanding Accrued and Unpaid Interest.

(b)     Each Assigned Receivable was made or purchased by a Seller or its Affiliates (or by a predecessor of such Seller or such Affiliate): (i) in the ordinary course of business at the time such Assigned Receivable was made or purchased; (ii) in all material respects in accordance with then existing applicable Laws; and (iii) in all material respects in

accordance with such Seller's or such Affiliate's applicable underwriting and documentation guidelines then in effect at the time of origination or purchase.

(c)     Each Assigned Receivable has been originated or purchased and serviced and administered in all material respects in accordance with (i) the CFC Parties' standard Loan servicing and operating procedures as in effect from time to time; (ii) all applicable Laws; and (iii) the respective Loan documents governing such Assigned Receivable.

(d)     Each Assigned Receivable is evidenced by an Assumed Receivables Contract and constitutes a legal, valid and binding obligation of the respective Obligor(s), enforceable against such Obligor(s) in accordance with its terms, subject to bankruptcy, insolvency, moratorium, reorganization or similar laws in effect which affect the enforcement of creditors' rights generally, or rules of law governing equitable relief and other equitable remedies, or public policy.

(e)     Each secured Assigned Receivable is secured by a valid, enforceable and perfected Lien on the secured property described in the applicable security agreement, mortgage, deed to secured debt or deed of trust, pledge, collateral assignment or other security agreement. No such Assigned Receivable which is so secured has been waived or modified in any manner which would interfere in any material respect with the security interest.

(f)     There is no material breach existing under an Assigned Receivable and the Sellers have not waived any material breach. The Sellers have performed their obligations in all material respects under the Assigned Receivables.

3.11.   Material Agreements.     Section 3.11 of the applicable Business Schedules collectively contains a complete and accurate list of the Material Agreements with respect to the applicable Purchased Business and Excluded Business, except for the Loan files. For purposes hereof, "Material Agreement" shall mean (a) any Contract which requires payments by, on behalf of, or to the CFC Parties of $500,000 or more in the aggregate, (b) any Assumed Agreement, (c) the Credit Facilities (and any forbearance agreements or waivers related thereto) and (d) the Lehman Documents, in each case including all amendments and modifications thereto; provided, however, excluding Contracts that are terminable on 60 days notice or less without penalty. Except to the extent affected by the Chapter 11 Case, all Material Agreements are valid, in full force and effect and have not been modified or amended in any material respect. Except as set forth in Section 3.11 of the applicable Business Schedules, to the Sellers' Knowledge, there are no material disputes, oral agreements or forbearance programs in effect as to any of the Material Agreements. None of the Sellers or any of their Affiliates that is a party to any Material Agreement has received written notice of any material default by the Sellers or their Affiliates of any of the Material Agreements to which it is a party and, to the Knowledge of the Sellers, there has not occurred any material default thereunder by any other party thereto (except to the extent resulting under the terms of any such Material Agreement as a result of the Chapter 11 Case). Each such Material Agreement constitutes the legal, valid and binding obligations of the Sellers or any of their Affiliates that is a party thereto and, to the Knowledge of the Sellers, the respective Third Party, and is enforceable in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, moratorium, reorganization or similar laws in effect which affect the enforcement of creditors' rights generally, or rules of law

governing specific performance, equitable relief and other equitable remedies, or public policy (including without limitation the Chapter 11 Case). All Material Agreements, except for the Loan files, Assumed Receivables Contracts and dealer agreements relating to the PL Business, HI Business and CL Business, have been made available to the Buyer.

3.12.   Intellectual Property.

(a)   Section 3.12(a) of the applicable Business Schedules sets forth a complete and correct list of all: (i) registrations and applications pertaining to the Transferred Trademarks and Other Transferred Intellectual Property and the registration or application number, registration or filing date, jurisdiction and record owner as to each; (ii) material unregistered Transferred Trademarks; (iii) material unregistered copyrights and material computer software owned by the Sellers or Mill Creek Bank in the Purchased Businesses; and (iv) Transferred Intellectual Property Agreements. All registered Transferred Trademarks and registered Other Transferred Intellectual Property are unexpired, and all renewal fees and other maintenance fees that have fallen due on or prior to the effective date of this Agreement have been paid. Except as set forth in Section 3.12(a) of the applicable Business Schedules, no registered Transferred Trademarks or registered Other Transferred Intellectual Property is the subject of any proceedings before any governmental, registration or other authority in any jurisdiction, including any office action or other form of preliminary or final refusal of registration. The consummation of the transactions contemplated hereby will not alter or impair any Transferred Intellectual Property in any material respect except to the extent any Transferred Intellectual Property Agreements require a Third Party's consent prior to transfer.

(b)   Except as set forth in Section 3.12(b) of the applicable Business Schedules and except for any Permitted Liens, the Sellers or Mill Creek Bank own all right, title and interest in and to, or have a valid and enforceable right to use the Transferred Intellectual Property. The Transferred Intellectual Property and the GE Purchased Assets represent all Intellectual Property rights necessary for the conduct of the Purchased Businesses as now conducted and presently contemplated. The Sellers and Mill Creek Bank are in compliance with all material contractual obligations relating to the protection of the Transferred Intellectual Property Agreements. To the Knowledge of the Sellers, there are no conflicts with, or infringements of, the Transferred Trademarks and Other Transferred Intellectual Property by any third party. To the Knowledge of the Sellers, the Transferred Trademarks and Other Transferred Intellectual Property do not conflict with or infringe any Intellectual Property of any Third Party. There is no claim, suit, action or proceeding pending or, to the Knowledge of the Sellers, threatened against any Seller or Mill Creek Bank: (i) alleging any such conflict or infringement with any Third Party's Intellectual Property; or (ii) challenging such Seller's or Mill Creek Bank's ownership or use of, or the validity or enforceability of, the Transferred Trademarks and Other Transferred Intellectual Property. Except as set forth in Section 3.12(b) of the applicable Business Schedules, no written claims of infringement or misappropriation of Intellectual Property have been received from Third Parties with respect to the applicable Purchased Business.

(c)   Except as set forth in Section 2.8 and in Section 3.12(c) of the applicable Business Schedules, none of the Sellers or Mill Creek Bank is under any obligation to pay royalties or other payments in connection with any agreement, or is restricted from assigning its