rights respecting any Intellectual Property, nor will any Seller or Mill Creek Bank otherwise be, as a result of the execution and delivery of this Agreement or the performance of a Seller's obligations under this Agreement, in breach of any agreement relating to the Intellectual Property.

(d)    To the Knowledge of the Sellers, except as set forth in <u>Section 3.12(d)</u> of the applicable Business Schedules, no present or former employee, officer or director of any of the Sellers or Mill Creek Bank, or agent or outside contractor of any of the Sellers or Mill Creek Bank, holds any right, title or interest, directly or indirectly, in whole or in part, in or to any Transferred Intellectual Property (except to the extent that the foregoing would be a Permitted Lien or would otherwise not be material).

(e)    (i) To the Knowledge of the Sellers, none of the Sellers' trade secrets have been used, disclosed or appropriated to the detriment of any of the Sellers or Mill Creek Bank for the benefit of any Person other than the Sellers or Mill Creek Bank; and (ii) to the Knowledge of the Sellers, no employee, independent contractor or agent of any of the Sellers or Mill Creek Bank, in each case in any manner which, individually or in the aggregate, could reasonably be expected to be material, has misappropriated any trade secrets or other confidential information of any other Person in the course of the performance of his or her duties as an employee, independent contractor or agent of such Seller or Mill Creek Bank, in each case in any manner which, individually or in the aggregate, could reasonably be expected to be material.

3.13.    <u>Brokerage</u>. Other than Credit Suisse First Boston, the fees and disbursements of which will be a prepetition claim against the CFC Parties, and Lazard Freres & Co. LLC, the fees and disbursements of which are to be paid by Parent, no Person has any claim for brokerage commissions, finders' fees or similar compensation in connection with the transactions contemplated by this Agreement based on any arrangement or agreement made by or on behalf of the Sellers or Mill Creek Bank.

3.14.    <u>Employees</u>. <u>Section 3.14</u> of each Business Schedule sets forth the employee identification numbers, names, positions, years of service and place of employment of all employees of the Sellers and Mill Creek Bank and any of their Affiliates for each applicable Purchased Business and Excluded Business who are as of the date hereof working primarily in the applicable Purchased Business, Excluded Business or Mill Creek Bank (the "<u>Employees</u>"). A separate corresponding list which sets forth severance and current compensation for the Employees was provided to the Buyer. None of the Sellers or Mill Creek Bank or any of their Affiliates is a party to a collective bargaining agreement covering any of the Employees and, to the Knowledge of the Sellers, no union organizing activities have occurred with respect to any Employees.

3.15.    <u>Affiliate Transactions</u>. <u>Section 3.15</u> of the applicable Business Schedules describes all intercompany or affiliated transactions which are material (individually or in the aggregate) or Contracts under which credits or services are provided to or on behalf of the applicable Purchased Business and Excluded Business by the Sellers or Mill Creek Bank (including any "subsidiary" of Mill Creek Bank, as that term is defined in section 23A of the Federal Reserve Act) and to or on behalf of the Sellers or Mill Creek Bank (including any such "subsidiary") by the applicable Purchased Business and Excluded Business and all intercompany

transactions or Contracts among the Sellers with respect to the applicable Purchased Business and Excluded Business (including, in each case, a description of the costs and expenses charged to the applicable Purchased Business and Excluded Business in connection therewith). Mill Creek Bank (and any such "subsidiary") is not, and has not been since January 1, 2000, in violation of section 23A or section 23B of the Federal Reserve Act, whether or not any such violation is known by any Governmental Authority.

3.16.   ERISA; Employee Benefits.  The Sellers have furnished or made available to the Buyer complete and correct copies of all employee benefit plans, as defined in Section 3(3) of ERISA, and all other retirement, deferred compensation, incentive compensation, insurance, bonus, medical, stock option, severance, retention, vision, dental, vacation policy and other material employee benefit plans in which the Employees participate ("Employee Benefit Plans"), the current summary plan description for each Employee Benefit Plan subject to ERISA and any similar description of any other Employee Benefit Plan. None of the Employee Benefit Plans are multiemployer plans (as defined in Section 3(37) of ERISA). Each Employee Benefit Plan which is a defined contribution pension plan intended to be qualified under Section 401(a) of the Tax Code is so qualified. None of the Employee Benefit Plans are established under, or subject to, the laws of any country other than the United States.

3.17.   Depository Institutions.

(a)   Mill Creek Bank is "well-capitalized" (as that term is defined at 12 C.F.R. 225.2(r)(2)(i) and 325.103(b)(1)) and "well managed" (as that term is defined at 12 C.F.R. 225.81(c)) and its examination rating under the Community Reinvestment Act of 1977 is satisfactory or outstanding. Mill Creek Bank is not in a "troubled condition" (as that term is defined at 12 C.F.R. 303.101(c)).

(b)   Except as set forth in Section 3.17 of the applicable Business Schedules, Mill Creek Bank is not, and has not been since January 1, 2000, subject to any supervisory or remedial agreement of any kind, including but not limited to any memorandum of understanding, agreement, cease-and-desist order, consent order or enforcement order with or from any Governmental Authority.

(c)   Mill Creek Bank is in compliance in all material respects with all applicable Laws. There are no material investigations or proceedings pending or, to the Knowledge of the Sellers, threatened, alleging or contemplating any material violation of any applicable Law.

3.18.   Litigation.  Except for the Chapter 11 Case, as of the date hereof, there are no claims, actions, suits, investigations, proceedings or orders pending, except as set forth in Section 3.18 of the applicable Business Schedules, or to the Knowledge of the Sellers threatened against or affecting the CFC Parties at law or in equity, or before or by any Governmental Authority, that, individually or in the aggregate, are reasonably likely to (a) have a Material Adverse Effect, (b) materially and adversely affect the Sellers' or Mill Creek Bank's performance under this Agreement and the other Transaction Documents to which the Sellers or Mill Creek Bank are a party or (c) materially delay or impair the consummation of the transactions contemplated hereby or thereby.

3.19.  Financial Statements.  Section 3.19 of the applicable Business Schedules sets forth the unaudited consolidated balance sheet of the applicable Purchased Business and Excluded Business as of December 31, 2001, December 31, 2002 and September 30, 2002 and the related unaudited statements of income for the fiscal years ended December 31, 2001 and December 31, 2002 and the period ended September 30, 2002, and the unaudited consolidated balance sheets of the Purchased Businesses and Excluded Businesses as of December 31, 2001, December 31, 2002 and September 30, 2002 and the related unaudited statements of income for the fiscal years ended December 31, 2001 and December 31, 2002 and the period ended September 30, 2002 (collectively, including the notes thereto, the "Financial Statements").  The Financial Statements have been prepared from the accounting Records of the Purchased Businesses and Excluded Businesses and fairly present, in all material respects, the financial position as of the dates thereof and the results of the operations of the Purchased Businesses and Excluded Businesses for the periods therein described, in each case in accordance with GAAP, consistently applied, except as otherwise provided in the Financial Statements and the notes thereto; provided that the Financial Statements reflect intercompany allocations of overhead and other non-specific expenses between the Purchased Businesses and Excluded Businesses which the Sellers believe are reasonable which have been disclosed to the Buyer in reasonable detail. The November 30 Balance Sheet sets forth the unaudited consolidated balance sheet of the Company as of November 30, 2002 and was prepared from the accounting Records of the Company and fairly presents, in all material respects, the financial position of the Company as of the date thereof, except with respect to Residual Interests, B-2 Certificates, servicing liabilities and the net present value of guaranteed liabilities for others.  The Records from which the Financial Statements and the November 30 Balance Sheet were prepared were complete and accurate in all material respects at the time of such preparation.

3.20.  Indebtedness; Guarantees; Absence of Undisclosed Liabilities.

(a)    Except as set forth in the Financial Statements, no CFC Party has any outstanding indebtedness for borrowed money.  Except as set forth in Section 3.20(a) of each Business Schedule, no CFC Party is a party to any Loan agreement whereby the CFC Party has borrowed money, structured in the form of a loan or purchase and sale, has any outstanding Guarantees in favor of any other Person or is otherwise liable for any indebtedness for borrowed money of any other Person.  Except as set forth in Section 3.20(a) of each Business Schedule, no CFC Party has any Liabilities, individually or in the aggregate, of the type required to be reflected on a balance sheet or in the notes thereto prepared in accordance with GAAP which were not fully reflected or reserved against in the Financial Statements (other than current Liabilities incurred in the ordinary course of business), except for those that would not reasonably be expected to have a Material Adverse Effect.

(b)    In the event that a Stock Sale is consummated, as of the Closing Date, each Subject Subsidiary and its Subsidiaries will have transferred all Liabilities other than Assumed Liabilities as contemplated by Section 2.1(b).

(c)    As of the close of business on March 6, 2003, the outstanding Lehman Debt Amount was $676,215,802.00.

3.21.  Residual Assets.  As of September 30, 2002, the amount of $198.6 million included in the consolidated balance sheets of the Company under the heading "Guaranty Liability related to interests in Securitization Trusts held by Others" reflects amounts due to the holders of the B-2 Certificates from the CFC Parties and has been determined in accordance with GAAP by the use of reasonable estimates and assumptions in calculating values. The Residuals Schedule identifies, among other things, all of the assets within the categories set forth therein that are owned by the Company or any other CFC Party and the information contained therein is accurate in all material respects as of December 19, 2002. The Sellers own all assets identified on the Residuals Schedule and all servicing, interest-only or other payment rights (whether certificated or uncertificated) in the nature of a retained or residual interest arising in connection with a Ginnie Mae loan pool identified on the Ginnie Mae Pool List included in Attachment A to Section 3.26 of the Purchased Businesses Schedule, which list includes all Ginnie Mae loan pools in which the Company or any other CFC Party holds any interest.

3.22.  Tax Matters.

(a)  Each of the CFC Parties has filed all Tax Returns that it was required to file, and each has paid all Taxes, whether or not required to be paid in connection with the filing of a Tax Return. Such Tax Returns are true, correct and complete. The reserves for Taxes in the Financial Statements are adequate. Except as set forth in Section 3.22(a) of the applicable Business Schedules, none of the CFC Parties has waived any statute of limitations in respect of any Tax Returns or Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency.

(b)  Section 3.22(b) of the applicable Business Schedules sets forth (i) all Income Tax Returns filed with respect to the CFC Parties, the Purchased Businesses and the Excluded Businesses for all open Tax years, (ii) those Tax Returns that have been audited, (iii) those Tax Returns that currently are the subject of audit, and (iv) any dispute or claim concerning Tax Liability relating to the Purchased Businesses, the Excluded Businesses or the CFC Parties. The Company has made available to the Buyer correct and complete copies of all federal and state Tax Returns, examination reports, and statements of deficiencies assessed against or agreed to by the CFC Parties with respect to the Purchased Businesses and the Excluded Businesses for all open Tax years.

(c)  Except as set forth in Section 3.22(c) of the applicable Business Schedules, (i) for all open Tax years all Taxes required to be withheld, collected or deposited by each CFC Party have been timely withheld, collected and deposited and, to the extent required by law, all such Taxes have been paid when due to the appropriate taxing authority and each CFC Party is in compliance with respect to all withholding and information and reporting requirements in the Tax Code; (ii) there are no closing agreements pursuant to Section 7121 of the Tax Code (or corresponding provision of state, local or foreign law) or rulings or requests for rulings relating to any CFC Party; (iii) none of the assets of any CFC Party is "tax-exempt use property" within the meaning of Section 168(h) of the Tax Code; (iv) none of the CFC Parties have filed a consent under Section 341(f) of the Tax Code concerning collapsible corporations; (v) no transaction contemplated by this Agreement is subject to withholding under Section 1445 of the Tax Code (relating to "FIRPTA"); (vi) none of the CFC Parties will be required to include any adjustment under Section 481(c) of the Tax Code (or any corresponding provision of state,

local or foreign law) in taxable income as a result of a change in accounting method for a Tax period beginning on or before the Closing Date; (vii) no claim has ever been made by a Taxing authority in a jurisdiction where any CFC Party has never paid Taxes or filed Tax Returns asserting that such CFC Party is or may be subject to Taxes assessed by such jurisdiction; (viii) no power of attorney has been granted with respect to any matter relating to Taxes of any CFC Party that is currently in effect; (ix) none of the CFC Parties has made, changed or revoked, or permitted to be made, changed or revoked, any election or method of accounting with respect to Taxes affecting or relating to any CFC Party; and (x) no election has been made under Section 754 of the Tax Code for a partnership or other entity treated as a partnership for U.S. federal income tax purposes in which any of the CFC Parties is a partner or member or holds a residual interest.

(d)    Except as set forth in <u>Section 3.22(d)</u> of the applicable Business Schedules, as to each of the entities or arrangements identified as a REMIC in <u>Section 3.22(d)</u> of the applicable Business Schedules, it:

(i)    has at all times since its "startup day" (as defined in Section 860G(a)(9) of the Tax Code) duly qualified as a "real estate mortgage investment conduit" under Section 860D(a) of the Tax Code, and will not, by virtue of the transactions contemplated by this Agreement, including without limitation changes in the amount of certain servicing fees provided for by the Securitization Documents, fail to qualify as a real estate mortgage investment conduit under Section 860D(a) of the Tax Code;

(ii)    has engaged in no " prohibited transactions" (as defined in Section 860F(a)(2) of the Tax Code) and has never received any contributions after its startup day subject to the tax imposed by Section 860G(d) of the Tax Code;

(iii)    has not held for more than 30 months any assets intended to be treated as "foreclosure property" under Section 860G(a)(8) of the Tax Code;

(iv)    had an aggregate basis in its assets, as of December 31, 2001 equal to that set forth in <u>Section 3.22(d)</u> of the applicable Business Schedules;

(v)    has reported bad debt losses with respect to defaults on Loans that it held at the time by writing off the loans upon liquidation of the underlying collateral;

(vi)    has reported cancellation of indebtedness income, or has reduced interest or original issue discount deductions, with respect to REMIC Regular Interests it has issued, (A) on the basis of claiming no deduction for original issue discount or interest for Regular Interests to which cash distributions are currently due but remain unpaid and (B) by treating payments by the guarantor of the Junior P&I Regular Interests to a REMIC as a result of defaults as gross income to such REMIC;

(vii)    treats Guarantee Fees as an item of expense and not as an item distributable to the holder of its related REMIC Residual Interest;

(viii)    has reported deductions for original issue discount and interest accruals with respect to the REMIC Regular Interests it issued based on their issue prices determined in accordance with Section 1273 of the Tax Code and Section 1.1273-2 of the Treasury Regulations;

(ix)    has based original issue discount deductions with respect to REMIC Regular Interests in each period on (A) the projected cash flow remaining to be distributed on such REMIC Regular Interests, taking into account the prepayment assumption used in pricing, but a zero loss assumption, with respect to the Loans it holds, (B) making present value computations with respect to such projected cash flow based on the original yield to maturity of such REMIC Regular Interests, and (C) if such computations resulted in negative original issue discount or positive premium amortization ("Deferred Recognition Amounts") with respect to any REMIC Regular Interest, suspending the recognition of such Deferred Recognition Amounts until there is subsequent positive original issue discount or negative premium amortization with respect to such REMIC Regular Interest;

(x)    has timely filed all Tax Returns required to be filed by such REMIC;

(xi)    has withheld and paid over in a timely fashion all Taxes or other amounts required to be withheld by such REMIC and paid over to any governmental taxing authority; and

(xii)    has never itself been examined by, or itself entered into any closing agreement with, the Internal Revenue Service, and is not bound by any such closing agreement entered into between the Company or the Selling Subsidiaries and the Internal Revenue Service.

(e)    As to each REMIC Residual Interest included in, or held by an entity included in, the Purchased Assets:

(i)    as of December 31, 2001, such REMIC Residual Interest had (A) an adjusted basis and remaining unrecognized gain or loss in the hands of its holder and (B) an adjusted issue price as set forth in Section 3.22(e) of the applicable Business Schedules;

(ii)    except as set forth in Section 3.22(e) of the applicable Business Schedules, "excess inclusions", as defined in Section 860E(c) of the Tax Code, are computed correctly on the Schedule Qs sent to the holder of such REMIC Residual Interest;

(iii)    Guarantee Fees are not treated as an item of income that is received with respect to such REMIC Residual Interest, but as a fee;

(iv)    all schedules and projections of taxable income and distributions furnished by the Company or the Selling Subsidiaries to the Buyer with respect to

any such REMIC Residual Interest are correct based on their assumptions; provided, however, that no representation is made regarding the accuracy of those assumptions; and

(v)    it has been held at all times by the Company or the Selling Subsidiaries.

(f)    As to each REMIC Regular Interest included in, or held by an entity included in, the Purchased Assets:

(i)    as of December 31, 2001, such REMIC Regular Interest had (A) an adjusted basis and remaining unrecognized gain or loss in the hands of its holder and (B) an adjusted issue price as set forth in Section 3.22(f) of the applicable Business Schedules;

(ii)    all schedules and projections of taxable income and distributions furnished by the Company or the Selling Subsidiaries to the Buyer with respect to any such REMIC Regular Interest are correct based on their assumptions; provided, however, that no representation is made regarding the accuracy of those assumptions; and

(iii)    it has been held at all times by the Company or the Selling Subsidiaries.

(g)    With respect to the NIMS Issuer:

(i)    it is not an association taxable as a corporation, a publicly traded partnership within the meaning of Section 7704 of the Tax Code, or a taxable mortgage pool within the meaning of Section 7701(i) of the Tax Code;

(ii)    the NIMS Notes are indebtedness of the NIMS Issuer for all purposes of the Tax Code;

(iii)    as of December 31, 2001, it had a basis in its assets and adjusted issue price for the NIMS Notes it issued in the amounts set forth in Section 3.22(g) of the applicable Business Schedules;

(iv)    it has timely filed all Tax Returns required to be filed by it;

(v)    the 2001 Tax Return of the NIMS Issuer furnished by the Sellers to the Buyer is true, correct and complete in all material respects, with the exception that it does not reflect certain adjustments in the basis of certain Residual Interests and IO Regular Interests held by the NIMS Issuer that are intended to be made to reflect a revaluation of such Residual Interests and IO Regular Interests as of the startup day of the REMIC that issued them, with such revaluation as of such date to be consistent with the revaluation of similar REMIC interests made in the audit of the Sellers' Tax Returns for the period ended December 31, 1997, and with

such adjustments to be made in an amended Tax Return of the NIMS Issuer prepared in accordance with Section 5.19(c); and

(vi)    the basis of the NIMS Equity in the hands of its holder or holders as of December 31, 2001 was the amount set forth in Section 3.22(g) of the applicable Business Schedules.

(h)    Except as set forth in Section 3.22(h) of the applicable Business Schedules as to each of the MESA Issuers:

(i)    it is classified as a corporation for United States federal income tax purposes;

(ii)    it is not subject to taxation in any domestic or foreign jurisdiction;

(iii)    the MESA Notes it has issued are indebtedness of the MESA Issuers for all purposes of the Tax Code;

(iv)    it is not engaged, and has never been engaged, in a United States trade or business, and will not be so treated assuming continued compliance with the terms of the Securitization Documents governing the issuance of the related MESA Notes by the parties thereto;

(v)    it holds no assets, or interests in assets, that produce income that is subject to withholding under Sections 1441 through 1446 of the Tax Code or are otherwise subject to withholding by any domestic or foreign jurisdiction;

(vi)    it has at all times during its existence been controlled by the Company and the Selling Subsidiaries;

(vii)    any Grantor Trust created to hold the MESA Collateral in connection with a Securitization qualifies as an "investment trust" within the meaning of Treasury Regulation Section 301.7701-4(c)(2) and is classified as a grantor trust for federal income tax purposes;

(viii)    as of December 31, 2001, it had a basis in its REMIC assets, and an adjusted issue price for the MESA Notes it issued, equal to those shown in Section 3.22(h) of the applicable Business Schedules;

(ix)    with respect to its REMIC assets, it has determined its income and deductions in the same manner as the REMICs listed in Section 3.22(g) of the applicable Business Schedules; and

(x)    the basis of the MESA Equity in the hands of its holder or holders as of December 31, 2001 was the amount shown in Section 3.22(g) of the applicable Business Schedules.

(i)     The transactions contemplated, including without limitation any changes in servicing fees or guarantee arrangements with respect to any REMIC, by this Agreement will not adversely affect the tax characterizations of any of the Securitizations as originally represented in connection with such Securitizations, whether or not such representations were the subject of confirming legal opinions.

(j)     No elections have been made to treat any Securitizations, or parts thereof, as "financial asset securitization investment trusts" within the meaning of Section 860L(a) of the Tax Code.

(k)     Each CFC Party has filed all material sales and use Tax Returns that it was required to file, and paid all Taxes shown as due thereon. Such Tax Returns are true, correct and complete. Except as provided in Section 3.22(k) of the Business Schedules, a CFC Party has collected all but an immaterial number of resale certificates or other applicable documents as required for the application of any exemption with respect to any sales or use Tax applicable to the transfer of a repurchased or repossessed asset by a CFC Party, including all but an immaterial number of resale certificates for sales of repossessed manufactured housing.

(l)     As to any Securitization, or interest therein, not described in subsections (d) through (h) of this Section 3.22:

(i)     the entity ("Other Securitization Entity") holding the assets and issuing the securities issued in such Securitization is either a grantor trust, a partnership or a disregarded entity, and not an association taxable as a corporation, a publicly traded partnership or a taxable mortgage pool, for federal income tax purposes;

(ii)     the Other Securitization Entity has filed Tax Returns throughout its existence that are true, correct and complete in all material respects;

(iii)     to the extent the Other Securitization Entity has issued instruments designated as notes, bonds, debentures or other evidences of indebtedness, such instruments will be characterized as indebtedness for federal income tax purposes; and

(iv)     to the extent the Other Securitization Entity has issued instruments designated as certificates, units or other equity instruments, such instruments will be characterized as either evidencing a beneficial ownership interest in the assets held by such Other Securitization Entity or as evidencing ownership of an equity interest in such Other Securitization Entity itself.

3.23.   Insurance. Set forth in Section 3.23 of the applicable Business Schedules is a list of all Insurance Policies for such Purchased Business and Excluded Businesses, including summary coverage terms and expiration dates. All premiums due and payable with respect to the Insurance Policies have been timely paid. No notice of cancellation of, or indication of an intention not to renew, any material Insurance Policy has been received by the Sellers. To the Knowledge of the Sellers, all such Insurance Policies are in full force and effect and the Sellers and Mill Creek Bank are not in default under any provisions of the Insurance Policies.

3.24. <u>Environment, Health and Safety</u>. The CFC Parties are in compliance in all material respects with all Environmental Laws applicable to the Purchased Businesses and the Purchased Assets and have not received written notice from any Governmental Authority or other Person alleging non-compliance or that they are otherwise liable for the clean-up or other environmental response costs pursuant to any Environmental Law.

3.25. <u>Accounting Controls</u>. The CFC Parties have devised and maintained systems of internal accounting controls which they believe are sufficient to provide reasonable assurances that (a) all material transactions are executed in accordance with its management's general or specific authorization; (b) all material transactions are recorded as necessary to permit the preparation of financial statements in conformity with GAAP or any other criteria applicable to such statements; (c) access to its material property and assets is permitted only in accordance with management's general or specific authorization; and (d) the recorded accountability for items is compared with the actual levels thereof at reasonable intervals and appropriate action is taken with respect to any variances.

3.26. <u>Summary of Securitizations</u>. The information set forth in <u>Section 3.26</u> of the applicable Business Schedules which identifies, among other things, all Securitizations, is true, complete and correct as of December 19, 2002.

3.27. <u>Representations as to Certain Purchased Assets</u>. <u>Exhibit A</u> sets forth certain additional representations and warranties with respect to the Loans and the Residual Assets.

3.28. <u>Securities Offerings</u>. The offering memoranda, offering circulars, prospectuses and any other offering documents or registration statements for the offering of securities, and any amendments or supplements thereto, distributed, delivered or filed in connection with the Securitizations of the CFC Parties, including, without limitation, the offering materials related to the NIMS Trust and the MESA Notes, as of their dates, did not contain any untrue statement of a material fact or omit to state any material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.

3.29. <u>No Powers of Attorney</u>. Except as set forth in <u>Section 3.29</u> of the applicable Business Schedules, no CFC Party has any powers of attorney or comparable delegations of authority outstanding with respect to the Purchased Assets.

3.30. <u>Securities Laws Matters; No Registration</u>. No trust, arrangement, issuer or other entity will be required to register as an investment company under the Investment Company Act of 1940, as amended, and no issue of securities or securities transaction will be required to be registered under the Securities Act of 1933, as amended, as a result of the sale of Purchased Assets pursuant to this Agreement. The Buyer will be an eligible transferee of any Residual Assets to be transferred to the Buyer under this Agreement in accordance with the documents governing each Securitization and any such transfer will be completed in accordance with such documents. The statutory or regulatory foundations for exemptions from registration under the Investment Company Act of 1940, as amended, on which the Securitizations rely include only Rule 3a-7, Section 3(c)(5)(C) and Section 3(c)(5)(A) of the Investment Company Act of 1940, as amended.

3.31.    <u>Green Tree RECS II Guaranty Corporation</u>. Except as set forth in <u>Section 3.31</u> of the applicable Business Schedules, Green Tree RECS II Guaranty Corporation ("<u>RECS</u>") has no outstanding indebtedness or other Liabilities or Guarantees in favor of any other Person. <u>Section 3.31</u> of the applicable Business Schedules contains a complete and accurate list of all Contracts to which RECS is a party, in each case including all amendments and modifications thereto (the "<u>RECS Contracts</u>"). To the Sellers' Knowledge, there are no disputes, oral agreements or forbearance programs in effect as to any of the RECS Contracts. There has not occurred any default by RECS under any of the RECS Contracts, and to the Knowledge of the Sellers, there has not occurred any default thereunder by any other party thereto. RECS has complied with all terms and conditions of its Organizational Documents.

3.32.    <u>Conseco HE/HI 2001-B-2, Inc</u>. Conseco HE/HI 2001-B-2, Inc. has no assets, properties, Contracts or rights which constitute Purchased Assets.

3.33.    <u>Conseco Finance Securitizations Corp.</u> Except as set forth in <u>Section 3.33</u> of the applicable Business Schedules, Conseco Finance Securitizations Corp. has no assets, properties or rights which constitute Purchased Assets. Except as set forth in <u>Section 3.33</u> of the applicable Business Schedules, Conseco Finance Securitizations Corp. has no indebtedness or other Liabilities or Guarantees in favor of any other Person. <u>Section 3.33</u> of the applicable Business Schedules contains a complete and accurate list of all Contracts to which Conseco Finance Securitizations Corp. is a party, in each case including all amendments and modifications thereto (the "<u>CFSC Contracts</u>"). Except as set forth in <u>Section 3.33</u> of the applicable Business Schedules, to the Sellers' Knowledge, there are no disputes, oral agreements or forbearance programs in effect as to any CFSC Contracts. Except as set forth in <u>Section 3.33</u> of the applicable Business Schedules, there has not occurred any default by Conseco Finance Securitizations Corp. under any of the CFSC Contracts. To the Knowledge of the Sellers, there has not occurred any default thereunder by any other party thereto. Conseco Finance Securitizations Corp. has complied with all terms and conditions of its Organizational Documents.

3.34.    <u>Green Tree First GP Inc.</u> Except as set forth in <u>Section 3.34</u> of the applicable Business Schedules, Green Tree First GP Inc. has no outstanding indebtedness or other Liabilities or Guarantees in favor of any other Person. <u>Section 3.34</u> of the applicable Business Schedules contains a complete and accurate list of all Contracts to which Green Tree First GP Inc. is a party, in each case including all amendments and modifications thereto (the "<u>GTF Contracts</u>"). To the Sellers' Knowledge, there are no disputes, oral agreements or forbearance programs in effect as to any of the GTF Contracts. There has not occurred any default by Green Tree First GP Inc. under any of the GTF Contracts, and to the Knowledge of the Sellers, there has not occurred any default thereunder by any other party thereto. Green Tree First GP Inc. has complied with all terms and conditions of its Organizational Documents.

3.35.    <u>Green Tree Second GP Inc.</u> Except as set forth in <u>Section 3.35</u> of the applicable Business Schedules, Green Tree Second GP Inc. has no outstanding indebtedness or other Liabilities or Guarantees in favor of any other Person. <u>Section 3.35</u> of the applicable Business Schedules contains a complete and accurate list of all Contracts to which Green Tree Second GP Inc. is a party, in each case including all amendments and modifications thereto (the "<u>GTS Contracts</u>"). To the Sellers' Knowledge, there are no disputes, oral agreements or forbearance

programs in effect as to any of the GTS Contracts. There has not occurred any default by Green Tree Second GP Inc. under any of the GTS Contracts, and to the Knowledge of the Sellers, there has not occurred any default thereunder by any other party thereto. Green Tree Second GP Inc. has complied with all terms and conditions of its Organizational Documents.

3.36.    Conseco Finance Advance Receivables Corp. Except for the Servicer Advance Facility, Conseco Finance Advance Receivables Corp. has no outstanding indebtedness or other Liabilities or Guarantees in favor of any other Person. The Contracts executed in connection with the Servicer Advance Facility, including all amendments and modifications thereto (the "CFARC Contracts"), are all of the Contracts to which Conseco Finance Advance Receivables Corp. is a party. The Sellers have delivered all CFARC Contracts to the Buyer. To the Sellers' Knowledge, there are no disputes, oral agreements or forbearance programs in effect as to any of the CFARC Contracts. Except as set forth in Section 3.36 of the applicable Business Schedules, there has not occurred any default by Conseco Finance Advance Receivables Corp. under any of the CFARC Contracts, and to the Knowledge of the Sellers, there has not occurred any default thereunder by any other party thereto. Conseco Finance Advance Receivables Corp. has complied with all terms and conditions of its Organizational Documents.

3.37.    Conseco Finance Liquidation Expense Advance Receivables 2002-B Corp. Except for the Clear Facility, Conseco Finance Liquidation Expense Advance Receivables 2002-B Corp. has no outstanding indebtedness or other Liabilities or Guarantees in favor of any other Person. The Contracts executed in connection with the Clear Facility, including all amendments and modifications thereto (the "CFLEAR 2002-B C Contracts"), are all of the Contracts to which Conseco Finance Liquidation Expense Advance Receivables 2002-B Corp. is a party. The Sellers have delivered all CFLEAR 2002-B C Contracts to the Buyer. To the Sellers' Knowledge, there are no disputes, oral agreements or forbearance programs in effect as to any of the CFLEAR 2002-B C Contracts. Except as set forth in Section 3.37 of the applicable Business Schedules, there has not occurred any default by Conseco Finance Liquidation Expense Advance Receivables 2002-B Corp. under any of the CFLEAR 2002-B C Contracts, and to the Knowledge of the Sellers, there has not occurred any default thereunder by any other party thereto. Conseco Finance Liquidation Expense Advance Receivables 2002-B Corp. has complied with all terms and conditions of its Organizational Documents.

3.38.    Convergent Lending Services, LLC. Except as set forth in Section 3.38 of the applicable Business Schedules, Convergent Lending Services, LLC has no outstanding indebtedness or other Liabilities or Guarantees in favor of any other Person. Section 3.38 of the applicable Business Schedules contains a complete and accurate list of all Contracts to which Convergent Lending Services, LLC is a party, in each case including all amendments and modifications thereto (the "Convergent Contracts"). To the Sellers' Knowledge, there are no disputes, oral agreements or forbearance programs in effect as to any of the Convergent Contracts. There has not occurred any default by Convergent Lending Services, LLC under any of the Convergent Contracts, and to the Knowledge of the Sellers, there has not occurred any default thereunder by any other party thereto. Convergent Lending Services, LLC has complied with all terms and conditions of its Organizational Documents.

ARTICLE IV.

REPRESENTATIONS AND WARRANTIES OF THE BUYER

As a material inducement to the Sellers to enter into this Agreement, the Buyer hereby represents and warrants to the Sellers the following:

4.1.    Organization and Corporate Power. The Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware, with the requisite power and authority to enter into this Agreement and the other Transaction Documents to which the Buyer is a party and perform its obligations hereunder and thereunder.

4.2.    Authorization of Transaction. The execution, delivery and performance of this Agreement and the other Transaction Documents to which the Buyer is a party have been duly and validly authorized by all requisite action on the part of the Buyer, and no other corporate proceedings on its part are necessary to authorize the execution, delivery or performance of this Agreement. This Agreement constitutes, and each of the other Transaction Documents to which the Buyer is a party shall when executed constitute, a valid and binding obligation of the Buyer, enforceable in accordance with their respective terms, except as such enforceability may be limited by applicable receivership, conservatorship and supervisory powers of bank regulatory agencies generally as well as by bankruptcy, insolvency, moratorium, reorganization or similar laws in effect which affect the enforcement of creditors' rights generally, or rules of law governing specific performance, equitable relief and other equitable remedies.

4.3.    No Violation. The Buyer is not subject to or obligated under its Organizational Documents, any applicable Law or any Contract, or any license, franchise or permit, which would be breached or violated by its execution, delivery or performance of this Agreement and the other Transaction Documents to which the Buyer is a party.

4.4.    Governmental Authorities and Consents. Except as required by (a) the Finance Laws, (b) the Insurance Laws and (c) the Change in Bank Control Act and Utah banking Laws with respect to the change of control of Mill Creek Bank, the Buyer is not required to submit any notice, report or other filing with any Governmental Authority, and no consent, approval or authorization of any Governmental Authority or any other Person is required to be obtained by the Buyer, in connection with the execution or delivery by it of this Agreement and the other Transaction Documents to which the Buyer is a party or the consummation of the transactions contemplated hereby or thereby, except for the filing and expiration or termination of the waiting period under the HSR Act. Except for the consents, approvals and authorizations related to the conditions set forth in Section 6.11(b) and (c) hereof, the Buyer is not aware of any fact or circumstance relating to the Buyer which would prohibit or unduly restrict the Buyer or any of the Sellers from obtaining any consent, approval or authorization of any Governmental Authority or any other person which is required to be obtained in connection with the transactions contemplated by this Agreement.

4.5.    Litigation. As of the date hereof, there are no claims, actions, suits, investigations, proceedings or orders pending or, to the Buyer's knowledge, threatened against or affecting the Buyer at law or in equity, or before or by any Governmental Authority, which

would adversely affect the Buyer's performance under this Agreement and the other Transaction Documents to which the Buyer is a party or the consummation of the transactions contemplated hereby or thereby.

4.6.    Brokerage.  No Person has any claim for brokerage commissions, finders' fees or similar compensation in connection with the transactions contemplated by this Agreement based on any arrangement or agreement made by or on behalf of the Buyer.

4.7.    Availability of Funds.  The Buyer has obtained commitment letters (true and correct copies of which have heretofore been provided to the Company) from financial institutions to borrow sufficient funds to enable it to consummate the transactions contemplated by this Agreement.  At the Closing, the Buyer will have sufficient funds to enable it to consummate the transactions contemplated by this Agreement.

4.8.    Stock Purchase.  The Shares of any Subject Subsidiary purchased by the Buyer pursuant to this Agreement, if any, are being purchased for investment only and not with a view to any public distribution thereof, and the Buyer will not offer to sell or otherwise dispose of such Shares so purchased by it in violation of any of the registration requirements of the Securities Act of 1933, as amended, or any applicable state securities laws.

4.9.    Knowledge.  As of the date hereof, the Buyer has no actual knowledge of any change, circumstance, breach or event which constitutes or has resulted in a Material Adverse Effect.

ARTICLE V.

ADDITIONAL AGREEMENTS

5.1.    Tax Matters.

(a)    Transfer Taxes.  All transfer, documentary, sales, use, stamp, registration and other such Taxes and fees (including any penalties and interest thereon) incurred in connection with this Agreement shall be paid by the Sellers when due, and the Sellers shall, at their own expense, file all necessary Tax Returns and other documentation with respect to all such transfer, documentary, sales, use, stamp, registration and other Taxes and fees, and if required by applicable law, the Buyer shall join in the execution of any such Tax Returns and other documentation; provided, however, the Sellers and the Buyer hereby waive any requirements under any bulk sale rule arising from any transaction under this Agreement that relates to the application of any sales or use Taxes.

(b)    Tax Sharing and Indemnification.

(i)    The Sellers shall indemnify and hold harmless the Buyer and its Affiliates, each Subject Subsidiary, each Subsidiary of any Subject Subsidiary, and their respective directors, officers, employees, representatives, agents, successors and assigns with respect to any and all Losses that may be imposed on the Buyer, any Subject Subsidiary, any Subsidiary of any Subject Subsidiary, or in respect of the Purchased Assets resulting from (A) any Taxes of any CFC Party

- 60 -

for any Pre-Closing Tax Period, (B) any Taxes of any Affiliated Group that includes Parent or any CFC Party, including any Liability for Tax under Treasury Regulation Section 1.1502-6 or any comparable state, local or foreign Tax provision, except for any Taxes of any Subject Subsidiary (or a Subsidiary of a Subject Subsidiary after the Closing Date) for any Post-Closing Tax Period relating to an Affiliated Group of which the Subject Subsidiary (or such Subsidiary of a Subject Subsidiary) is a member after the Closing Date, (C) any breach of any representation or warranty of the Sellers contained in <u>Section 3.22</u> or any schedule delivered pursuant thereto, (D) any Taxes arising from a Section 338 Election with respect to any CFC Party, or (E) any Taxes arising out of the application of any bulk sale rule under federal, state, local or foreign law to any transaction contemplated by this Agreement including Taxes resulting from the failure to comply with any such bulk sale rule applicable in respect of any sales and use taxes.

(ii)    For any federal, state, local or foreign Tax purposes, Taxes, if any, attributable to a Straddle Period of any Subject Subsidiary or any Subsidiary of a Subject Subsidiary shall be allocated to (A) the Sellers for the Pre-Closing Tax Period, and (B) the Buyer for the Post-Closing Tax Period. For purposes of the preceding sentence, Taxes for the Pre-Closing Tax Period and for the Post-Closing Tax Period of each Straddle Period shall be determined on the basis of an interim closing of the books as of the close of business on the Closing Date as if such Straddle Period consisted of one Taxable period ending at the close of business on the Closing Date followed by a Taxable period beginning on the day following the Closing Date. For purposes of this subparagraph (ii), exemptions, allowances or deductions that are calculated on an annual basis, such as the deduction for depreciation, shall be apportioned on a daily basis. Real, personal and intangible property Taxes of any Selling Subsidiary or any Subsidiary of any Subject Subsidiary or any Subsidiary of a Subject Subsidiary shall be equal to the amount of such property Taxes for the entire Straddle Period multiplied by a fraction, the numerator of which is the number of days during the Straddle Period that are in the Pre-Closing Tax Period and the denominator of which is the total number of days in the Straddle Period. For purposes of this <u>Section 5.1</u> and the representation contained in <u>Section 3.22</u>, any Tax that is based in whole or in part on income earned during a particular Taxable period shall be deemed to be a Tax attributable to and imposed in respect of such Taxable period; <u>provided, that</u> for purposes of this sentence, the term "<u>Taxable period</u>" shall include any portion of a Taxable period that ends on and includes the Closing Date.

(iii)    Except as otherwise provided in <u>Section 5.1</u>, if a payment is required under <u>Section 5.1</u>, the Sellers shall discharge their obligation by paying the amount due not later than 10 days after notice to the Sellers stating that an amount is owed under <u>Section 5.1</u> to the Buyer, the amount thereof, and that an indemnity payment is requested.

(iv)    For the avoidance of doubt, any amount payable by the Sellers pursuant to <u>Section 5.1(a)</u> shall be reduced by any estimated tax paid prior to

Closing with respect to the Tax for which Buyer would otherwise have been liable under <u>Section 5.1(b)(i)</u>.

(c)    <u>Tax Returns.</u>

(i)    The Sellers shall prepare or cause to be prepared, and file or cause to be filed, all Tax Returns of each CFC Party, including consolidated, combined or unitary Tax Returns which include any CFC Party, for all Taxable periods of each CFC Party that end on or prior to the Closing Date. All such Tax Returns shall be prepared on a basis that is consistent with the manner in which the Sellers prepared or filed such Tax Returns for prior periods. No later than 30 days prior to the due date of such Tax Returns, the Sellers shall provide the Buyer with copies of (A) in the case of consolidated, combined or unitary Tax Returns that include a Subject Subsidiary and any Subsidiary of such Subject Subsidiary, pro forma materials for each Subject Subsidiary to be included in such consolidated, combined or unitary Tax Returns, (B) all other Tax Returns prepared by Sellers pursuant to <u>Section 5.1(c)</u>, and (C) such work papers and other documents as may be reasonably necessary to determine the accuracy and completeness of such materials or Tax Returns. If the Buyer notifies the Sellers in writing within 10 days after receiving such materials or a Tax Return of any comments of the Buyer, the Sellers shall incorporate any such reasonable comments provided by the Buyer. If Sellers dispute the reasonableness of any such comment by the Buyer, such dispute shall be resolved by a "Big Four" accounting firm as selected by the Buyer in its discretion (other than an accounting firm regularly and materially used by the Buyer or its Affiliates) and such Tax Returns (or any amendment to such return) shall be filed in a manner consistent with resolution of such dispute. The Sellers shall, upon the Buyer's request, make reasonably available to the Buyer at a mutually convenient time and location any personnel involved in the preparation of any materials or Tax Return subject to this <u>Section 5.1(c)(i)(A)</u> and <u>(B)</u> for the purpose of answering any questions the Buyer may have regarding any such materials or Tax Return or the manner in which the same was prepared. The Buyer shall be responsible for filing all Tax Returns required to be filed by or on behalf of each Subject Subsidiary and each Subsidiary of any Subject Subsidiary for Taxable periods ending after the Closing Date.

(ii)    With respect to any Tax Return required to be filed by the Buyer pursuant to subparagraph (i) above for a Straddle Period of any Subject Subsidiary or any Subsidiary of a Subject Subsidiary, the Buyer shall provide the Company with true copies of each of such completed Tax Returns, such work papers and other documents as may be reasonably necessary to determine the accuracy and completeness of such Tax Returns, and a statement setting forth the amount of Tax shown on such Tax Return that is allocable to the Sellers pursuant to subparagraph (ii) of paragraph (b) above (the "<u>Statement</u>") at least 30 days prior to the due date for the filing of such Tax Return. If the Company notifies the Buyer in writing within 10 days after receiving the Statement that the Company questions the information contained therein, then a "Big Four" accounting firm as selected by the Buyer in its discretion (other than an

accounting firm regularly and materially used by the Buyer or its Affiliates) shall be instructed to review the Statement and determine its accuracy and reasonableness within 15 days. If such accounting firm determines that the Statement is accurate, or if the Company does not provide any such notification, then not later than five days before the due date for payment of Taxes with respect to such Tax Return, the Sellers shall pay to the Buyer an amount equal to the Taxes shown on the Statement as being allocable to the Sellers pursuant to subparagraph (ii) of paragraph (a) above. If the accounting firm appointed to review a Statement pursuant to the foregoing procedure in this Section 5.1(c)(ii) determines that the Statement is inaccurate, the Buyer will amend the Statement and any related Tax Returns in a manner consistent with removing any such inaccuracy, and the Sellers shall pay the amount due to the Buyer within five days of the receipt of the amended Statement.

(iii)    After the Closing Date, the Buyer and the Sellers shall provide each other with reasonable cooperation in connection with the preparation of Tax Returns of the CFC Parties and shall make available to the other and to any Taxing authority, as reasonably requested, all information, records or documents relating to Tax liabilities or potential Tax liabilities of the Selling Subsidiaries and their Subsidiaries for all periods prior to or including the Closing Date and shall preserve all such information, records and documents until the expiration of any statute of limitations or extensions thereof.

(d)    Tax Contests. The Buyer shall promptly notify the Company in writing upon receipt by the Buyer, any Subject Subsidiary or any Subsidiary thereof of written notice of any Tax Proceeding in respect of any Subject Subsidiary or any Affiliate of any Subject Subsidiary which, if determined adversely to the taxpayer, may be grounds for indemnification under this Section 5.1. Notwithstanding the foregoing, the failure of the Buyer to give notice under the preceding sentence shall not affect the Buyer's right to indemnification or relieve the Sellers of any other obligations hereunder unless such failure shall preclude the defense of such claim and the Sellers have been materially prejudiced by the Buyer's failure to give such notice, in which case the Sellers shall be relieved from their obligations under Section 5.1 only to the extent of such material prejudice. After notice to the Buyer, the Sellers will have the right to elect to assume the defense of any such Tax Proceeding at the Sellers' own expense. The Buyer and its representatives shall have the right to observe any such Tax Proceeding with counsel of its choice and at its own expense and to receive in advance copies of all submissions to be made to any Tax authority or to any court. The Sellers, in exercising their control of any such Tax Proceeding, shall consider in good faith all comments and suggestions of the Buyer in respect of such Tax Proceeding, including but not limited to comments on submissions and overall strategy. In the event that issues relating to potential adjustment for which the Sellers may be held liable are required to be dealt with in the same Tax Proceeding as separate issues relating to a potential adjustment for which the Buyer, a Subject Subsidiary, a Subsidiary of a Subject Subsidiary or an Affiliate thereof may be liable, the Buyer shall have the right, at its own expense, to control the Tax Proceeding with respect to the latter issues. Under waiver of its right to indemnity hereunder, the Buyer may take sole control of any Tax Proceeding, at its sole cost and expense, and in such case the Sellers shall have no right to observe or participate in such Tax Proceeding. The Sellers shall not enter into any compromise or agreement to settle any claim in a Tax

Proceeding involving Liability for Taxes of a Subject Subsidiary, a Subsidiary of a Subject Subsidiary, or for which the Sellers may otherwise be required to indemnify the Buyer under this Agreement without the consent of the Buyer, such consent not to be unreasonably withheld. Any refund received by the Buyer or any Affiliate thereof of Taxes with respect to which the Sellers have made payment pursuant to its obligation under Section 5.1(b) shall be for the account of the Sellers.

(e)    Tax Sharing Agreements.  Any and all Tax sharing, Tax indemnity or Tax allocation agreements between any Seller, a Subject Subsidiary and/or any Affiliate thereof that were in effect at any time on or prior to the Closing shall terminate not later than the Closing. No further amounts shall be payable by any the Buyer, any Subject Subsidiary, any Subsidiary of a Subject Subsidiary or any Affiliate thereof under such agreements following the Closing and the Buyer, any Subject Subsidiary, any Subsidiary of a Subject Subsidiary, or any Affiliate thereof shall have no further obligations thereunder following the Closing. Notwithstanding the foregoing, with respect to the filing of consolidated income Tax Returns to the extent permitted by law each Subject Subsidiary shall elect to relinquish any carryback period which would include any Pre-Closing Tax Period with respect to carrybacks of net operating losses, net capital losses, unused tax credits and other deductible or creditable tax attributes.

(f)    Claims Adjusted for Tax Benefits.  The amount of any indemnity payment owed by the Sellers to the Buyer under this Section 5.1 shall be adjusted if such indemnity payment is made in connection with (i) the purchase of Purchased Businesses or (ii) the purchase of any Subject Subsidiary or any Subsidiary of any Subject Subsidiary if a Section 338 Election is made with respect to such purchase.  The amount of any such indemnity payment shall be reduced to take account of any net Tax benefit realized by the Buyer arising from the item resulting in such indemnity payment, and increased by any net Tax cost realized by the Buyer as a result of the receipt of such indemnity payment being treated as income or as a reduction in purchase price. For purposes of this Section 5.1(f), (x) any net Tax benefit shall be calculated by discounting (based on semi-annual compounding) the Tax benefit from the date it is expected to be realized to the date the indemnity payment is made using a discount rate equal to the overpayment rate contained in Section 6621(a)(1) of the Tax Code and (y) any net Tax cost shall be calculated by increasing the indemnity payment by an interest factor (based on semi-annual compounding) equal to the overpayment rate contained in Section 6621(a)(1) of the Tax Code from the Closing Date to the date the indemnity payment is made.

(g)    Allocation.  Prior to the Closing, the Parties shall endeavor to agree upon an allocation of the Purchase Price and the Assumed Liabilities among the Purchased Assets. If the Parties agree upon such an allocation, such allocation shall be used for all purposes, including Tax and financial accounting purposes and including with respect to any Section 338 Election. The Sellers, their Affiliates and the Buyer will file all Tax Returns (including amended returns and claims for refund) and information reports in a manner consistent with such allocation. Without limiting the generality of the foregoing, the Buyer's allocation of the adjusted grossed-up basis (within the meaning of Treasury Regulation Section 1.338-5) and the Sellers' allocation of the aggregate deemed sales price (within the meaning of Treasury Regulation Section 1.338-4) shall be consistent with such allocation.

(h)    Cooperation on Tax Matters.

(i)    The Buyer and the Sellers shall cooperate fully, as and to the extent reasonably requested by any Party, in connection with the filing of Tax Returns for the Purchased Businesses, including without limitation any REMICs listed on the Business Schedules, and any Tax Proceeding in respect of the Purchased Businesses. Such cooperation shall include the retention and (upon any Party's request) the provision of records and information which are reasonably relevant to any such Tax Proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder. The Buyer and the Sellers agree (A) to retain all books and records with respect to Tax matters and pertinent to the Purchased Businesses until the expiration of the statute of limitations (and, to the extent notified by the other Party, any extensions thereof) for the respective taxable periods, and to abide by all record retention agreements entered into with any taxing authority, and (B) to give the other Party reasonable written notice prior to transferring, destroying or discarding any such books and records and, if the other Party so requests, such Party shall allow the other Party to take possession of such books and records.

(ii)    To facilitate the Buyer's decision on whether to acquire assets through an election to purchase the Shares of a Subject Subsidiary under Section 2.1(b), and whether to effect a Section 338 Election in respect to one or more Subject Subsidiaries, the Sellers shall deliver to the Buyer as promptly as practicable following the execution and delivery of this Agreement any and all information reasonably requested by the Buyer in connection with determining the expected Tax consequences of the transactions contemplated by this Agreement (such information to include, without limitation, information regarding the Tax attributes of the Sellers including information regarding the adjusted tax basis of each asset owned by any Selling Subsidiary). Such information shall be provided at the Sellers' expense and shall be the most current information reasonably available; provided, however, that all such information shall be current as of a date no earlier than September 30, 2002.

(i)    Tax Election.  In any case in which the Buyer elects a Stock Sale, the Sellers will, at the Buyer's request no later than six months after the Closing Date join in treating the transaction as a purchase of assets for Tax purposes through an election under Tax Code Section 338(h)(10) and any analogous provision of state, local or foreign Law (a "Section 338 Election"). The Buyer shall provide to the Sellers (i) a draft Internal Revenue Service Form 8023 no later than eight months after the Closing Date prepared in a manner consistent with Section 5.1(g) and (ii) any other forms necessary to effect the Section 338 Election under state, local or foreign Law no later than 30 days prior to the due date thereof. Any dispute with respect to such forms shall be resolved in the manner set forth in Section 5.1(c)(i) and such forms shall be executed on behalf of the Sellers and delivered to the Buyer at least 15 days prior to the last day for filing such forms when due and in the manner required under applicable Law. The Buyer may make such requests separately with respect to a Section 338 Election with respect to any Subject Subsidiary and any Subsidiary of any Subject Subsidiary. If the Buyer requests that one

or more Section 338 Elections be made with respect to any Subject Subsidiary and/or any Subsidiary of any Subject Subsidiary, then Section 5.1(g) shall apply to determine the allocation of the Purchase Price and other relevant items among the assets of the Subject Subsidiaries and, if applicable, one or more of its Subsidiaries. The Sellers shall deliver to the Buyer as promptly as practicable, and in any event no later than May 1, 2003, any and all information in connection with determining whether to make any Section 338 Election (such information to include, without limitation, the adjusted tax basis of each asset owned by any Selling Subsidiary and the Sellers' (and any Affiliate of the Sellers') tax basis in the stock of each Selling Subsidiary). Any and all information provided pursuant to this Section 5.1(i) shall be provided at the Sellers' expense and shall be the most current information reasonably available; provided, however, that (x) all such information provided shall be current as of no earlier than September 30, 2002, (y) the Sellers shall deliver to the Buyer as promptly as practicable, and in any event within 20 days of receipt of the Buyer's request therefor, updates of the information provided pursuant to (x) of this proviso that is current as of no earlier than December 31, 2002.

5.2.  Access to Information and Facilities.  The Sellers agree that, during the Pre-Closing Period, the Buyer and its representatives shall, upon reasonable notice and so long as such access does not unreasonably interfere with the business operations of any CFC Party, have full access to all Facilities, officers and management employees (and the Sellers shall use their commercially reasonable efforts to cause the CFC Parties' independent accountants to be available to the Buyer on the same basis) and shall be entitled to make such reasonable investigation of the properties, businesses and operations of the CFC Parties and such examination of the Records and financial condition of the CFC Parties as it reasonably requests.

5.3.  Confidentiality.

(a)  The Buyer acknowledges that all information provided to it and any of its Affiliates, employees, agents and representatives by the Sellers and their respective Affiliates, employees, agents and representatives ("Confidential Information") is subject to the terms of the Confidentiality Agreement, the terms of which are hereby incorporated herein by reference although, notwithstanding such agreement, the Buyer may disclose Confidential Information to any nationally recognized securities or statistical rating agency if and to the extent that the Buyer determines that doing so is desirable. Effective upon, and only upon, the Closing, the Confidentiality Agreement shall terminate; provided, however, that Buyer acknowledges that the Confidentiality Agreement shall terminate only with respect to Confidential Information that relates solely to the Purchased Businesses.

(b)  The Company agrees that, after the Closing Date, the Company shall, and shall use all reasonable efforts to cause its Affiliates and its and their directors, officers, employees and advisors to, keep the Buyer Information (as defined below) confidential following the Closing Date, except that any such Buyer Information required by law or legal or administrative process to be disclosed may be disclosed without violating the provisions of this Section 5.3(b). For purposes of this Agreement, the term "Buyer Information" shall mean all information concerning the Buyer and its Affiliates (including information relating to the Purchased Businesses or any client, customer or supplier of the Purchased Businesses).

5.4.    Conduct of the Businesses Prior to Closing.    Subject to the obligations of a debtor-in-possession and any limitations on operations imposed by the Bankruptcy Court, except as otherwise expressly contemplated by this Agreement (including without limitation the filing of the Chapter 11 Case) or with the prior written consent of the Buyer, during the Pre-Closing Period, the CFC Parties shall (a) conduct the Purchased Businesses in the ordinary course of business consistent with past practice; (b) use commercially reasonable efforts to preserve intact the Purchased Businesses and the value of the Purchased Assets, to keep available the services of its current employees and agents and to maintain its relations and good will with its customers, regulators and any others with whom or with which it has business relations; (c) not take any action in violation of this Agreement; (d) file all Tax Returns when due (taking into account all extensions) and pay all Taxes when due; and (e) use all Excess Cash to repay the DIP Loan in accordance with the terms thereof, to the extent there is then outstanding indebtedness under the DIP Loan.

5.5.    Restrictions on Certain Actions.    Without limiting the generality of Section 5.4, and except as otherwise set forth in Section 5.5 of the Business Schedules or as otherwise expressly provided in this Agreement, prior to the Closing, the Company shall not and shall not permit any Subsidiary, without the prior written consent of the Buyer, to:

(a)    mortgage, pledge, assign, grant any participation or security interest in or otherwise further encumber any of the Purchased Assets;

(b)    sell, transfer or liquidate Purchased Assets unless such sale, transfer or liquidation is in the ordinary course of business consistent with past practice and all proceeds from such activities are used to (i) reduce the Lehman Debt Amount, (ii) eliminate, discharge or reduce Assumed Liabilities or (iii) purchase, originate or acquire additional assets, properties, contracts and rights of the same type as the assets, properties, contracts and rights sold, transferred or liquidated and which are acceptable to the Buyer as Purchased Assets; provided, however, that in no event shall more than $10 million in aggregate outstanding principal balance of Purchased Assets be sold, transferred or liquidated during the Pre-Closing Period; and provided, further, that (I) the Company may sell to Lehman Brothers Holdings Inc. or its Affiliates during the period from December 19, 2002 to the Closing Date (A) up to $318 million in outstanding principal balance of Loans subject to the Lehman Warehouse Facility and (B) up to $150 million per month in outstanding principal balance of Loans originated with the proceeds of the Additional Lehman Debt, in each case provided there is a corresponding reduction in the Lehman Debt Amount and at a price at not less than such outstanding principal balance, without the prior written consent of the Buyer and (II) the Company may sell the MH Community Loans and Floorplan Certificates on economic terms not materially different than as set forth in Section 5.5 of the applicable Business Schedules and apply the net proceeds received therefrom (after repayment of related indebtedness) as required by the DIP Loan;

(c)    amend its Organizational Documents; provided that the Company shall be entitled to convert Conseco Finance Servicing Corp., Conseco Finance Credit Corp., Conseco Finance Corp.-Alabama, Conseco Finance Advance Receivables Corp. and Conseco Finance Liquidation Expense Advance Receivables Corp. to a limited liability company;

(d)    except for the potential sale of Conseco Finance Credit Card Funding Corp. pursuant to the transactions contemplated by the GE Approved Agreement, (i) issue, sell or deliver (whether through the issuance or granting of options, warrants, commitments, subscriptions, rights to purchase, or otherwise) any shares of its capital stock of any class or any other securities or equity equivalents; or (ii) amend in any material respect any of the terms of any such securities outstanding as of the date hereof;

(e)    (i) split, combine or reclassify any shares of its capital stock or any other securities or equity equivalents; (ii) declare, set aside or pay any dividend or other distribution (whether in cash, stock or property or any combination thereof) in respect of its capital stock or any other securities or equity equivalents; (iii) repurchase, redeem or otherwise acquire any of its securities; (iv) adopt a plan of complete or partial liquidation or resolutions providing for or authorizing a liquidation, dissolution, merger, consolidation, restructuring, recapitalization, or other reorganization of any CFC Party; or (iv) repay intercompany indebtedness owed to Affiliates except in payment of services rendered;

(f)    (i) create, incur, guarantee, or assume any indebtedness for borrowed money or otherwise become liable or responsible for the obligations of any other Person; or (ii) other than in the ordinary course of business, make any loans, advances, or capital contributions to, or investments in, any other Person (other than to wholly owned Subsidiaries or another CFC Party, except Mill Creek Bank or Mill Creek Bank Servicing Corp.) other than the DIP Loan or Additional Lehman Debt;

(g)    except as specifically set forth in the GE Approved Agreement, or as may be required by applicable Laws, enter into, adopt or make any material amendments to or terminate any collective bargaining agreement, bonus, profit sharing, compensation, severance, termination, stock option, stock appreciation right, restricted stock, performance unit, stock equivalent, stock purchase, pension, retirement, deferred compensation, employment, severance or other employee benefit agreement, trust, plan, fund or other arrangement for the benefit or welfare of any director, officer or employee; provided that the Company and its Subsidiaries shall not be restricted from entering into, making any amendment to or terminating any agreement with an immaterial number of individual directors, officers or employees or an immaterial group of employees in the ordinary course of business;

(h)    acquire (by merger, consolidation, or acquisition of stock or assets or otherwise) any Person, or other business organization or division thereof which would be included in the Purchased Businesses;

(i)    make any capital expenditure or expenditures in the Purchased Businesses in excess of the aggregate amount set forth in the capital expenditures budget agreed upon by the Parties or, in the absence of such an agreement, not consistent with past practices;

(j)    enter into, assume, amend, modify, cancel, waive or change in any respect any Assumed Agreement, any material Contract other than solely with respect to an Excluded Business or Excluded Asset, the Lehman Documents (other than any amendment to continue the forbearance period under the Lehman Forbearance Agreement, provided no such amendment includes any provision which adversely affects the Purchased Assets, the Assumed Liabilities, or

the Purchase Price) or the GE Approved Agreement; provided however that the Company or any of its Subsidiaries may amend the GE Approved Agreement without the consent of the Buyer if such amendment does not adversely affect the Buyer;

       (k)    enter into any Contract with an Affiliate other than Contracts entered into in the ordinary course of business consistent with past practices, involving no more than $100,000 per Contract or series of related Contracts and that do not affect or impact the Purchased Assets or the Assumed Liabilities or interfere with or impede the consummation of the transactions contemplated hereby;

       (l)    with respect to the Purchased Businesses, change in any material respect any of the accounting principles or practices used by it, except for any change required by reason of a concurrent change in generally accepted accounting principles, or write-down the value of any assets, revalue any asset or write-off as uncollectible any receivables except in the ordinary course of business consistent with past practices;

       (m)    make any changes in material servicing, billing or collection operations or policies of the Purchased Businesses;

       (n)    with respect to the Purchased Businesses, deviate in any material respect from existing policies and procedures with respect to (i) classification of assets; (ii) accrual of interest; (iii) underwriting, pricing, originating, selling and servicing; and (iv) obtaining or extending financing and credit; or

       (o)    breach or otherwise fail to perform any of their material duties under their asset-backed securities transactions and servicing agreements other than as contemplated by the Parties in connection with the Chapter 11 Case.

If, prior to the Closing, the DIP Loan has been terminated, the Sellers shall agree to amend this Agreement to incorporate in all material respects into this Agreement those covenants (or portions thereof) of the "Borrower" thereunder contained in ARTICLES VI, VII and VIII of the DIP Loan as may be requested by the Buyer in good faith, other than the Excluded Covenants (as defined below) and those covenants (or portions thereof) that are not reasonably applicable to an asset seller (as opposed to a borrower). "Excluded Covenants" means the covenants contained in Section 7.9, 7.11, 8.1, 8.2, 8.3, 8.4, 8.5, 8.6, 8.9, 8.10 and 8.12 of the DIP Loan.

    5.6.   _Press Releases and Announcements._  No press releases or public disclosure related to this Agreement and the transactions contemplated herein, or other announcements to the employees, customers or suppliers of any Party shall be issued without the mutual prior written approval of the Parties, except for any public disclosure which is required by applicable law or regulation. Prior to making any public disclosure required by applicable Law or regulation, the disclosing Party shall give the other Party a copy of the proposed disclosure and reasonable opportunity to comment on the same to the extent practicable.

5.7.    Approvals of Third Parties; Satisfaction of Conditions to Closing.

(a)    Subject to the terms of this Agreement, the Parties will use their reasonable best efforts to cause the Closing to occur, and will cooperate with one another, to secure all necessary consents, approvals, authorizations and exemptions from Governmental Authorities and other third parties, including all consents required by Sections 6.4 and 7.4, as promptly as possible. The Sellers, with the Buyer's reasonable cooperation, will use their reasonable best efforts to obtain the satisfaction of the conditions specified in ARTICLE VI. The Buyer, with the Sellers' reasonable cooperation, will use its reasonable best efforts to obtain the satisfaction of the conditions specified in ARTICLE VII.

(b)    The Parties shall cooperate in preparing, submitting, filing, updating and publishing (as applicable), as expeditiously as possible, all applications, notifications and other filings as may be required by or may be advisable under applicable Laws with respect to the transactions contemplated by this Agreement, including, without limitation, those of the FDIC, the State Banking Authority and any other applicable state or federal regulatory agency and those under the HSR Act. The Parties shall bear the costs and expenses of their respective filings; provided, however, that each of the Buyer and the Company shall pay one-half the filing fees in connection with the filing under the HSR Act. The Parties shall use their respective reasonable best efforts to make such filings as promptly as practicable (and in any event within 10 Business Days) following December 19, 2002. The Parties will use their commercially reasonable best efforts to obtain such approvals and accomplish such actions as expeditiously as possible (provided, however, that neither Party shall be required to agree to commercially unreasonable and materially burdensome conditions, other than any requirement that it be well-capitalized).

(c)    The Parties shall respond to any requests for additional information made by either of such agencies, as expeditiously as possible, and to cause the waiting periods under applicable laws and regulations, including the HSR Act, to terminate or expire at the earliest possible date and to resist in good faith, at each of their respective cost and expense (including the institution or defense of legal proceedings), any assertion that the transactions contemplated hereby constitute a violation of the antitrust or competition Laws, all to the end of expediting consummation of the transactions contemplated hereby. Each of the Buyer, on the one hand, and the Sellers, on the other, shall consult with the other prior to any meetings, by telephone or in person, with the staff of the applicable Governmental Authorities, and each of Buyer and the Sellers shall have the right to have a representative present at any such meeting.

(d)    Each Party represents, warrants and agrees that any information furnished by it for inclusion in any regulatory application will be true and complete as of the date so furnished.

5.8.    Bankruptcy Actions.

(a)    The Company and Conseco Finance Servicing Corp. filed their respective Chapter 11 Cases on December 17, 2002. The Filing Company Subsidiaries except the SPEs commenced their Chapter 11 Cases on or before February 3, 2003. The Company may defer the commencement of a Chapter 11 Case with respect to the SPEs until such date prior to the Closing Date as shall be agreed between the Company and the Buyer, it being expressly

understood that, (A) such deferred filing date shall not be later than a date as will allow, in the reasonable judgment of the Buyer and assuming, for this purpose, that the other conditions set forth in this Agreement would be satisfied, (I) the Closing to occur on a date not later than the date the Closing would have occurred but for such delayed filing and (II) the provisions of the Sale Order to be fully effective as to the SPEs and binding on holders of claims against, and interests in, the SPEs and (B) the Company and the SPEs shall take all actions within their power (including, without limitation, giving notice and taking other actions in connection with the Company's Chapter 11 Case) to allow the transfer of the Purchased Assets owned by the SPEs to take place on the Closing Date. Except for the SPEs, any other Selling Subsidiary that has not commenced a Chapter 11 Case shall not be required to file without a written amendment to this Purchase Agreement signed by the Company, the Selling Subsidiary, and the Buyer. The Sellers who have commenced a Chapter 11 Case shall obtain enter of the Sale Order by March 14, 2003 and the entry of a final 9019 Order not later than the date provided in the DIP Loan.

(b)    The Buyer covenants and agrees that it shall cooperate with the Sellers in connection with furnishing information or documents to Sellers to satisfy the requirements of adequate assurance of future performance under section 365(f)(2)(B) of the Bankruptcy Code.

(c)    In the event an appeal is taken, or a stay pending appeal is requested from any of the Orders of the Bankruptcy Court in connection with the sale of the Purchased Assets, the Sellers shall immediately notify the Buyer of such appeal or stay request and, upon the Buyer's request, shall provide to the Buyer within three Business Days after the Sellers' receipt thereof a copy of the related notice of appeal or order of stay. The Sellers shall also provide the Buyer with written notice of any motion or application filed in connection with any appeal from any of such Orders.

5.9.    Exclusivity; No Solicitation of Transactions.    The Sellers represent that, other than the transactions contemplated by this Agreement, they are not parties to or bound by any agreement with respect to a possible merger, sale, restructuring, refinancing or other disposition of all or any material part of the Purchased Businesses or the Purchased Assets. Prior to the entry of the Bidding Procedures Order on the Bankruptcy Court's docket, the Sellers shall not, directly or indirectly, (a) solicit or participate in negotiations or discussions regarding any Acquisition Proposal, regardless of whether such offer was unsolicited, or furnish any information with respect to, assist or participate in or facilitate in any other manner any effort or attempt by any Person (other than the Buyer and its Affiliates) to do or seek to do any of the foregoing, (b) execute an agreement with respect to an Acquisition Proposal, or (c) except as provided in this Agreement, seek or support Bankruptcy Court approval of a motion or Order inconsistent in any way with the transactions contemplated in this Agreement. Subsequent to the entry of the Bidding Procedures Order on the Bankruptcy Court's docket, the Sellers shall not, directly or indirectly, through any officer, director, employee, agent, professional or advisor, solicit any Acquisition Proposal (other than as expressly permitted under the Bidding Procedures Order) or participate in any negotiations or discussions with respect to any Acquisition Proposal; provided, however, that after entry of the Bidding Procedures Order on the Bankruptcy Court's docket, nothing herein shall preclude the Sellers from taking any action in the Chapter 11 Case seeking to sell, pursuant to a Qualifying Bid (as defined in the Original Agreement) in connection with the Auction process established in the Bidding Procedures Order, the Purchased Assets. From the date of the issuance of the Sale Order and until the Closing Date and provided that the Buyer

is proceeding in good faith to consummate the transactions contemplated hereby in a timely manner, neither the Sellers nor any of their Affiliates shall discuss, negotiate or consummate any transaction involving (i) the issuance, redemption, sale or exchange or other disposition of any equity interest in the Sellers or (ii) the sale, exchange, liquidation, reorganization, or other disposition of all or any part of the Purchased Assets. Notwithstanding the foregoing, the Sellers shall not be restricted from entering into the Backup Agreements.

    5.10.  <u>Employees</u>.

        (a)

           (i)    Subject to <u>Section 5.10(a)(iii)</u>, the Buyer shall offer employment, effective as of the Closing Date, to those Employees who are employed primarily in the Purchased Businesses as identified in <u>Section 5.10(a)</u> of the applicable Business Schedules (the "<u>Business Employees</u>") as of the Closing Date (other than any such Employees in respect of whom a notice of termination of employment has been given by the Company or one of its Subsidiaries); <u>provided, however</u>, that the Buyer shall have the option not to offer employment to some or all of the Business Employees and in lieu thereof pay severance to any such Business Employee not offered employment in accordance with the amount of severance set forth on the list which was provided to the Buyer in accordance with <u>Section 3.14</u>. To the extent permitted under applicable Law, the payment of severance to any Business Employee not offered employment shall be reduced by any liability of the Buyer to such Business Employee under the Federal Worker Adjustment Retraining and Notification Act of 1988, as amended (the "<u>WARN Act</u>"), and the Sellers shall take such actions as are reasonably required, including the amendment of any severance plan or agreement covering the Business Employees, to allow for such reductions. Each Business Employee who is paid severance by the Buyer shall be required as a condition to the receipt of such severance to execute a general release in favor of the Buyer and its Affiliates and the Sellers and their Affiliates in form and substance satisfactory to the Buyer. Subject to <u>Section 5.10(a)(iii)</u>, Liabilities for paid time off, sick leave and vacation pay for Business Employees as set forth under the heading "PTO" in <u>Section 5.10(a)</u> of the applicable Business Schedules shall be Assumed Liabilities hereunder.

           (ii)    Promptly following the execution of this Agreement, the Sellers shall provide the Buyer with such assistance as the Buyer may request with respect to identifying employees who are not Business Employees but who perform significant support functions for the Purchased Businesses ("<u>Support Employees</u>"). The Buyer shall have until April 30, 2003 to determine which Support Employees shall be offered employment. The Buyer, in its sole discretion, shall have the right to offer employment to any Support Employee provided, however, that if the GE Condition is satisfied, the Buyer shall have the right to offer employment to any Support Employee (A) who performs significant support functions for the Purchased Businesses, (unless the Buyer agrees that GE may offer employment to any such employee), (B) who performs significant

support functions in the HI Origination Business or the PL Business, subject to the prior consent of GE unless GE does not offer employment to such employees, (C) listed under the "Unallocated" heading on Section 5.10(a) of the Business Schedules, subject to the fourth sentence of this Section 5.10(a)(ii) and except for Gayle Mines and Ann Heefer and (D) except Chad Cook and Kevin Van Voorst listed on Section 5.10(a) of the Business Schedules. Support Employees listed under the heading "Unallocated Risk Management Employees" on Section 5.10(a) of the Business Schedules ("URM Employees") shall be offered employment by such joint venture as the Buyer and GE shall establish (the "JV Arrangements") in accordance with such terms as mutually agreed upon by the parties to the JV Arrangements, including an allocation of costs within the joint venture based on the proportion of work done for each respective joint venture party, and Buyer shall not offer employment to any URM Employee, except that if the Closing Date occurs prior to the closing of the transactions contemplated by the GE Approved Agreement, the Buyer may offer employment to URM Employees. If the Buyer has offered employment to URM Employees (pursuant to the above sentence), any such employees who accept the Buyer's offer shall remain employees of Buyer until the closing of transactions contemplated by the GE Approved Agreement, and thereafter shall be employed pursuant to the JV Arrangements, except that if the GE Approved Agreement is terminated, such URM Employees shall continue as employees of the Buyer. During such time as any URM Employees are employed by the Buyer prior to either the closing of the transactions contemplated by the GE Approved Agreement or, in the event of the termination of the GE Approved Agreement, such time that the Sellers sell or liquidate the Excluded Businesses (but in no event later than six months following the Closing Date) such employees shall continue to provide support services to the Excluded Businesses, and the Sellers (or GE if appropriate) shall reimburse the Buyer for the proportionate cost of employing such URM Employees, based on the percentage of such employees' time dedicated to the Excluded Businesses, as mutually determined by the Buyer and the Sellers in good faith. Except with respect to URM Employees who are employed jointly pursuant to the JV Arrangements as described herein, the Buyer shall have no Liability whatsoever for Support Employees who are not offered employment or who do not accept such offers of employment. Liabilities for paid time off, sick leave and vacation pay for Support Employees who are hired pursuant to this paragraph (ii) as set forth under the heading, "PTO", on a schedule that was provided to the Buyer shall be Assumed Liabilities hereunder.

(iii)    Promptly following the execution of this Agreement, the Sellers shall provide the Buyer and its representatives, advisors and accountants with such assistance as the Buyer may request with respect to identifying any Employees who are included in Section 5.10(a) of the applicable Business Schedules who are corporate-level Employees whose costs may have been allocated to one or more of the Purchased Businesses. Any such employees whose salary and wages have been historically (over the past 12 months) allocated to, or otherwise treated as, corporate overhead expense may, at the Buyer's option, be excluded from the definition of Business Employees (and therefore

from Section 5.10(a) of the applicable Business Schedules). The Buyers shall have no Liability whatsoever for Employees who are so excluded from the definition of Business Employees (and Section 5.10(a) of the applicable Business Schedules).

(iv)    If the GE Condition is satisfied, notwithstanding anything to the contrary in Section 5.10(a), the Buyer shall offer employment to all employees listed on the IT Employees portion of Section 5.10(a) of the applicable Business Schedules where such employees are listed under the "CFN" column ("Buyer IT Employees") and the Buyer shall not offer employment to any employees listed on the IT Employees portion of Section 5.10(a) of the applicable Business Schedules where such employees are listed under the "GE PL/HI/CI" column ("GE IT Employees"). If the GE Condition is satisfied, (A) the Buyer will assume severance and paid time off, sick leave and vacation pay obligations (on a basis otherwise consistent with this Section 5.10 and as set forth on the list provided pursuant to Section 3.14) with respect to Buyer IT Employees and will assume no Liabilities for paid time off, sick leave and vacation pay as set forth under the heading "PTO" on the schedule that was provided to the Buyer pursuant to Section 3.14 or severance with respect to GE IT Employees and (B) no GE IT Employees will be Business Employees.

(b)    Those Business Employees and Support Employees who are offered employment and accept such offers of employment and become employees of the Buyer are referred to herein as the "Transferred Employees". Each such offer of employment shall be at the same salary or wage level (and on substantially the same terms and conditions) applicable to each such Transferred Employee immediately prior to the Closing and the Buyer shall not reduce such salary or wage level during the 12-month period following the Closing. The Buyer also agrees to provide the Transferred Employees and their covered dependents with welfare and retirement benefits that are reasonable and customary for a business of the type and size of the Buyer. Except with respect to URM Employees who are employed pursuant to the JV Arrangements as described herein, the Buyer shall have no obligation to offer employment to, and shall assume no liability with respect to, any employees other than the Business Employees.

(c)    Within 45 days of the Closing Date, the Buyer shall pay Business Employees the commissions relating to pre-Closing loan originations for the month in which the Closing occurs, as calculated under the commission program in effect immediately prior to the Closing, regardless of whether such program is in effect at any time following the Closing.

(d)    As soon as reasonably practicable following the Closing, the Buyer or one of its Affiliates shall establish a tax-qualified deferred contribution retirement plan and, to the extent allowable by Law, the Buyer shall take any and all necessary action to cause the trustee of such plan, if requested to do so by a Transferred Employee, to accept a direct "rollover" of all or a portion of such employee's distribution (excluding "employer securities" as defined in ERISA) from any Employee Benefit Plan which is a tax-qualified retirement plan, provided that, with respect to each such plan, the Sellers have provided to the Buyer such information as requested by the Buyer sufficient to establish that such plan is qualified under Section 401(a) of the Tax Code.

(e)     The Buyer shall pay to each Transferred Employee whose employment is terminated by the Buyer or one of its Affiliates within 12 months of the Closing Date severance equivalent to that set forth on the list which was provided to the Buyer in accordance with Section 3.14.

(f)     The CFC Parties agree to timely perform and discharge all requirements under the WARN Act to the extent applicable and under applicable state and local laws and regulations for the notification of its Employees arising from the sale of the Purchased Assets to the Buyer up to and including the Closing Date for those employees who will become Transferred Employees effective as of the Closing Date. After the Closing Date, the Buyer shall be responsible for performing and discharging all requirements under the WARN Act and under applicable state and local laws and regulations for the notification of its employees with respect to the Purchased Assets and the Businesses. The Parties shall provide one another with all assistance reasonably requested by each Party to ensure that the Parties can comply with their respective notification requirements of the WARN Act, including assistance with the provision of such notices to Employees prior to Closing. The Buyer agrees to indemnify the Sellers and their Affiliates and their respective directors, officers, employees, consultants and agents for, and to hold them harmless from and against, any and all Losses arising or resulting, or alleged to arise or result from liabilities arising under the WARN Act with respect to any Transferred Employees or to any Business Employees not offered employment by the Buyers, provided that the Sellers have complied with the covenants set forth in Section 5.10(a).

(g)     To the extent permitted under the Buyer's welfare benefit plans, the Buyer shall (i) waive pre-existing condition requirements (except with respect to any pre-existing condition for which coverage was denied under any welfare benefit plan of the CFC Parties), evidence of insurability provisions, waiting period requirements or any similar provisions under any welfare benefit plans maintained by the Buyer for Transferred Employees after the Closing Date, and (ii) apply toward any deductible requirements and out-of-pocket maximum limits under its Employee welfare benefit plans any amounts paid (or accrued) by each Transferred Employee under the CFC Parties' welfare benefit plans during the applicable plan year in which the Closing Date occurs. The Buyer shall recognize for purposes of eligibility and vesting under its policies and employee benefit plans, the service of any Transferred Employee with the CFC Parties or any of their Affiliates prior to the Closing Date.

(h)     Claims of Transferred Employees and their eligible beneficiaries and dependents for medical, dental, prescription drug, life insurance, and/or other welfare benefits ("Welfare Benefits") (other than disability benefits as described below) that are incurred before the Closing Date shall be the sole responsibility of the Sellers and the Sellers' welfare benefit plans. Claims of Transferred Employees and their eligible beneficiaries and dependents for Welfare Benefits (other than disability benefits) that are incurred on or after the Closing Date shall be the sole responsibility of the Buyer and the Buyer's welfare benefit plans. For purposes of the preceding provisions of this paragraph, a medical/dental claim shall be considered incurred on the date when the medical/dental services are rendered or medical/dental supplies are provided, and not when the condition arose or when the course of treatment began. Claims of individuals receiving long-term disability benefits under a disability plan of the Sellers or any CFC Party as of the Closing Date shall be the sole responsibility of the Sellers and such plan. Claims of Transferred Employees and their eligible beneficiaries and dependents for short-term

or long-term disability benefits that are made on or after the Closing Date shall be the sole responsibility of the Buyer.

(i)    The CFC Parties shall be responsible for satisfying obligations under Section 601 et seq. of ERISA and Section 4980B of the Tax Code, to provide continuation coverage to or with respect to any of the CFC Parties' employees and their covered dependents in accordance with law with respect to any "qualifying event" occurring on or prior to the Closing Date (including any termination of employment of an Employee which occurs in connection with the transaction contemplated herein).   The Buyer shall be responsible for satisfying obligations under Section 601 et seq. of ERISA and Section 4980B of the Tax Code, to provide continuation coverage to or with respect to any of the Transferred Employees and their covered dependents in accordance with law with respect to any "qualifying event" which occurs after the Closing Date.

(j)    Section 5.10(j) of the Business Schedules identifies all employment, retention, severance, change in control and any other similar agreements between the Sellers or any Affiliate of the Seller and any Transferred Employee (the "Employee Agreements").   The Buyer shall have no Liability with respect to any Employee Agreement except for the Assumed Retention Agreements, copies of which have been provided to the Buyer, and then only to the extent the Employee who is a party to the Assumed Retention Agreement is not employed primarily in an Excluded Business.

5.11.   Transition.   Subject to the obligations of a debtor-in-possession and any limitations on operations imposed by the Bankruptcy Court, the Sellers shall operate in good faith in an effort not to take any action which is designed, intended or might reasonably be anticipated to have the effect of discouraging customers, suppliers, vendors, service providers, employees, lessors, licensors and other business relations from maintaining the same business relationships with the Purchased Businesses after the date of this Agreement and during the Pre-Closing Period, the Sellers shall use their commercially reasonable good faith efforts to encourage customers, suppliers, vendors, service providers, employees, lessors, licensors and other business relations to maintain the same business relationships with the Purchased Businesses after the date of this Agreement.   On and after the date hereof, the Sellers shall cooperate with the Buyer to identify and provide all reasonable information and access with respect to the transition services referred to in Section 5.28 and Section 6.6.

5.12.   Seller's Trademarks.   After the Closing, the Buyer may use and distribute in connection with the ownership or operation of the Purchased Business shipping materials, stationery, invoices, sales, promotional or other forms and literature comprising part of the Purchased Assets and which bear the name "Conseco" or "Conseco Finance" or the Conseco design (except as are transferred to the Buyer at Closing) only if the Buyer uses all commercially reasonable efforts to attach a sticker, name plate or other notice previously approved by the Seller which discloses the acquisition of such Purchased Asset(s) by the Buyer. Such right shall terminate 180 days following the Closing Date. Once such right has terminated, the Buyer shall deliver (or cause to be delivered) to the Sellers, destroy or cause to be destroyed (with a certification of destruction), all of such items and the Buyer further agrees that it shall immediately cease to use or display names or materials bearing the name "Conseco", "Conseco Finance" or the Conseco design trademarks or any derivative thereof.

5.13.  Notices to Obligors.  No later than 15 days prior to the Closing Date, the Company shall prepare, and transmit to each Obligor on each Loan that is part of the Purchased Assets, a notice in a form satisfying the requirements, as applicable, of Regulation X of the Department of Housing and Urban Development under the Real Estate Settlement Procedures Act, as well as all other applicable legal requirements, and reasonably acceptable to the Buyer, to the effect that the Loan and, as applicable, the servicing of the Loan, will be transferred to the Buyer at Closing and directing that payments be made after the Closing Date to the Buyer at any address of the Buyer specified by the Buyer, with the Buyer's name as payee on any checks or other instruments used to make such payments and the Buyer will notify each Obligor of the effectiveness of the Closing. The Company and the Buyer shall consult and cooperate with each other in the preparation of such notices and they each shall bear one-half of the expenses incurred for the preparation and transmission of such notices.  With respect to all such Loans on which payment notices or coupon books have been issued, the Buyer shall have the opportunity to prepare new payment notices or coupon books reflecting the name and address of the Buyer as the Person to whom and the place at which payments are to be made and to have such new payment notices or coupon books included with the notices prepared and transmitted by the Company.

5.14.  Non-Solicitation and Non-Competition.

(a)    The Sellers acknowledge that the agreements and covenants contained in this Section 5.14 are essential to protect the value of the Purchased Assets being acquired by the Buyer.

(b)    During the period commencing on the date of the Original Agreement and ending on the fifth anniversary of the Closing Date, neither the Sellers nor any of their Subsidiaries shall for themselves or on behalf of or in conjunction with any Person, directly or indirectly, solicit, endeavor to entice away from the Buyer, or otherwise directly or indirectly interfere with the relationship of the Buyer with any Person who within the prior 12 months had been an employee of the Buyer; provided, however, that the foregoing provision will not prevent the Sellers from hiring any such Person (i) who responds to a public advertisement placed by the Sellers or any of their Subsidiaries, or (ii) who has been terminated by Buyer or any of its Affiliates.

(c)    During the period commencing on the date of the Original Agreement and ending on the fifth anniversary of the Closing Date, neither the Sellers nor any of their Subsidiaries shall participate or engage, directly or indirectly, whether as an employee, agent, officer, consultant, director, stockholder, partner, joint venturer, investor or otherwise, in the businesses of the Purchased Businesses anywhere in the world.

(d)    The Parties agree that a monetary remedy for a breach of the agreements set forth in this Section 5.14 will be inadequate and impracticable and further agree that such a breach would cause irreparable harm, and that the non-breaching party shall be entitled to temporary and permanent injunctive relief without the necessity of proving actual damages. In the event of such a breach, the breaching party agrees that the non-breaching party shall be entitled to such injunctive relief, including temporary restraining orders, preliminary injunctions and permanent injunctions as a court of competent jurisdiction shall determine.

(e)    If any of the provisions of this <u>Section 5.14</u> is invalid in part, it shall be curtailed, as to time, location or scope, to the minimum extent required for its validity under the laws of the United States and shall be binding and enforceable with respect to the Sellers, as applicable, as so curtailed; it being the intention of the Parties that the provisions of this <u>Section 5.14</u> be enforced to the fullest extent permissible under the laws and policies of each jurisdiction in which enforcement may be sought, and that the unenforceability (or the modification to conform to such laws and policies of any provision of this <u>Section 5.14</u>) shall not render unenforceable or impair the remainder of the provision of this <u>Section 5.14</u>.

5.15.    <u>Further Actions</u>.    Following the Closing, the Sellers agree not to take any action in the Chapter 11 Case, including, but not limited to, any action in connection with proposing or confirming any plan of reorganization that would limit, impair or adversely alter the Buyer's rights under this Agreement (but this Section shall not limit the Sellers' rights under this Agreement or the enforcement thereof).

5.16.    <u>Further Assurances</u>.    Upon the request of the Buyer or its successors and assigns at any time after the Closing Date, the Sellers will forthwith execute and deliver such further instruments of assignment, transfer, conveyance, endorsement, direction or authorization and other documents as the requesting party or parties or its or their counsel may request in order to perfect title of the Buyer and its successors and assigns to the Purchased Assets (including the Shares purchased in a Stock Sale) or otherwise to effectuate the purposes of this Agreement and the Transaction Documents. In particular, the Sellers shall, at the Buyer's request, to the extent permitted by the documents governing the NIMS Notes and MESA Notes, take all steps reasonably requested by Buyer to cause the NIMS Notes, the MESA Notes or both to be retired and the NIMS Collateral, the MESA Collateral or both to be purchased by the Buyer rather than the NIMS Equity or the MESA Equity.

5.17.    <u>Mail Forwarding</u>.    For a period of one year after the Closing Date, the Sellers shall maintain adequate staff or engage an outside service at their own expense to accept and forward to the Buyer all mail and other communications received by the CFC Parties relating to the Purchased Assets.

5.18.    <u>DIP Loan</u>.    Contemporaneously with the execution and delivery of the Original Agreement, the Sellers entered into a debtor-in-possession credit facility with FPS DIP LLC and the other lenders party thereto (including the revolving credit loans and term loans thereunder and as amended from time to time, the "<u>DIP Loan</u>").

5.19.    <u>REMIC Items Reflected on Tax Returns; Bring Down on Certain Information</u>.

(a)    For each entity described as a REMIC on the Business Schedules, if so requested by the Buyer, the Sellers shall, no later than the due date (including extensions) of the 2002 Tax Returns of such entity, reflect on the 2002 Tax Returns of the related REMICs, in a manner reasonably satisfactory to the Buyer, the adjustments resulting from the revaluation of certain REMIC Regular Interests and REMIC Residual Interests as a result of the Sellers' tax audit for the period ended December 31, 1997, with such Tax Returns reflecting prior years' adjustments. The Buyer shall be provided with a draft of such Tax Returns at least 30 days prior

to the date the same is filed. The Sellers shall make all changes to such drafts as reasonably requested by the Buyer.

(b)      The Sellers shall deliver, or cause to be delivered, to the Buyer by the earlier of the 20th day prior to the Closing Date or April 15, 2003 updated, true, correct and complete information as of December 31, 2002 with respect to the basis, adjusted issue price and remaining unrecognized gain of various instruments or assets as to which the Sellers are making representations and warranties as of December 31, 2001 pursuant Sections 3.22(d)(iv), (e)(i), (f)(i), (g)(iii), g(vi), h(vii) and h(ix) hereof.

(c)      The Sellers may, with the consent of the Buyer, and shall, at the request of the Buyer, file an amended 2001 Tax Return for the NIMS Issuer to reflect certain adjustments in the basis of REMIC Residual Interests and IO Regular Interests held by the NIMS Issuer in order to reflect a revaluation of such REMIC Residual Interests and IO Regular Interests as of the startup day of the REMIC that issued them, consistent with the revaluation as of the startup day of similar REMIC interests made in the audit of the Sellers' Tax Returns for the period ended December 31, 1997.

5.20.    Title Insurance. Not later than 30 days after the date of this Agreement, the Sellers shall cause to be delivered to the Buyer a commitment for a 1992 form ALTA title insurance policy (the "Title Commitments") for each Owned Real Premises from Chicago Title Insurance Company (the "Title Company"). At the Buyer's sole discretion, the Buyer may deliver written notice to the Sellers not later than the later of (i) 30 days prior to the Closing or (ii) 15 days after receipt by the Buyer of the Title Commitments, whereupon the Seller shall (x) make an application with the Title Company for the issuance of title insurance policies (the "Title Insurance Policies") for the Owned Real Premises in such insured amounts equal to the current fair market value of each Owned Real Premises, as reasonably agreed to by the Buyer and the Sellers, and (y) order an ALTA survey or survey update of the Owned Real Premises (the "Surveys") from surveyors licensed to do business in the States of Minnesota and South Dakota (the "Surveyors"). The Sellers shall give instructions to the Title Company and the Surveyors to deliver directly to the Buyer and the Sellers copies of the Title Company's report, the results of any searches for Uniform Commercial Code financing statements filed against the Owned Real Premises, the Tax and departmental searches and the survey reading and the Surveys, and any updates or continuations thereof and any supplements thereto. Such Title Insurance Policies and Surveys shall be delivered to the Buyer at Closing. At or prior to the Closing, the Sellers shall be responsible for clearing all Liens (other than Permitted Liens and matters shown on Section 3.8(a) of the Business Schedules) on title to the Owned Real Premises objected to by the Buyer in a timely manner. Payment of all title and Survey costs in connection with this Agreement shall be borne equally by the Company and the Buyer.

5.21.    Preparation of License Applications. As promptly as possible after the date hereof, the Sellers shall prepare drafts, which drafts shall be as complete as possible, of all notifications or other filings or applications that are advisable or are required to be filed by the Buyer pursuant to the Finance Laws in order to consummate the transactions contemplated hereby, for the Buyer's reasonable review, augmentation and filing. The Sellers shall provide all reasonable assistance and cooperation with respect to the Buyer's efforts to obtain such licenses.

5.22.  Provision of Bank Information.  The Sellers shall use commercially reasonable efforts to arrange for a meeting between representatives of the FDIC and state banking authorities (collectively, the "Regulators") and representatives of the Buyer and their financing sources, at which the Regulators shall be asked to discuss with them the results of examinations of Mill Creek Bank and other regulatory issues or concerns.  The Company shall seek to schedule the meeting as soon as reasonably practicable after the date of this Agreement, but in no event more than 15 Business Days after the date of this Agreement.  In addition, as soon as reasonably practicable after the date of this Agreement, but in no event more than 10 Business Days after the date of this Agreement, the Sellers shall provide to the Buyer to the extent permitted by Law the following information with respect to Mill Creek Bank: (i) copies of all examination reports issued by the FDIC or state banking authorities since January 1, 2000; (ii) copies of all supervisory or remedial agreements of any kind, including, but not limited to, memoranda of understanding, agreements, cease-and-desist orders, consent orders and enforcement orders outstanding at any time since January 1, 2000; (iii) copies of all supervisory correspondence, including, but not limited to, correspondence related to (i) and (ii) above; and (iv) copies of all internal analyses, including, but not limited to, memoranda, notes, correspondence and messages, and data, including, but not limited to, financial reports and reports concerning intercompany balances, regarding compliance with sections 23A and 23B of the Federal Reserve Act with respect to intercompany agreements with Mill Creek Bank (together with the discussions between the Buyer and the Regulators described above, the "Bank Information").

5.23.  Access to Records After the Closing.

(a)  For a period of eight years after the Closing Date, the Sellers and their representatives shall have reasonable access to all of the Files transferred to the Buyer hereunder to the extent that such access may reasonably be required by the Sellers in connection with matters relating to or affected by the Excluded Assets, the Excluded Liabilities and other reasonable requests related to the Company's remaining activities and obligations.  Such access shall be afforded by the Buyer upon receipt of reasonable advance notice and during normal business hours.  The Sellers shall be solely responsible for any costs or expenses incurred by them pursuant to this Section 5.23(a).  If the Buyer shall desire to dispose of any such Files prior to the expiration of such eight-year period, the Buyer shall, prior to such disposition, give the Sellers a reasonable opportunity, at their expense, to segregate and remove such Files as the Sellers may select.  Notwithstanding the foregoing, the Buyer recognizes and understands that the Sellers are party to litigation, and may become engaged in future litigation, regarding the Sellers' acquisition, operation and management of the Company and its Subsidiaries.  The Buyer agrees to reasonably cooperate with the Sellers in the prosecution and defense of any such litigation.  The Buyer also agrees to provide the Sellers with access to its employees, and to make its employees available for testimony upon reasonable terms and upon reasonable notice given by the Sellers.  The Sellers will pay any reasonable costs associated with the Buyer's cooperation in such litigation matters.

(b)  For a period of eight years after the Closing Date, the Buyer and its representatives shall have reasonable access to all of the Files relating to the Purchased Businesses which the Sellers or any of their respective Affiliates may retain after the Closing Date.  Such access shall be afforded by the Sellers and their respective Affiliates upon receipt of

reasonable advance notice and during normal business hours. The Buyer shall be solely responsible for any costs and expenses incurred by it pursuant to this Section 5.23(b). If the Sellers or any of their respective Affiliates shall desire to dispose of any such Files prior to the expiration of such eight-year period, the Sellers shall, prior to such disposition, give the Buyer a reasonable opportunity, at the Buyer's expense, to segregate and remove such Files as the Buyer may select. If the GE Condition is met and in the event any Records are acquired by GE, the Sellers shall cause GE to provide the Buyer and its representatives access to Records on terms and conditions substantially similar to the terms and conditions set forth in this Section 5.23(b).

(c)    In the event that the Buyer acquires any Records that relate to any GE Purchased Assets, the Buyer shall provide GE and its representatives access to such Records on terms and conditions substantially similar to the terms and conditions in Section 5.23(b); provided, however, that GE shall be solely responsible for any costs and expenses incurred by it and the Buyer pursuant to this Section 5.23(c).

5.24.  Liens.  The Sellers have provided to the Buyer written notice of a description of all Liens (except Permitted Liens) on the Purchased Assets. On or prior to the Closing, the Sellers shall deliver to the Buyer evidence of the satisfaction, discharge or other termination of all such Liens (except Permitted Liens) on the Purchased Assets.

5.25.  Exclusion of Certain Purchased Assets.  If, during the Pre-Closing Period, the Buyer, pursuant to Section 2.1(a)(ii) hereof, determines to exclude all of the outstanding capital stock of Mill Creek Bank from the Purchased Assets, thereby deeming such capital stock or other assets as Excluded Assets hereunder, the Parties agree to negotiate reasonably in good faith to modify the terms and conditions of this Agreement, the Transaction Documents and the Business Schedules to address any separation or transition issues which may arise upon such determination, including, without limitation, such issues with respect to Assigned Agreements, Intellectual Property, Facilities, Employees and the Insurance Business.

5.26.  Certain Insurance Matters.

(a)    The Sellers acknowledge that, pursuant to Section 2.1(a)(ii), the Buyer may at its option elect not to purchase any Insurance Assets and that, pursuant to Section 2.1(b), the Buyer may elect to purchase the Insurance Business through a Stock Sale of one or more of the Insurance Subsidiaries. To the extent that the Buyer does not elect to purchase the Insurance Business through a Stock Sale and (ii) the transfer to the Buyer of any of the Insurance Assets may not be made without (x) the consent or waiver of any other party to any such asset or of any other Person or (y) the approval of any Governmental Authority under the laws and regulations of the applicable jurisdictions in which the Insurance Business operates, or if such transfer would constitute a breach thereunder or otherwise violate applicable law (such consents, waivers and approvals, collectively, the "Insurance Approvals"), this Agreement shall not constitute an actual or attempted transfer of any such asset unless and until such consent, waiver or approval has been duly obtained or such transfer otherwise becomes lawful (such Insurance Assets included in the Purchased Assets and not transferred as a result of this Section 5.26, a "Non-Transferred Insurance Asset"; and the portion of the Insurance Business to which such Non-Transferred Insurance Assets relate, the "Non-Transferred Insurance Business"). Any portion of the Insurance Business that consists of a reinsurance business shall be transferred to the Buyer

through a reinsurance arrangement or novation and assumption (subject to the consent of the ceding insurers), as elected by the Buyer.

(b)     If any Insurance Approvals referenced in <u>Section 5.26(a)</u> are not obtained prior to the Closing Date, and until the impracticalities of transfer referred to therein are resolved to the Buyer's satisfaction, the Sellers shall (i) provide or cause to be provided to the Buyer the Insurance Profits (as defined below) and other benefits earned or received by the Sellers in respect of the Non-Transferred Insurance Assets, (ii) cooperate in any arrangement, lawful as to both the Sellers and the Buyer, designed to provide such Insurance Profits and other benefits to the Buyer and (iii) enforce for the account of the Buyer any rights of the Sellers arising from the Non-Transferred Insurance Assets, in each case after consulting with and upon the advice and direction of the Buyer until the date such transfer may occur in compliance with <u>Section 5.26(a)</u> (with respect to any portion of the Non-Transferred Insurance Business, the date on which such transfer to the Buyer may occur is referred to herein as the "<u>Transfer Date</u>").

(c)     Without limiting the generality of the foregoing, until the Transfer Date, (i) the Sellers shall continue to conduct the Non-Transferred Insurance Business in the manner in which such business has been conducted prior to the date hereof, including, without limitation, securing or placing new and renewal business with respect to the insurance products sold through the Non-Transferred Insurance Business, and shall maintain adequate staff for such purpose, (ii) the Sellers shall provide all reasonable assistance to the Buyer in obtaining all Insurance Approvals necessary or advisable to effect the transfer of the Non-Transferred Insurance Assets to the Buyer as promptly as practicable, (iii) the Sellers shall continue to provide all support services (including referral, billing and collection services) provided by them as of the date hereof with respect to the Non-Transferred Insurance Business (other than any such services that are provided by the MH Servicing Business, if the MH Servicing Business is purchased by the Buyer on the Closing Date), and (iv) the Sellers shall not amend, terminate or otherwise dispose of any Non-Transferred Insurance Assets, and shall otherwise use their reasonable best efforts to keep in place their relationships with the insurance companies providing the insurance products sold through the Non-Transferred Insurance Business and with any other Persons through which such insurance products are marketed or sold (including, without limitation, obtaining any necessary approvals from such insurance companies or other Persons to the transfer to the Buyer of the Insurance Business). The Buyer and the Sellers shall, prior to the Closing Date, develop a budget for the Non-Transferred Insurance Business (such agreed budget, the "<u>Insurance Budget</u>"). Until the Transfer Date, (x) the Sellers shall grant the Buyer reasonable access to the books, records, and personnel of the Non-Transferred Insurance Business, (y) the Sellers shall not, and shall not permit any Subsidiary to, take any of the actions set forth in <u>Section 5.5</u> with respect to the Non-Transferred Insurance Business or incur, without the prior written consent of the Buyer, any cost, expense or liability not included in the Insurance Budget, and (z) the Sellers shall advise the Buyer promptly of any material developments with respect to the Non-Transferred Insurance Business and the Non-Transferred Insurance Assets.

(d)     If the Closing occurs, until the applicable Transfer Date, the Buyer shall be entitled to receive all "Insurance Profits" earned by the Sellers in respect of the Non-Transferred Insurance Business and the Non-Transferred Insurance Assets during the period commencing on the Closing Date and ending on the applicable Transfer Date. "<u>Insurance Profits</u>" shall mean, for any period, the difference between (i) all commissions and other

payments earned by the Sellers pursuant to the Non-Transferred Insurance Assets during such period, whether in respect of insurance placed before or after the Closing Date, and (ii) any direct, out-of-pocket costs incurred during such period in providing the services referred to in clause (c)(iii) above to the extent included in the Insurance Budget. Insurance Profits shall be computed on a bi-weekly basis, if possible under the Sellers' existing systems (but in any event not less frequent than monthly), during the period between the Closing Date and Transfer Date, and the Sellers shall pay to the Buyer, by wire transfer, an amount equal to the Insurance Profit for such period within two Business Days after computation thereof. The Buyer shall have the right to review and contest all such computations.

(e)     Upon the receipt of the applicable Insurance Approvals, the Sellers shall promptly transfer or cause to be transferred the applicable Non-Transferred Insurance Assets to the Buyer free and clear of all Liens (other than Permitted Liens) for no additional consideration.

(f)     Reserved.

(g)     Any claims by the Buyer for Insurance Profits shall, pursuant to section 364(c)(1) of the Bankruptcy Code, enjoy super-priority over administrative expense claims against the Sellers under section 503(b) or 507(b) of the Bankruptcy Code.

(h)     The foregoing provisions shall be binding on all successors and permitted assigns of the Sellers (including permitted assigns of all or a portion of the MH Servicing Business) and shall terminate five years after the Closing. Without limiting the foregoing, the Sellers shall ensure that any successor servicer or subservicer with respect to all or a portion of the MH Servicing Business, including, without limitation, any purchaser of all or a portion of the MH Servicing Business, shall, as a condition to becoming such, agree in writing to the foregoing terms and the other arrangements contemplated herein.

5.27.    Financial Information.

(a)     The Sellers shall prepare and deliver to the Buyer, within 10 Business Days after every calendar month-end between the date hereof and the Closing Date (the "Post-Signing Balance Sheets") a true, complete and correct consolidated balance sheet of the Company which shall not be materially different in form and substance from the items on the November 30 Balance Sheet other than any change to reflect a transaction contemplated by this Agreement or otherwise approved by the Buyer or other than in respect of any Excluded Assets or Excluded Liabilities. The Sellers shall also prepare and deliver to the Buyer as soon as reasonably practicable after every calendar month-end between the date hereof and the Closing Date, true, complete and correct ledger information of the Company which shall be in the form previously delivered to the Buyer.

(b)     Five days prior to the Closing Date, the Sellers shall prepare and deliver to the Buyer a consolidated balance sheet which represents the Company's good faith and best estimate of the Company's consolidated balance sheet as of the Closing Date which shall not be materially different in form and substance from the items on the November 30 Balance Sheet other than any change to reflect a transaction contemplated by this Agreement or otherwise

approved by the Buyer or other than in respect of any Excluded Assets or Excluded Liabilities (the "Closing Date Balance Sheet").

5.28.    GE Loan Services; Transition Services.    If the GE Condition is met, the Buyer agrees to negotiate in good faith with GE to provide certain loan servicing for up to 18 months, relating to the home improvement and consumer loans originated by the HI Origination Business and the CL Origination Business and any such loans on the balance sheet of Mill Creek Bank at the time of closing of the GE Approved Agreement, on terms and conditions reasonably acceptable to the Buyer. If the GE Condition is met, the Buyer further agrees to negotiate the provision of certain interim transition services including, but not limited to, network administration, data center support and system maintenance on terms and conditions reasonably acceptable to the Buyer and the Buyer agrees use all commercially reasonable efforts to endeavor to provide all necessary notices and obtain all necessary consents or approvals in connection with the provision of such interim transition services. If the GE Closing occurs before the Closing, then Sellers shall negotiate in good faith one or more agreements with GE concerning any of the above matters; provided, however, that the Sellers shall not, prior to the Closing, enter into any such agreements with GE which may extend to any time after the Closing Date unless the Buyer shall have approved the terms and conditions thereof. Notwithstanding anything to the foregoing, if the Sellers shall have entered into one or more agreements with respect to any of the above matters in a form reasonably acceptable to the Buyer prior to Closing, the Buyer agrees to assume such agreements from the Sellers; provided however that the Buyer shall only assume Liabilities thereunder arising after the Closing Date.

5.29.    Intellectual Property Licenses.

(a)    In the event the Buyer elects to exclude the capital stock of Mill Creek Bank pursuant to Section 2.1(a)(ii), the Buyer shall grant to the Sellers a non-exclusive, royalty-free, worldwide license to use any Intellectual Property necessary for the conduct of Mill Creek Bank. Such license shall be perpetual (subject to customary termination provisions) and the Sellers shall have the right to grant sublicenses with the prior written consent of the Buyer.

(b)    If the GE Condition is met, the Buyer agrees to negotiate in good faith with GE to grant GE a non-exclusive, worldwide, royalty-free license to use the trademarks "Mill Creek Bank," "Mill Creek Financial Services," "Mill Creek Mortgage," "Mill Creek Servicing Corporation," "green tree" and "Speaking of Credit" in connection with servicing loans, which shall include a right for GE to use any materials that incorporate these trademarks and that were created by the Sellers prior to the Closing for use with servicing loans. Notwithstanding anything to the foregoing, if the Sellers shall have entered into one or more such license agreements in a form reasonably acceptable to the Buyer prior to Closing, the Buyer agrees to assume such agreements from the Sellers; provided however that the Buyer shall only assume Liabilities thereunder arising after the Closing Date.

(c)    If the GE Condition is satisfied and if Sellers enter into a license agreement with GE as contemplated by Section 5.31(d) of the GE Approved Agreement, the Sellers shall seek to assign and shall, if permitted by GE, assign such license agreement to Buyer at the Closing and, if so assigned, such license agreement shall become an Assumed Agreement hereunder.

5.30.  GE Leases.  If the GE Condition shall have been satisfied, the Buyer agrees to negotiate in good faith to enter into a lease for premises at 1400 Turbine Drive, Rapid City, South Dakota and an agreement to provide access to the data center located at 7360 South Kyrene Road, Building C/1, Tempe Arizona with GE or its Affiliate on substantially similar terms as those set forth on Exhibit C hereto and in a form reasonably acceptable to the Buyer (or, if the Sellers shall have entered into agreements for such premises with GE or its Affiliate on substantially similar terms as those set forth on Exhibit C hereto and in a form reasonably acceptable to the Buyer prior to Closing, the Buyer agrees to assume such agreements from the Sellers; provided however that the Buyer shall only assume Liabilities thereunder arising after the Closing Date).

5.31.  Waiver of B-2 Guarantee Rights.  If and to the extent that the separation of the B-2 Guarantee Rights from the B-2 Certificates is not permitted under the MH Servicing Contracts or applicable law or is not ordered by the Bankruptcy Court by a Final Order, (x) the Buyer agrees to irrevocably waive and not assert any B-2 Guarantee Rights against any CFC Party or otherwise and shall cause any direct or indirect transferee to abide by such waiver and (y) the Sellers agree, and shall cause the CFC Parties to agree, that all other cash flows associated with or derivative of the B-2 Certificates shall immediately be assigned, transferred and delivered to Buyer and all rights and claims associated with or derivative of the B-2 Certificates shall be enforced, at the direction and expense of the Buyer, for the exclusive benefit of the Buyer.

5.32.  Termination of HE Origination Business.  Notwithstanding any provision of this Agreement to the contrary, including without limitation Section 5.4 and Section 5.5 above, (a) the Buyer acknowledges that the Sellers intend to discontinue and terminate the origination portion of the HE Business (the "HE Origination Business"), including without limitation, the termination of certain employees and the rejection of certain contracts associated with the HE Origination Business and (b) the Sellers are hereby permitted to take all actions reasonably necessary or desirable to effect (i) the termination of the HE Origination Business and (ii) the termination, as mutually determined by the Buyer and the Company, of any Business Employee or group of Business Employees or any employees that the Buyer elects to hire pursuant to Section 5.10(a)(ii), whether or not related to the HE Origination Business (the "Terminated Employees").  Notwithstanding any provision to the contrary in this Agreement, in the event the Sellers discontinue or terminate the HE Origination Business or terminate any Terminated Employees, (i) the Buyer hereby agrees to reimburse the Sellers at the Closing for all out-of-pocket costs or expenses paid by any of the Sellers or any of their respective Affiliates in connection with the discontinuation or termination of the HE Origination Business or termination of Terminated Employees, as appropriate, prior to the Closing, including without limitation severance to all employees who are terminated in connection with the discontinuation of the HE Origination Business and all Liabilities for paid time off, sick leave and vacation pay, (ii) all such out-of-pocket costs or expenses in connection with the termination of the HE Origination Business or in connection with the termination of Terminated Employees incurred by any of the Sellers or any of their respective Affiliates in connection with the discontinuation or termination of the HE Origination Business or termination of Terminated Employees prior to the Closing which have not been paid by the Buyer to the Sellers at Closing shall be Assumed Liabilities, including (x) severance to all employees who are terminated in connection with the discontinuation of the HE Origination Business in accordance with the amount of severance set forth on the list which was provided to the Buyer in accordance with Section 3.14, and (y) all

Liabilities for paid time off, sick leave and vacation pay for such employees as set forth under the heading "PTO" in Section 5.10(a) of the applicable Business Schedules, in each case to the extent such costs and expenses have not been paid prior to the Closing by the Sellers and reimbursed by the Buyer at the Closing.

5.33.    Seller Transition Services. If the transaction contemplated by the GE Agreement does not close, then (A) Buyer shall provide the Sellers with (i) loan servicing relating to the home improvement and consumer loans originated by the HI Origination Business and the CL Origination Business and any such loans on the balance sheet of Mill Creek Bank at the time of the Closing Date and (ii) services including, without limitation, network administration, data center support and system maintenance on terms and conditions reasonably acceptable to Sellers (collectively, the "Loan and IT Services") until such time as the Excluded Businesses are sold or liquidated, but in any event not more than six months after the Closing Date; provided that, upon Sellers' request, Buyer agrees to negotiate in good faith for the provision of such Loan and IT Services to Sellers after such six-month period upon mutually acceptable terms; and (B) Buyer shall use reasonable efforts (and Seller shall ensure that any applicable purchase agreement for the Excluded Businesses contains a provision requiring the buyer of such Excluded Businesses to use such reasonable efforts) to reach mutual agreement with the buyer of the Excluded Businesses as to the provision by Buyer of the Loan and IT Services to such buyer in a manner that is reasonable with respect to the Excluded Businesses.

ARTICLE VI.

CONDITIONS PRECEDENT TO THE BUYER'S OBLIGATIONS

The obligation of the Buyer to consummate the transactions contemplated by this Agreement is subject to the fulfillment of the following conditions as of the Closing Date:

6.1.    Representations and Warranties; Covenants; Certificates.

(a)    The representations and warranties of the Sellers contained in this Agreement, and in any agreement, instrument, or document executed and delivered by them in connection with the Closing, shall be true and correct on and as of the Closing Date as if made on and as of such date, except as affected by transactions permitted by this Agreement and except to the extent that any such representation or warranty is made as of a specified date, in which case such representation or warranty shall have been true and correct as of such specified date, except in each case to the extent that the failures in the aggregate of such representations and warranties (disregarding any qualifications as to materiality contained therein) to be true and correct would not reasonably be expected to have, and have not had, a Material Adverse Effect.

(b)    The Sellers shall have performed and complied in all material respects with all agreements, obligations, covenants and conditions required by this Agreement to be performed or complied with by it on or prior to the Closing, including, without limitation, the covenants set forth in Sections 5.4 and 5.5.