(c)    The Buyer shall have received a certificate, dated as of the Closing Date, signed by authorized officers of the Sellers to the effect that such conditions set forth in Sections 6.1(a) and (b) hereof have been satisfied in all respects.

6.2.    Bankruptcy Condition.  The Bankruptcy Court shall have entered the Sale Order, which shall be a Final Order which has not been vacated, reversed, modified, rescinded or stayed as of the Closing Date.

6.3.    Litigation.  There shall be in effect no pending or threatened injunction, decree or order of, or any other action or proceeding before, any Governmental Authority that could reasonably be expected to (a) prevent the consummation of the transactions contemplated hereby, (b) cause the transactions to be rescinded following the consummation thereof or (c) have a material adverse effect on the Buyer to operate the Purchased Businesses post-Closing.

6.4.    Approvals.    All authorizations, permits, licenses, certificates of authority, consents, Orders, filings, notices and approvals (other than bulk sale approvals) necessary to permit the Sellers to perform the transactions contemplated hereby and required for the Buyer to own the Purchased Assets and to operate the Purchased Businesses post-Closing from any Government Authority shall have been duly obtained, made or given, shall be in form and substance reasonably satisfactory to the Buyer, shall not be subject to the satisfaction of any material condition that has not been satisfied or waived and shall be in full force and effect; provided, however, that the Buyer shall not unreasonably withhold a waiver of this Section 6.4 based on a failure to obtain an insignificant authorization, permit, license, certificate of authority, consent or approval.  All material authorizations, permits, licenses, certificates of authority, consents, Orders, filings, notices and approvals (other than bulk sale approvals) necessary to permit the Sellers to perform the transactions contemplated hereby and required for the Buyer to own the Purchased Assets and to operate the Purchased Businesses post-Closing from any Third Party shall have been duly obtained, made or given, shall be in form and substance reasonably satisfactory to the Buyer, shall not be subject to the satisfaction of any material condition that has not been satisfied or waived and shall be in full force and effect.  All terminations or expirations of waiting periods imposed by any Governmental Authority necessary for the transactions contemplated under this Agreement, if any, shall have occurred.  This includes, but is not limited to, the termination or expiration of all applicable waiting periods relating to the HSR Act and the satisfactory conclusion of any proceedings that may have been filed or instituted thereunder.

6.5.    Instruments of Conveyance and Transfer; Title.  The Sellers shall have delivered to the Buyer such bills of sale, deeds, endorsements, assignments and other good and sufficient instruments of conveyance and transfer, including the Intellectual Property Assignment Agreements, in form and substance, reasonably satisfactory to the Buyer and its counsel, as are reasonably necessary to vest in the Buyer good and marketable title to all of the interest of the Sellers in the Purchased Assets, free and clear of all Liens, other than Permitted Liens and the Lien identified in Section 3.8(a) of the applicable Business Schedules with respect to the Owned Real Premises located in Rapid City, South Dakota, opinions of counsel (including with respect to the matters covered in Section 3.30) and other documents and instruments referred to in Section 2.3(b); provided, however, that if the GE Condition is satisfied, then the Owned Real Premises located in Rapid City, South Dakota shall be transferred free and clear of such Lien

identified in Section 3.8(a) of the applicable Business Schedules. With respect to each Residual Asset, the Buyer or its designee shall have been made the registered owner of such Residual Asset pursuant to the terms of the related governing documents. In the case of a Stock Sale, the Company shall deliver to the Buyer or its designees (a) stock certificates representing the Shares, duly endorsed in blank for transfer or accompanied by appropriate stock powers duly executed in blank, with all taxes, direct or indirect, attributable to the transfer of the Shares paid or provided for; (b) the minutes and stock records of the Subject Subsidiary; and (c) signature cards from all banks or financial institutions with which the Subject Subsidiary has an account designating signatures approved by the Buyer to become effective immediately following the Closing.

6.6.    Transition Services Agreement. The Buyer and the Sellers shall have entered into and delivered a transition services agreement, on terms to be agreed upon by the Parties acting reasonably and to cover such services as the Buyer reasonably determines (by written notice to Sellers) by the later of the date of April 1, 2003 or 15 days after the Sellers have identified the (x) relevant services pursuant to Section 5.13 and (y) the terms under which they are provided are necessary to operate the Purchased Businesses post-Closing to the extent such services were provided by the Sellers prior to the Closing (the "Transition Services Agreement"); provided, however, that the foregoing shall not be a condition to Closing if the Sellers shall have used their good faith efforts to negotiate the Transition Services Agreement and notwithstanding such good faith efforts no agreement is reached with respect thereto. Notwithstanding anything to the contrary contained in ARTICLE III of this Agreement, to the extent that certain assets or services are so identified by the Sellers as to be provided to the Buyer pursuant to the Transition Services Agreement, it is expressly understood and agreed that the fact that such assets or services are not owned by the Buyer after the Closing shall not be deemed to be a breach of any of the representations or warranties contained in ARTICLE III.

6.7.    Resignation or Removal of Officers and Directors of Subject Subsidiaries. In the case of a Stock Sale, the directors and officers of the Subject Subsidiary identified by the Buyer shall have: (a) delivered letters of resignation from their respective positions at the Subject Subsidiary in form and substance satisfactory to the Buyer or (b) been removed from their respective positions at the Subject Subsidiary by the taking of the requisite corporate action in form and substance satisfactory to the Buyer.

6.8.    Lehman Facility. The outstanding Lehman Debt Amount shall not, during any time from December 19, 2002 to the Closing Date, be in excess of a total aggregate amount of $975 million, and there shall not have occurred any sale, transfer or liquidation of the Purchased Assets held under the Lehman Facilities except as permitted by Section 5.5(b). On and as of the Closing Date, and without limiting the foregoing, no Purchased Asset that is in whole or in part an asset subject to a repurchase agreement shall be liquidated, set off or otherwise the subject of an exercise of remedies thereunder.

6.9.    No Material Adverse Effect. Since December 31, 2002, there shall not have been any change, circumstance or event which constitutes or has resulted in, or that, in the Buyer's reasonable judgment, could reasonably be expected to result in, a Material Adverse Effect.

6.10.    Reserved.

6.11.  Servicing Rights.

(a)    The Buyer shall be the servicer or successor servicer with respect to all Non-MH Servicing Rights under each Non-MH Servicing Contract and the Buyer shall be recognized as the servicer or successor servicer with respect to all Non-MH Servicing Rights under each Non-MH Servicing Contract, and any servicing fees or reimbursement for servicer advances shall be of the priority accorded to a successor servicer in the cash flow waterfall with respect to the Securitization covered by such Non-MH Servicing Contract, in each case as evidenced by the Sale Order.

(b)    The Buyer shall be the servicer or successor servicer with respect to all MH Servicing Rights under each MH Servicing Contract and the Buyer shall be recognized as the servicer or successor servicer with respect to all MH Servicing Rights under each MH Servicing Contract, any servicing fees shall be senior in the cash flow waterfall with respect to the Securitization covered by such MH Servicing Contract (except in the case of the securitization trusts set forth on Exhibit E for which P&I insurance is in force, in which cases, the Revised Monthly Servicing Fee (as defined in the 9019 Order) will be paid in the highest priority that will not adversely affect the continuation in force of such insurance) and any reimbursement for servicer advances shall be as set forth in the Consent Agreement, in each case as evidenced by (x) the Sale Order, (y) the 9019 Order, and (z) a Consent Agreement which is in full force and effect and the conditions precedent of which shall have been satisfied or waived by the parties thereto as of the Closing Date (provided that if a Consent Agreement is not entered into or does not remain in full force and effect, the Buyer shall be satisfied that the foregoing orders or other arrangements as may be in effect are sufficient to provide the Buyer with the foregoing rights).

(c)    The servicing fees under each MH Servicing Contract shall have been increased to 125 basis points (or such other amount as shall be provided in a Consent Agreement which is in full force and effect) and such increase shall have been confirmed by a Final Order of the Bankruptcy Court.

6.12.  Tax Opinion.

(a)    In respect of each Securitization in which a Residual Asset, the MESA Equity or the NIMS Equity was issued or created, the Sellers shall furnish to the Buyer an opinion of counsel to the effect that:

(i)    in the case of a Securitization involving the creation of one or more REMICs, each such REMIC will, assuming that compliance with the terms of its governing documents, be qualified as a real estate mortgage investment conduit within the meaning of Section 860D(a) of the Code;

(ii)    in the case of the NIMS Issuer, that it will not be classified as an association treated as a corporation for federal income tax purposes, as a publicly traded partnership within the meaning of Section 7704 of the Code, or as a taxable mortgage pool within the meaning of Section 7701(i) of the Code and that the NIMS Notes will be treated as indebtedness for federal income tax purposes;

(iii)    in the case of the MESA Issuers, each will be classified as a corporation for federal income tax purposes, if each is managed in accordance with the terms of its governing documents, it will not be considered engaged in a United States trade or business within the meaning of Section 864 of the Code, and the MESA Notes will be treated as indebtedness for federal income tax purposes; and

(iv)    in the case of an Other Securitization Entity, it will be classified as a grantor trust, a partnership or a disregarded entity, and not an association taxable as a corporation, a publicly traded partnership or a taxable mortgage pool, for federal income tax purposes, and, to the extent that it has issued instruments designated as notes, bonds, debentures or other evidences of indebtedness, such instruments will be characterized as indebtedness for federal income tax purposes;

provided, however, that with respect to Section 6.12(a)(i), such an opinion of counsel shall be required only with respect to 75 percent of the total value of such Securitizations and Sellers shall use their best efforts to obtain such an opinion of counsel with respect to the remaining 25 percent of such Securitizations.

(b)    The requirement of this Section 6.12 may be satisfied by the delivery of a letter from the law firm that rendered the opinion as to the U.S. federal income tax treatment of the Securitization in which the relevant Residual was created, which letter states that the Buyer is entitled to rely on such opinion to the same extent as the party to whom the opinion was originally issued. A copy of the relevant opinion shall be attached to the letter that states that the Buyer is entitled so to rely.

6.13.    Data Service Contracts.    The Sellers shall have secured for the Buyer the intellectual property, systems, data and telecommunications contracts set forth in Section 6.13 of the applicable Business Schedules, including, without limitation, the following contracts: (a) telecommunications and data communications services with AT&T; (b) telecommunications and data communications services with MCI/Worldcom; (c) database management and data analysis services with Acxiom; and (d) database license with Oracle. Without limiting the foregoing, at the reasonable request of any of the Sellers, whether due to an inability to obtain consent or otherwise, the Buyer and the Sellers shall cooperate and use their good faith efforts to make alternate arrangements which will be reasonably satisfactory to the Buyer.

6.14.    Acceptance of Employment Offers.    With respect to each of the Purchased Businesses, the Buyer shall have received acceptances of offers of employment from a sufficient number of employees of the Purchased Business so as to be able to operate the Purchased Business in a manner reasonably consistent with its operating history, as reasonably determined by the Buyer in the exercise of its good faith discretion.

6.15.    Parent Guarantee.    The Bankruptcy Court (with respect to the bankruptcy proceeding of Parent) shall have entered an Order which shall be a Final Order approving the letter agreement delivered by Parent on December 19, 2002 with respect to certain tax matters.

6.16.  <u>Goldman</u>.  The Goldman Final DIP Order shall not have been entered by the Bankruptcy Court.  The Goldman Credit Agreement and the Goldman Commitment Letter shall have been terminated in all respects.  Except for the $8.75 million fee approved in the Goldman Interim Order, the Company and its Subsidiaries shall have no Liability to Goldman or its Affiliates under the Goldman Commitment Letter or the Goldman Credit Agreement.

Any condition specified in this <u>ARTICLE VI</u> may be waived by the Buyer; <u>provided, however</u>, that no such waiver shall be effective unless it is set forth in a writing executed by the Buyer or unless the Buyer agrees in writing to consummate the transactions contemplated by this Agreement without fulfillment of such condition.

ARTICLE VII.

CONDITIONS PRECEDENT TO THE SELLERS' OBLIGATIONS

The obligation of the Sellers to consummate the transactions contemplated by this Agreement is subject to the fulfillment of the following conditions as of the Closing Date:

7.1.  <u>Representations and Warranties; Covenants; Certificates</u>.

(a)  The representations and warranties of the Buyer contained in this Agreement, and in any agreement, instrument, or document executed and delivered by it in connection with the Closing, shall be true and correct on and as of the Closing Date as if made on and as of such date, except as affected by transactions permitted by this Agreement and except to the extent that any such representation or warranty is made as of a specified date, in which case such representation or warranty shall have been true and correct as of such specified date, except in each case to the extent that the failures in the aggregate of such representations and warranties (disregarding any qualifications as to materiality contained therein) to be true and correct would not reasonably be expected to have, and have not had, a material adverse effect on the Buyer or its ability to perform its obligations hereunder or to consummate the transactions contemplated herein.

(b)  The Buyer shall have performed and complied in all material respects with all agreements, obligations, covenants and conditions required by this Agreement to be performed or complied with by it on or prior to the Closing.

(c)  The Sellers shall have received a certificate, dated as of the Closing Date, signed by authorized officers of the Buyer to the effect that such conditions set forth in <u>Section 7.1(a)</u> and (b) hereof have been satisfied in all respects.

7.2.  <u>Bankruptcy Condition</u>.  The Bankruptcy Court shall have entered the Sale Order, which shall be a Final Order which has not been vacated, reversed, modified, rescinded or stayed as of the Closing Date.

7.3.  <u>Litigation</u>.  There shall be in effect no pending or threatened injunction, decree or order of, or any other action or proceeding before, any Governmental Authority that could reasonably be expected to prevent the consummation of the transactions contemplated hereby or cause the transactions to be rescinded following the consummation thereof.

7.4.    Approvals.    The authorizations, permits, licenses, certificates of authority, consents, notices, filings, orders and approvals (other than bulk sale approvals) set forth in Section 7.4 of the applicable Business Schedules shall have been duly obtained, made or given, shall be in form and substance reasonably satisfactory to the Sellers, shall not be subject to the satisfaction of any material condition that has not been satisfied or waived and shall be in full force and effect. All terminations or expirations of waiting periods imposed by any Governmental Authority necessary for the transactions contemplated under this Agreement, if any, shall have occurred. This includes, but is not limited to, the termination or expiration of waiting periods under the HSR Act.

7.5.    Reserved.

7.6.    Other Documents.    The Sellers shall have received all other documents and instruments referred to in Section 2.3(b).

Any condition specified in this ARTICLE VII may be waived by the Sellers; provided that no such waiver shall be effective against the Sellers unless it is set forth in a writing executed by the Sellers or unless the Sellers agree in writing to consummate the transactions contemplated by this Agreement without the fulfillment of such condition.

ARTICLE VIII.

TERMINATION

8.1.    Termination Prior to Closing.    This Agreement may be terminated prior to the Closing as follows:

(a)    by mutual written agreement of the Buyer and the Company;

(b)    by the Buyer or the Company, if there shall be in effect a Final Order restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement;

(c)    by the Buyer (provided that Buyer is not then in material breach of any representation, warranty, covenant or other agreement contained herein), if there shall have been a breach of any of the representations or warranties of Sellers which would have a Material Adverse Effect or a material breach of any of the covenants set forth in this Agreement on the part of the Sellers, which breach is not cured within 30 days following written notice to the Company (so long as such breach is capable of being cured);

(d)    by the Company (provided that none of the Sellers is then in material breach of any representation, warranty, covenant or other agreement contained herein), if there shall have been a breach of any of the representations or warranties which would have a material adverse effect on Buyer's ability to perform its obligations hereunder or to consummate the transactions contemplated herein or a material breach of any of the covenants set forth in this Agreement on the part of the Buyer, which breach is not cured within 30 days following written notice to the Buyer (so long as such breach is capable of being cured);

(e)    by the Buyer, if by the respective dates required by <u>Section 5.8</u> hereof the Chapter 11 Case shall not have commenced or the Interim 9019 Order, the Bidding Procedures Order, the 9019 Order or the Sale Order shall not have been entered, or if any such Orders are vacated, reversed, modified, amended or stayed;

(f)    by the Buyer or the Company, if the Company accepts a higher and better offer for the Purchased Assets in accordance with <u>Section 5.8</u> hereof and the Bidding Procedures Order (other than of the Buyer);

(g)    by the Buyer or the Company, if the Bankruptcy Court enters an order approving any Acquisition Proposal (other than a sale of the Purchased Assets to the Buyer);

(h)    by the Buyer or the Company, if the Closing has not occurred by June 1, 2003, provided such failure of the Closing to occur is not caused by a breach of this Agreement by the terminating party, <u>provided</u>, that the Buyer shall be entitled to extend such date for an additional period of up to 90 days if such failure to close is a result of the condition set forth in <u>Section 6.4</u> to be satisfied;

(i)    by the Buyer, if the Credit Commitments (as defined in the DIP Loan) shall have been terminated or the Loans (as defined in the DIP Loan) shall have been declared due and payable, in each case pursuant to <u>Section 9.2</u> of the DIP Loan; or

(j)    if the Bankruptcy Court declines to enter the Sale Order because the Bankruptcy Court finds that the sale of the Purchased Assets under this Agreement can only be approved through or in the context of a plan of reorganization.

8.2.    <u>Break-Up Fee and Expense Reimbursement</u>.

(a)    If this Agreement is terminated pursuant to <u>Sections 8.1(f)</u>, <u>8.1(g)</u> or <u>8.1(j)</u> the Sellers shall, jointly and severally, pay to the Buyer in immediately available funds a cash fee equal to $30 million (the "<u>Break-Up Fee</u>"), such fee to be paid upon the earliest to occur of (i) the closing of the Acquisition Proposal; (ii) the consummation of a plan under chapter 11 of the Bankruptcy Code by the CFC Parties; (iii) the date which is 20 Business Days after the entry of a sale order with respect to an Acquisition Proposal or (iv) the date which is 20 Business Days after the Bankruptcy Court declines to enter the Sale Order for the reason set forth in <u>Section 8.1(j)</u> hereof. If this Agreement is terminated pursuant to <u>Section 8.1(h)</u> as a result of the failure of the Company to deliver the capital stock of Mill Creek Bank free and clear of all Liens at the Closing (other than in the case where the Buyer has elected not to purchase such stock pursuant to <u>Section 2.1(a)(ii)</u>) the Sellers shall, jointly and severally, pay to the Buyer in immediately available funds the Break-Up Fee, such fee to be paid within two days after such termination. If this Agreement is terminated for any other reason permitted by <u>Section 8.1</u> (other than pursuant to <u>Section 8.1(d)</u>), and the Sellers (or any of them) within one year thereafter consummate an Acquisition Proposal which constituted a higher and better offer (whether or not constituting a Qualifying Bid) (as defined in the Original Agreement), the Sellers shall, jointly and severally, pay to the Buyer in immediately available funds the Break-Up Fee, such fee to be paid upon consummation of such Acquisition Proposal. The Break-Up Fee shall not be payable except under the circumstances provided in this <u>Section 8.2(a)</u>.

(b)     If this Agreement is terminated pursuant to Sections 8.1(b), 8.1(c), 8.1(e) or 8.1(h) (without regard to the second proviso thereof), then the Sellers shall, jointly and severally, pay or reimburse the Buyer for all of the Buyer's actual out-of-pocket costs, fees, expenses (including, without limitation, the Buyer's half of the HSR Act filing fee and the reasonable fees and expenses of consultants, financial advisors, accountants, counsel and financing sources), incurred by the Buyer (or the Investors) in connection with the transactions contemplated by this Agreement, whether or not incurred before or after the date of this Agreement, in an amount not to exceed $5 million, which shall consist of the Buyer's actual and reasonable costs and fees incurred (the "Expense Reimbursement").     The Expense Reimbursement shall be made within five Business Days after the Buyer presents reasonable supporting documentation therefor to the Sellers and the official committee of unsecured creditors appointed in the Chapter 11 Case. The Expense Reimbursement shall not be payable except under the circumstances provided in this Section 8.2(b).

(c)     The Sellers' obligation to pay the Break-Up Fee and the Expense Reimbursement pursuant to this Section 8.2 shall survive termination of this Agreement and shall constitute an administrative expense of the Sellers under section 364(c)(1) of the Bankruptcy Code with priority over any and all administrative expenses of the kind specified in section 503(b) or 507(b) of the Bankruptcy Code.

(d)     The Break-Up Fee, payable under the circumstances provided in Section 8.2(a), and the Expense Reimbursement, payable under the circumstances provided in Section 8.2(b), shall be the exclusive remedies of the Buyer and its Affiliates for any termination of this Agreement prior to the Closing. In no event shall the Sellers or any of their respective Affiliates or representatives have any Liability with respect to the Buyer or any other Person hereunder in excess of the applicable Break-Up Fee and Expense Reimbursement in the event that this Agreement terminates for any reason permitted by Section 8.1, and any claim, right or cause of action by the Buyer or any other Person against the Sellers or their respective Affiliates or representatives in excess of the applicable Break-Up Fee and Expense Reimbursement is hereby fully waived, released and forever discharged. In no event shall the Sellers or their respective Affiliates have any Liability to the Buyer or any other Person for any special, consequential or punitive damages, and any such claim, right or cause of action for any damages that are special, consequential or punitive or for specific performance of this Agreement is hereby fully waived, released and forever discharged.

8.3.     Termination by Reason of Buyer Default.     If this Agreement is terminated pursuant to Section 8.1(d), the sole and exclusive remedy of the CFC Parties and their Affiliates shall be strictly limited to retention of the Purchased Assets and the prompt payment by the Buyer to the Company of an amount not to exceed $100 million for any Losses on an after Tax basis actually incurred or suffered by the Sellers as a result of such breach, as liquidated damages (the "Seller Liquidated Damages"). In no event shall the Buyer or any of its Affiliates or representatives have any Liability to the CFC Parties or their respective Affiliates or any other Person hereunder in excess of the Seller Liquidated Damages in the event that this Agreement terminates pursuant to Section 8.1(d), and any claim, right or cause of action by the CFC Parties or their respective Affiliates or any other Person against the Buyer or its Affiliates or representatives in excess of the Seller Liquidated Damages is hereby fully waived, released and forever discharged. In no event shall the Buyer or any of its Affiliates or representatives have

any liability to the CFC Parties or their respective Affiliates in the event that this Agreement is terminated for any other reason other than pursuant to Section 8.1(d), and any claim, right or cause of action by the CFC Parties or their respective Affiliates or any other Person against the Buyer or its Affiliates or representatives is hereby fully waived, released and forever discharged. In no event shall the Buyer or its Affiliates have any Liability to the CFC Parties or their respective Affiliates or any other Person for any special, consequential or punitive damages, and any such claim, right or cause of action for any damages that are special, consequential or punitive or for specific performance of this Agreement is hereby fully waived, released and forever discharged. Concurrently with the execution of this Agreement, J.C. Flowers I L.P., Fortress Investment Trust II and Cerberus Capital Management, L.P. shall have delivered to the Company an indemnification letter in the form of Exhibit D attached hereto.

8.4.    Effect of Termination.    If none of the transactions contemplated hereby are consummated then this Agreement shall become null and void and of no further force and effect and there shall be no Liability on the part of any Party to any other Party or its shareholders, directors or officers, except as contemplated by ARTICLE VIII and ARTICLE X hereof. The Parties hereby acknowledge that the amounts payable pursuant to this ARTICLE VIII are commercially reasonable and necessary to induce the Buyer to enter into and consummate the transactions contemplated by this Agreement.

ARTICLE IX.

SURVIVAL OF REPRESENTATIONS; INDEMNIFICATION

9.1.    Survival of Representations.

(a)    The respective representations and warranties of the Parties contained herein and in any Transaction Document or in any other agreement, certificate, instrument or other document delivered pursuant hereto or hereto shall survive the Closing until a date 12 months from the Closing Date, provided that representations and warranties contained in Section 3.22 shall survive until 60 days after the lapse of the applicable statute of limitations. No claim may be asserted nor may any action be commenced against the Sellers pursuant to Section 9.2(a)(ii) or against the Buyer pursuant to Section 9.2(b)(i) unless written notice of such claim or action is received by the Sellers, in the case of Section 9.2(a)(ii), and Buyer, in the case of Section 9.2(b)(i), on or prior to the date on which the representation or warranty is based ceases to survive as set forth in the prior sentence (it being agreed and understood that if a claim for a breach of a representation or warranty is timely made, the representation or warranty shall, solely for purposes of such claim, survive until the date on which such claim is finally liquidated or otherwise resolved).

(b)    Except as otherwise provided herein, the respective post-Closing covenants of the Parties contained in this Agreement, the Transaction Documents or in any other agreement, certificate, instrument or other document delivered pursuant hereto or thereto shall survive the Closing indefinitely. Pre-Closing covenants and failure to satisfy any condition to the other party's obligation to consummate the transactions contemplated by this Agreement shall not survive the Closing. Notwithstanding anything to the contrary set forth herein, the representations and warranties pertaining to any claim filed prior to the expiration of the relevant

survival period specified in <u>Section 9.1(a)</u> hereof, shall, solely for purposes of such claim survive until the resolution of such claim.

9.2.    <u>Indemnification.</u>

(a)    From and after the Closing and in addition to any other remedies available to the Buyer Indemnified Parties pursuant to <u>Section 10.15</u> in equity (but subject to <u>Section 9.6</u>), subject to <u>Section 9.3</u> hereof, the Sellers shall indemnify, defend and hold the Buyer, the Investors, their Affiliates and their respective directors, officers, employees, representatives, agents, successors and assigns (collectively, the "<u>Buyer Indemnified Parties</u>") harmless from and against all Losses on an after-Tax basis that may be incurred or suffered by any Buyer Indemnified Party resulting or arising from, related to or incurred or suffered in connection with:

(i)    any failure of the Sellers to assume, pay, perform and discharge any Excluded Liability;

(ii)    any breach of any representation or warranty of the Sellers contained in this Agreement or the certificate delivered pursuant to <u>Section 6.1(c)</u> above; or

(iii)    any breach of any covenant, obligation or agreement of the Sellers contained herein or in any Transaction Document or in any other agreement, certificate, instrument or other document delivered pursuant thereto or hereto which is required to be performed by any Sellers after the Closing.

(b)    From and after the Closing, subject to <u>Section 9.3</u> hereof, the Buyer shall indemnify, defend and hold the Sellers, their Affiliates and their respective directors, officers, employees, representatives, agents, successors and assigns (collectively, the "<u>Seller Indemnified Parties</u>", and together with the Buyer Indemnified Parties, the "<u>Indemnified Parties</u>") harmless from and against all Losses, that may be incurred or suffered by any Seller Indemnified Party resulting or arising from, related to or incurred or suffered in connection with:

(i)    any breach of any representation or warranty of the Buyer contained in this Agreement or the certificate delivered pursuant to <u>Section 7.1(c)</u> above;

(ii)    any breach of any covenant, obligation or agreement of the Buyer contained herein or in any Transaction Document or in any other agreement, certificate, instrument or other document delivered pursuant thereto or hereto which is required to be performed by the Buyer after the Closing; or

(iii)    any failure of the Buyer to assume, pay, perform and discharge any Assumed Liability.

9.3.    <u>Qualifications on Indemnification.</u>    Notwithstanding anything to the contrary contained in this Agreement,

(a)     the Sellers shall not be required to indemnify the Buyer Indemnified Parties for any Losses pursuant to <u>Section 9.2(a)(ii)</u> (other than with respect to representations under <u>Sections 3.22, 3.31, 3.32, 3.33, 3.34, 3.35, 3.36, 3.37 and 3.38</u>) until the aggregate amount of such Losses exceeds $10 million (the "<u>Indemnity Deductible</u>"), and then only for the excess of such Losses over such Indemnity Deductible; <u>provided</u>, <u>however</u>, that the Sellers shall not be required to indemnify the Buyer Indemnified Parties for any Losses pursuant to <u>Section 9.2(a)(ii)</u> (other than with respect to representations under <u>Sections 3.22, 3.31, 3.32, 3.33, 3.34, 3.35, 3.36, 3.37 and 3.38</u>) for any Losses in the aggregate in excess of $100 million (the "<u>Cap</u>");

(b)     the Buyer shall not be required to indemnify the Seller Indemnified Parties for any Losses (i) pursuant to <u>Section 9.2(b)(i)</u> until the aggregate amount of such Losses exceeds the Indemnity Deductible, and then only for the excess of such Losses over such Indemnity Deductible; <u>provided</u>, <u>however</u>, that the Buyer shall not be required to indemnify the Seller Indemnified Parties for any Losses pursuant to <u>Section 9.2(b)(i)</u> for any Losses in the aggregate in excess of the Cap;

(c)     for the purposes of determining whether the Indemnity Deductible has been attained (but not for purposes of determining whether any Indemnified Party is entitled to indemnification for Losses pursuant to <u>Section 9.2(a)(ii)</u> or <u>Section 9.2(b)(i)</u> once such Indemnity Deductible has been met), all qualifications as to "material," "materiality," "<u>Material Adverse Effect</u>," or similar exception or qualifier contained therein shall be disregarded; and

(d)     after the Buyer has recovered $10 million for Losses pursuant to this <u>ARTICLE IX</u>, the Sellers shall not be required to indemnify the Buyer Indemnified Parties for any Losses resulting or arising from, related to or incurred or suffered in connection with any breach of any representation or warranty of the Sellers contained in this Agreement or the certificate delivered pursuant to <u>Section 6.1(c)</u> above or which are actually known by the Buyer prior to the Closing.

9.4.    <u>Notice and Defense of Claims</u>.

(a)     <u>Notice of Claims</u>.  If an Indemnified Party desires to assert a Direct Claim or receives notice of the assertion of any claim or of the commencement of any Third Party Claim with respect to which indemnification is to be sought from an Indemnifying Party, the Indemnified Party will give such Indemnifying Party reasonable prompt notice thereof, but the failure to give timely notice will not affect the rights or obligations of the Indemnifying Party except to the extent that, as a result of such failure, the Indemnifying Party has been materially prejudiced by the Indemnified Party's failure to give such notice, in which case the Indemnifying Party shall be relieved from its obligations hereunder only to the extent of such material prejudice.  Such notice shall describe the nature of the Third Party Claim in reasonable detail and will indicate the estimated amount, if practicable, of the Loss that has been or may be sustained by the Indemnified Party.  Any Notice of a Direct Claim will state the nature of such claim in reasonable detail and indicate the estimated amount, if practicable.

(b)     <u>Third Party Claim Defense</u>.  The Indemnifying Party will have the right to participate in or, by giving Notice to the Indemnified Party, to elect to assume the defense of, any Third Party Claim at such Indemnifying Party's own expense and by such Indemnifying Party's

own counsel. The Indemnified Party shall have the right, but not the obligation, to participate at its own expense in the defense thereof by counsel of the Indemnified Party's choice and shall in any event use its commercially reasonable efforts to cooperate with and assist the Indemnifying Party; provided, however, that any Indemnified Party shall be entitled to participate in the defense of any such Third Party Claim with counsel of its own choice at the expense of the Indemnifying Party if, in the good faith judgment of the Indemnified Party's counsel, representation by the Indemnifying Party's counsel presents a material conflict of interest or if the Indemnified Party has conflicting defenses. If within 10 calendar days after an Indemnified Party provides notice to the Indemnifying Party of any Third Party Claim, the Indemnified Party receives notice from the Indemnifying Party that such Indemnifying Party has elected to assume the defense of such Third Party Claim, the Indemnifying Party will not be liable for any legal expenses subsequently incurred by the Indemnified Party in connection with the defense thereof. Without the prior written consent of the Indemnified Party (not to be unreasonably withheld), the Indemnifying Party will not enter into any settlement or compromise of any Third Party Claim unless the sole relief provided is monetary damages that are paid in full by the Indemnifying Party.

(c)    Direct Claim.  The Indemnifying Party will have a period of 45 calendar days from the receipt of notice of a Direct Claim within which to respond to such Direct Claim. If the Indemnifying Party does not respond within such 45-day period, the Indemnifying Party will be deemed to have accepted such Direct Claim. If the Indemnifying Party rejects such Direct Claim, the Indemnified Party will be free to seek enforcement of its rights to indemnification under this Agreement.

9.5.    Tax Treatment.    The Parties agree that any indemnification payments made pursuant to this Agreement shall be treated for Tax purposes as an adjustment to the Purchase Price, unless otherwise required by applicable Law. All indemnification payments under this Agreement shall include an amount sufficient to hold the recipient harmless on a net after-Tax basis from all Taxes imposed with respect to the receipt or on account of the payment.

9.6.    Remedy.  Absent fraud, from and after the Closing, the sole remedy of a party in connection with a breach of any representation or warranty contained in this Agreement or in any certificate delivered pursuant to Section 6.1(c) or Section 7.1(c) shall be as set forth in this ARTICLE IX.

9.7.    Administrative Expense; Administrative Priority.   The first $10.0 million of the Sellers' obligations under Section 5.1(b)(i) and this ARTICLE IX shall constitute an administrative expense of the Sellers under section 364(c)(1) of the Bankruptcy Code with priority over any and all administrative expenses of the kind specified in section 503(b) or 507(b) of the Bankruptcy Code and the balance of such obligations shall be an unsecured prepetition claim. Notwithstanding anything to the contrary contained herein, the Parties acknowledge and agree that the obligations of the CFC Parties pursuant to Section 5.10(a)(ii) and Section 5.33 shall be separately enforceable at law or in equity and shall not constitute a claim under ARTICLE IX hereof. The Sellers' obligations under Section 5.10(a)(ii) and Section 5.33 shall constitute an administrative expense of the Sellers' estates pursuant to Section 503(b)(1) of the Bankruptcy Code.

ARTICLE X.

MISCELLANEOUS

10.1.  Expenses.  Except as otherwise specifically provided in this Agreement, the Sellers and the Buyer will each pay all costs and expenses incurred by each of them, or on their behalf respectively, in connection with this Agreement and the transactions contemplated hereby, including fees and expenses of their own financial consultants, accountants and counsel.

10.2.  Amendment and Waiver.  This Agreement may be amended and any provision of this Agreement may be waived, provided that any such amendment or waiver shall be binding upon a Party hereto only if such amendment or waiver is set forth in a writing executed by such Party.  No course of dealing between or among any persons having any interest in this Agreement shall be deemed effective to modify, amend or discharge any part of this Agreement or any rights or obligations of any Party hereto under or by reason of this Agreement.

10.3.  Notices.  All notices, demands and other communications given or delivered under this Agreement shall be in writing and shall be deemed to have been given when personally delivered, mailed by first class mail, return receipt requested, or delivered by express courier service or telecopied (with hard copy to follow).  Notices, demands and communications to the Sellers and the Buyer shall, unless another address is specified in writing, be sent to the address or telecopy number indicated below:

Notices to the Sellers:                          Conseco Finance Corp.
                                                 1100 Landmark Towers
                                                 Saint Paul, Minnesota 55102
                                                 Attention:  Charles H. Cremens
                                                 Telecopy No.:  (651) 293-5746

                                                 with copies (which shall not constitute notice) to:

                                                 Kirkland & Ellis
                                                 200 East Randolph Drive
                                                 Chicago, IL 60601
                                                 Attention:     James H.M. Sprayregen, P.C.
                                                 Telecopy:     (312) 861-2200

                                                 Official Committee of Unsecured Creditors of
                                                 Conseco Finance Corp. and
                                                 Conseco Finance Servicing Corp.
                                                 c/o Commonwealth Advisors
                                                 247 Florida St.
                                                 Baton Rouge, LA 70821
                                                 Telecopy: (225) 343-1645
                                                 Attention:  Walter A. Morales.

and

Greenberg Traurig, LLP
77 W. Wacker Drive, Suite 2400
Chicago, IL 60601
Telecopy: (312) 456-8435
Attention: Keith J. Shapiro

Notices to the Buyer:              c/o J.C. Flowers I L.P.
                                   399 Park Avenue, 27th Floor
                                   New York, New York 10022
                                   Attention: David I. Schamis
                                   Telecopy No: (646) 349-4889

                                   c/o Fortress Investment Trust II
                                   1251 Avenue of the Americas
                                   New York, New York 10020
                                   Attention: William Doniger
                                   Telecopy No: (212) 798-6070

                                   and

                                   c/o Cerberus Capital Management, L.P.
                                   450 Park Avenue, 28th Floor
                                   New York, New York 10022
                                   Attention: Mark Neporent
                                   Telecopy No: (212) 891-1540

                                   with copies (which shall not constitute notice) to:

                                   Willkie Farr & Gallagher
                                   787 Seventh Avenue
                                   New York, NY 10019
                                   Attention:    Thomas M. Cerabino
                                   Telecopy:     (212) 728-8111

                                   and

                                   Milbank Tweed Hadley & McCloy LLP
                                   601 South Figueroa Street, 30th Floor
                                   Los Angeles, CA 90017
                                   Attention: Neil J. Wertlieb
                                   Telecopy: (213) 629-5063

    10.4.  Binding Agreement; Assignment.  This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns; provided that neither this Agreement nor any of the rights,

interests or obligations hereunder may be assigned by the Sellers without the prior written consent of the Buyer or by the Buyer without the prior written consent of the Sellers. Notwithstanding the foregoing, without the prior written consent of the Sellers, each of the Buyer and its permitted assigns may at any time, in its sole discretion, assign, in whole or in part, (a) its rights and obligations pursuant to this Agreement and the other Transaction Documents to one or more of its Affiliates or to one or more other Persons controlled, directly or indirectly, by any of the Investors, (b) its rights under this Agreement and the other Transaction Documents for collateral security purposes to any lender providing financing to the Buyer, such permitted assign or any of their Affiliates and any such lender may exercise all of the rights and remedies of the Buyer or such permitted assign hereunder and thereunder; and (c) its rights under this Agreement and the other Transaction Documents, in whole or in part, to any subsequent purchaser of the Buyer, such permitted transferee or any of their divisions or any material portion of their assets (whether such sale is structured as a sale of stock, sale of assets, merger, recapitalization or otherwise). However, the Buyer and its permitted assigns shall not be released or novated from any obligations assigned by the Buyer or its permitted assigns pursuant to this <u>Section 10.4</u>.

10.5. <u>Severability</u>. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provisions or the remaining provisions of this Agreement.

10.6. <u>Construction</u>. The language used in this Agreement shall be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction shall be applied against any Person. Any reference to any federal, state, local or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context otherwise requires. The word "including" shall mean "including without limitation".

10.7. <u>Captions</u>. The captions used in this Agreement are for convenience of reference only and do not constitute a part of this Agreement and shall not be deemed to limit, characterize or in any way affect any provision of this Agreement, and all provisions of this Agreement shall be enforced and construed as if no caption had been used in this Agreement.

10.8. <u>Entire Agreement</u>. The annexes, exhibits and schedules identified in this Agreement are incorporated herein by reference. This Agreement and the documents referred to herein (including the Confidentiality Agreement) contain the entire agreement between the Parties and supersede any prior understandings, agreements or representations by or between the Parties, written or oral, which may have related to the subject matter hereof in any way, including without limitation the Original Agreement. Except as expressly set forth in <u>ARTICLE III</u> and <u>ARTICLE IV</u> of this Agreement (or in the certificates to be delivered pursuant to <u>Section 6.1(c)</u> and <u>Section 7.1(c)</u>, no Party makes any representation or warranty of any kind, express or implied, and it is further understood and agreed that Sellers make no representation or warranty of any kind with respect to the future value or profitability of the Purchased Businesses or the Purchased Assets.

10.9.  Counterparts.  This Agreement may be executed in multiple counterparts, each of which shall be deemed an original but all of which taken together shall constitute one and the same instrument.

10.10.  Governing Law.  All questions concerning the construction, validity and interpretation of this Agreement shall be governed by and construed in accordance with the domestic laws of the State of New York, without giving effect to any choice of law or conflict of law provision (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.

10.11.  Parties in Interest.  Nothing in this Agreement, express or implied, is intended to confer on any Person other than the Parties and their respective successors and assigns any rights or remedies under or by virtue of this Agreement.

10.12.  Consent to Jurisdiction.  THE PARTIES AGREE THAT JURISDICTION AND VENUE IN ANY ACTION BROUGHT BY ANY PARTY PURSUANT TO THIS AGREEMENT SHALL PROPERLY (BUT NOT EXCLUSIVELY) LIE IN ANY FEDERAL OR STATE COURT LOCATED IN NEW YORK, NEW YORK; PROVIDED, HOWEVER, THE PARTIES AGREE THAT JURISDICTION AND VENUE IN ANY ACTION BROUGHT BY ANY PARTY PURSUANT TO THIS AGREEMENT OVER ANY DISPUTE RELATING TO THE AUCTION OR THE PURCHASED ASSETS OR THIS AGREEMENT SHALL EXCLUSIVELY LIE WITH THE BANKRUPTCY COURT SO LONG AS THE BANKRUPTCY COURT SHALL BE WILLING TO HEAR SUCH DISPUTE.  BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH PARTY IRREVOCABLY SUBMITS TO THE JURISDICTION OF SUCH COURTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY WITH RESPECT TO SUCH ACTION.  THE PARTIES IRREVOCABLY AGREE THAT VENUE WOULD BE PROPER IN SUCH COURT, AND HEREBY WAIVE ANY OBJECTION THAT SUCH COURT IS AN IMPROPER OR INCONVENIENT FORUM FOR THE RESOLUTION OF SUCH ACTION.  THE PARTIES FURTHER AGREE THAT THE MAILING BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, OF ANY PROCESS REQUIRED BY ANY SUCH COURT SHALL CONSTITUTE VALID AND LAWFUL SERVICE OF PROCESS AGAINST THEM, WITHOUT NECESSITY FOR SERVICE BY ANY OTHER MEANS PROVIDED BY STATUTE OR RULE OF COURT.

10.13.  Delivery by Facsimile.  This Agreement and any Transaction Document, and any amendments hereto or thereto, to the extent signed and delivered by means of a facsimile machine, shall be treated in all manner and respects as an original Contract and shall be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person.  At the request of any Party hereto or to any such Contract, each other Party hereto or thereto shall re-execute original forms thereof and deliver them to all other parties.  No Party hereto or to any such Contract shall raise the use of a facsimile machine to deliver a signature or the fact that any signature or Contract was transmitted or communicated through the use of a facsimile machine as a defense to the formation of a Contract and each such Party forever waives any such defense.

10.14.  Disclosure Schedules.   All schedules attached hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  The description or listing of a matter, event or thing within the schedules (whether in response for a description or listing of material items or otherwise) shall not be deemed an admission or acknowledgment that such matter, event or thing is "material" for any purpose.  In addition, matters reflected in the schedules are not necessarily limited to matters required by this Agreement to be reflected in such schedules.   Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature.

10.15.  Specific Performance.   The Buyer shall be entitled to seek specific performance of the obligations to be performed by the Sellers in accordance with the provisions of this Agreement.

* * * * *

IN WITNESS WHEREOF, the undersigned have executed this Asset Purchase Agreement as of the date first written above.

CONSECO FINANCE CORP.

By: _____
Name: _____
Its: _____

CONSECO FINANCE SERVICING CORP.

By: _____
Name: _____
Its: _____

CONSECO FINANCE CORP. - ALABAMA

By: _____
Name: _____
Its: _____

CONSECO FINANCE CREDIT CORP.

By: _____
Name: _____
Its: _____

CONSECO FINANCE CONSUMER
DISCOUNT COMPANY

By: _____
Name: _____
Its: _____

CONSECO FINANCE LOAN COMPANY

By: _____
Name: _____
Its: _____

CONSECO FINANCE CANADA HOLDING
COMPANY

By: _____
Name: _____
Its: _____

CONSECO FINANCE CANADA COMPANY

By: _____
Name: _____
Its: _____

CONVERGENT LENDING SERVICES, LLC

By: _____
Name: _____
Its: _____

Mar 13 03 11:03p    Rudnickas Family         651-269-8332        p.2
03/13/03  THU 20:59 FAX 312 861 2200       KIRKLAND & ELLIS                   ⌀002

CONSECO FINANCE CONSUMER
DISCOUNT COMPANY

By: _____
Name: _____
Its: _____


CONSECO FINANCE LOAN COMPANY

By: _____
Name: _____
Its: _____


CONSECO FINANCE CANADA HOLDING
COMPANY

By: _____
Name: _____
Its: _____


CONSECO FINANCE CANADA COMPANY

By: _____
Name: _____
Its: _____

CONVERGENT LENDING SERVICES, LLC

By: _____
Name: ALBERT J. RUDNICKAS
Its: PRESIDENT

GREEN TREE FINANCE CORP. - FIVE

By: _____
Name: _____
Its: _____


GREEN TREE RESIDUAL FINANCE CORP. I

By: _____
Name: _____
Its: _____


CONSECO FINANCE CREDIT CARD
FUNDING CORP.

By: _____
Name: _____
Its: _____

CONSECO FINANCE SECURITIZATIONS
CORP.

By: _____
Name: _____
Its: _____


CONSECO HE/HI 2001-B-2, INC.

By: _____
Name: _____
Its: _____

CONSECO FINANCE ADVANCE
RECEIVABLES CORP.

By: _____

Name: _____

Its: _____


CONSECO FINANCE LIQUIDATION
EXPENSE ADVANCE RECEIVABLES 2002-B-
CORP.

By: _____

Name: _____

Its: _____