IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| Conseco, Inc., et al.,[1] | ) | Case No. 02 B49672 |
|  | ) | Honorable Carol A. Doyle |
| Debtors. | ) | (Jointly Administered) |

**FINANCE COMPANY DEBTORS' SIXTH AMENDED JOINT LIQUIDATING PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE**

**FILED**
UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
SEP 0 9 2003
KENNETH S. GARDNER, CLERK
PS REP. - JJ

James H.M. Sprayregen, P.C. (ARDC. No. 6190206)
Anup Sathy (ARDC No. 6230191)
Roger J. Higgins (ARDC No. 6257915)
Ross M. Kwasteniet (ARDC No. 6276604)
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL 60601-6636
(312) 861-2000 (telephone)
(312) 861-2200 (facsimile)

Counsel for the Debtors and Debtors-in-Possession
Dated: September 9, 2003

---

[1]  The Finance Company Debtors comprise the following entities:  (i) Conseco Finance Corp. and Conseco Finance Servicing Corp. (n/k/a Green Tree Servicing LLC) (the "Initial Finance Company Debtors"; (ii) Conseco Finance Corp. - Alabama (n/k/a Green Tree AL LLC), Conseco Finance Credit Corp., (n/k/a Green Tree Credit LLC), Conseco Finance Consumer Discount Company (n/k/a Green Tree Consumer Discount Company), Conseco Finance Canada Holding Company, Conseco Finance Canada Company, Conseco Finance Loan Company (n/k/a Green Tree Loan Company), Rice Park Properties Corporation, Landmark Manufactured Housing, Inc., Conseco Finance Net Interest Margin Finance Corp. I, Conseco Finance Net Interest Margin Finance Corp. II, Green Tree Finance Corp. - Two, Conseco Agency of Nevada, Inc., (n/k/a Green Tree Insurance Agency of Nevada, Inc.) Conseco Agency of New York, Inc., (n/k/a Green Tree Insurance Agency of New York, Inc.), Green Tree Floorplan Funding Corp., Conseco Agency, Inc., (n/k/a Green Tree Insurance Agency, Inc.), Conseco Agency of Alabama, Inc., (n/k/a Green Tree Insurance Agency of Alabama, Inc.), Conseco Agency of Kentucky, Inc., (n/k/a Green Tree Insurance Agency of Kentucky, Inc.), and Crum-Reed General Agency, Inc. (n/k/a Green Tree Insurance Agency of Texas, Inc.) (collectively, the "CFC Subsidiary Debtors"), (iii) Green Tree Residual Finance Corp. I, and Green Tree Finance Corp. - 5 (the " New Debtors"), and (iv) Conseco Finance Credit Card Funding Corp. ("CFCCFC").

**DEFENDANT'S EXHIBIT**
D
tabbies

TABLE OF CONTENTS

Page

ARTICLE I.

DEFINED TERMS, RULES OF INTERPRETATION,
COMPUTATION OF TIME AND GOVERNING LAW ............................................................ 1
    A.    Rules of Interpretation, Computation of Time and Governing Law ................................. 1
    B.    Proponents of Plan ............................................................................................................ 1
    C.    Defined Terms .................................................................................................................. 1

ARTICLE II.

SUBSTANTIVE CONSOLIDATION
OF ASSETS AND LIABILITIES OF DEBTORS;
CANCELLATION OF INTERCOMPANY CLAIMS ........................................................... 13
    A.    Substantive Consolidation ............................................................................................. 13
    B.    Cancellation of Intercompany Claims ........................................................................... 13

ARTICLE III.

UNCLASSIFIED CLAIMS AGAINST THE FINANCE COMPANY DEBTORS ................... 14
    A.    DIP Facility Claims ........................................................................................................ 14
    B.    Administrative Claims .................................................................................................... 14
    C.    Priority Tax Claims ........................................................................................................ 14

ARTICLE IV.

CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS
AND EQUITY INTERESTS ................................................................................................. 15
    A.    Summary ......................................................................................................................... 15
    B.    Classification and Treatment of Classified Claims and Equity Interests: ..................... 16

ARTICLE V.

ACCEPTANCE OR REJECTION OF THE PLAN .............................................................. 18
    A.    Voting Classes ................................................................................................................ 19
    B.    Acceptance by Impaired Classes ................................................................................... 19
    C.    Presumed Acceptance of the Plan .................................................................................. 19
    D.    Presumed Rejection of the Plan ..................................................................................... 19
    E.    Non-Consensual Confirmation ...................................................................................... 19

ARTICLE VI.

PROVISIONS FOR IMPLEMENTATION OF THE PLAN .................................................. 19
    A.    Sale of Assets ................................................................................................................. 19
    B.    Intercompany Settlement Agreement ............................................................................. 20
    C.    Establishment of the Post-Consummation Estate .......................................................... 20
    D.    Funding Expenses of the Post-Consummation Estate .................................................... 21
    E.    Corporate Action ............................................................................................................ 21
    F.    Appointment of Plan Administrator ............................................................................... 21
    G.    Cancellation of Notes, Instruments, Debentures and Equity Securities ........................ 21
    H.    Creation of Claim Settlement Escrow Account .............................................................. 21
    I.    Creation of Professional Fee Sub-Escrow Account ....................................................... 21
    J.    Creation of Employee Benefit Sub-Escrow Account ..................................................... 21
    K.    Creation of Consent Agreement Reserve Account ........................................................ 21

L.    Creation of Post-Consummation Estate Budget Sub-Escrow Account...........................21
M.    Creation of 93/94 Note Claim Escrow Account ...................................................22
N.    Creation of the HE/HI/REC Reserve Account ....................................................22
O.    Creation of BED Escrow Account.................................................................22
P.    Purchase of Director and Officer Tail Insurance Policy .......................................22
Q.    Retiree Benefits ...............................................................................22
R.    Dismissal of Certain Actions ..................................................................22
S.    Shared Recovery Escrow Implementation..........................................................22

ARTICLE VII.

EXECUTORY CONTRACTS AND UNEXPIRED LEASES .................................................................22
A.    Assumption and Rejection of Executory Contracts and Unexpired Leases...........................22
B.    Rejection Claims; Cure of Defaults ............................................................22

ARTICLE VIII.

PROVISIONS REGARDING DISTRIBUTIONS........................................................................23
A.    Time and Method of Distributions ..............................................................23
B.    Manner of Payment under the Plan ..............................................................23
C.    Delivery of Distributions.....................................................................23
D.    Undeliverable Distributions...................................................................24
E.    Compliance with Tax Requirements/Allocation...................................................24
F.    Time Bar to Cash Payments .....................................................................24
G.    Distributions after Effective Date ............................................................24
H.    Fractional Dollars; De Minimis Distributions ..................................................24
I.    Setoffs.......................................................................................25
J.    Preservation of Finance Company Debtors' Subordination Rights .................................25
K.    Waiver by Creditors of All Subordination Rights ..............................................25
L.    Settlement of Claims and Controversies........................................................25

ARTICLE IX.

PROCEDURES FOR RESOLUTION OF DISPUTED, CONTINGENT
AND UNLIQUIDATED CLAIMS OR EQUITY INTERESTS..............................................................25
A.    Objections to Claims; Prosecution of Disputed Claims..........................................25
B.    Estimation of Claims .........................................................................26
C.    Controversy Concerning Impairment ............................................................26
D.    Payments and Distributions on Disputed Claims ...............................................26

ARTICLE X.

CONDITIONS PRECEDENT TO CONFIRMATION
AND EFFECTIVE DATE OF THE PLAN ..........................................................................26
A.    Conditions Precedent to Confirmation .........................................................26
B.    Conditions Precedent to Effective Date of the Plan............................................27
C.    Waiver of Conditions Precedent ...............................................................27
D.    Effect of Non-Occurrence of Consummation.....................................................28

ARTICLE XI.

RELEASE, INJUNCTIVE AND RELATED PROVISIONS..............................................................28
A.    Compromise and Settlement.....................................................................28
B.    Releases by the Finance Company Debtors.......................................................28
C.    Releases by Holders of Claims.................................................................29

D.    Mutual Releases Among the Finance Company Debtors, the Committee, the
      Securitization Trustees and Lehman................................................................... 29
E.    Exculpation................................................................................................ 30
F.    Preservation of Rights of Action .................................................................
G.    Release and Satisfaction of Claims; Termination of Equity Interests; Injunction ........... 32

ARTICLE XII.

POST-CONSUMMATION ESTATE; THE PLAN ADMINISTRATOR ........................................ 32
      A.    Generally ..................................................................................... 32
      B.    Purpose of the Post-Consummation Estate ............................................ 32
      C.    Transfer of Assets to Post-Consummation Estate ..................................... 33
      D.    Valuation of Assets........................................................................ 33
      E.    Distribution; Withholding................................................................. 33
      F.    Post-Consummation Estate Implementation........................................... 34
      G.    Disputed Claims Reserve.................................................................. 34
      H.    Termination of Post-Consummation Estate ............................................ 34
      I.    Termination of Plan Administrator...................................................... 34
      J.    Exculpation; Indemnification ............................................................

ARTICLE XIII.

RETENTION OF JURISDICTION .................................................................... 34

ARTICLE XIV.

MISCELLANEOUS PROVISIONS ................................................................... 35
      A.    Modification of Plan Supplement........................................................ 36
      B.    Effectuating Documents, Further Transactions and Corporation Action................ 36
      C.    Dissolution of Committee................................................................. 36
      D.    Payment of Statutory Fees............................................................... 36
      E.    Modification of Plan ...................................................................... 36
      F.    Revocation of Plan ........................................................................ 37
      G.    Successors and Assigns ................................................................... 37
      H.    Reservation of Rights ..................................................................... 37
      I.    Section 1146 Exemption................................................................... 37
      J.    Further Assurances ........................................................................ 37
      K.    Service of Documents...................................................................... 38
      L.    Transactions on Business Days ........................................................... 38
      M.    Filing of Additional Documents .......................................................... 38
      N.    Post-Effective Date Fees and Expenses................................................. 38
      O.    Severability................................................................................ 38
      P.    Conflicts ................................................................................... 38
      Q.    Term of Injunctions or Stays ............................................................. 39
      R.    Entire Agreement.......................................................................... 39
      S.    Closing of the Chapter 11 Cases......................................................... 39

## FINANCE COMPANY DEBTORS' SIXTH AMENDED JOINT LIQUIDATING PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE

Pursuant to title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, the Finance Company Debtors and Debtors-in-Possession (including, for purposes of the Plan, the New Filing Entities) in the above-captioned and numbered cases, hereby respectfully propose the following Sixth Amended Joint Liquidating Plan of Reorganization under Chapter 11 of the Bankruptcy Code (as defined):

### ARTICLE I.

### DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME AND GOVERNING LAW

A.    *Rules of Interpretation, Computation of Time and Governing Law*

1.    For purposes herein: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) any reference herein to an existing document or exhibit Filed, or to be Filed, shall mean such document or exhibit, as it may have been or may be amended, modified or supplemented; (d) unless otherwise specified, all references herein to Sections and Articles are references to Sections and Articles hereof or hereto; (e) the words "herein," "hereof" and "hereto" refer to the Plan in its entirety rather than to a particular portion of this Plan; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (h) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

2.    In computing any period of time prescribed or allowed hereby, the provisions of Fed. R. Bankr. P. 9006(a) shall apply.

3.    Except to the extent that the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, instrument, release, indenture or other agreement or document entered into in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof.

B.    *Proponents of Plan*

The Finance Company Debtors have proposed this Plan. Article IV contains the classification and treatment of Claims and Equity Interests against the Finance Company Debtors. The Holding Company Debtors are not proponents of this Plan.

C.    *Defined Terms*

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1.    *"93/94 Notes"* means, collectively, (i) the $200,000,000 original principal amount 8.125% senior notes due February 15, 2003, issued by CNC, with $67,892,689 in principal and accrued but unpaid interest outstanding as of the Initial Petition Date, and (ii) the $200,000,000 original principal amount 10.5% senior notes

due December 15, 2004, issued by CNC, with $25,855,090 in principal and accrued but unpaid interest outstanding as of the Initial Petition Date.

2.    *"93/94 Note Claims"* means all unpaid principal and interest (prepetition and postpetition) on the 93/94 Notes, through the Effective Date, plus reasonable, documented costs and fees provided for under the indentures governing the 93/94 Notes.

3.    *"93/94 Note Claim Escrow Account"* means an interest-bearing savings account created on the Effective Date, funded out of the Sale Proceeds pursuant to the Sale Orders and maintained by the Plan Administrator, solely for the purpose of paying, and sufficient to pay, the Allowed 93/94 Note Claims.

4.    *"Accrued Professional Compensation"* means, at any given moment, all accrued fees and expenses (including but not limited to success fees) for services rendered by all Professionals in the Chapter 11 Cases that the Bankruptcy Court has not denied by Final Order, to the extent such fees and expenses have not been paid regardless of whether a fee application is filed for such amount. To the extent a court denies by Final Order a Professional's fees or expenses, such amounts shall no longer be considered Accrued Professional Compensation.

5.    *"Administrative Claim"* means a Claim for costs and expenses of administration under sections 503(b), 507(a)(1), 507(b) or 1114(e)(2) of the Bankruptcy Code, including, but not limited to: (i) the actual and necessary costs and expenses incurred after the Initial Petition Date of preserving the Estate and operating the businesses of the Finance Company Debtors (such as wages, salaries, reimbursement obligations or commissions for services and payments for goods and other services and leased premises); (ii) compensation for legal, financial advisory, accounting and other services and reimbursement of expenses awarded or allowed under sections 328, 330(a) or 331 of the Bankruptcy Code or otherwise for the period commencing on the Initial Petition Date and ending on the Confirmation Date; (iii) all fees and charges assessed against the Estate under chapter 123 of title 28 United States Code, 28 U.S.C. §§ 1911-1930, (iv) any obligations designated as Allowed Administrative Claims pursuant to a Final Order, and (v) those Allowed Administrative Claims paid by the Holding Company Debtors which are properly allocable to the Finance Company Debtors as determined by the Plan Administrator or by Final Order of the Bankruptcy Court. .

6.    *"Affiliate"* means any Entity that is an affiliate of the Finance Company Debtors within the meaning of section 101(2) of the Bankruptcy Code.

7.    *"Allowed"* means, with respect to Claims or Equity Interests, (i) any Claim against or Equity Interest in a Finance Company Debtor, proof of which is timely Filed, or by order of the Bankruptcy Court is not or will not be required to be Filed, (ii) any Claim or Equity Interest that has been or is hereafter listed in the Schedules as neither disputed, contingent or unliquidated, and for which no timely proof of Claim has been Filed, or (iii) any Claim Allowed pursuant to the Plan; *provided, however,* that with respect to any Claim or Equity Interest described in clauses (i) or (ii) immediately above, such Claim or Equity Interest shall be Allowed only if (x) no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court or (y) such an objection is so interposed and the Claim or Equity Interest shall have been Allowed by a Final Order (but only if such allowance was not solely for the purpose of voting to accept or reject the Plan). Except as otherwise specified in the Plan or a Final Order of the Bankruptcy Court, the amount of an Allowed Claim shall not include interest on such Claim from and after the Initial Petition Date.

8.    *"Auction Date"* means March 4, 2003, as continued from time to time.

9.    *"B-2 Guarantee Claims"* means all Claims based on or derived from the CFC guarantee of those certain certificates commonly known as "B-2 certificates".

10.    *"Ballot"* or *"Ballots"* mean the ballots accompanying the Disclosure Statement upon which Holders of Impaired Claims or Impaired Equity Interests entitled to vote shall indicate their acceptance or rejection of the Plan in accordance with the Plan and the Voting Instructions.

11.      *"Balloting Agent"* means Bankruptcy Management Corporation, retained by order of the Bankruptcy Court dated January 14, 2003.

12.      *"Bankruptcy Code"* means title 11 of the United States Code and applicable portions of titles 18 and 28 of the United States Code.

13.      *"Bankruptcy Court"* means the United States Bankruptcy Court for the Northern District of Illinois, or any other court having jurisdiction over the Chapter 11 Cases.

14.      *"Bankruptcy Rules"* means the Federal Rules of Bankruptcy Procedure, as amended from time to time, as applicable to the Chapter 11 Cases, promulgated under 28 U.S.C. § 2075 and the General, Local and Chambers Rules of the Bankruptcy Court, as amended from time to time.

15.      *"BED Escrow Account"* means an interest bearing account created on or before the Effective Date, pursuant to the BED Settlement Agreement, funded out of the Sale Proceeds in the amount of $1,412,401.34, which account shall be maintained by the Plan Administrator, solely for the purposes described in the BED Settlement Agreement.

16.      *"BED Settlement Agreement"* means that certain settlement agreement between the Finance Company Debtors and the South Dakota Board of Economic Development approved by the Bankruptcy Court on March 14, 2003, resolving the South Dakota Board of Economic Development's objection to entry of the CFN Sale Order.

17.      *"Beneficial Holder"* means the Person or Entity holding the beneficial interest in a Claim or Equity Interest.

18.      *"Bid Procedures Order"* means that certain order of the Bankruptcy Court dated January 8, 2003, approving, among other things, bidding procedures in connection with the sale of substantially all of the assets of the Finance Company Debtors.

19.      *"Business Day"* means any day, other than a Saturday, Sunday, "legal holiday" (as defined in Fed. R. Bankr. P. 9006(a)) or any other day on which commercial banks in New York, New York are required or are authorized to close by law or executive order.

20.      *"Buyers"* means CFN and GE.

21.      *"Cash"* means legal tender of the United States of America or the equivalent thereof, including bank deposits and checks.

22.      *"Cash Management Order"* means that certain order of the Bankruptcy Court, entered on or about December 18, 2002, approving and authorizing the continuation of the Finance Company Debtors' cash management system.

23.      *"Causes of Action"* means all Claims, actions, causes of action, choses in action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, third-party claims, counterclaims, and crossclaims (including, but not limited to, all claims and any avoidance, recovery, subordination or other actions against insiders and/or any other Persons or Entities under the Bankruptcy Code, including sections 506, 510, 542, 543, 544, 545, 547, 548, 549, 500, 551, and 553 of the Bankruptcy Code or otherwise) of the Finance Company Debtors, the Debtors-in-Possession, and/or the Post-Consummation Estate (including, but not limited to, those actions described in Article XI hereof) that are or may be pending on the Effective Date or instituted by the Plan Administrator, on behalf of the Post-Consummation Estate, after the Effective Date against any Person or Entity, based in law or equity, including, but not limited to, under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether asserted or unasserted as of the date of entry of the Confirmation Order (unless released, waived, settled or resolved

3

pursuant to the Plan or otherwise prior to the Effective Date). Causes of Action include, but are not limited to, Third Party Actions, but do not include any such actions included in the Divested Assets (if any)).

24.    "*CFC*" means Conseco Finance Corp., a Delaware corporation.

25.    "*CFC/CIHC Intercompany Note*" means that certain $1,460,799,080 note due May 11, 2005, issued September 9, 2000, by CFC to CIHC, with $277,376,671 in principal and accrued but unpaid interest outstanding as of the Petition Date.

26.    "*CFC Preferred Stock*" means those 750 shares of 9% Redeemable Cumulative Preferred Stock of CFC, held by CNC, with a stated value of $1 million per share.

27.    "*CFC Residual Intercompany Claims*" means the amount (if any) that CIHC owes to CFC on account of the CIHC/CFC Intercompany Note after setoff of the CFC/CIHC Intercompany Note.

28.    "*CFC Subsidiary Debtor Petition Date*" means February 3, 2003.

29.    "*CFN*" means CFN Investments Holdings LLC, a Delaware limited liability company.

30.    "*CFN Closing Date*" means June 23, 2003, the date on which the transaction contemplated by the CFN Purchase Agreement closed.

31.    "*CFN Purchase Agreement*" means that certain Amended and Restated Asset Purchase Agreement, dated March 14, 2003, between CFC and certain of its subsidiaries and CFN.

32.    "*CFN Sale Order*" means that certain order entered by the Bankruptcy Court on March 14, 2003, authorizing and approving the CFN Purchase Agreement.

33.    "*CFSC*" means Conseco Finance Servicing Company, a Delaware corporation.

34.    "*Chapter 11 Cases*" means the following cases styled *In re: Conseco, Inc., et al.*, including (i) the chapter 11 bankruptcy cases filed by CFC and CFSC on the Initial Petition Date in the Bankruptcy Court, with case numbers 02-49675-02-49676, (ii) the chapter 11 bankruptcy cases filed by the CFC Subsidiary Debtors on the CFC Subsidiary Debtor Petition Date in the Bankruptcy Court, with case numbers 03-04692-03-04709 and (iii) the chapter 11 bankruptcy cases filed by the New Filing Entities and CFCCFC prior to Confirmation.

35.    "*CIHC*" means CIHC, Incorporated, a Delaware corporation.

36.    "*CIHC/CFC Intercompany Note*" means the $400 million original principal amount note dated May 11, 2002, issued by CIHC to CFC, with approximately $315,030,986 in principal and accrued but unpaid interest as of the Initial Petition Date.

37.    "*Claim*" means a claim (as defined in section 101(5) of the Bankruptcy Code) against a Debtor, including, but not limited to: (a) any right to payment from a Debtor whether or not such right is reduced to judgment, liquidated, unliquidated, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or (b) any right to an equitable remedy for breach of performance if such performance gives rise to a right of payment from a Debtor, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

38.    "*Claims Objection Deadline*" means one year after the Effective Date.

39.    "*Claim Settlement Escrow Account*" means an interest-bearing savings account created on the Effective Date, funded out of the Sale Proceeds and maintained by the Plan Administrator, in the amount of $165,000,000, minus any amounts paid on account of Claims after the CFN Closing Date until the Effective Date

that would have been paid under the Plan from the Claim Settlement Escrow Account if such account had been funded on the CFN Closing Date.

40.    *"Class"* means a category of Holders of Claims or Equity Interests as set forth in Article IV herein.

41.    *"Committee"* means the Official Committee of Unsecured Creditors of the Finance Company Debtors.

42.    *"Committee Members"* means any current or former members of the Committee.

43.    *"CNC"* means Conseco Inc., an Indiana corporation.

44.    *"Confirmation"* means the entry on the docket by the Clerk of the Bankruptcy Court of the Confirmation Order, subject to all conditions specified in Article X.A herein having been satisfied or waived pursuant to Article X.C herein.

45.    *"Confirmation Date"* means the date upon which the Confirmation Order is entered by the Bankruptcy Court in its docket, within the meaning of Fed. R. Bankr. P. 5003 and Fed R. Bankr. P. 9021.

46.    *"Confirmation Hearing"* means the hearing at which the Bankruptcy Court considers the Confirmation Order.

47.    *"Confirmation Order"* means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

48.    *"Consent Agreement Reserve Account"* means that certain account funded in the amount of $35 million by CFC on or around the CFN Closing Date, plus all Third Party Action Reserve Account Net Litigation Proceeds (if any), to be administered and distributed according to the terms of that certain Consent Agreement dated March 14, 2003, by and among CFC, Wells Fargo Bank Minnesota, National Association, U.S. Bank National Association, Federal National Mortgage Association, the Committee, the Ad Hoc Securitization Holders Committee and CFN.

49.    *"Consenting Parties"* means, collectively, each Holder of a Claim (i) who has accepted the Plan and is a Holder in a Class that has, as a Class, voted to accept the Plan, or (ii) who (a) receives a distribution of property if the Plan is Confirmed; and (b) has not properly and timely submitted the Opt Out Notice.

50.    *"Consummation"* means the occurrence of the Effective Date.

51.    *"Creditor"* means any Holder of a Claim.

52.    *"Debtors-in-Possession"* means the Finance Company Debtors, as debtors-in-possession in the Chapter 11 Cases.

53.    *"DIP Facility Claims"* means Claims derived from or based upon the FPS DIP Facility, the GTFC/GTRFC DIP Facility and all additional debtor-in-possession facilities entered into by the Finance Company Debtors prior to the Effective Date, if any.

54.    *"Director and Officer Insurance Policy"* means those policies provided or described in the Plan Supplement.

55.    *"Director and Officer Tail Insurance Policy"* means a $50 million six–year tail policy on terms no less favorable to such individuals than as set forth in the Director and Officer Insurance Policy.

5

56.    *"Disclosure Statement"* means the Disclosure Statement for the Second Amended Joint Liquidating Plan of Reorganization of the Finance Company Debtors under Chapter 11 of the Bankruptcy Code, dated May 7, 2003, as amended, supplemented, or modified from time to time, describing the Plan, that is prepared and distributed in accordance with sections 1125, 1126(b) and/or 1145 of the Bankruptcy Code and Bankruptcy Rule 3018 and/or other applicable law.

57.    *"Disputed"* means, with respect to any Claim or Equity Interest, as of the date of determination, any Claim or Equity Interest: (a) listed on the Schedules as unliquidated, disputed or contingent, unless and until it is Allowed; (b) as to which any Finance Company Debtor or any other party-in-interest has Filed a timely objection or request for estimation in accordance with the Bankruptcy Code and the Bankruptcy Rules, which objection or request for estimation has not been withdrawn or determined by a Final Order; (c) as to which the deadline for filing objections has not passed (whether or not an objection has been filed), unless and to the extent such Claim or Equity Interest has been Allowed pursuant to an order that is a Final Order; or (d) is otherwise disputed by any of the Finance Company Debtors or any other party in interest in accordance with applicable law, which dispute has not been withdrawn or determined by a Final Order.

58.    *"Distribution Record Date"* means the date for determining which Holders of Claims and Equity Interests are eligible to receive distributions hereunder, and shall be the Effective Date or such other date as designated in an order of the Bankruptcy Court.

59.    *"Divested Assets"* has the meaning ascribed to "Purchased Assets" under the CFN Purchase Agreement and GE Purchase Agreement.

60.    *"Effective Date"* means the date selected by the Finance Company Debtors which is a Business Day after the Confirmation Date on which: (a) no stay of the Confirmation Order is in effect, and (b) all conditions specified in Article X.B herein have been (x) satisfied or (y) waived pursuant to Article X.C herein.

61.    *"Employee Benefit Sub-Escrow Account"* means an interest-bearing savings account funded out of the Claim Settlement Escrow Account and maintained by the Plan Administrator, solely for the purpose of paying, and sufficient to pay, all Shared Employee Benefit Liabilities allocable to the Finance Company Debtors.

62.    *"Entity"* means an entity as defined in section 101(15) of the Bankruptcy Code.

63.    *"Equity Interest"* means all equity interests in any of the Finance Company Debtors, including, but not limited to, all issued, unissued, authorized or outstanding shares of stock together with any warrants, options or contract rights to purchase or acquire such interests at any time.

64.    *"Escrow Accounts"* means all escrow accounts and sub-escrow accounts called for or contemplated by this Plan.

65.    *"Estates"* means the collective estates of each of the Finance Company Debtors created by section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases for each of the Finance Company Debtors.

66.    *"Exculpated Parties"* means the Finance Company Debtors, the Committee, the Securitization Trustees and all officers, directors, employees, members, attorneys, actuaries, financial advisors, accountants, investment bankers, agents, professionals and representatives of each of the foregoing (whether current or former, in each case in their capacity as such, and only if serving in one such capacity on the Petition Date or thereafter).

67.    *"File"* or *"Filed"* means file or filed with the Bankruptcy Court in the Chapter 11 Cases.

68.    *"Final Decree"* means the decree contemplated under Fed. R. Bankr. P. 3022.

69.    *"Final DIP Order"* means, collectively, (a) that certain order of the Bankruptcy Court, entered on or about January 14, 2003, authorizing and approving the FPS DIP Facility; and (b) that certain order of the

6

Bankruptcy Court, entered on or about April 14, 2003, authorizing and approving certain amendments to the FPS DIP Facility.

70.    *"Final Order"* means an order of the Bankruptcy Court (i) as to which the time to appeal, petition for certiorari or move for reargument, reconsideration or rehearing has expired and as to which no appeal, petition for certiorari or other proceedings for reargument, reconsideration or rehearing is pending; or (ii) if an appeal, writ of certiorari, reargument or rehearing thereof has been sought, such order has been affirmed by the highest court to which such order was appealed or from which certiorari was sought, such order, reargument, reconsideration or rehearing has been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for reargument, reconsideration or rehearing has expired; *provided, however,* that the possibility of a motion under Rule 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule being Filed with respect to such order, shall not cause such order to be deemed a non-Final Order.

71.    *"Finance Company Debtor Employees"* means employees of the Finance Company Debtors on or prior to the Effective Date.

72.    *"Finance Company Debtor"* or *"Debtor"*, as the case may be, shall mean, as the context requires, any of the Finance Company Debtors.

73.    *"Finance Company Debtors"* means Conseco Finance Corp., Conseco Finance Servicing Corp., Conseco Finance Corp. - Alabama, Conseco Finance Credit Corp., Conseco Finance Consumer Discount Company, Conseco Finance Canada Holding Company, Conseco Finance Canada Company, Conseco Finance Loan Company, Rice Park Properties Corporation, Landmark Manufactured Housing, Inc., Conseco Finance Net Interest Margin Finance Corp. I, Conseco Finance Net Interest Margin Finance Corp. II, Green Tree Finance Corp. - Two, Conseco Agency of Nevada, Inc., Conseco Agency of New York, Inc., Green Tree Floorplan Funding Corp., Conseco Agency, Inc., Conseco Agency of Alabama, Inc., Conseco Agency of Kentucky, Inc., Crum-Reed General Agency, Inc., Green Tree Finance Corp. - Five, Green Tree Residual Finance Corp. I, and Conseco Finance Credit Card Funding Corp.

74.    *"Finance Company Shared Recovery Allocation Amount"* means 70% of the Cash or assets in the Shared Recovery Escrow Account that, upon distribution to the Post-Consummation Estate, shall no longer constitute a Shared Recovery Amount.

75.    *"FPS DIP Facility"* means that certain DIP credit facility approved by Final Order of the Bankruptcy Court on January 14, 2003, as amended from time to time, as between the Finance Company Debtors, U.S. Bank National Association and FPS DIP LLC, an affiliate of Fortress Investment Group LLC, J.C. Flowers & Co. LLC., and Cerberus Capital Management, L.P., in an amount not to exceed $150,000,000.

76.    *"GE"* means General Electronic Capital Corporation, a Delaware corporation, as purchaser under the GE Purchase Agreement.

77.    *"GE Closing Date"* means June 25, 2003, the date on which the transaction contemplated by the GE Purchase Agreement closed.

78.    *"GE Purchase Agreement"* means that certain Asset Purchase Agreement dated March 14, 2003, between CFC and certain of its subsidiaries and GE.

79.    *"GE Sale Order"* means that certain order entered by the Bankruptcy Court on March 14, 2003, authorizing and approving the GE Purchase Agreement.

80.    *"General Unsecured Claim"* means any Claim against any Finance Company Debtor that is not a/an (i) DIP Facility Claim, (ii) Administrative Claim, (iii) Priority Tax Claim, (iv) Other Priority Claim, (v) Other Secured Claim, (vi) 93/94 Note Claim or (vii) Lehman Final Secured Claims.

81.    *"Governmental Unit"* has the meaning ascribed to it in section 101(27) of the Bankruptcy Code.

82. *"GTFC/GTRFC DIP Facility"* means that certain Final Order entered by the Bankruptcy Court on January 14, 2003, pursuant to which CFC was authorized to borrow up to $25 million from Green Tree Finance Corp.-Five ("GTFC") and Green Tree Residual Finance Corp. I ("GTRFC").

83. *"HE/HI/REC Reserve Account"* means a reserve account in the amount of $5,000,000 for the benefit of certain home equity, home improvement and recreational vehicle trusts, to be used to reimburse holders of certificates in such trusts for monetary losses as provided in the U.S. Bank Settlement Stipulation.

84. *"Holder"* means the Beneficial Holder of an Equity Interest or Claim.

85. *"Holding Company Debtors"* means CNC, CIHC, CIHIC, Inc., a Delaware corporation, and Partners Health Group, Inc., an Illinois corporation.

86. *"Holding Company Debtors' Plan"* means that certain Holding Company Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code, filed on or about January 31, 2003, as amended from time to time.

87. *"Holding Company Shared Recovery Allocation Amount"* means 30% of the Cash or assets in the Shared Recovery Escrow Account.

88. *"Impaired"* means with respect to any Class of Claims or Equity Interests, a Claim or Equity Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

89. *"Impaired Claim"* or *"Impaired Equity Interest"* means a Claim or Equity Interest, as the case may be, classified in an Impaired Class.

90. *"Initial Petition Date"* means December 17, 2002.

91. *"Intercompany Claim"* means any Claim held by any direct or indirect subsidiary of the Finance Company Debtors against any Finance Company Debtor or by any Finance Company Debtor against any other Finance Company Debtor.

92. *"Intercompany Interests"* means any and all Equity Securities of a Finance Company Debtor or any subsidiary of a Finance Company Debtor that are owned by any Finance Company Debtor or any subsidiary of any Finance Company Debtor as of the Record Date.

93. *"Lehman"* means, collectively, Lehman ALI Inc., Lehman Brothers Inc., Lehman Commercial Paper Inc., and Lehman Brothers Holdings Inc. and their affiliates.

94. *"Lehman Adjustment Amount"* means the difference between the Lehman Current Secured Claims and the Lehman Final Secured Claims.

95. *"Lehman Adversary Proceeding"* means that certain adversary proceeding filed on or about April 16, 2003, by the Committee against Lehman.

96. *"Lehman Appeal"* means that certain appeal by Lehman of the decision by the Bankruptcy Court estimating the amount of its guarantee claim against CIHC at $0.00, pending in the United States District Court for the Northern District of Illinois, Case No. 03-CV-3741.

97. *"Lehman Current Secured Claims"* means any and all Claims of Lehman against any Finance Company Debtor (exclusive only of the Lehman Unsecured Claim), whether or not arising under, related to or derived from the Lehman Residuals Facilities and Lehman Warehouse Facility, and any modifications, forbearance agreements or other ancillary agreements related thereto, which shall be Allowed in the amount of $702,678,774.03 as of June 9, 2003.

98.    *"Lehman Final Secured Claims"* means any and all Claims of Lehman against any Finance Company Debtor (exclusive only of the Lehman Unsecured Claim), whether or not arising under, related to or derived from the Lehman Residuals Facilities and Lehman Warehouse Facility, and any modifications, forbearance agreements or other ancillary agreements related thereto, as of the CFN Closing Date, which shall be Allowed in an amount equal to the Lehman Current Secured Claims plus or minus the Lehman Adjustment Amount, *provided* however that the Lehman Final Secured Claims shall not be Allowed until the Lehman Adjustment Amount has been determined as set forth in Article IV.B.3. below; and *provided further* that the Lehman Final Secured Claims were paid in full in Cash on the CFN Closing Date.

99.    *"Lehman Released Parties"* means Lehman, any of its affiliates, and any of their respective directors, officers, partners, shareholders, principals, employees, agents, and representatives.

100.    *"Lehman Releasees"* means the Finance Company Debtors, on behalf of themselves and their respective estates, the Holding Company Debtors on behalf of themselves and their respective estates, the Consenting Parties, the Securitization Trustees, and the Committee, in each case for itself and its members, officers, directors, employees, shareholders, affiliates, securityholders and any other person or entity taking by, through or in the right of any of the foregoing.

101.    *"Lehman Residuals Facilities"* means (a) the Master Repurchase Agreement and Annex to Master Repurchase Agreement Supplemental Terms and Conditions, each dated as of September 29, 1999, between Green Tree Residual Finance Corp. I and Lehman Brothers Inc., as amended from time to time, and as each of the same may be further amended in accordance with the terms thereof and of the CFN Purchase Agreement and GE Purchase Agreement and (b) the Asset Assignment Agreement, dated as of February 13, 1998, as amended or modified from time to time, and as may be further amended in accordance with the terms thereof and of the CFN Purchase Agreement and GE Purchase Agreement.

102.    *"Lehman Subordinate Secured Claim"* means $13.5 million of the Lehman Final Secured Claim.

103.    *"Lehman Unsecured Claim"* means that certain proof of claim filed by Lehman against CFC, numbered 49675-002354, which Claim shall be capped at no more than $1 million.

104.    *"Lehman Warehouse Facility"* means the Second Amended and Restated Master Repurchase Agreement, dated as of January 30, 2002, between Lehman Commercial Paper, Inc. and Green Tree Finance Corp.-Five, as amended from time to time, and as the same may be further amended in accordance with the terms thereof and of the CFN Purchase Agreement and GE Purchase Agreement.

105.    *"Lien"* means any charge against or interest in property to secure payment of a debt or performance of an obligation, including a right of set off to secure payment of a debt or performance of an obligation.

106.    *"Master Ballots"* mean the master ballots accompanying the Disclosure Statement upon which Holders of Impaired Claims or Impaired Equity Interests shall indicate their acceptance or rejection of the Plan in accordance with the Voting Instructions.

107.    *"Mill Creek Standing Motion"* means that certain motion filed on or about April 21, 2003, by the Committee seeking standing to pursue certain alleged claims regarding the pledge of shares of Mill Creek Bank, Inc.

108.    *"Net Litigation Proceeds"* means gross proceeds recovered from litigation less any costs and expenses associated with such litigation.

109.    *"New Filing Entities"* shall mean Conseco Finance Credit Card Funding Corp., Green Tree Residual Finance Corp. I, and Green Tree Finance Corp.-Five, which entities have filed voluntary chapter 11 petitions.

9

110.    *"Official Bankruptcy Forms"* means the Official and Procedural Bankruptcy Forms, prescribed by the Judicial Conference of the United States, in accordance with Fed. R. Bankr. P. 9009.

111.    *"Opt Out Notice"* means that certain notice, to be approved by the Bankruptcy Court, sent to Holders of Class 4 and 5 Claims, giving such Holders the option to opt out of the Release Provision set forth in Article XI.C hereof.

112.    *"Other Priority Claims"* means any and all Claims accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

113.    *"Other Secured Claims"* means any and all Secured Claims held by any Creditors that are not otherwise specifically described herein, but not including (1) the Lehman Final Secured Claims and (2) the 93/94 Note Claims.

114.    *"Person"* means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, trustee, United States Trustee, estate, unincorporated organization, government, Governmental Unit (as defined in the Bankruptcy Code), agency, or political subdivision thereof, or other entity.

115.    *"Petition Date"* means, collectively, the Initial Petition Date, the CFC Subsidiary Debtor Petition Date and shall be deemed to include the dates on which each New Filing Entity and CFCCFC has filed or files a voluntary chapter 11 petition.

116.    *"Plan"* means this Joint Plan of Reorganization pursuant to Chapter 11 of the Bankruptcy Code, together with all exhibits hereto, either in its present form or as it may be altered, amended, modified or supplemented from time to time in accordance with the terms hereof, the Bankruptcy Code and the Bankruptcy Rules.

117.    *"Plan Administrator"* means Bridge Associates, LLP, or an entity solely controlled by Bridge Associates, LLP, and Anthony H.N. Schnelling, not individually, but solely representing Bridge Associates, LLP as Plan Administrator.

118.    *"Plan Supplement"* means the compilation of documents and form of documents, schedules and exhibits to be Filed prior to Confirmation in accordance with Article XIV.A of the Plan, which may be amended from time to time until Confirmation.

119.    *"Post-Consummation Estate"* means the trust to be created on the Effective Date in accordance with the provisions of Article XII of the Plan and the Post-Consummation Estate Agreement for the benefit of holders of certain Allowed Claims.

120.    *"Post-Consummation Estate Advisory Board"* means the committee appointed pursuant to the Post-Consummation Estate Agreement to oversee the Post-Consummation Estate and the Plan Administrator.

121.    *"Post-Consummation Estate Agreement"* means the trust agreement, in form and substance satisfactory to CFC and the Committee, that documents the Post-Consummation Estate, describes the powers, duties and responsibilities of the Plan Administrator and the liquidation and distribution of proceeds of the Residual Assets, and describes the powers, duties and responsibilities of the Post-Consummation Estate Advisory Board.

122.    *"Post-Consummation Estate Budget"* means the budget, in form and substance acceptable to the Committee, for wind-down expenses projected to be paid by the Post-Consummation Estate (including Administrative, Other Secured and Priority Claims under the Plan), which budget is annexed as an exhibit to the Plan Supplement.

123.    *"Post-Consummation Estate Budget Sub-Escrow Account"* means an interest-bearing savings account within the Claim Settlement Escrow Account, funded out of the Claim Settlement Escrow Account and

maintained by the Plan Administrator, solely for the purpose of paying, and sufficient to pay, the Claims set forth in the Post-Consummation Estate Budget.

124.    "*Prepetition Note Balance*" means the net prepetition balance owed by CIHC to CFC after the set-off of the CFC/CIHC Intercompany Note against the CIHC/CFC Intercompany Note.

125.    "*Priority Non-Tax Claim*" means a Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code other than a Priority Tax Claim.

126.    "*Priority Tax Claim*" means a Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

127.    "*Professional Fee Sub-Escrow Account*" means an interest-bearing savings account within the Claim Settlement Escrow Account, funded out of the Claim Settlement Escrow Account and maintained by the Plan Administrator solely for the purpose of paying, and sufficient to pay, all Accrued Professional Compensation.

128.    "*Professional*", or collectively "*Professionals*" means a Person or Entity employed pursuant to a Final Order in accordance with sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Confirmation Date, pursuant to sections 327, 328, 329, 330 and 331 of the Bankruptcy Code, or for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

129.    "*Pro Rata*" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in such Class.

130.    "*Proof of Claim*" has the meaning ascribed to it in Fed. R. Bankr. P. 3001.

131.    "*Purchase Agreements*" means, collectively, the CFN Purchase Agreement and the GE Purchase Agreement.

132.    "*Record Date*" means April 25, 2003, as the date to be established for the purpose of determining those Holders of Allowed Claims and Equity Interests that are entitled to vote to accept or reject this Amended Modified Plan.

133.    "*Releasees*" means the Finance Company Debtors and their subsidiaries (direct and indirect), the Committee, Lehman, Wilmington Trust, the Securitization Trustees and all current and former officers, directors, employees, members, attorneys, actuaries, financial advisors, accountants, investment bankers, agents, professionals and other representatives of each of the foregoing, in each case in their capacity as such, and only if serving in one such capacity on the Petition Date or thereafter.

134.    "*Residual Assets*" means all assets of the Finance Company Debtors and their subsidiaries that are not Divested Assets, including any amounts remaining in Escrow Accounts after determination by the Plan Administrator in consultation with the Post Consummation Estate Advisory Board that all Claims related thereto have been paid in full or appropriately reserved.

135.    "*Residual Balance*" means the Finance Company Shared Recovery Allocation Amount, the Supplemental Recovery and the Residual Cash.

136.    "*Residual Cash*" means the remainder of the Sale Proceeds after (i) funding the Claim Settlement Escrow Account, the BED Escrow Amount, the HE/HI/REC Reserve Account, and the Consent Agreement Reserve Account and (ii) paying the Other Secured Claims, Lehman Final Secured Claims (other than the Lehman Subordinate Secured Claims) and 93/94 Note Claims in full, in Cash, to the extent Allowed, on the Effective Date or as soon thereafter as practicable.

137.    "*Sale Orders*" means, collectively, the GE Sale Order and the CFN Sale Order.

11

138.    *"Sale Proceeds"* means the Cash received or to be received by the Debtors pursuant to the terms of the Sale Transactions.

139.    *"Sale Transactions"* means, collectively, those transactions contemplated by the CFN Purchase Agreement and the GE Purchase Agreement (including, in the case of the GE Purchase Agreement, those assets contemplated thereunder to be sold by the Finance Company Debtors).

140.    *"Schedules"* mean the schedules of assets and liabilities, schedules of executory contracts, and the statement of financial affairs that the Bankruptcy Court requires the Debtors to file pursuant to section 521 of the Bankruptcy Code, the Official Bankruptcy Forms and the Bankruptcy Rules, as they may be amended and supplemented from time to time.

141.    *"Scheduling Order"* means the order entered by the Bankruptcy Court on May 7, 2003, granting the Finance Company Debtors' motion to establish scheduling procedures, which was filed on or about April 1, 2003, and amended from time to time thereafter.

142.    *"Secured Claim"* means (a) a Claim that is secured by a lien on property in which the Estate has an interest, which lien is valid, perfected and enforceable under applicable law or by reason of a Final Order, or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code, or (b) a Claim Allowed under this Plan as a Secured Claim.

143.    *"Securitization Trustees"* means U.S. Bank National Association and Wells Fargo Bank Minnesota, National Association, solely in their capacity as securitization trustees.

144.    *"Shared Employee Benefit Liabilities"* means those obligations which have arisen or may in the future arise with respect to those employee benefit programs where liability is shared or joint and several as between the Finance Company Debtors and (i) the Holding Company Debtors or (ii) Conseco Services, LLC.

145.    *"Shared Recovery Amounts"* means any and all Cash or assets of Finance Company Debtors or the Post-Consummation Estate, exclusive of the Supplemental Recovery, Residual Cash and amounts to fund the Escrow Accounts (except as set forth below) and pay Allowed Other Secured Claims, including but not limited to recoveries from Residual Assets, Causes of Action, proceeds from sale transactions (excluding the Supplemental Recovery, Residual Cash and amounts to fund the Escrow Accounts and pay Allowed Other Secured Claims), and unused portions of all Escrow Accounts.

146.    *"Shared Recovery Escrow Account"* means an interest bearing savings account created on the Effective Date, administered by the Plan Administrator, containing the proceeds of the Shared Recovery Amounts.

147.    *"Subject Subsidiary"* shall have the meaning set forth in section 2.1(b) of the CFN Purchase Agreement.

148.    *"Substantial Contribution Motion"* means that certain motion, docket number 3459 in these Chapter 11 Cases, filed on or about May 29, by certain creditors seeking administrative expense treatment for certain fees and expenses.

149.    *"Substantive Consolidation Order"* means the Order of the Bankruptcy Court substantively consolidating, for limited purposes, the Chapter 11 Cases (which may be part of the Confirmation Order), but providing that substantive consolidation shall not be implemented with respect to and shall not otherwise affect the distributions to be made on account of the Lehman Final Secured Claims (other than the Lehman Subordinate Secured Claims) or the DIP Facility Claims.

150.    *"Supplemental Recovery"* means $38 million of New CNC Common Stock (as defined in the Holding Company Debtors' Plan), at plan value, under the Holding Company Debtors' Plan.

151.    "*Third Party Actions*" means any Cause of Action that does not include: (a) an action brought by the Finance Company Debtors or the Committee pursuant to Chapter 5 of the Bankruptcy Code, (b) an action to enforce a claim or any distribution on any intercompany claim of the CFC Debtors against the Holding Company Debtors, and (c) an action to void and terminate the pledge of the shares of Mill Creek Bank Inc.

152.    "*Third Party Action Reserve Account Net Litigation Proceeds*" means fifty percent (50%) of any Net Litigation Proceeds exceeding $100 million in the aggregate which are recovered from Third Party Actions.

153.    "*Unimpaired*" means, with respect to a Class of Claims or Equity Interests, a Claim or Equity Interest that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

154.    "*Unimpaired Classes*" means Classes 1 and 2, which are not impaired Classes within the meaning of section 1124 of the Bankruptcy Code.

155.    "*U.S. Bank*" means U.S. Bank National Association, solely in its capacity as a Securitization Trustee.

156.    "*U.S. Bank Settlement Stipulation*" means that certain stipulation to be entered into between the Finance Company Debtors and U.S. Bank, as approved by the Bankruptcy Court on June 19, 2003, and entered on July 15, 2003, resolving U.S. Bank's objection to the Plan and providing for (i) the creation of the HE/HI/REC Escrow Account, (ii) the estimation of those B-2 Guarantee Claims commonly known as "HE/HI/REC" claims, and (iii) the allocation of all B-2 Guarantee Claims.

157.    "*Voting Deadline*" means June 13, 2003, as extended from time to time.

158.    "*Voting Instructions*" means the instructions for voting on the Plan contained in the section of the Disclosure Statement entitled "SOLICITATION; VOTING PROCEDURES" and in the Ballots and the Master Ballots.

159.    "*Wilmington Trust*" means Wilmington Trust Company, as indenture trustee for the 93/94 Notes.

160.    "*Wind-down Costs*" means the costs necessary to administer the Post-Consummation Estate in accordance with the Post-Consummation Estate Budget.

## ARTICLE II.

### SUBSTANTIVE CONSOLIDATION
### OF ASSETS AND LIABILITIES OF DEBTORS;
### CANCELLATION OF INTERCOMPANY CLAIMS

A.    *Substantive Consolidation*

Pursuant to the Substantive Consolidation Order, upon the Effective Date, the Finance Company Debtors' Estates and all of the debts of all of the Finance Company Debtors will be substantively consolidated for purposes of treating the Claims pursuant to Article IV hereof, including for voting, confirmation and distribution purposes, *provided, however*, that substantive consolidation shall not be implemented with respect to and shall not otherwise affect the distributions to be made on account of the Lehman Final Secured Claims (other than the Lehman Subordinate Secured Claims) or the DIP Facility Claims.

B.    *Cancellation of Intercompany Claims*

Pursuant to the terms of the Substantive Consolidation Order, all Finance Company Debtor Intercompany Claims will be extinguished except as necessary to preserve the Causes of Action. Further, all Claims which lie or could lie against more than one Finance Company Debtor will be Allowed, if at all, solely against the primary

obligor, and any guarantee or cross-guarantee Claims against other Finance Company Debtors are hereby extinguished.

### ARTICLE III.

### UNCLASSIFIED CLAIMS AGAINST THE FINANCE COMPANY DEBTORS

A.    *DIP Facility Claims*

Pursuant to the Final DIP Order, the CFN Sale Order and the GE Sale Order, the DIP Facility Claims (if any) will be paid in full in Cash out of the Claim Settlement Escrow Account. To the extent any DIP Facility Claim has not been fully paid prior to the Effective Date, subject to the provisions of sections 328, 330(a) and 331 of the Bankruptcy Code, each Holder of a DIP Facility Claim will be paid the full unpaid amount of such DIP Facility Claim in Cash from the Claim Settlement Escrow Account on the Effective Date or as soon thereafter as is practicable.

B.    *Administrative Claims*

Except as otherwise set forth in the Plan, subject to the provisions of sections 328, 330(a) and 331 of the Bankruptcy Code, each Holder of an Allowed Administrative Claim will be paid out of the Claim Settlement Escrow Account the full unpaid amount of such Allowed Administrative Claim in Cash (i) on the Effective Date or as soon thereafter as is practicable, (ii) if such Administrative Claim is Allowed after the Effective Date, on the date such Administrative Claim is Allowed, or as soon thereafter as is practicable, or (iii) upon such other terms as may be agreed upon by such Holder and the respective Finance Company Debtor or otherwise upon an order of the Bankruptcy Court; *provided that* the Post-Consummation Estate shall pay Allowed Administrative Claims representing obligations incurred in the ordinary course of business and not previously paid by the Finance Company Debtors from the Claim Settlement Escrow Account. The Finance Company Debtors are not obligated to pay Administrative Claims allowed solely against any Holding Company Debtors or the Post-Consummation Estate (other than Allowed Administrative Claims of the U.S. Internal Revenue Service, to the extent the U.S. Internal Revenue Service is entitled to assert such Claims under applicable nonbankruptcy law), but the Plan Administrator is obligated to pay, out of the Claim Settlement Escrow Account, as administrative expenses, those expenses which are properly allocable to the Finance Company Debtors or the Plan Administrator, including expenses that have been or will be paid by the Holding Company Debtors or their affiliates (other than the Finance Company Debtors) on behalf of or for the benefit of the Finance Company Debtors or their affiliates.

Notwithstanding anything in this Plan to the contrary, U.S. federal and state taxing authorities shall not be required to file an Administrative Claim for taxes (or penalties and interest with respect to such taxes) for a tax period after the Petition Date until the Finance Company Debtors or the Plan Administrator have first filed with such taxing authority any and all required tax returns and the time for assessment and collection of such liability, as provided under the nonbankruptcy statutory authority governing such time limits, has expired.

Notwithstanding anything in this Plan to the contrary, claims of local governments with respect to postpetition ad valorem taxes need not be filed or otherwise submitted to the Court for approval but shall instead be paid as billed in the ordinary course of business. The liens for these taxes shall remain in effect on the property until the taxes are paid pursuant to applicable non-bankruptcy law.

C.    *Priority Tax Claims*

On the Effective Date or as soon as practicable thereafter, each Holder of an Allowed Priority Tax Claim due and payable on or prior to the Effective Date shall be paid out of the Claim Settlement Escrow Account, at the option of the respective Debtor, (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim, or (b) Cash over a six-year period from the date of assessment as provided in section 1129(a)(9)(C) of the Bankruptcy Code, with interest payable at a fixed rate determined as of the Confirmation Date by the formula provided in section 6621(a)(2) of the Internal Revenue Code and compounded daily (as provided in section 6622 of the Internal Revenue Code). Any deferred payments made pursuant to section 1129(a)(9)(C) of the Bankruptcy Code shall be

by equal monthly Cash payment beginning on the first day of the calendar month following the Effective Date. Interest shall accrue from the Confirmation Date. The amount of any Priority Tax Claim that is not an Allowed Claim or that is not otherwise due and payable on or prior to the Effective Date, and the rights of the Holder of such Claim, if any, to payment in respect thereof shall (x) be determined in the manner in which the amount of such Claim and the rights of the Holder of such Claim would have been resolved or adjudicated if the Chapter 11 Cases had not been commenced, (y) survive the Effective Date and Consummation of the Plan as if the Chapter 11 Cases had not been commenced, and (z) not be discharged pursuant to section 1141 of the Bankruptcy Code.

If the Finance Company Debtors or the Plan Administrator substantially default on the payments of a tax due to any U.S. federal or state taxing authority under this Plan, then the total amount still owed to such taxing authority under this Plan shall become due and payable, and such taxing authority may collect such amount through the administrative and judicial collection provisions of such agency or as otherwise permitted under nonbankruptcy law. In this context, "substantial default" shall mean that the Finance Company Debtors or the Plan Administrator have defaulted on three Plan payments to the relevant taxing authority and have ceased making the payments called for under the Plan, and, after receiving notice of such default from such taxing authority, have not attempted to cure the default and satisfy their Plan obligations. The Finance Company Debtors or the Plan Administrator shall file any objections to Priority Tax Claims within 180 days of the Effective Date. Nothing in this Plan shall affect the provisions of the Tax Anti-Injunction Act, 28 U.S.C. § 1341.

## ARTICLE IV.

## CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS

A.    *Summary*

The categories of Claims and Equity Interests listed below classify Claims against and Equity Interests in the Finance Company Debtors for all purposes, including voting, confirmation and distribution pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or Equity Interest shall be deemed classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class. A Claim or Equity Interest is in a particular Class only to the extent that such Claim or Equity Interest is Allowed in that Class and has not been paid or otherwise satisfied prior to the Effective Date.

THIS PLAN SEEKS TO SUBSTANTIVELY CONSOLIDATE THE FINANCE COMPANY DEBTORS' ESTATES (OTHER THAN WITH RESPECT TO THE LEHMAN FINAL SECURED CLAIMS (EXCEPT THE LEHMAN SUBORDINATE SECURED CLAIM), THE 93/94 NOTE CLAIMS AND THE DIP FACILITY CLAIMS), AS FURTHER DESCRIBED IN ARTICLE II HEREIN. IF THE BANKRUPTCY COURT AUTHORIZES AND ORDERS SUCH SUBSTANTIVE CONSOLIDATIONS, THE COMBINED CASH AND OTHER ASSETS OF ALL OF THE FINANCE COMPANY DEBTORS AND THE POST-CONSUMMATION ESTATE SHALL SATISFY ALL ALLOWED CLAIMS AGAINST THE FINANCE COMPANY DEBTORS OR THEIR ESTATES.

### Summary of Classification and Treatment of Claims and Equity Interests

| Class | Claim | Status | Voting Right |
|-------|-------|--------|--------------|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3 | Lehman Final Secured Claims | Impaired | Entitled to vote |
| 4 | 93/94 Note Claims | Impaired | Entitled to vote |
| 5 | General Unsecured Claims | Impaired | Entitled to vote |
| 6 | Equity Interests | Impaired | Deemed to reject |

15

B.      *Classification and Treatment of Classified Claims and Equity Interests:*

1.      Class 1  Other Priority Claims

(a)      *Classification:* Class 1 comprises the Other Priority Claims, which are Claims against the Finance Company Debtors.

(b)      *Treatment:* The legal, equitable and contractual rights of the Holders of Allowed Class 1 Claims are unaltered by the Plan. Unless otherwise agreed to by the Holders of the Allowed Other Priority Claim and the Finance Company Debtors, each Holder of an Allowed Class 1 Claim shall receive, in full and final satisfaction of such Allowed Class 1 Claim, one of the following treatments, in the sole discretion of the Finance Company Debtors (or, after the Effective Date, the Plan Administrator) and funded from the Claim Settlement Escrow Account:

(i)      payment of each Allowed Class 1 Claim in full in Cash on the Effective Date or as soon thereafter as is practicable; *provided that* Class 1 Claims representing obligations incurred in the ordinary course of business will be paid in full in Cash when such Class 1 Claims become due and owing in the ordinary course of business; or

(ii)      such Claim will be treated in any other manner so that such Claim shall otherwise be rendered Unimpaired pursuant to section 1124 of the Bankruptcy Code.

(c)      *Voting:* Class 1 is Unimpaired and the Holders of Class 1 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Claims in Class 1 are not entitled to vote to accept or reject the Plan.

2.      Class 2  --Other Secured Claims

(a)      *Classification:* Class 2 comprises the Other Secured Claims.

(b)      *Treatment:* The Plan will not alter any of the legal, equitable and contractual rights of the Holders of Class 2 Claims. Unless otherwise agreed to by the Holder of the Allowed Class 2 Claim and the Finance Company Debtors, each Holder of an Allowed Class 2 Claim shall receive, in full and final satisfaction of such Allowed Class 2 Claim, one of the following treatments, in the sole discretion of the Finance Company Debtors (or, after the Effective Date, the Plan Administrator):

(i)      the payment of such Holders' Allowed Class 2 Claim in full in Cash on the Effective Date;

(ii)      the payment to Holders of the sale or disposition proceeds of the collateral securing each such Allowed Class 2 Claim to the extent of the value of the Holder's interest in such property;

(iii)      the surrender to each Holder of all collateral securing each such Allowed Class 2 Claim without representation or warranty by or further recourse against the relevant Finance Company Debtor; *provided that,* such surrender must render each such Allowed Class 2 Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code; or

(iv)      treatment in any other manner so as to render the Allowed Class 2 Claim otherwise Unimpaired pursuant to section 1124 of the Bankruptcy Code.

On the Effective Date or as soon as practicable thereafter, any Allowed Class 2 Claims of U.S. federal or state taxing authorities shall be paid, at the option of the respective Debtor (or, after the Effective Date, the Plan Administrator), (a) Cash in an amount equal to the amount of such Allowed Class 2 Claim, or (b) Cash over a six-year period from the date of assessment of the tax to which the claim relates, with interest payable at a fixed

16

rate determined as of the Confirmation Date by the formula provided in section 6621(a)(2) of the Internal Revenue Code and compounded daily (as provided in section 6622 of the Internal Revenue Code). Any deferred payments made pursuant to this provision of the Plan shall be by equal monthly Cash payment beginning on the first day of the calendar month following the Effective Date. Interest shall accrue from the Confirmation Date.

Notwithstanding any other provision of this Plan, any oversecured Allowed Class 2 Claim of any U.S. federal or state taxing authority shall be entitled to postpetition interest at the rate provided for in section 6621(a)(2) of the Internal Revenue Code up to the amount by which the value of the property securing the oversecured Allowed Class 2A Claim exceeds the value of such claim.

U.S. federal and state taxing authorities shall retain the tax liens and rights to setoff securing their Allowed Class 2 Claims, if any, and, in the event the Finance Company Debtors (or, after the Effective Date, the Plan Administrator) substantially default on the payment of such claims (as provided for in this Plan), then the total amount still owed to such taxing authority under this Plan shall become due and payable, and the taxing authority may collect such amount through the administrative or judicial collection provisions of such agency or as otherwise permitted under nonbankruptcy law. In this context, "substantial default" shall mean that the Finance Company Debtors (or after the Effective Date, the Plan Administrator) have defaulted on three Plan payments to the relevant taxing authority and have ceased making the payments called for under the Plan, and, after receiving notice of such default from the taxing authority, have not attempted to cure the default and satisfy their Plan obligations.

On the Effective Date, or as soon as practicable thereafter, any Allowed Class 2 Claims of U.S. federal, state, or local governmental entities for *ad valorem* taxes shall be paid in full in Cash with post-petition interest (on such claims as are oversecured) at the applicable statutory rate up to the amount by which the value of the property securing such oversecured claim exceeds the value of such claim and with post-confirmation interest at a rate of 8% per annum accruing from the Confirmation Date. Allowed Class 2 Claims of U.S. federal, state, or local governmental entities for *ad valorem* taxes with respect to which an objection is filed shall be paid within 30 days of the entry of the final order resolving the objection, with post-petition interest (on such claims as are oversecured) at the applicable statutory rate up to the amount by which the value of the property securing such oversecured claim exceeds the value of such claim and with post-confirmation interest at a rate of 8% per annum accruing from the Confirmation Date. The liens with respect to such tax claims shall remain in full force and effect on the property of the Finance Company Debtors or the proceeds thereof until such claims are finally paid in full.

(c)     *Voting:* Class 2 is Unimpaired and the Holders of Class 2 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Claims in Class 2 are not entitled to vote to accept or reject the Plan.

3.     Class 3—Lehman Final Secured Claims

(a)     *Classification:* Class 3 comprises the Lehman Final Secured Claims.

(b)     *Treatment:* Subject to the last sentence of this paragraph (b), Holders of Allowed Class 3 Claims shall receive, in full and final satisfaction of the Lehman Final Secured Claims, payment in full in Cash on the CFN Closing Date of an amount equal to the Lehman Final Secured Claims minus the amount of the Lehman Subordinate Secured Claim. Lehman shall receive such distribution regardless of whether the GE Closing Date has occurred, but such distribution shall be subject to disgorgement if the Effective Date does not occur, to the extent required pursuant to a Final Order in the Lehman Adversary Proceeding. After the Effective Date, the Lehman Final Secured Claims shall not be subject to offset, counterclaims or defenses of any kind. After the Effective Date, the security interests securing the Lehman Final Secured Claims as Allowed hereby shall not be subject to avoidance or attack of any kind. On the CFN Closing Date Lehman shall present the Finance Company Debtors and the Committee with their proposed calculation of the Lehman Final Secured Claim and the Lehman Adjustment Amount. If Lehman and the Finance Company Debtors and the Committee are unable to agree on the Lehman Adjustment Amount, the parties shall seek an expedited determination by the Bankruptcy Court of the Lehman Adjustment Amount; provided, however, that such determination shall not affect in any manner the Lehman Current Secured Claim. To the extent there is any dispute as to the Lehman Adjustment Amount, the Finance Company Debtors shall advance to Lehman (or allow Lehman to retain) the amount asserted by Lehman, and Lehman

shall be obligated to return to the Finance Company Debtors or to the Plan Administrator any amounts that the Bankruptcy Court determines were not properly included in the Lehman Adjustment Amount. Lehman shall receive no distributions on account of the Lehman Subordinate Secured Claim unless and until such time as all Class 5 General Unsecured Claims are paid in full in Cash, including interest thereon.

      (c)    *Voting*: Class 3 is Impaired and the Holders of Class 3 Claims are entitled to vote to accept or reject the Plan.

4.    *Class 4—93/94 Note Claims*

      (a)    *Classification*: Class 4 comprises the 93/94 Note Claims against the Finance Company Debtors.

      (b)    *Treatment*: Holders of Allowed 93/94 Note Claims against the Finance Company Debtors shall receive, in full and final satisfaction of their Claims against the Finance Company Debtors and the Holding Company Debtors, the payment of Cash equal to the amount of each such Allowed Class 4 Claim, payable on the Effective Date or as soon thereafter as is practicable.

      (c)    *Voting*: Class 4 is Impaired and Holders of Allowed Class 4 Claims are entitled to vote to accept or reject the Plan.

5.    Class 5 –General Unsecured Claims

      (a)    *Classification*: Class 5 comprises the General Unsecured Claims against the Finance Company Debtors.

      (b)    *Treatment*: Holders of Allowed Class 5 Claims shall receive, in full and final satisfaction of their Allowed Class 5 Claims, their respective Pro Rata shares of the Residual Balance, *provided however*, that, as set forth in the Bid Procedures Order, CFN shall not be entitled directly, or through the Securitization Trustees, to receive any distribution on account of any B-2 Guarantee Claims it may hold or in the future acquire.

      (c)    *Voting*: Class 5 is Impaired and the Holders of Class 5 Claims are entitled to vote to accept or reject the Plan.

6.    Class 6   Equity Interests

      (a)    *Classification*: Class 6 comprises the Equity Interests in the Finance Company Debtors.

      (b)    *Treatment*: On the Effective Date, Class 6 Equity Interests will be cancelled and the Holders thereof will receive no distribution on account of their Interests.

      (c)    *Voting*: Class 6 is Impaired and the Holders of Class 6 Equity Interests are conclusively deemed to have rejected the Plan. Holders of Class 6 Equity Interests shall not be entitled to vote to accept or reject the Plan.

## ARTICLE V.

## ACCEPTANCE OR REJECTION OF THE PLAN

A.    *Voting Classes*

    Subject to Article V.C hereof, Holders of Claims in each Impaired Class of Claims are entitled to vote as a class to accept or reject the Plan. Each Holder of an Allowed Claim in Classes 3, 4, and 5 shall be entitled to vote to accept or reject the Plan.

B.    *Acceptance by Impaired Classes*

An Impaired Class of Claims shall be deemed to have accepted the Plan if (a) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (b) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.

C.    *Presumed Acceptance of the Plan*

Classes 1 and 2 are Unimpaired under the Plan, and, therefore, are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

D.    *Presumed Rejection of the Plan*

Class 6 is deemed to reject the Plan.

E.    *Non-Consensual Confirmation*

To the extent that any Impaired Class rejects this Plan or is deemed to have rejected this Plan, the Debtors will request confirmation of this Plan as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke or withdraw this Plan or any document in the Plan Supplement, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

## ARTICLE VI.

## PROVISIONS FOR IMPLEMENTATION OF THE PLAN

A.    *Sale of Assets*

On or prior to the Effective Date, the Finance Company Debtors shall consummate the Sale Transactions pursuant to the terms of the Purchase Agreements. On the Effective Date, and periodically thereafter if additional Residual Assets become available, the Residual Assets shall be transferred to the Post-Consummation Estate.

B.    *Intercompany Settlement Agreement*

As between the Finance Company Debtors and their Affiliates, on the one hand, and the Holding Company Debtors and their affiliates, on the other hand, there shall be no distributions made on account of prepetition intercompany claims, including intercompany notes and unpaid interest thereon. Further, on the Effective Date, the Finance Company Debtors and their Affiliates shall waive any subrogation claims they may have had against the Holding Company Debtors and their affiliates arising out of the distributions to Holders of the 93/94 Notes under this Plan.

- The Finance Company Debtors shall receive the Supplemental Recovery, as provided in the Holding Company Debtors' Plan, and shall be deemed to have accepted the Holding Company Debtors' Plan.

- The Holding Company Debtors shall be entitled to receive the Holding Company Shared Recovery Allocation Amount.

- The Holding Company Debtors and their Affiliates and the Finance Company Debtors and their Affiliates shall mutually release each other and their respective directors, officers, employees, attorneys, actuaries, financial advisors, accountants, investment bankers, agents, Professionals and representatives from any and all Claims (as defined in section 101(5) of the Bankruptcy Code), obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including

any derivative Claims asserted on behalf of such party, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, that the party or its subsidiaries would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest or other Person or Entity, based in whole or in part upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date, other than Claims or liabilities arising out of or relating to any Releasee's obligations to repay its obligations under the D&O Credit Facilities. Notwithstanding any other provision of this Plan, the Holding Company Debtors and their affiliates do not waive and shall not be deemed to have waived their rights to receive payment or distributions on account of any B-2 Guarantee Claims they may hold directly, through the Securitization Trustees, or otherwise.

- The B-2 Guarantee Claims with respect to manufactured housing securitization trusts shall be Allowed in the aggregate amount of $600 million, the method of allocating distributions in satisfaction of which shall be approved by the Bankruptcy Court pursuant to the U.S. Bank Settlement Stipulation after the notice period contemplated therein.

- The B-2 Guarantee Claims for the HE/HI/REC securitization trusts shall be estimated in a manner approved by the Finance Company Debtors and the Committee, and allocated in accordance with the U.S. Bank Settlement Stipulation. The Bankruptcy Court shall approve any such allocation after the notice period contemplated by the U.S. Bank Settlement Stipulation.

- To the extent the Claim Settlement Escrow Account is not sufficient to pay all Allowed Claims to be paid therefrom and any Allowed Administrative Claims paid by the Holding Company Debtors for or on behalf of the Finance Company Debtors (which are properly allocable to the Finance Company Debtors), the Holding Company Debtors will not assert such Claims against the Finance Company Debtors.

- In no event will the Claim Settlement Escrow Account be used to fund any award under the Substantial Contribution Motion. Any award under the Substantial Contribution Motion shall be paid, to the extent Cash is available, out of the Residual Balance.

C.    *Establishment of the Post-Consummation Estate*

On the Effective Date, the Finance Company Debtors (other than the Subject Subsidiaries on and after the CFN Closing Date), on their own behalf and on behalf of holders of Allowed Claims shall execute the Post-Consummation Estate Agreement and shall take all other steps necessary to establish the Post-Consummation Estate pursuant to the Post-Consummation Estate Agreement. On the Effective Date, and in accordance with and pursuant to the terms of the Plan, the Finance Company Debtors shall transfer to the Post-Consummation Estate all of their right, title, and interest in all of the Residual Assets (including, unless otherwise provided for in the Plan, the purchase price paid by the respective purchasers under the Purchase Agreements). In connection with the transfer of these assets, including rights and Causes of Action, any attorney-client privilege, work-product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the Post-Consummation Estate shall vest in the Post-Consummation Estate and its representatives, and the Debtors and the Post-Consummation Estate are authorized to take all necessary actions to effectuate the transfer of such privileges.

D.    *Funding Expenses of the Post-Consummation Estate*

The Finance Company Debtors (other than the Subject Subsidiaries on and after the CFN Closing Date) shall not be obligated to provide any funding with respect to the Post-Consummation Estate after they transfer the Residual Assets to the Post-Consummation Estate. As more fully described in the Post-Consummation Estate Agreement, any Cash in the Post-Consummation Estate shall be applied in accordance with the terms of the Post-Consummation Estate Budget, *first*, to the fees, costs, expenses (each of the foregoing in an amount not to exceed amounts approved pursuant to the Post-Consummation Estate Budget) and liabilities of the Plan Administrator, *second*, to satisfy any other administrative and Wind Down Costs of the Post-Consummation Estate (each in an

amount not to exceed amounts approved pursuant to the Post-Consummation Estate Budget), and _third_, to the distributions provided for pursuant to the Plan.

E.    *Corporate Action*

Upon the entry of the Confirmation Order by the Bankruptcy Court, all matters provided under the Plan involving the corporate structure of the Debtors shall be deemed authorized and approved without any requirement of further action by the Finance Company Debtors, the Finance Company Debtors' shareholders or the Debtors' boards of directors. To the extent such action has not been completed subsequent to the entry of the Substantive Consolidation Order, the Finance Company Debtors (and their boards of directors) shall dissolve or otherwise terminate their existence following the Effective Date and are authorized to dissolve or terminate the existence of wholly-owned non-Debtor subsidiaries following the Effective Date as well as any remaining health, welfare or benefit plans. Except as provided herein, the entry of the Substantive Consolidation Order does not adversely affect the rights, claims, liens, mortgages or security interests of Holders of Secured Claims in their respective Collateral.

F.    *Appointment of Plan Administrator*

On the Effective Date, compliance with the provisions of the Plan shall become the general responsibility of the Plan Administrator and the Plan Administrator shall be appointed in accordance with the Post-Consummation Estate Agreement.

G.    *Cancellation of Notes, Instruments, Debentures and Equity Securities*

On the Effective Date, except to the extent provided otherwise in the Plan or the CFN Purchase Agreement, all notes, instruments, certificates and other documents evidencing Claims and all Equity Interests in any of the Finance Company Debtors shall be canceled and deemed terminated.

H.    *Creation of Claim Settlement Escrow Account*

On the Effective Date, the Plan Administrator shall establish the Claim Settlement Escrow Account.

I.    *Creation of Professional Fee Sub-Escrow Account*

Upon creation of the Claim Settlement Escrow Account, the Plan Administrator shall establish the Professional Fee Sub-Escrow Account as a sub-account within the Claim Settlement Escrow Account, and shall reserve the amounts necessary to ensure the payment of all Accrued Professional Compensation.

J.    *Creation of Employee Benefit Sub-Escrow Account*

Upon creation of the Claim Settlement Escrow Account, the Plan Administrator shall establish the Employee Benefit Sub-Escrow Account as a sub-account within the Claim Settlement Escrow Account, and shall reserve the amounts necessary to ensure the payment of the Finance Company Debtors' proportionate share of any Shared Employee Benefit Liabilities.

K.    *Creation of Consent Agreement Reserve Account*

On or about the CFN Closing Date the Consent Agreement Reserve Account shall have been funded.

L.    *Creation of Post-Consummation Estate Budget Sub-Escrow Account*

Upon creation of the Claim Settlement Escrow Account, the Plan Administrator shall establish the Post-Consummation Estate Budget Sub-Escrow Account as a sub-account within the Claim Settlement Escrow Account and reserve the amounts necessary for the payment of the Post-Consummation Estate Budget.

M.    *Creation of 93/94 Note Claim Escrow Account*

On the Effective Date, and pursuant to the GE Sale Order, the Plan Administrator shall establish the 93/94 Note Claim Escrow Account and reserve the amounts necessary for the payment of the Allowed 93/94 Note Claims under the Plan.

N.    *Creation of the HE/HI/REC Reserve Account*

On the Effective Date, the Plan Administrator shall establish the HE/HI/REC Reserve Account.

O.    *Creation of BED Escrow Account*

On the Effective Date the Plan Administrator shall establish the BED Escrow Account.

P.    *Purchase of Director and Officer Tail Insurance Policy*

On or before the Effective Date, the Plan Administrator shall purchase the Director and Officer Tail Insurance Policy out of funds in the Claim Settlement Escrow Account.

Q.    *Retiree Benefits*

The Finance Company Debtors (other than the Subject Subsidiaries on and after the CFN Closing Date) shall timely pay any retiree benefits as defined in section 1114(a) of the Bankruptcy Code to the extent that such retiree benefits are payable by the Finance Company Debtors. Such retiree benefits include those that arise from the plans, funds or programs described in the Plan Supplement, and payment of such retiree benefits shall be made out of the Claim Settlement Escrow Account.

R.    *Dismissal of Certain Actions*

On or as soon as practicable after the Effective Date: (i) the Committee shall dismiss, with prejudice, the Lehman Adversary Proceeding; (ii) Lehman shall dismiss, with prejudice, the Lehman Appeal, and (iii) the Mill Creek Standing Motion will be deemed denied with prejudice.

S.    *Shared Recovery Escrow Implementation*

The Plan Administrator shall deposit all Shared Recovery Amounts into the Shared Recovery Escrow Account on the Effective Date and as Shared Recovery Amounts become available after the Effective Date.

## ARTICLE VII.

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.    *Assumption and Rejection of Executory Contracts and Unexpired Leases*

Any executory contracts or unexpired leases that have not expired by their own terms on or prior to the Effective Date, which the Finance Company Debtors have not assumed and assigned or rejected with the approval of the Bankruptcy Court (whether as part of the Sale Transactions or otherwise), or that are not the subject of a motion to assume the same pending as of the Effective Date, shall be deemed rejected by the Finance Company Debtors on the Effective Date and the entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

B.    *Rejection Claims; Cure of Defaults*

*If the rejection of an executory contract or unexpired lease pursuant to Plan Consummation results in damages to the other party or parties to such contract or lease, any Claim for such damages, if not heretofore*

*evidenced by a Proof of Claim that has been Filed, shall be forever barred and shall not be enforceable against the Finance Company Debtors, the Post-Consummation Estate, or their properties, successors or assigns, unless a Proof of Claim is Filed and served upon counsel for the Plan Administrator on or before thirty (30) days after the later to occur of (i) the Effective Date; and (ii) the date of entry of an order by the Bankruptcy Court authorizing rejection of a particular executory contract or unexpired lease.*

## ARTICLE VIII.

## PROVISIONS REGARDING DISTRIBUTIONS

A.    *Time and Method of Distributions*

The Plan Administrator, on behalf of the Post-Consummation Estate, or such other Entity as may be designated by the Plan Administrator, on behalf of the Post-Consummation Estate, will make all distributions required under the Plan in accordance with the Post-Consummation Estate Agreement. The Plan Administrator will make initial distributions in consultation with the Post-Consummation Estate Advisory Board after the Effective Date. Whenever any distribution to be made under the Plan is due on a day other than a Business Day, the Plan Administrator will make each such distribution, without interest, on the immediately succeeding Business Day, but any such distribution will have been deemed to have been made on the date due. Unless the Entity or Person receiving a payment agrees otherwise, the Plan Administrator, at its election, will make any payment in Cash to be made by the Post-Consummation Estate by check drawn on a domestic bank or by wire transfer from a domestic bank. Distributions referred to in this Article refer to Unsecured Claims and shall be made after (i) paying (or reserving for) all Allowed Other Secured Claims, Allowed Lehman Final Secured Claims (other than the Lehman Subordinate Secured Claim), and Allowed 93/94 Note Claims, (ii) funding the Consent Agreement Reserve Account, HF/HI/REC Reserve Account and the BED Escrow Account, (iii) funding the Claim Settlement Escrow and all sub-accounts thereunder, and (iv) paying all Allowed DIP Facility Claims, Allowed Administrative Claims, Allowed Priority Tax Claims, and Allowed Other Priority Claims out of the Claim Settlement Escrow Account. Any time the amount of Cash in the Shared Recovery Escrow Account exceeds $5 million, the Plan Administrator shall distribute such Cash by paying the Holding Company Debtors the Holding Company Shared Recovery Allocation Amount and distributing the Finance Company Shared Allocation Amount pursuant to the Plan.

With respect to any distribution to the Securitization Trustees under the manufactured housing securitization trusts, the Plan Administrator will provide such trustees, to the extent known, a written schedule setting forth the amount being distributed to each such trust and each class of Claims therein. The method of allocation within the trusts shall be determined in accordance with the U.S. Bank Settlement Stipulation and the order of the Bankruptcy Court on August 27, 2003.

B.    *Manner of Payment under the Plan*

Any payment in Cash to be made by the Debtors or the Plan Administrator shall be made, at the election of the Debtors or the Plan Administrator, as the case may be, by check drawn on a domestic bank or by wire transfer from a domestic bank.

C.    *Delivery of Distributions*

Subject to the provisions of Fed. R. Bankr. P. 2002(g), and except as otherwise provided herein, distributions and deliveries to Holders of record of Allowed Claims shall be made at the address of each such Holder set forth on the Finance Company Debtors' books and records unless superseded by the address set forth on proofs of claim filed by any such Holders, or at the last known address of such a Holder if no proof of claim is filed or if the Finance Company Debtors has been notified in writing of a change of address. Except as further provided by the Plan or the Bankruptcy Code, the Plan Administrator will make all distributions in accordance with the provisions of the applicable indenture participation agreement, loan agreement or analogous instrument or agreement, if any. Distributions on account of the manufactured housing B-2 Guarantee Claims shall be made directly to the relevant Securitization Trustee, who shall make all distributions pursuant to the U.S. Bank Settlement Stipulation or other order of the Bankruptcy Court.

D.    *Undeliverable Distributions*

    1.    Holding of Undeliverable Distributions:

        If any distribution to any Holder is returned to the Plan Administrator as undeliverable, no further distributions shall be made to such Holder unless and until the Plan Administrator is notified, in writing, of such Holder's then-current address. All Entities ultimately receiving undeliverable Cash shall not be entitled to any interest or other accruals of any kind. Nothing contained in the Plan shall require the Plan Administrator to attempt to locate any Holder of an Allowed Claim or an Allowed Interest.

    2.    Failure to Claim Undeliverable Distributions:

        Any holder of an Allowed Claim that does not assert its rights pursuant to the Plan to receive a distribution within six (6) months from and after the date such distribution is returned as undeliverable shall have such holder's Claim for such undeliverable distribution discharged and shall be forever barred from asserting any such Claim against the Post-Consummation Estate, the Plan Administrator or the Residual Assets. In such case, any consideration held for distribution on account of such Claim or Interest shall revert to the Post-Consummation Estate for distribution to the beneficiaries of the Post-Consummation Estate in accordance with the terms of the Plan.

E.    *Compliance with Tax Requirements/Allocation*

    To the extent applicable, the Post-Consummation Estate shall comply with all tax withholding and reporting requirements imposed on it by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. For tax purposes, distributions received in respect of Allowed Claims will be allocated first to the principal amount of such Claims, with any excess allocated to unpaid accrued interest.

F.    *Time Bar to Cash Payments*

    Checks issued by the Plan Administrator on account of Allowed Claims shall be null and void if not negotiated within ninety (90) days from and after the date of issuance thereof. Requests for reissuance of any check shall be made directly to the Plan Administrator by the holder of the Allowed Claim with respect to which such check originally was issued. Any claim in respect of such a voided check shall be made within six (6) months from and after the date of issuance of such check. After such date, all Claims in respect of voided checks shall be discharged and forever barred and the Post-Consummation Estate shall retain all monies related thereto for distribution to the beneficiaries of the Post-Consummation Estate in accordance with the terms of the Plan.

G.    *Distributions after Effective Date*

    Distributions made after the Effective Date to Holders of Claims that are not Allowed Claims as of the Effective Date, but which later become Allowed Claims, shall be deemed to have been made on the Effective Date. Unless otherwise specifically provided in the Plan, the Finance Company Debtors shall not be obligated to pay interest on account of any Claim not paid on the Effective Date.

H.    *Fractional Dollars; De Minimis Distributions*

    Notwithstanding anything contained herein to the contrary, payments of fractions of dollars will not be made. Whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment made will reflect a rounding of such fraction to the nearest dollar (up or down), with half dollars being rounded down. The Plan Administrator will not make any payment of less than Fifty Dollars ($50) with respect to any Allowed Claim unless a request therefor is made in writing to the Plan Administrator on or before ninety (90) days after the Effective Date.

I.       *Setoffs*

The Plan Administrator may, pursuant to sections 502(d) or 553 of the Bankruptcy Code or applicable nonbankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account thereof (before any distribution is made on account of such Claim), the Claims, rights and Causes of Action of any nature that the Debtors may hold against the Holder of such Allowed Claim; *provided, however,* that neither the failure to effect such a set-off nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors of any such claims, rights and Causes of Action that the Debtors may possess against such Holder; and, *provided, further,* that nothing contained in the Plan is intended to limit the rights of any Creditor to effectuate a set-off in accordance with the provisions of sections 362 and 553 of the Bankruptcy Code.

J.       *Preservation of Finance Company Debtors' Subordination Rights*

All subordination rights and claims relating to the subordination by the Finance Company Debtors of the Allowed Claim of any Creditor shall remain valid, enforceable and unimpaired in accordance with section 510 of the Bankruptcy Code or otherwise, except as otherwise provided in the Plan.

K.       *Waiver by Creditors of All Subordination Rights*

Except as otherwise ordered by the Bankruptcy Court, each Holder of a Claim shall be deemed to have waived all contractual, legal and equitable subordination rights that they may have, whether arising under general principles of equitable subordination, section 510(c) of the Bankruptcy Code or otherwise, with respect to any and all distributions to be made under the Plan, and all such contractual, legal or equitable subordination rights that each holder of a Claim has individually and collectively with respect to any such distribution made pursuant to this Plan shall be discharged and terminated, and all actions related to the enforcement of such subordination rights will be permanently enjoined.

L.       *Settlement of Claims and Controversies*

Pursuant to Fed. R. Bankr. P. 9019 and in consideration for the distributions and other benefits provided under the Plan, the provisions of this Plan shall constitute a good faith compromise and settlement of claims or controversies relating to the contractual, legal and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim, or any distribution to be made on account of any such Allowed Claim.

## ARTICLE IX.

## PROCEDURES FOR RESOLUTION OF DISPUTED, CONTINGENT AND UNLIQUIDATED CLAIMS OR EQUITY INTERESTS

A.       *Objections to Claims; Prosecution of Disputed Claims*

1.       The Finance Company Debtors prior to the Effective Date and thereafter the Plan Administrator (in accordance with the Post-Consummation Estate Agreement) shall object to the allowance of Claims or Equity Interests Filed with the Bankruptcy Court with respect to which they dispute liability or allowance in whole or in part. All objections shall be litigated or settled prior to Final Order; *provided, however,* that the Plan Administrator (within any parameters as may be established by the Post-Consummation Estate Agreement) shall have the authority to file, settle, compromise or withdraw any objections to Claims, without approval of the Bankruptcy Court. Unless otherwise ordered by the Bankruptcy Court, the Debtors or the Plan Administrator will file and serve all objections to Claims as soon as practicable.

2.       Notwithstanding the foregoing, the Plan Administrator, on behalf of the Post-Consummation Estate, shall have the exclusive right to object to the allowance of Administrative Claims and Secured Claims for one year from the Effective Date if no other deadline to object to such Claims is set by the Bankruptcy Court (the

"Objection Period"): _provided, however,_ that the Plan Administrator shall have the right to seek extension of the Objection Period.

B.    _Estimation of Claims_

The Finance Company Debtors prior to the Effective Date and thereafter the Plan Administrator, on behalf of the Post-Consummation Estate, may at any time request that the Bankruptcy Court estimate any contingent or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Plan Administrator previously have objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. Subject to the provisions of section 502(j) of the Bankruptcy Code, in the event that the Bankruptcy Court estimates any contingent or Disputed Claim, the amount so estimated shall constitute the maximum allowed amount of such Claim. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors or the Post-Consummation Estate may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

C.    _Controversy Concerning Impairment_

If a controversy arises as to whether any Claims or Class of Claims are Impaired under the Plan, the Bankruptcy Court shall, after notice and a hearing, determine that controversy before the Confirmation Date.

D.    _Payments and Distributions on Disputed Claims_

1.    Notwithstanding any provision hereof to the contrary, except as otherwise agreed to by the Finance Company Debtors (other than the Subject Subsidiaries on and after the CFN Closing Date), prior to the Effective Date and thereafter the Plan Administrator, on behalf of the Post-Consummation Estate, in their sole discretion, no partial payments or partial distributions will be made in satisfaction of a Disputed Claim until it is resolved by settlement or a Final Order.

2.    Notwithstanding the foregoing, the Finance Company Debtors (other than the Subject Subsidiaries on and after the CFN Closing Date) prior to the Effective Date and thereafter Plan Administrator, as the case may be, will set aside for each Holder of a Disputed Claim such portion of Cash as necessary to provide required distributions if that Claim were an Allowed Claim, either based upon the amount of the Claim as filed with the Bankruptcy Court or the amount of the Claim as estimated by the Bankruptcy Court.

3.    At such time as a Disputed Claim becomes, in whole or in part an Allowed Claim, the Plan Administrator shall distribute to the Holder thereof the distributions, if any, to which such Holder is then entitled under the Plan. Such distribution, if any, will be made as soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing such Disputed Claim becomes a Final Order. No interest will be paid on Disputed Claims that later become Allowed or with respect to any distribution in satisfaction thereof to a Holder.

## ARTICLE X.

## CONDITIONS PRECEDENT TO CONFIRMATION AND EFFECTIVE DATE OF THE PLAN

A.    _Conditions Precedent to Confirmation_

The following are conditions precedent to confirmation of this Plan that must be (i) satisfied or (ii) waived in accordance with Article X.C below.

26

X.B.2, X.B.3, X.B.4, X.B.6, X.B.7, X.B.8, X.B.9 and X.B.10 above. If the Confirmation Order is vacated, this Plan shall be null and void in all respects and nothing contained in this Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtors; (2) prejudice in any manner the rights of the Finance Company Debtors; or (3) constitute an admission, acknowledgment, offer or undertaking by the Finance Company Debtors in any respect.

D.     *Effect of Non-Occurrence of Consummation*

If the Confirmation Order is vacated, this Plan shall be null and void in all respects and nothing contained in this Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Finance Company Debtors; (2) prejudice in any manner the rights of the Finance Company Debtors or any other party; or (3) constitute an admission, acknowledgment, offer or undertaking by the Finance Company Debtors in any respect.

## ARTICLE XI.

## RELEASE, INJUNCTIVE AND RELATED PROVISIONS

A.     *Compromise and Settlement*

The allowance, classification and treatment of all Allowed Claims and Allowed Equity Interests and their respective distributions and treatments hereunder take into account and/or conform to the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code or otherwise. As of the Effective Date, any and all such rights described in preceding sentence are settled, compromised and released pursuant hereto. In addition, the allowance, classification and treatment of Allowed Claims in Classes 3, 4 and 5 takes into account any Causes of Action, claims or counterclaims, whether under the Bankruptcy Code or otherwise under applicable law, that may exist between the Finance Company Debtors and the Holders of such Claims, and, as of the Effective Date, any and all such Causes of Action, claims and counterclaims are settled, compromised and released pursuant hereto. The Confirmation Order shall approve the releases by all Persons and Entities of such contractual, legal and equitable subordination rights or Causes of Action, claims or counterclaims against such Holder satisfied, compromised and settled in this manner. Notwithstanding any other provision of this Plan, the Finance Company Debtors and the Plan Administrator shall not be deemed to have waived any Causes of Action against any Consenting Party, with the sole exceptions of Lehman, Holders of 93/94 Note Claims, Wilmington Trust, the Securitization Trustees, and the Holding Company Debtors.

B.     *Releases by the Finance Company Debtors*

Except as otherwise specifically provided in the Plan or in the Plan Supplement, for good and valuable consideration, including the service of the Releasees to facilitate the expeditious reorganization of the Finance Company Debtors and the implementation of the restructuring contemplated by the Plan, the Releasees, on and after the Effective Date, are deemed released by the Finance Company Debtors and the Post-Consummation Estate from any and all Claims (as defined in section 101(5) of the Bankruptcy Code), obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative Claims asserted on behalf of a Finance Company Debtor, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, that the Finance Company Debtors or their subsidiaries would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest or other Person or Entity, based in whole or in part upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date, other than Claims or liabilities arising out of or relating to any Releasee's obligations to repay its obligations under the D&O Credit Facilities or related documents.

C.     *Releases by Holders of Claims*

On and after the Effective Date, each Consenting Party shall be deemed to have unconditionally released each Releasee from any and all Claims (as defined in section 101(5) of the Bankruptcy Code), obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative Claims asserted on behalf of a Finance Company Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Person or Entity would have been legally entitled to assert (whether individually or collectively), based in whole or in part upon any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date in any way relating or pertaining to (w) the purchase or sale, or the rescission of a purchase or sale, of any security of a Finance Company Debtor, (x) a Finance Company Debtor, (y) the Chapter 11 Cases, or (z) the negotiation, formulation and preparation of the Plan, or any related agreements, instruments or other documents. No portion of the releases by the Consenting Parties in any way impairs any Cause of Actions, liability, Claim or right arising out of or relating to (a) any act or omission of a Releasee that constitutes (1) a failure to perform the duty to act in good faith, with the care of an ordinarily prudent person and in a manner the Releasee reasonably believed to be in the best interests of the corporation (to the extent such duty is imposed by applicable non-bankruptcy law), or (2) constitutes willful misconduct, gross negligence or recklessness or (b) any Releasee's obligations to repay its obligations under the D&O Credit Facilities or related documents.

D.     *Mutual Releases Among the Finance Company Debtors, the Committee, the Securitization Trustees and Lehman*

1.     Upon the effectiveness of the releases contemplated in section D(2) below, each of the Lehman Releasees releases, waives, compromises and settles any and all rights, claims and causes of action that any of them has or has had against the Lehman Released Parties from any and all actions, causes of action, suits, claims, demands, charges, debts, sums of money, judgments, damages, levies and executions of whatsoever kind, nature or description arising from or relating to, any one or more of the Finance Company Debtors, their respective estates and their respective chapter 11 cases, any securities issued by any of the Finance Company Debtors, any financial accommodations or loans made to, or other financing transactions with, any of the Finance Company Debtors, and any actions taken with respect to, relating to or in connection with any of the foregoing, which any Lehman Releasee ever had or now has against any of the Lehman Released Parties, and the consequences thereof, including any claims, losses, costs or damages, including compensatory and punitive damages, in each case, whether known or unknown, liquidated or unliquidated, fixed or contingent, direct or indirect, upon or by reason of any matter, act, occurrence, transaction, event or thing prior to or existing on the Effective Date.

2.     In addition to Article XI.B and XI.C above, effective upon the Effective Date, Lehman and the other Lehman Released Parties release, waive, compromise and settle any and all rights, claims and causes of action that any of them has or has had against any of the Lehman Releasees (except for the Lehman Unsecured Claim) from any and all actions, causes of action, suits, claims, demands, charges, debts, sums of money, judgments, damages, levies and executions of whatsoever kind, nature or description arising from or relating to, any one or more of the Finance Company Debtors, their respective estates and their respective chapter 11 cases, any securities issued by any of the Debtors, any financial accommodations or loans made to, or other financing transactions with, any of the Finance Company Debtors, and any actions taken with respect to, relating to or in connection with any of the foregoing, which any Lehman Released Party ever had or now has against any Lehman Releasee, and the consequences thereof, including any claims, losses, costs or damages, including compensatory and punitive damages, in each case, whether known or unknown, liquidated or unliquidated, fixed or contingent, direct or indirect, upon or by reason of any matter, act, occurrence, transaction, event or thing prior to or existing on the Effective Date.

E.     *Exculpation*

*The Exculpated Parties shall neither have, nor incur any liability to any Person or Entity for any pre- or post-petition act taken or omitted to be taken in connection with, or related to formulating, negotiating, preparing, disseminating, implementing, administering, Confirming or Consummating the Plan, the Disclosure Statement or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other pre- or post-petition act taken or omitted to be taken in connection with or*

*in contemplation of the restructuring of the Finance Company Debtors; provided, however, that the foregoing provisions of this Article XI.E shall have no effect on the liability of any Person or Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence, recklessness or willful misconduct, and, provided further, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her or its duties pursuant to, or in connection with, the Plan.*

F.    *Preservation of Rights of Action*

  1.    Maintenance of Causes of Action

        Except as otherwise provided in the Plan or the Purchase Agreements, the Post-Consummation Estate shall retain all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, in any court or other tribunal including, without limitation, in an adversary proceeding Filed in one or more of the Chapter 11 Cases, including, but not limited to, the actions specified in the Plan Supplement.

        Except as otherwise provided in the Plan, in accordance with section 1123(b)(3) of the Bankruptcy Code, any Claims, rights, and Causes of Action that the respective Finance Company Debtors may hold against any Entity shall vest in the Post-Consummation Estate. The Post-Consummation Estate, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Claims, rights or Causes of Action. The Post-Consummation Estate shall have the exclusive right, authority, and discretion to institute, prosecute, abandon, settle, or compromise any and all such Claims, rights, and Causes of Action without the consent or approval of any third party and without any further order of court.

  2.    Preservation of All Causes of Action Not Expressly Settled or Released

        The Finance Company Debtors are currently investigating whether to pursue potential Causes of Action against certain Persons or Entities. They have not yet completed this investigation. Therefore, subject to the Releases granted in Article XI hereof, the Plan Administrator shall retain, on behalf of the Post-Consummation Estate, all rights on behalf of the Finance Company Debtors and the Post-Consummation Estate to commence and pursue any and all Causes of Action (under any theory of law, including, without limitation, the Bankruptcy Code, and in any court or other tribunal including, without limitation, in any adversary proceeding Filed in the Chapter 11 Cases) discovered in any subsequent investigation that the Plan Administrator may deem appropriate. Potential Causes of Action currently being investigated by the Finance Company Debtors, which may be pursued by the Finance Company Debtors prior to the Effective Date and by the Plan Administrator, on behalf of the Post-Consummation Estate, after the Effective Date, to the extent warranted, include, without limitation, (i) a list of potential Claims and Causes of Action that will be set forth in the Plan Supplement to the extent determined as of the date thereof; and (ii) Preference Actions that will be set forth in the Plan Supplement to the extent determined as of the date thereof (although the Finance Company Debtors and, after the Effective Date, the Plan Administrator, on behalf of the Finance Company Debtors and the Post-Consummation Estate reserve all rights to pursue any and all Preference Actions discovered subsequent to the Filing Date of the Plan Supplement). Additionally, without limitation, the Finance Company Debtors hereby reserve the rights of the Plan Administrator, on behalf of the Post-Consummation Estate, to pursue:

        (a)    Any other Causes of Action (excluding any potential Causes of Action released, waived or settled under the Plan or prior to the Effective Date), whether legal, equitable or statutory in nature, arising out of, or in connection with the Finance Company Debtors' businesses or operations, including, without limitation, the following: possible claims against vendors, landlords, sublessees, assignees, customers or suppliers for warranty, indemnity, back charge/set-off issues, overpayment or duplicate payment issues and collections/accounts receivables matters; deposits or other amounts owed by any creditor, lessor, utility, supplier, vendor, landlord, sublessee, assignee, or other Person or Entity; employee, management or operational matters; claims against landlords, sublessees and assignees arising from the various leases, subleases and assignment agreements relating thereto, including, without limitation, claims for overcharges relating to taxes, common area maintenance and other similar charges; financial reporting; environmental, and product liability matters; actions against insurance carriers relating to coverage,

indemnity or other matters; counterclaims and defenses relating to notes or other obligations; contract or tort claims which may exist or subsequently arise:

(b)      Any and all avoidance actions pursuant to any applicable section of the Bankruptcy Code, including, without limitation, sections 544, 545, 547, 548, 549, 550, 551, 553(b) and/or 724(a) of the Bankruptcy Code, arising from any transaction involving or concerning any of the Finance Company Debtors;

(c)      Any and all Causes of Action listed in the Schedule of Causes of Action set forth in the Plan Supplement; and

(d)      In addition, any other Causes of Action that currently exist or may subsequently arise and which have not been otherwise set forth herein, in the Cause of Action Summary or in the List of Retained Causes of Action, because the facts upon which such Causes of Action are based are not currently or fully known by the Finance Company Debtors and, as a result, cannot be raised during the pendency of the Chapter 11 Cases (collectively, the "Unknown Causes of Action"). The failure to list any such Unknown Cause of Action herein, or in the Cause of Action Summary or the List of Retained Causes of Action, is not intended to limit the rights of the Plan Administrator, on behalf of the Post-Consummation Estate, to pursue any Unknown Cause of Action to the extent the facts underlying any such Unknown Cause of Action subsequently become fully known to the Finance Company Debtors.

Unless Causes of Action against a Person or Entity are expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order, the Finance Company Debtors (before the Effective Date) and the Plan Administrator, on behalf of the Post-Consummation Estate (post-Effective Date), expressly reserve all Causes of Action and Unknown Causes of Action, including the Causes of Action described herein and in the Causes of Action Summary and the List of Retained Causes of Action, as well as any other Causes of Action or Unknown Causes of Action, for later adjudication and therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches shall apply to such Causes of Action upon or after the confirmation or Consummation of the Plan. In addition, the Finance Company Debtors, the Plan Administrator, on behalf of the Post-Consummation Estate, and any successors-in-interest thereto, expressly reserve the right to pursue or adopt any Claims not so waived, relinquished, released, compromised on settled that are alleged in any lawsuit in which the Finance Company Debtors are a defendant or an interested party, including the lawsuits described in the Disclosure Statement, against any Person or entity, including, without limitation, the plaintiffs and co-defendants in such lawsuits.

Moreover, Causes of Action shall also include any causes of action that may arise after the Effective Date against any Person or Entity to whom the Finance Company Debtors have incurred an obligation (whether on account of services rendered to the Post-Consummation Estate, or the purchase or sale of goods or otherwise), or who has received services from the Finance Company Debtors or a transfer of money or property of the Finance Company Debtors, or who has transacted business with the Finance Company Debtors, or leased equipment or property from the Finance Company Debtors should assume that such obligation, transfer, or transaction may be reviewed by the Finance Company Debtors subsequent to the Effective Date and may, to the extent not theretofore waived, relinquished, released, compromised or settled, be the subject of an action after the Effective Date, whether or not (i) such Person or Entity has Filed a proof of Claim against the Finance Company Debtors in the Chapter 11 Cases; (ii) such Person's or Entity's proof of Claim has been objected to; (iii) such Person's or Entity's Claim was included in the Finance Company Debtors' Schedules; or (iv) such Person's or Entity's scheduled Claim has been objected to by the Finance Company Debtors or has been identified by the Finance Company Debtors as disputed, contingent, or unliquidated.

Except as otherwise provided in the Plan or in any contract, instrument, release, Indenture or other agreement entered into in connection with the Plan, in accordance with section 1123(b)(3) of the Bankruptcy Code, any Claims, rights, and Causes of Action that the respective Finance Company Debtors, Estates, or Post-Consummation Estates may hold against any Person or Entity, including but not limited to those Causes of Action listed in the Disclosure Statement, shall vest in the Post-Consummation Estate, and the Post-Consummation Estate shall retain and may exclusively enforce, as the authorized representatives of the respective Estates and Post-

Consummation Estates, any and all such Claims, rights, or Causes of Action. The Plan Administrator, on behalf of the Post-Consummation Estate, may pursue any and all such Claims, rights, or Causes of Action, as appropriate, in accordance with the best interests of the Post-Consummation Estate. Subject to Article XII herein, the Plan Administrator, on behalf of the Post-Consummation Estate, shall have the exclusive right, authority, and discretion to institute, prosecute, abandon, settle, or compromise any and all such Claims, rights, and Causes of Action without the consent or approval of any third party and without any further order of the Bankruptcy Court. Nothing in this Plan shall limit the ability of any party to name any Releasee for nominal purposes only in any Cause of Action for the sole purpose of invoking coverage (if any) under applicable insurance policies; provided that under no circumstances shall such naming affect, alter, amend or impair the provisions of the Plan or other agreements with respect to the liability (if any) of any such Releasee, including any release, waiver or exculpation provisions related thereto.

G.    *Release and Satisfaction of Claims; Termination of Equity Interests; Injunction*

Except as otherwise provided herein, and as set forth in the Confirmation Order and except with respect to the Post-Confirmation Estate: (a) the rights afforded herein and the treatment of all Claims and Equity Interests herein, shall be in exchange for and in complete satisfaction and release of, all Claims and Equity Interests of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, against the Finance Company Debtors or any of their assets and properties, (b) on the Effective Date, all such Claims against, and Equity Interests in, the Finance Company Debtors shall be satisfied and released in full, and **(c) all Persons shall be precluded from asserting against the Finance Company Debtors, the Post-Confirmation Estates, their successors or their assets or properties, any other or further Claims or Equity Interests based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Confirmation Date.**

## ARTICLE XII.

## POST-CONSUMMATION ESTATE; THE PLAN ADMINISTRATOR

A.    *Generally*

The powers, authority, responsibilities and duties of the Post-Consummation Estate and the Plan Administrator are set forth in and shall be governed by the Post-Consummation Estate Agreement. The Finance Company Debtors (other than the Subject Subsidiaries on and after the CFN Closing Date) and the Committee shall appoint the Plan Administrator, and shall have the sole authority to administer all assets prior to their transfer to the Post-Consummation Estate.

B.    *Purpose of the Post-Consummation Estate*

The Post-Consummation Estate shall be established for the primary purpose of liquidating its assets, in accordance with Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Post-Consummation Estate. Accordingly, the Post-Consummation Estate shall, in an expeditious but orderly manner, liquidate and convert to cash the Post-Consummation Estate Assets, make timely distributions to the Beneficiaries and not unduly prolong its duration. The Post-Consummation Estate shall not be deemed a successor-in-interest of the Finance Company Debtors for any purpose other than as specifically set forth herein or in the Post-Consummation Estate Agreement. The Post-Consummation Estate is intended to qualify as a "grantor trust" for federal income tax purposes with the Beneficiaries treated as grantors and owners of the trust.

C.    *Transfer of Assets to Post-Consummation Estate*

1.    The Finance Company Debtors and the Plan Administrator shall establish the Post-Consummation Estate on behalf of the Beneficiaries pursuant to the Post-Consummation Estate Agreement, to be treated as the grantors and deemed owners of the Post-Consummation Estate Assets and the Finance Company Debtors shall as set forth below transfer, assign, and deliver to the Post-Consummation Estate, on behalf of the Beneficiaries, all of their right, title, and interest in the Post-Consummation Estate Assets, including claims and causes of action of the

Finance Company Debtors, other than any claims and causes of action waived, exculpated or released in accordance with the provisions herein, notwithstanding any prohibition of assignability under applicable non-bankruptcy law. The Post-Consummation Estate shall agree to accept and hold the Post-Consummation Estate Assets in the Post-Consummation Estate for the benefit of the Beneficiaries, subject to the terms herein and the Post-Consummation Estate Agreement.

2.      On the Effective Date, the Finance Company Debtors shall transfer the Post-Consummation Estate Assets to the Post-Consummation Estate for the benefit of the Beneficiaries. Notwithstanding any prohibition of assignability under applicable non-bankruptcy law, all Assets and properties encompassed by this Plan shall vest in the Post-Consummation Estate in accordance with section 1141 of the Bankruptcy Code. Upon the transfer of the Post-Consummation Estate Assets to the Post-Consummation Estate, the Finance Company Debtors shall have no interest in or with respect to such Post-Consummation Estate Assets or the Post-Consummation Estate.

3.      For all federal income tax purposes, all parties (including, without limitation, the Finance Company Debtors, the Plan Administrator and the Beneficiaries) shall treat the transfer of the Post-Consummation Estate Assets by the Finance Company Debtors to the Post-Consummation Estate, as set forth in the Post-Consummation Estate Agreement, as a transfer of such assets by the Finance Company Debtors to the Holders of Allowed Claims entitled to distributions under this Plan, followed by a transfer by such Holders to the Post-Consummation Estate. Thus, the Beneficiaries shall be treated as the grantors and owners of a grantor trust for federal income tax purposes.

D.      *Valuation of Assets*

As soon as practicable after the Effective Date, the Post-Consummation Estate (to the extent that the Plan Administrator deems it necessary or appropriate in his sole discretion) shall value the Residual Assets based on the good faith determination of the Post-Consummation Estate and shall apprise the Beneficiaries of the Post-Consummation Estate of such valuation. The valuation shall be used consistently by all parties (including the Finance Company Debtors, the Plan Administrator and the Beneficiaries of the Post-Consummation Estate) for all federal income tax purposes. The Bankruptcy Court shall resolve any dispute regarding the valuation of these assets.

E.      *Distribution; Withholding*

The Plan Administrator shall make distributions to the Beneficiaries of the Post-Consummation Estate as provided in the Post-Consummation Estate Agreement. The Post-Consummation Estate may withhold from amounts distributable to any Entity or Person any and all amounts, determined in the Plan Administrator's sole discretion, to be required by any law, regulation, rule, ruling, directive or other governmental requirement. After appropriate reserves have been established to fund amounts set forth above and as identified in the Post-Consummation Estate Budget (including, but not limited to, amounts to pay Allowed Administrative Expense Claims, Priority Tax Claims, Other Priority Non-Tax Claims and the fees and expenses of the Plan Administrator and the Post-Consummation Estate), the funds to be distributed to the Holders of Allowed Class 5 Claims shall be distributed to such Holders on a Pro Rata basis at the sole discretion of the Plan Administrator. Distributions on account of the B-2 Guarantee Claims shall be made as set forth in the Order of this Court, dated August 27, 2003, Approving (1) the Allocation of the Allowed Claim to Holders of Manufactured Housing Certificates Guaranteed by Conseco Finance Corp., (2) the Allowed Claims to the Holders of Home Equity/Home Improvement and Recreational Vehicle Trust Certificates Guaranteed by Conseco Finance Corp., and (3) the Reserve Account for the Benefit of Holders of Home Equity/Home Improvement and Recreational Vehicle Securitization Certificates.

F.      *Post-Consummation Estate Implementation*

On the Effective Date, the Post-Consummation Estate will be established and become effective for the benefit of the Holders of Allowed Claims entitled to distributions under the Plan. The Post-Consummation Estate Agreement shall contain provisions customary to trust agreements utilized in comparable circumstances, including, but not limited to, any and all provisions necessary to ensure the continued treatment of the Post-Consummation Estate as a grantor trust and the Holders of Allowed Claims as the grantors and owners thereof for federal income tax purposes. All parties (including the Finance Company Debtors, the Plan Administrator and Holders of Allowed

Claims) shall execute any documents or other instruments as necessary to cause title to the applicable assets to be transferred to the Post-Consummation Estate.

G.     *Disputed Claims Reserve*

The Plan Administrator shall maintain, in accordance with the Plan Administrator's powers and responsibilities under this Plan and the Post-Consummation Estate Agreement, a reserve for any distributable amounts required to be set aside on account of Disputed Claims (the "Disputed Claims Reserve"). The Plan Administrator, shall, in his sole discretion, distribute such amounts (net of any expenses, including any taxes relating thereto), as provided herein and in the Post-Consummation Estate Agreement, as such Disputed Claims are resolved by Final Order, and such amounts shall be distributable in respect of such Disputed Claims as such amounts would have been distributable had the Disputed Claims been Allowed Claims as of the Effective Date. The Post-Consummation Estate will pay taxes on the taxable net income or gain allocable to Holders of Disputed Claims on behalf of such Holders and, when such Disputed Claims are ultimately resolved, Holders whose Disputed Claims are determined to be Allowed Claims will receive distributions from the Post-Consummation Estate net of taxes which the Post-Consummation Estate previously paid on their behalf.

H.     *Termination of Post-Consummation Estate*

The Post-Consummation Estate will terminate as soon as practicable, but in no event later than the fifth (5th) anniversary of the Effective Date; *provided, however,* that, on or prior to the date six (6) months prior to such termination, the Bankruptcy Court, upon motion by a party in interest, may extend the term of the Post-Consummation Estate for a finite period, if such an extension is necessary to liquidate the Residual Assets. Notwithstanding the foregoing, multiple extensions may be obtained so long as Bankruptcy Court approval is obtained at least six (6) months prior to the expiration of each extended term; *provided, however,* that the Plan Administrator receives an opinion of counsel or a favorable ruling from the Internal Revenue Service that any further extension would not adversely affect the status of the Post-Consummation Estate as a grantor trust for federal income tax purposes.

I.     *Termination of Plan Administrator*

The duties, responsibilities and powers of the Plan Administrator shall terminate in accordance with the terms of the Post-Consummation Estate Agreement.

J.     *Exculpation; Indemnification*

*The Plan Administrator, the Post-Consummation Estate, the Advisory Board, the Non-Professionals, the Professionals or their representatives shall be exculpated and indemnified pursuant to the terms of the Post-Consummation Estate Agreement.*

## ARTICLE XIII.

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain such jurisdiction over any matter arising under the Bankruptcy Code related to the Chapter 11 Cases or the Plan after Confirmation and after the Effective Date, including jurisdiction to:

1.     allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of Claims or Equity Interests;

2.     grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

3.      resolve any matters related to the assumption, assumption and assignment or rejection of any executory contract and unexpired lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom;

4.      ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions hereof;

5.      decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving a Finance Company Debtor that may be pending on the Effective Date, or that, pursuant to the Plan, may be instituted by the Plan Administrator or the Post-Consummation Estate after the Effective Date; provided however that the Plan Administrator and the Post-Consummation Estate shall reserve the right to commence collection actions, actions to recover receivables and other similar actions in all appropriate jurisdictions;

6.      enter such orders as may be necessary or appropriate to implement or consummate the provisions hereof and all contracts, instruments, releases, indentures and other agreements or documents created in connection with the Plan, the Disclosure Statement or the Post-Consummation Estate Agreement;

7.      resolve any cases, controversies, suits or disputes that may arise in connection with the Consummation, interpretation or enforcement of the Plan or any Person's or Entity's obligations incurred in connection with the Plan;

8.      issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with Consummation or enforcement of the Plan, except as otherwise provided herein;

9.      resolve any cases, controversies, suits or disputes with respect to the releases, injunction and other provisions contained in Article XI hereof and enter any orders that may be necessary or appropriate to implement such releases, injunction and other provisions;

10.     enter and implement any orders that are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

11.     determine any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order, the Post-Consummation Estate Agreement or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan or the Disclosure Statement or the Post-Consummation Estate Agreement;

12.     resolve any disputes over distributions from the Consent Agreement Reserve Account and HE/HI/REC Reserve Account; and

13.     enter an order and/or final decree concluding the Chapter 11 Cases.

## ARTICLE XIV.

## MISCELLANEOUS PROVISIONS

A.      *Modification of Plan Supplement*

Modification of or amendments to the Plan Supplement may be Filed with the Bankruptcy Court before the Confirmation. Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article XIV.E hereof. Upon its Filing, the Plan Supplement may be inspected in the office of the clerk of the Bankruptcy Court or its designee during normal business hours. Holders of Claims and Equity Interests may obtain a copy of the Plan Supplement by contacting Bankruptcy Management Corporation at 1-888-909-0100 or review such documents on the internet at www.bmccorp.net/Conseco. The documents contained in the

Plan Supplement are an integral part of the Plan and shall be approved by the Bankruptcy Court pursuant to the Confirmation Order.

B.    *Effectuating Documents, Further Transactions and Corporation Action*

Each of the Finance Company Debtors is authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions hereof and the notes and securities issued pursuant hereto.

Prior to, on or after the Effective Date (as appropriate), all matters provided for hereunder that would otherwise require approval of the shareholders or directors of the Debtors shall be deemed to have occurred and shall be in effect prior to, on or after the Effective Date (as appropriate) pursuant to the general corporation laws of the States of Minnesota, Delaware, New York, Pennsylvania, Minnesota, Nevada, Alabama, Kentucky, Utah and Texas (as appropriate) without any requirement of further action by the shareholders or directors of the Finance Company Debtors.

C.    *Dissolution of Committee*

Upon the Effective Date, the Committee shall dissolve, except with respect to any appeal of an order in the Chapter 11 Cases and applications for Professional Fees, and Committee Members and the Committee's Professionals shall be released and discharged from all rights, duties and liabilities arising from, or related to, the Chapter 11 Cases.

D.    *Payment of Statutory Fees*

All fees payable pursuant to section 1930(a) of title 28 of the United States Code, as determined by the Bankruptcy Court at the hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed or closed, whichever occurs first.

E.    *Modification of Plan*

Subject to the limitations contained in the Plan:

1.    the Finance Company Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order; and

2.    after the entry of the Confirmation Order, the Finance Company Debtors, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

F.    *Revocation of Plan*

The Finance Company Debtors reserve the right (with the prior consent of the Committee) to revoke or withdraw the Plan prior to the Confirmation Date and to file subsequent plans of reorganization. If a Debtor revokes or withdraws the Plan, or if Confirmation or Consummation does not occur, then (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Equity Interest or Class of Claims or Equity Interests), assumption or rejection of executory contracts or leases affected by the Plan, and any document or agreement executed pursuant hereto, shall be deemed null and void, and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against, or any Equity Interests in, such Debtor or any other Person, (ii) prejudice in any manner the rights of such Debtor or any other Person, or (iii) constitute an admission of any sort by such Debtor or any other Person.

G.    *Successors and Assigns*

The rights, benefits and obligations of any Person or Entity named or referred to herein shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign of such Person or Entity.

H.    *Reservation of Rights*

Except as expressly set forth herein, this Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. None of the filing of this Plan, any statement or provision contained herein, or the taking of any action by any Finance Company Debtor with respect to this Plan, the Disclosure Statement or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Finance Company Debtor with respect to the Holders of Claims or Equity Interests prior to the Effective Date.

I.    *Section 1146 Exemption*

Pursuant to section 1146(c) of the Bankruptcy Code, under this Plan, (i) the issuance, distribution, transfer or exchange of any debt, equity security or other interest in the Debtors; (ii) the creation, modification, consolidation or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (iii) the making, assignment or recording of any lease or sublease; or (iv) the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, including any deeds, bills of sale, assignments or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to this Plan shall not be subject to any document recording tax, mortgage recording tax, stamp tax or similar government assessment, and the appropriate state or local government official or agent shall be directed by the Bankruptcy Court to forego the collection of any such tax or government assessment and to accept for filing and recording any of the foregoing instruments or other documents without the payment of any such tax or government assessment.

All subsequent issuances, transfers or exchanges of securities, or the making or delivery of any instrument of transfer by the Debtors in the Chapter 11 Cases, whether in connection with a sale under section 363 of the Bankruptcy Code or otherwise, shall be deemed to be or have been done in furtherance of this Plan. Specifically, because the Sale Transactions are being conducted pursuant to this Plan, any instrument of transfer that would effect transfer of the Divested Assets as proposed in pleadings filed in these Chapter 11 Cases may not be taxed under any law imposing a stamp tax or similar tax.

J.    *Further Assurances*

The Debtors and all Holders of Claims or Equity Interests receiving distributions hereunder and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan.

K.    *Service of Documents*

Any pleading, notice or other document required by the Plan to be served on or delivered to the Finance Company Debtors shall be sent by first class U.S. mail, postage prepaid to:

Conseco Finance Corp.,
Conseco Finance Servicing Corp.,
Conseco Finance Corp. - Alabama,
Conseco Finance Credit Corp.,
Conseco Finance Consumer Discount Company,
Conseco Finance Canada Holding Company,
Conseco Finance Canada Company,
Conseco Finance Loan Company,
Rice Park Properties Corporation,
Landmark Manufactured Housing, Inc.,

with copies to:

Kirkland & Ellis LLP
200 E. Randolph Drive
Chicago, Illinois 60601
Attn:   James H.M. Sprayregen, P.C.
        Anup Sathy
        Roger J. Higgins
        Ross M. Kwasteniet

Conseco Finance Net Interest Margin Finance Corp. I,
Conseco Finance Net Interest Margin Finance Corp. II,
Green Tree Finance Corp. - Two,
Conseco Agency of Nevada, Inc.,
Conseco Agency of New York, Inc.,
Green Tree Floorplan Funding Corp.,
Conseco Agency, Inc.,
Conseco Agency of Alabama, Inc.,
Conseco Agency of Kentucky, Inc.,
Crum-Reed General Agency, Inc.,
Conseco Finance Credit Card Funding Corp.,
Green Tree Residual Finance Corp. I,
Green Tree Finance Corp.- Five
345 St. Peter Street
1100 Landmark Towers
Saint Paul, MN, 55102
Attn:    Brian Corey, General Counsel

L.    *Transactions on Business Days*

If the date on which a transaction may occur under this Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

M.    *Filing of Additional Documents*

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

N.    *Post-Effective Date Fees and Expenses*

From and after the Effective Date, the Plan Administrator on behalf of the Post-Confirmation Estate shall, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, pay the reasonable professional fees and expenses incurred by the Post-Confirmation Estates related to the Consummation and to the implementation of this Plan.

O.    *Severability*

The provisions of this Plan shall not be severable unless such severance is agreed to by the Finance Company Debtors or, if after the Effective Date, by the Plan Administrator, on behalf of the Post-Confirmation Estate, and such severance would constitute a permissible modification of this Plan pursuant to section 1127 of the Bankruptcy Code.

P.    *Conflicts*

To the extent any provision of the Post-Consummation Estate Agreement, the Disclosure Statement, or any document executed in connection therewith or any documents executed in connection with the Confirmation Order (or any exhibits, schedules, appendices, supplements or amendments to any of the foregoing) conflicts with, or is in any way inconsistent with, the terms of this Plan, the terms and provisions of this Plan shall govern and control, provided however that nothing in this Plan shall be deemed to modify or supercede any of the terms of the Final DIP Order, the CFN Sale Order, the GE Sale Order or the Cash Management Order.

Q.    *Term of Injunctions or Stays*

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and still

38

extant on the Confirmation Date (excluding any injunctions or stays contained in this Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date. All injunctions or stays contained in this Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

R.     *Entire Agreement*

This Plan and the Plan Supplement (as amended) supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings and representations on such subjects, all of which have become merged and integrated into this Plan.

S.     *Closing of the Chapter 11 Cases*

The Post-Consummation Estate shall promptly, upon the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Fed. R. Bankr. P. 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 cases.

Dated: _September 9_, 2003

Respectfully Submitted,

CONSECO FINANCE CORP.

By: _____
Name:   Charles H. Cremens
Title:    President & CEO


CONSECO FINANCE SERVICING CORP.

By: _____
Name:   Charles H. Cremens
Title:    President


GREEN TREE RESIDUAL FINANCE CORP. I

By: _____
Name:   Charles H. Cremens
Title:    President


GREEN TREE FINANCE CORP. FIVE

By: _____
Name:   Charles H. Cremens
Title:    President


CONSECO FINANCE NET INTEREST MARGIN FINANCE CORP. I

By: _____
Name:   Charles H. Cremens
Title:    President


CONSECO FINANCE NET INTEREST MARGIN FINANCE CORP. II

By: _____
Name:   Charles H. Cremens
Title:    President

CRUM-REED GENERAL AGENCY INC.

By: _____
Name:   Charles H. Cremens
Title:    President


GREEN TREE FINANCE CORP.-TWO

By: _____
Name:   Charles H. Cremens
Title:    President


CONSECO FINANCE CANADA COMPANY (Green Tree Financial Canada Company)

By: _____
Name:   Charles H. Cremens
Title:    President


CONSECO AGENCY OF KENTUCKY, INC. (Green Tree Agency of Kentucky, Inc.)

By: _____
Name:   Charles H. Cremens
Title:    President


LANDMARK MANUFACTURED HOUSING, INC.

By: _____
Name:   Charles H. Cremens
Title:    Senior Vice President and Secretary


CONSECO AGENCY OF ALABAMA, INC. (Green Tree Agency of Alabama, Inc.)

By: _____
Name:   Charles H. Cremens
Title:    President

RICE PARK PROPERTIES CORPORATION

By:
Name:    Charles H. Cremens
Title:    President


GREEN TREE FLOORPLAN FUNDING CORP.

By:
Name:    Charles H. Cremens
Title:    President


CONSECO FINANCE LOAN COMPANY (Green Tree Financial Loan Company)

By:
Name:    Charles H. Cremens
Title:    President


CONSECO FINANCE CONSUMER DISCOUNT COMPANY (Green Tree Consumer Discount Company)

By:
Name:    Charles H. Cremens
Title:    President


CONSECO FINANCE CANADA HOLDING COMPANY (Green Tree Financial Canada Holding Company)

By:
Name:    Charles H. Cremens
Title:    President


CONSECO FINANCE CREDIT CORP. (Green Tree Credit Corp.)

By:
Name:    Charles H. Cremens
Title:    President


CONSECO AGENCY OF NEW YORK, INC. (GTA Agency, Inc.)

By:
Name:    Charles H. Cremens
Title:    President

CONSECO AGENCY INC. (Green Tree Agency, Inc.)

By: _____
Name:    Charles H. Cremens
Title:    President


CONSECO FINANCE CORP.-ALABAMA (Green Tree Financial Corp.-Alabama)

By: _____
Name:    Charles H. Cremens
Title:    President


CONSECO FINANCE CREDIT CARD FUNDING CORP.

By: _____
Name:    Charles H. Cremens
Title:    President


MILL CREEK SERVICING CORPORATION

By: _____
Name:    Charles H. Cremens
Title:    President


CONSECO AGENCY OF NEVADA, INC.
(Green Tree Agency of Nevada, Inc.)

By: _____
Name:    Charles H. Cremens
Title:    President


GREEN TREE FINANCE CORP.-FIVE

By: _____
Name:    Charles H. Cremens
Title:    President

GREEN TREE RESIDUAL FINANCE CORP. I

By:

Name:    Charles H. Cremens
Title:    President


CONSECO FINANCE CREDIT CARD FUNDING CORP.

By:

Name:    Charles H. Cremens
Title:    President

Prepared by:

James H.M. Sprayregen, P.C. (ARDC No. 6190206)
Anup Sathy (ARDC No. 6230191)
Roger J. Higgins (ARDC No. 6257915)
Ross M. Kwasteniet (ARDC No. 6276604)
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, IL 60601-6636
(312) 861-2000 (telephone)
(312) 861-2200 (facsimile)

COUNSEL TO DEBTORS AND DEBTORS IN POSSESSION