1           IN THE UNITED STATES DISTRICT COURT

2             FOR THE MIDDLE DISTRICT OF ALABAMA

3                     NORTHERN DIVISION

4

5

6   JULIE ANN MANGINA,

7                 Plaintiff,

8   vs.                                    CIVIL ACTION NO.

9                                          2:05-CV-485-F

10  CONSECO FINANCE CORP. et al.,

11                Defendants.

12

13

14                 *     *     *     *     *

15

16

17              DEPOSITION OF JULIE ANN MANGINA,

18  taken pursuant to notice and stipulation on behalf of the

19  Plaintiff, in the Law Offices of David E. Allred, 7030

20  Fain Park Drive, Montgomery, Alabama, before Angela

21  Fulmer, Certified Shorthand Reporter and Notary Public in

22  and for the State of Alabama at Large, on October 20,

23  2005, commencing at 10:30 a.m.

1               APPEARANCES

2

3    FOR THE PLAINTIFF:

4           ANDERSON K. NELMS, ESQUIRE

5           Attorney at Law

6           847 S. McDonough Street

7           Montgomery, Alabama   36104

8

9    FOR THE DEFENDANT:

10          DAVID E. ALLRED, ESQUIRE

11          Attorney at Law

12          7030 Fain Park Drive, Suite 9

13          Montgomery, Alabama   36117

14

15   ALSO PRESENT:

16           Christy Knight

17           Kevin Knight

18

19

20

21

22

23

 1   A.   August 18th, 1989 to July of '97.

 2   Q.   Okay.  Did that marriage end in a divorce?

 3   A.   Yes.

 4   Q.   All right.  When were you married to Greg Moody?

 5   A.   I was married to Greg from April of 1999 to -- I

 6        don't know.  I was only married about a year and a

 7        half so...

 8   Q.   About one and a half years?

 9   A.   Yes.

10   Q.   All right.  How did that marriage end?  Was that a

11        divorce?

12   A.   Divorce.

13   Q.   Well, all of your divorces and pending divorces, are

14        they in Jefferson County?

15   A.   Yes.

16   Q.   Have you had any other marriages other than the ones

17        you've told me about?

18   A.   None.

19   Q.   All right.  You and Kevin Knight have two children;

20        is that correct?

21   A.   Correct.

22   Q.   What about you and Greg Moody?  Did y'all have any

23        children?

```
 1   A.   No, sir.

 2   Q.   When you got a divorce from Kevin Knight, was there

 3        an order entered that you were to pay child support?

 4   A.   Yes.

 5   Q.   Did you pay it?

 6   A.   No.

 7   Q.   Why not?

 8             MR. NELMS:   Object to the form.   Answer

 9        the question.

10   A.   Because Kevin and I agreed that when they were with

11        me I would pay and when they were with him he would

12        pay.

13   Q.   Was there a hearing or proceeding about that in

14        August of last year?

15   A.   Yes.

16   Q.   And was there an order entered that you were to pay

17        the arrearage?

18   A.   Yes.

19   Q.   And you were behind about twenty-three thousand

20        dollars or so?

21   A.   Yes.   That's what they say.

22             MR. NELMS:   Object to the form.

23   Q.   And was there also a garnishment against your
```

1       report in February of '05?

2    A. To see if I had anything on there that was negative

3       as far as -- to see if I owed anyone.

4    Q. To see if there was anything on there for what now?

5    A. Just to make sure I didn't owe anything as far as

6       any little bills, any small -- any small debts.

7    Q. And what was it that prompted that kind of an

8       inquiry?

9    A. Everybody gets a free credit report once a year.

10   Q. So what are you telling me as to why you looked it

11      up?

12              MR. NELMS:  Object to the form.

13   A. Because it was a free credit report.

14   Q. Okay.  So you looked up the report because it was

15      free?

16   A. Uh-huh.  Yes.

17   Q. Any other reason?

18   A. No.

19   Q. So you just got up one morning and you said, okay, I

20      can get a free credit report, I'm going to get one?

21   A. Yes.

22              MR. NELMS:  Object to the form.

23   Q. Any other thing you want to tell me as to why you

```
 1        been taken off.

 2   Q.   Let's see if I can find this thing here.  This is --

 3        at my request your lawyer sent me this right here

 4        that I want to show you.  And that's the only copy

 5        I've got.  Is that what you're talking about that

 6        you got in February of this year?

 7   A.   Yes.

 8   Q.   Okay.  And do you say that that in any way shows or

 9        proves or provides evidence that Christy Knight did

10        something wrong?

11   A.   It shows that her company's name is on my credit

12        report.

13   Q.   Okay.  Is that -- and let me see that a minute

14        here.  Did you circle that where it's got --

15             MR. NELMS:  Object to the question.

16             MR. ALLRED:  I'm sorry?

17             MR. NELMS:  Object to the form.

18   Q.   Did you circle that that's on -- well, it's actually

19        Page 4 of 5, 4 of 5.  And do you see where that's

20        circled?

21   A.   Uh-huh.

22             MR. NELMS:  Yes.

23   A.   Yes.
```

1   Q.   Did you circle that?

2   A.   Yes.

3   Q.   Okay.  And you got -- you got ahold of this in

4        February of '05, and then you circled that where it

5        says Conseco Finance Corporation?

6   A.   Yes.

7   Q.   All right.  Now, explain to me how it is that

8        because that's on your credit report that Christy

9        Knight did that --

10            MR. NELMS:  Object to the form.

11  Q.   -- or caused it to be on there.

12            MR. NELMS:  Object to the form.

13  A.   You want me to explain to you why her company's name

14       is on my credit report?

15  Q.   Well, what I want you to do is -- you sued Christy

16       Knight; right?

17  A.   Uh-huh.

18  Q.   And you say that she did some things to get a credit

19       report on you; is that correct?

20  A.   Uh-huh.

21  Q.   And then I asked you about the credit report.  So

22       the credit report we're talking about is this one

23       here we were looking at; right?

1    A.    Right.

2    Q.    And on Page 4 of it it's got it circled on there.

3          So what I want to know is how it is that you say

4          that Christy Knight had something to do with that

5          being on that piece of paper.

6    A.    There is a South --

7                MR. NELMS:  Object to the form.

8    A.    -- a South Dakota phone number right there

9          (indicating).

10   Q.    Okay.

11   A.    I called the South Dakota company.  They tell me, we

12         need your Social Security number.  I give them my

13         social.  No, we do not have an account.  She asked

14         me what state I was in.  I told her Alabama.

15         Birmingham, Alabama.  Call the Birmingham office.  I

16         called the Birmingham office.  I spoke to a woman

17         named Mandy.

18   Q.    Okay.

19   A.    And Mandy asked me, is there anyone in this office

20         that you know that could have done -- that could

21         have done this.  And this phone conversation has

22         been taped, so they have a copy of this phone

23         conversation at Green -- or Greentree or Conseco.

1       And I said, I really do not want to say -- I don't

2       want to get anyone in trouble.  I don't want anyone

3       to lose their job if I am wrong.

4   Q.  All right.

5   A.  And she tells me that she cannot help me until I

6       give her a name.  So I tell her Christy Knight or

7       Dusty Price.  And she proceeds to tell me that they

8       cannot pull credit from their computers.  I said,

9       well, then somebody has pulled my credit, your

10      company's name is on my credit report, and we need

11      to figure out why.

12  Q.  Okay.

13  A.  And Christy is the only one with access to my Social

14      Security number.

15  Q.  All right.  How else do you say that this credit

16      report came to be because of Christy Knight?

17  A.  She has my Social Security number.

18  Q.  How do you know that?

19  A.  Kevin and I have children together.  We both have

20      Blue Cross insurance.  Blue Cross -- this is before

21      Blue Cross changed their policy.

22  Q.  All right.  Anything else that you say is evidence

23      that Christy Knight did this?

1        support your allegations in the complaint that

2        Christy Knight had something to do with this credit

3        report being generated?

4   A.   No.

5   Q.   All right.  Do you have -- in looking at this thing

6        here -- by that I mean the credit report -- there

7        are some other entries on there.  And let me turn it

8        around so you can look at it.  But there's two car

9        dealerships and some other things.  Let's kind of

10       look at it in the middle of the table there.  And if

11       that thing says -- and to make sure I've got the

12       dates right, it would have been in early '05 that

13       you got ahold of this; right?  I'm sorry.  Go ahead.

14  A.   Go ahead.  I'm sorry.

15  Q.   Early '05 that you got it?

16  A.   No.

17  Q.   Because it says, date issued 3/28/05; right?

18  A.   That's what it says.

19  Q.   That's the date you asked for it, thereabouts?

20  A.   No.  They -- they had sent several copies.  After I

21       pulled my first copy off of the computer, I'd -- I

22       had made some -- oh, what are they called when

23       you -- when you dispute something.  I had tried -- I

Page 56

```
 1   A.   No.

 2   Q.   What do you claim are your damages as a result

 3        of the allegations you make against Christy Knight?

 4        What -- how do you say you've been damaged?

 5   A.   It's just an invasion of my privacy.

 6   Q.   All right.

 7   A.   It's like somebody breaking into your own house and

 8        going through your stuff.  That's my business.  That

 9        is nobody's business but mine.

10   Q.   Okay.  Have you sustained any damages as a result of

11        anything that you say Christy Knight has done?

12   A.   None.

13   Q.   All right.  Does anybody know about this fact that

14        Conseco apparently shows up on your credit report

15        besides you -- well, let me ask that first --

16        besides you?

17             MR. NELMS:  That you know of.

18   Q.   I guess you've told your lawyer.  I would assume you

19        did.

20   A.   Everybody I can find.  Everybody that, you know --

21        everybody.

22   Q.   Okay.

23             MR. NELMS:  Object to the form.
```

Page 57

1   Q.  And is -- everybody you can find, is that -- does

2       that mean that when you --

3   A.  Friends, family.

4   Q.  Okay.  When you talked to friends and family -- that

5       information about your credit report, do you -- that

6       Conseco's on there, do you tell them about it?

7   A.  I tell them.

8   Q.  Okay.  You're the one that publishes the information

9       to people that don't otherwise know?

10  A.  Right.

11          MR. NELMS:  Object to the form.

12  Q.  Do you have any information that Christy Knight has

13      published any information to anybody about your

14      credit?

15  A.  No.  I do not have that.

16          MR. NELMS:  Object to the form.

17  A.  No.

18  Q.  How many people do you think you've told?

19  A.  Oh, a hundred.

20          MR. NELMS:  It's not a slander case.

21  Q.  What are you -- the hundreds of people that you

22      tell, what do you tell them?

23  A.  What do I tell them?

1  Q.  Yes, ma'am.

2  A.  That someone at Conseco Finance pulled my credit.

3  Q.  What else do you tell them?

4  A.  I don't appreciate it.

5  Q.  All right.  Do you tell them who you think did it?

6  A.  I -- I tell them who I think did it, yes.

7  Q.  Okay.

8  A.  Who I --

9  Q.  Is that --

10  A.  -- think did it.

11  Q.  Is that who you're talking about, is that Christy

12      Knight?

13  A.  That is Christy Knight.

14  Q.  These hundreds of people that you tell, then, when

15      you tell this story to them, you tell them that you

16      think Christy Knight did this; right?

17  A.  Yes.

18  Q.  Okay.  Give us a minute here, if you will, please,

19      ma'am.

20              (A brief discussion was held off the

21               record.)

22              MR. ALLRED:  That's all the questions.

23                      EXAMINATION

1      York second.

2  Q.  All right.  And that information came from you

3      because you told them --

4  A.  Exactly.

5  Q.  -- right?  And you don't have any information that

6      anyone has found out about this credit report or

7      Conseco being on there and that they came to that

8      information or that knowledge independent from you

9      telling them; is that correct?

10  A.  Correct.

11  Q.  All right.  Now, you said awhile ago each time --

12      that each time there's a credit inquiry your credit

13      score goes down?

14  A.  Yes.

15  Q.  All right.  Tell me what you're talking about there.

16      I had asked you awhile ago what your credit score

17      is, and you said you didn't know.

18  A.  I -- I don't know my credit score.

19  Q.  Do you have any information you can tell us that it

20      was a certain score before this inquiry and it's a

21      different score after it?

22  A.  No.

23  Q.  You don't have any of that information?

Page 72

1   A.   No.  But I have a very good friend that works at a

2        car lot that also told me every time your credit is

3        pulled -- if you go to a buy a new car today and

4        they deny you, your score drops.

5   Q.   All right.

6   A.   If you go the next day and they deny you credit,

7        your score drops.  If you go the next day and they

8        deny you credit, your score drops.  Every time there

9        is an inquiry made your score drops.

10  Q.   Okay.  But this friend you're talking about -- what

11       car lot are we talking about now?

12  A.   Jim Burke Automotive.

13  Q.   Okay.  And who's the friend?

14  A.   Bill Brown.

15  Q.   Okay.  And you told me awhile ago you've not been

16       denied any credit?

17  A.   No.  I've not -- I've not bought anything.

18  Q.   All right.  And you've not applied for credit and

19       been denied credit; correct?

20  A.   No.  I've -- actually, right after Mike and I

21       divorced, I bought a brand new car.  But I had to

22       take it back because I do not make enough money to

23       have my car and a brand new car in my name alone.

1    Q.   Do you claim that that problem that you're

2         describing to me, that that was caused in any way by

3         Christy Knight or anything she did?

4    A.   No.   That has nothing to do with Christy Knight.

5    Q.   All right.   And then on the credit score -- applying

6         and getting denied is what would cause the credit

7         score to drop; is that right?

8    A.   Correct.

9              MR. NELMS:   Object to the form.

10   Q.   And so you've not had any denials?

11   A.   No.   I was approved for the car.   And --

12   Q.   Okay.   Well --

13   A.   And then after two weeks, I had to take the car back

14        because I had too many cars in my name and not

15        enough money.

16   Q.   Yes, ma'am.   Would there be a document anywhere that

17        you know about that would show that you had a

18        certain credit score before June 9th of 2003 and

19        then after that date it was a lower score?

20   A.   No.

21   Q.   Okay.   And I want to make sure I didn't miss

22        something here, but there was a question that was

23        asked to you and it sounded like it was a

1    A.    No.

2    Q.    Did you tell them that you once filed bankruptcy?

3    A.    No.

4    Q.    Did you tell them what your credit score was?

5    A.    No.

6    Q.    Did you share any of your personal credit

7          information with these people when you discussed

8          with them the fact that you believed Conseco had

9          wrongfully pulled your credit report?

10   A.    No.  I did not tell any information --

11   Q.    Okay.

12   A.    -- of that nature.

13   Q.    Okay.

14                         EXAMINATION

15   BY MR. ALLRED:

16   Q.    I forgot to ask you this.

17          You read Paragraph 18 in the complaint.  I want

18    to ask you about that.  You said in here -- or your

19    lawyer did -- willful conduct on the part of Knight

20    was accomplished for an improper evil purpose to

21    gain advantage in a civil lawsuit regarding a

22    domestic dispute.

23          What do you mean by that?

```
 1   A.   Our two children.

 2   Q.   Well, explain to me how you claim that there would

 3        be some advantage gained in a civil lawsuit.

 4   A.   My two children actually -- they're torn between

 5        their mother and their father.

 6   Q.   Okay.

 7   A.   And she tells me she -- she needs to do -- she did a

 8        skip trace to find my last three known addresses.

 9        For what reason is beyond me.

10   Q.   All right.  Anything else?

11   A.   No.  It's -- that has everything -- to me it has

12        everything to do with my two children.

13   Q.   All right.  Now, y'all got divorced in 1997?

14   A.   Yes.

15   Q.   And then -- well, is it true there was not a hearing

16        on anything to do with the divorce until August of

17        '04; is that right?

18   A.   Right.  I guess.  We just didn't --

19   Q.   Any follow-up court hearings?

20   A.   No.

21   Q.   All right.  And then in August of '04 the Court

22        couldn't find you or couldn't get you served, could

23        they?  Wasn't there a problem getting you to come to
```