**FIRST PREMIER** #4610074132018051
PO BOX 5114
SIOUX FALLS, SD 57117-5114
(800) 584-7097

**Loan Type:** CREDIT CARD
**Remarks:** CREDIT CARD LOST/STOLEN

| | | | |
|---|---|---|---|
| **Balance:** | $0 | **Pay Status:** | PAID OR PAYING AS AGREED |
| **Date Updated:** | 03/2005 | **Account Type:** | REVOLVING ACCOUNT |
| **High Balance:** | $245 | **Responsibility:** | INDIVIDUAL ACCOUNT |
| **Credit Limit:** | $300 | **Date Opened:** | 09/2003 |
| | | **Date Closed:** | 10/2003 |
| | | **Date Paid:** | 10/2003 |

| Date Payments (25 months) | 0 | 0 | 0 | 0 | Last 18 Months: | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | feb | jan | dec | nov | oct | sep | aug | jul | jun | may | apr | mar | feb | 04 | dec | nov | oct | sep |

## Regular Inquiries

The following companies have received your credit report. Their inquiries remain on your credit report for two years.

**PROVIDIAN FINANCIAL CORP**
P O BOX 9007
PLEASANTON, CA 94566
Phone number not available
**Requested On:** 03/18/2005   **Inquiry Type:** INDIVIDUAL

**THE COLE COMPANIES**
544 GADSDEN HWY
BIRMINGHAM, AL 35235
(205) 833-0463
**Requested On:** 01/26/2004   **Inquiry Type:** PARTICIPANT

**FIRST PREMIER BANK**
900 W DELAWARE
PO BOX 5114
SIOUX FALLS, SD 57117
(605) 357-3440
**Requested On:** 09/23/2003   **Inquiry Type:** INDIVIDUAL

**EAGLEMARK S BK**
3850 ARROWHEAD DRI
CARSON CITY, NV 89706
(800) 699-2336
**Requested On:** 04/22/2003   **Inquiry Type:** INDIVIDUAL

**JIM BURKE MOTORS VIA JIM BURKE AUTOMOTIVE**
1301 5TH AVE N
BIRMINGHAM, AL 35203
(205) 324-3371
**Requested On:** 03/11/2004   **Inquiry Type:** INDIVIDUAL
**Permissible Purpose:** CREDIT TRANSACTION

**SERRA CHEVROLET VIA NCC/SERRA CHEVROLET**
1170 CENTERPOINT P
BIRMINGHAM, AL 35215
(205) 853-2906
**Requested On:** 10/11/2003   **Inquiry Type:** INDIVIDUAL
**Permissible Purpose:** CREDIT TRANSACTION

**CONSECO FINANCE CORP.**
P.O. BOX 6150
RAPID CITY, SD 57709
(800) 544-8056
**Requested On:** 06/09/2003   **Inquiry Type:** INDIVIDUAL

## Inquiry Analysis

The companies that request your credit report must provide certain information about you. Within the past 90 days, companies that requested your report provided the following information:

**PROVIDIAN FINANCIAL CORP   Requested On:** 03/18/2005
Identifying information they provided:
JULIE A. MANGINA
330 WOODBROOK DR
GARDENDALE, AL 35071

EXHIBIT "A"

1    Q.  Okay.  And how long have you lived at your current
2        address?
3    A.  Seven years.
4    Q.  Okay.  And where did you reside before that?
5    A.  In Warrior?
6    Q.  Yes, please.
7    A.  I can't remember the address.  I was there for a
8        short period.
9    Q.  Where was that?
10   A.  In Warrior, Alabama.
11   Q.  Oh, Warrior.  I'm sorry.  I didn't hear you.
12   A.  Uh-huh.
13   Q.  All right.  I'm going to ask you a series of
14       questions this morning about some facts that
15       allegedly took place regarding this lawsuit.  And if
16       at any point in time you don't understand my
17       questions, it's perfectly all right for you to tell
18       me you don't understand the question.  Ask me to
19       restate it or explain it and I will do so.
20           Have you ever been deposed before?
21   A.  No.
22   Q.  Okay.  So this is a new experience for you.  You'll
23       need to answer the questions out loud and verbally.

1        You can't nod your head or shake your head or give
2        me any hand gestures because Ms. Fulmer won't be
3        able to take that down on her stenographic machine.
4        Do you understand?
5    A.  Yes.
6    Q.  Okay.  How are your currently employed?
7    A.  I'm an Inventory Control Assistant at Greentree
8        Servicing.
9    Q.  Inventory Control Assistant.  What is that?
10   A.  We repossess mobile homes and sell them.
11   Q.  How long have you been with Greentree?
12   A.  Greentree, since July of '03 or '04.
13   Q.  '03 or '04?
14   A.  I think it was '03.  Uh-huh.
15   Q.  Okay.  And what was your original position as you
16       were hired in July of '03?
17   A.  I was not hired in '03.  It was Conseco.  And
18       Greentree bought Conseco.
19   Q.  So you worked for Conseco before it became
20       Greentree?
21   A.  Correct.
22   Q.  All right.  Same office?
23   A.  Correct.

1    Q.  What did you do for Conseco?
2    A.  I was an Inventory Control Assistant.
3    Q.  For how long?
4    A.  It's a total of five years.  Since September 1st,
5        2000.
6    Q.  What did you do before that?
7    A.  I worked at a pet store.  Or -- no.  I sat at home
8        with Lucas and Chelsea.
9    Q.  All right.  Tell me about your education.  Did you
10       graduate from high school?
11   A.  Yes.  Graduated from Mortimer Jordan in 1994.
12   Q.  Did you go on to school after that?
13   A.  No.
14   Q.  Okay.  Tell me about any training that you've
15       received either at Greentree or Conseco.
16   A.  Any training as just as far as my job?
17   Q.  Yes, ma'am.
18   A.  Just how to process our paperwork when we repossess
19       homes.
20   Q.  Okay.
21   A.  No special training.
22   Q.  All right.  What is your relationship to Kevin
23       Knight?

1    A.  He is my husband.
2    Q.  How long have y'all been married?
3    A.  November 14th will be two years.
4    Q.  So you were married November the 14th, 2003?
5    A.  Correct.
6    Q.  All right.  In your job position as an Inventory
7        Control Assistant there at Greentree, do you have
8        access to computers?
9    A.  Yes.
10   Q.  All right.  Are those computers connected online to
11       the Internet?
12   A.  Yes.
13   Q.  All right.  Do you have access to TransUnion credit
14       reports?
15   A.  No.
16   Q.  Okay.  Do you know how to pull a TransUnion credit
17       report?
18   A.  No.
19   Q.  All right.  Does anybody in your office have access
20       to TransUnion credit reports?
21   A.  Not to my knowledge, no.
22   Q.  Nobody can pull a credit report from your office?
23   A.  No.  Not a credit report, no.

Page 9

1   Q.   All right.  You seem to distinguish between credit
2        report and something else.  What other thing are you
3        referring to?
4   A.   They have a way of looking at a credit heading, I'm
5        told, a credit report -- but it's not a credit
6        heading they -- my regional manager said.
7   Q.   Okay.  What do you understand a credit heading to
8        be?
9   A.   A job -- I mean, a -- their home address and --
10       where they live.
11  Q.   Okay.  Anything else?
12  A.   Not to my knowledge, no.
13  Q.   Okay.  Do you ever have an opportunity to get these
14       credit headings that you've referred to?
15  A.   No.
16  Q.   Okay.  Do you know what a skip trace is?
17  A.   Yes.
18  Q.   Tell me what you believe that to be.
19  A.   Public information.
20  Q.   Public information?
21  A.   Correct.
22  Q.   Okay.  What kind of public information?
23  A.   Anything you can get out of a phone book.  Anything

Page 10

1        you can go to the court system and get if a person
2        has filed bankruptcy or whatever.
3   Q.   Okay.  And how do you perform a skip trace?
4   A.   I don't know.
5   Q.   Okay.  It's not something you do in your job?
6   A.   No.
7   Q.   Okay.
8   A.   I'm not a collector.
9   Q.   All right.  Is anybody in your office a collector?
10  A.   We have probably thirty collectors.
11  Q.   Okay.  Are all of them there at your office in
12       Birmingham?
13  A.   We have regions throughout the United States.  But,
14       yes, we do have some in our Birmingham office.
15  Q.   How many?
16  A.   About thirty.
17  Q.   Okay.
18  A.   It's not an exact number.
19  Q.   Do they have access to these credit headings?
20  A.   I'm not for sure.
21  Q.   Okay.  And they perform the skip traces, I believe
22       you said earlier?
23  A.   Yes.  They pull up address information.

Page 11

1   Q.   Okay.  And you said part of your job as an Inventory
2        Control Assistant was to repo mobile homes?
3   A.   Correct.
4   Q.   Okay.  What exactly is entailed in repoing a mobile
5        home?
6   A.   I process paperwork.  I send out a notice of private
7        sale, which is a ten-day certified letter.  I'm
8        responsible for having the home picked up and sold.
9   Q.   Okay.  Do you have occasion where you have a hard
10       time locating one of the debtors?
11  A.   No.  I don't locate debtors.  I send the mover out
12       to the physical location.
13  Q.   Okay.  So you would never have any opportunity in
14       your job to try to trace down a debtor?
15  A.   No.
16  Q.   Okay.
17  A.   That's not by responsibility.
18  Q.   So whether it's your responsibility or not, my
19       question was, have you ever --
20  A.   I do not have access to locate a debtor.
21  Q.   Okay.  But is it something that you've ever done in
22       your tenure there at either Conseco or Greentree?
23  A.   No.

Page 12

1   Q.   Okay.  Did you ever have a telephone conversation
2        with the plaintiff, Ms. Mangina, wherein you told
3        her that you did pull her credit report?
4   A.   No.
5   Q.   Did you ever tell her that you did perform a skip
6        trace on her?
7   A.   No.
8   Q.   Did you ever tell your husband Kevin that you had --
9   A.   No.
10  Q.   -- performed a skip trace -- let me ask -- let me
11       finish the question before you answer.  Did you ever
12       tell your husband Kevin that you had performed a
13       skip trace or pulled the credit report of the
14       plaintiff, Julie Mangina?
15  A.   No.
16  Q.   Okay.  Are you aware of any conversations in which
17       your husband, Kevin, called Mike Mangina in regard
18       to Julie's complaining about your pulling her credit
19       report?
20  A.   There was many a conversation.
21  Q.   All right.  Let's start with the first one.
22            MR. ALLRED:  These are going to be
23       conversations about what now?

Page 21

1  Q. All right.  Anything else that you say is evidence
2     that Christy Knight did this?
3  A. She -- on actually, the day that I called the South
4     Dakota office at about one thirty -- in between one
5     and one thirty that afternoon -- her cell phone
6     number was on my caller ID, but I was at work.  And
7     then that evening she proceeds to -- her husband
8     proceeds to call my husband wanting to know why I
9     began calling around wanting to start crap at
10    Christy's office.  Well, he has a few words with my
11    husband, and then he has a few words with me.  And
12    then Christy gets on the phone --
13 Q. He being Kevin?
14 A. He being Kevin.
15 Q. Okay.
16 A. And then Christy gets on the phone and tells me,
17    yes, I did it.  I did a skip trace on you, and what
18    I did was perfectly legal.  Ask anyone you want to.
19 Q. Do you claim that Christy Knight ever said that she
20    pulled a -- or requested a credit report on you?
21 A. No.
22 Q. All right.
23 A. Skip trace.

Page 22

1  Q. All right.  Anything else that you say is evidence
2     that Christy Knight caused that Conseco inquiry to
3     be on your credit report?
4  A. I don't understand.  What do you mean?
5  Q. Well --
6  A. I mean other than --
7  Q. -- what have you been answering?  That was the same
8     question.
9  A. Other --
10 Q. I just want --
11        MR. NELMS:  Object to the form.
12 Q. -- to make sure that I get all of it.
13 A. Other than the fact she had -- she admitted to me
14    that she pulled a -- or she did a skip trace and she
15    has a copy of my Social -- Social Security number.
16 Q. Anything else?  And by anything else -- it's the
17    same question.  I want to make sure I get all the
18    details that you say are evidence to support your
19    claim that Christy Knight --
20 A. No.
21 Q. -- caused this inquiry to be made that shows up as
22    Conseco.
23 A. No.

Page 23

1  Q. All right.  So you've told me about everything;
2     right?
3  A. Correct.
4  Q. Okay.  Now, when did you call this South Dakota --
5  A. Three --
6  Q. -- office?  I'm sorry.  Go ahead.
7  A. I called them on -- it was 3/10/2005.
8  Q. Okay.
9  A. And that was the same day I spoke with Mandy, the
10    same day I spoke with Kevin, and the same day I
11    spoke with Christy.
12 Q. All right.  When you made the telephone call to
13    South Dakota -- there's a number shown on here.  Is
14    that the number you called?
15 A. The one eight hundred, yes, sir.
16 Q. And it says -- well, that one that's on there --
17    there's no use for me to read it off.  But that --
18    inside that circle, that one eight hundred number,
19    that's the one you --
20 A. Uh-huh.
21 Q. -- called; right?  Okay.
22        Now, when you called that number, tell me as
23    best you remember what you said and what whoever

Page 24

1     answered the phone said, please, ma'am.
2  A. Whoever it was that answered the phone --
3  Q. Yes, ma'am.
4  A. Excuse me -- I told them that I had just pulled a
5     credit report on myself and that this -- your
6     company's name is on my report and I would like to
7     know why.
8  Q. All right.
9  A. She -- they asked me for my Social Security number,
10    and I gave them my Social Security number.  And they
11    told me they do not have an account on me and have
12    never shown anything whatsoever of ever having an
13    account.  And she -- that's when she asked me what
14    state I was in and for me to call that -- the
15    company in my state.
16 Q. You told her Alabama --
17 A. Uh-huh.
18 Q. -- obviously?
19 A. Yes.
20 Q. And did they tell you to call Conseco in Alabama?
21 A. Yes.
22 Q. Did they give you a number to call?
23 A. Yes.

Page 57

1  Q.  Okay.

2          MR. NELMS:  Object to the form.

3  Q.  And is -- everybody you can find, is that -- does

4     that mean that when you --

5  A.  Friends, family.

6  Q.  Okay.  When you talked to friends and family -- that

7     information about your credit report, do you -- that

8     Conseco's on there, do you tell them about it?

9  A.  I tell them.

10 Q.  Okay.  You're the one that publishes the information

11    to people that don't otherwise know?

12 A.  Right.

13         MR. NELMS:  Object to the form.

14 Q.  Do you have any information that Christy Knight has

15    published any information to anybody about your

16    credit?

17 A.  No.  I do not have that.

18         MR. NELMS:  Object to the form.

19 A.  No.

20 Q.  How many people do you think you've told?

21 A.  Oh, a hundred.

22         MR. NELMS:  It's not a slander case.

23 Q.  What are you -- the hundreds of people that you

Page 58

1     tell, what do you tell them?

2  A.  What do I tell them?

3  Q.  Yes, ma'am.

4  A.  That someone at Conseco Finance pulled my credit.

5  Q.  What else do you tell them?

6  A.  I don't appreciate it.

7  Q.  All right.  Do you tell them who you think did it?

8  A.  I -- I tell them who I think did it, yes.

9  Q.  Okay.

10 A.  Who I --

11 Q.  Is that --

12 A.  -- think did it.

13 Q.  Is that who you're talking about, is that Christy

14    Knight?

15 A.  That is Christy Knight.

16 Q.  These hundreds of people that you tell, then, when

17    you tell this story to them, you tell them that you

18    think Christy Knight did this; right?

19 A.  Yes.

20 Q.  Okay.  Give us a minute here, if you will, please,

21    ma'am.

22         (A brief discussion was held off the

23         record.)

Page 59

1          MR. ALLRED:  That's all the questions.

2              EXAMINATION

3  BY MR. NELMS:

4  Q.  I'd like to ask you a few questions.

5         You were asked about telephone calls that you

6     made in regard to your discovery that there was a

7     notation on your credit report that Conseco had

8     pulled your credit report; is that correct?

9  A.  Correct.

10 Q.  Okay.  You said that the first call you made was to

11    the eight hundred number or the toll-free number

12    that was listed in your credit report next to the

13    Conseco?

14 A.  Correct.

15 Q.  And you said that you spoke to an individual who

16    answered the phone there at Conseco, and I did not

17    get what, specifically, you first asked.

18 A.  I asked them why their company's name would be on my

19    credit report since I do not have an account or have

20    never filed for any type of credit with these

21    people.

22 Q.  But, specifically, what was -- what was the response

23    from the person that you spoke with?

Page 60

1  A.  She -- she asked me for my Social Security number

2     first.

3  Q.  Okay.  And do you understand why she asked you for

4     your Social Security number?

5  A.  She was looking for an account.

6  Q.  And have you ever had an account with Conseco?

7  A.  I have never.

8  Q.  Have you ever had an account with Greentree?

9  A.  Never.

10 Q.  Okay.  Have you ever had insurance with Conseco?

11 A.  No.

12 Q.  Okay.  Did you know that Conseco has an insurance

13    division?

14 A.  No.

15 Q.  Did you ever own a trailer?

16 A.  No.

17 Q.  Did you ever own a recreational vehicle?

18 A.  No.

19 Q.  Have you ever owned a car that was financed with

20    anybody that was an affiliate of Conseco?

21 A.  No.

22 Q.  Did you ever fill out a credit application with

23    Conseco?

Page 61

```
 1   A.   No.
 2   Q.   Did you ever fill out a credit application with
 3        Greentree?
 4   A.   No.
 5   Q.   Do you ever get any solicitations by mail from
 6        either Greentree or Conseco?
 7   A.   No.
 8   Q.   Did you ever respond to any marketing or
 9        solicitations from Greentree or Conseco?
10   A.   No.
11   Q.   Okay.  Other than you giving your Social Security
12        number to the person on the telephone when you
13        called the eight hundred number that was listed on
14        your credit report, have you ever had any reason or
15        cause to believe that Conseco or Greentree should
16        have your Social Security number?
17   A.   No.
18   Q.   Okay.  Is it your testimony and contention here
19        today at your deposition that you had a telephone
20        conversation on March the 10th with Mandy Carter of
21        Greentree/Conseco in Birmingham?
22   A.   Yes.
23   Q.   Okay.  Were you aware before you had this
```

Page 62

```
 1        conversation with Mandy Carter that the defendant,
 2        Christy Knight, was employed at that Birmingham
 3        location?
 4   A.   Yes.
 5   Q.   Okay.  Was it your intention when you made that
 6        telephone call to get Christy Knight in trouble?
 7   A.   No.
 8             MR. ALLRED:  Object to the form.
 9   Q.   Was it your intention when you called Christy Knight
10        that day to interfere with Christy Knight's
11        employment relationship with her employer?
12             MR. ALLRED:  Object to the form.
13   A.   No.  I did not call Christy Knight.  I called Mandy.
14   Q.   Okay.  But the question was, was it your intention
15        to interfere?
16   A.   No.
17   Q.   It's your testimony today that on March the 10th a
18        telephone conversation took place in which you, Mike
19        Mangina, Kevin Knight, and Christy Knight were
20        involved?
21   A.   Yes.
22   Q.   And is it your testimony today that Christy Knight
23        admitted to you that she had, in fact, done a skip
```

Page 63

```
 1        trace on you?
 2   A.   Yes.
 3             MR. ALLRED:  Object to the form.
 4   Q.   Did you testify earlier today that Christy Knight
 5        stated she had performed a skip trace?
 6   A.   Yes.
 7   Q.   I believe you testified earlier that you believe a
 8        skip trace to be where you try to find somebody's
 9        address?
10   A.   Yes.
11   Q.   Is that a correct statement?
12   A.   (No response.)
13   Q.   Is that a correct statement?
14   A.   Correct.
15   Q.   Okay.  Did you know at the time you had this
16        conversation with -- excuse me.  The conversation
17        that we reference on March the 10th in which Mike
18        Mangina, Kevin Knight, Christy Knight, and yourself
19        were involved, did you have an understanding at that
20        time as to whether or not there was a requirement
21        that your credit report be pulled in order to do a
22        skip trace?
23   A.   No.
```

Page 64

```
 1   Q.   Do you understand that now?
 2   A.   No.
 3   Q.   Okay.  Have you ever used before March the 10th,
 4        2005 the term skip trace?
 5   A.   No, I have not.
 6   Q.   You testified earlier today that you believe that
 7        Christy Knight had access to your Social Security
 8        number; is that correct?
 9   A.   Correct.
10   Q.   And how do you know this?
11   A.   She -- Kevin and I have children together, and I
12        have -- I have -- I had to give them a Blue Cross
13        Insurance card.
14   Q.   Okay.  Well, how would she get your Social Security
15        number from a Blue Cross card?
16   A.   Before Blue Cross changed their policy numbers, it
17        was your Social Security number.  Three letter
18        prefix, your Social Security number.
19   Q.   Okay.  So you contend that she could have gotten
20        your Social Security number from that card?
21   A.   Correct.
22   Q.   Okay.  And did you believe in March of 2005 that she
23        knew your correct home address?
```

Page 69

```
1   Q.  Do you understand the difference between
2       compensatory and punitive?
3   A.  Well, first of all, I mean, you know, nobody needs
4       to be pulling anybody's credit report, period.
5   Q.  Okay.  Go ahead.
6   A.  Period.  It's -- it is embarrassing, humiliating.
7       It's -- you know, this is -- this is the biggest
8       bunch of crap I have ever in my life had to go
9       through.  So, you know, people shouldn't be able to
10      walk around legally and be able to pull somebody's
11      credit.
12  Q.  Okay.
13          MR. NELMS:  Nothing further.
14              EXAMINATION
15  BY MR. ALLRED:
16  Q.  Now, let me ask you about any kind of humiliation or
17      embarrassment you claim to have sustained.  That
18      would be after you told the hundreds of people that
19      you told us that you told -- you informed about this
20      Conseco credit report issue; is that right?
21  A.  No.  How do I know -- no.
22  Q.  Well, the only person that knew about this would be
23      you and anybody you told, because you told me that
```

Page 70

```
1       you don't have any information that Christy Knight
2       published this information to anybody.
3   A.  Well, no, I don't have any --
4           MR. NELMS:  Object to the form.
5   Q.  All right.  Ma'am?
6   A.  I don't have any information that Christy -- or --
7       but there again, she could have.
8   Q.  Okay.  Do you -- as far as any -- tell me exactly
9       how you claim to have been humiliated or embarrassed
10      by anything that you say Christy Knight did.
11  A.  That is my personal business.  My personal business.
12  Q.  Okay.
13  A.  No one else's.
14  Q.  All right.  Anything else?
15  A.  No.  That -- that is mine.
16  Q.  All right.  And you told me awhile ago -- I'm not
17      going to go back through all that.  But the only
18      people that know about it besides you and the folks
19      at Conseco that you called and talked to are just
20      the hundreds of folks that you've told about it --
21  A.  Yeah.
22  Q.  -- is that right?  And nobody else?
23  A.  I don't go around showing people my credit report,
```

Page 71

```
1       but I let them know that people at Conseco Finance
2       Company will be able to pull your credit in a New
3       York second.
4   Q.  All right.  And that information came from you
5       because you told them --
6   A.  Exactly.
7   Q.  -- right?  And you don't have any information that
8       anyone has found out about this credit report or
9       Conseco being on there and that they came to that
10      information or that knowledge independent from you
11      telling them; is that correct?
12  A.  Correct.
13  Q.  All right.  Now, you said awhile ago each time --
14      that each time there's a credit inquiry your credit
15      score goes down?
16  A.  Yes.
17  Q.  All right.  Tell me what you're talking about there.
18      I had asked you awhile ago what your credit score
19      is, and you said you didn't know.
20  A.  I -- I don't know my credit score.
21  Q.  Do you have any information you can tell us that it
22      was a certain score before this inquiry and it's a
23      different score after it?
```

Page 72

```
1   A.  No.
2   Q.  You don't have any of that information?
3   A.  No.  But I have a very good friend that works at a
4       car lot that also told me every time your credit is
5       pulled -- if you go to a buy a new car today and
6       they deny you, your score drops.
7   Q.  All right.
8   A.  If you go the next day and they deny you credit,
9       your score drops.  If you go the next day and they
10      deny you credit, your score drops.  Every time there
11      is an inquiry made your score drops.
12  Q.  Okay.  But this friend you're talking about -- what
13      car lot are we talking about now?
14  A.  Jim Burke Automotive.
15  Q.  Okay.  And who's the friend?
16  A.  Bill Brown.
17  Q.  Okay.  And you told me awhile ago you've not been
18      denied any credit?
19  A.  No.  I've not -- I've not bought anything.
20  Q.  All right.  And you've not applied for credit and
21      been denied credit; correct?
22  A.  No.  I've -- actually, right after Mike and I
23      divorced, I bought a brand new car.  But I had to
```

Page 77

1    domestic dispute.
2        What do you mean by that?
3  A.  Our two children.
4  Q.  Well, explain to me how you claim that there would
5      be some advantage gained in a civil lawsuit.
6  A.  My two children actually -- they're torn between
7      their mother and their father.
8  Q.  Okay.
9  A.  And she tells me she -- she needs to do -- she did a
10     skip trace to find my last three known addresses.
11     For what reason is beyond me.
12  Q.  All right.  Anything else?
13  A.  No.  It's -- that has everything -- to me it has
14     everything to do with my two children.
15  Q.  All right.  Now, y'all got divorced in 1997?
16  A.  Yes.
17  Q.  And then -- well, is it true there was not a hearing
18     on anything to do with the divorce until August of
19     '04; is that right?
20  A.  Right.  I guess.  We just didn't --
21  Q.  Any follow-up court hearings?
22  A.  No.
23  Q.  All right.  And then in August of '04 the Court

Page 78

1    couldn't find you or couldn't get you served, could
2      they?  Wasn't there a problem getting you to come to
3      court in August of '04?
4  A.  We didn't go to court.
5  Q.  Well, at --
6  A.  Oh, the -- of '04?
7  Q.  -- the hearing -- '04.
8  A.  '04.  We -- they mailed it to the wrong -- I work
9      for Birmingham Radiological Group.
10  Q.  They mailed it to the wrong address?
11  A.  They mailed it to Birmingham Radiology Group, which
12     is in Mountainbrook.
13  Q.  All right.
14  A.  I work in Homewood.
15  Q.  They, meaning the court, mailed --
16  A.  But yet --
17  Q.  Wait a minute.  I just want to find out what the
18     facts are.  All right.
19        Now, in August of '04 when you say they mailed
20     it to the -- you were fixing to say wrong address?
21  A.  Correct.
22  Q.  So there was a dispute about your address in August
23     of '04; correct?

Page 79

1  A.  Correct.
2  Q.  Had you kept Kevin informed of where you were living
3      so he could get up with you?  Did you keep the Court
4      informed prior to that?
5  A.  Kevin knew exactly where I've always lived.  Always.
6  Q.  You did --
7  A.  I've pretty much always lived within five to ten
8      miles from him.
9  Q.  Then wasn't there a hearing?  And yo   dn't show up
10     for the hearing in August of '04?
11  A.  Yes.
12  Q.  Okay.  And then after that did you con    the Court
13     and give them your correct address?
14  A.  Yes.
15  Q.  All right.  Now, can you think of any way or any
16     reason Christy Knight would want to find your
17     address in June of '03 --
18        MR. NELMS:  Object to the form.
19  Q.  -- if the dispute didn't come up till over a year
20     later?
21  A.  Don't have a clue.
22  Q.  Okay.  Thank you, ma'am.
23        EXAMINATION

Page 80

1  BY MR. NELMS:
2  Q.  When did you get divorced?
3        MR. ALLRED:  All right.  Kevin.
4  Q.  When did you get divorced?
5  A.  When did Kevin and I divorce?  Nineteen -- July of
6      '97.
7  Q.  Is that before June the 9th of 2003?
8  A.  Yes.
9  Q.  When did Kevin marry Christy?
10  A.  It was November of two thousand -- two years ago.
11     Two thousand -- I don't know.
12  Q.  Was it before June the 9th of 2003?
13  A.  No.
14  Q.  They got married after --
15  A.  They got --
16  Q.  -- June the 9th of 2003?
17  A.  They got married two thousand -- November of 2003, I
18     think.
19  Q.  Okay.  So they got married about three months after
20     this alleged credit pull took place?
21  A.  I think so.
22  Q.  Okay.  Were they dating in June 9th of --
23  A.  They were living together.